IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIRVIEW HOSPITAL, et al.,            )
                                      )
        Plaintiffs,                   )
                                      )
        v.                            )        Civ. Action No. 1:05cv01065 (RWR)
                                      )
MICHAEL O. LEAVITT,                   )
                                      )
        Defendant.                    )
_____)

## DEFENDANT'S MOTION TO DISMISS OR, IN
## THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendant in the above captioned action respectfully moves this Court for an order dismissing plaintiffs' complaint for lack of subject-matter jurisdiction, failure to exhaust administrative remedies, failure to state a claim upon which relief can be granted, and the expiration of the statute of limitations. In the first, alternative, defendant respectfully moves, pursuant to Fed. R. Civ. P. 9(b), for an order dismissing plaintiffs' complaint for failure to plead fraud or similar fault with particularity. In the second alternative, defendant respectfully moves, pursuant to Fed. R. Civ. P. 56(b), for an order granting summary judgment in favor of defendant on the grounds that there exists no genuine issue of material fact and defendant is entitled to judgment as a matter of law. For the reasons in support of these

motions, defendant respectfully refers the Court to the attached memorandum of points and

authorities and statement of material facts as to which there exists no genuine issue.

Respectfully submitted,

OF COUNSEL:
PAULA M. STANNARD                    PETER D. KEISLER
Acting General Counsel               Assistant Attorney General

KATHLEEN H. MCGUAN                   KENNETH L. WAINSTEIN
Associate General Counsel            United States Attorney

MARK D. POLSTON                      _____
Acting Deputy Associate
General Counsel                      SHEILA M. LIEBER
                                     PETER ROBBINS
                                     Department of Justice
ROBERT BALDERSTON                    20 Massachusetts Avenue, N.W., Room 7142
Attorney                             Washington, D.C.  20530
Department of Health                 Tel:  (202) 514-3953
and Human Services                   Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIRVIEW HOSPITAL, et al.,               )
                                          )
            Plaintiffs,                   )
                                          )
    v.                                    )          Civ. Action No. 1:05cv01065 (RWR)
                                          )
MICHAEL O. LEAVITT,                       )
                                          )
            Defendant.                    )
_____)

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

OF COUNSEL:
PAULA M. STANNARD                    PETER D. KEISLER
Acting General Counsel               Assistant Attorney General

KATHLEEN H. MCGUAN                   KENNETH L. WAINSTEIN
Associate General Counsel            United States Attorney

MARK D. POLSTON                      SHEILA M. LIEBER
Acting Deputy Associate              PETER ROBBINS
General Counsel                      Department of Justice
                                     20 Massachusetts Avenue, N.W., Room 7142
ROBERT BALDERSTON                    Washington, D.C. 20530
Attorney                             Tel:  (202) 514-3953
Department of Health
and Human Services                   Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  The Medicare Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   B.  Cost Reports, Intermediary Determinations, Parties to the Intermediary's
       Determination, and the Functions of Intermediaries . . . . . . . . . . . . . . . . . . . . . . . . . 2

   C.  Administrative and Judicial Review of Disputed Claims . . . . . . . . . . . . . . . . . . . . . . 4

   D.  The Reopening Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   I.  PLAINTIFFS HAVE NO ENTITLEMENT TO DOUBLE REIMBURSEMENT . . . . . 12

   II.  THE CORRECTNESS OF INITIAL PAYMENT DETERMINATIONS
       CANNOT BE CHALLENGED BY MEANS OF MANDAMUS . . . . . . . . . . . . . . . . . 13

   III.  THERE IS NO SUCH THING AS A "STATUTORY DUTY" TO REOPEN
        PAYMENT DETERMINATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   IV.  THE SECRETARY WAS UNDER NO DUTY TO ISSUE AN OPINION ON
        THE TREATMENT OF THE UCP TAX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   V.  PLAINTIFFS CANNOT MAINTAIN AN ACTION TO ENFORCE 42 C.F.R.
       § 405.1885(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.  The Secretary, CMS and Intermediaries Are Not "Parties to the
             Intermediary's Determination" as Defined by 42 C.F.R. § 405.1805 . . . . . . . . . 18

        B.  An Intermediary Does Not "Procure" Its Own Determination . . . . . . . . . . . . . . 20

        C.  A Duty to Reopen Can Potentially Arise Only After Fraud or Similar Fault
             "Is Established" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        D.  Plaintiffs' Complaint Does Not Allege Any Active or Passive
             Misrepresentation on Which Justifiable Reliance Was Placed . . . . . . . . . . . . . 22

      E.   Plaintiffs' Complaint Does Not Allege Fraud or Similar Fault with
          Particularity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.  PLAINTIFFS ARE NOT ENTITLED TO MANDAMUS RELIEF BECAUSE
     THEY HAVE NOT EXHAUSTED ALTERNATIVE MEANS OF RELIEF . . . . . . . . 26

      A.   Plaintiffs' Claim Is on All Fours with the Mandamus Theory
          Rejected in Heckler v. Ringer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      B.   The Decision in Monmouth Medical Center v. Thompson Is
          Distinguishable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      C.   Plaintiffs Failed to Exhaust Available Remedies Because They
          Did Not Request a Permissive Reopening in a Timely Fashion . . . . . . . . . . . . 32

VII.  MANDAMUS RELIEF SHOULD BE DENIED ON EQUITABLE GROUNDS . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## INTRODUCTION

In this action, three hospitals seek Medicare reimbursements that they either have already received or never claimed to begin with.  Payment determinations for the relevant years, which date back two decades, have long been closed and final.  Plaintiffs' demand to reopen them by means of the extraordinary writ of mandamus is patently without merit.

## STATUTORY AND REGULATORY BACKGROUND

### A.  The Medicare Program

Title XVIII of the Social Security Act, commonly known as the "Medicare Act," establishes a program of health insurance for the elderly and disabled.  Medicare Part A provides coverage for hospital inpatient care.  Part B is a supplemental program that covers outpatient care, such as physician visits.  Part C provides an alternative form of managed care.  Part D provides coverage for prescription drugs.  The entire program is administered by the Secretary of Health and Human Services through the Centers for Medicare & Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration.

The Medicare program currently pays out more than $270 billion in claims every year.  2004 CMS Statistics at 26.  To make it possible to handle this staggering volume, the Secretary hires contractors, usually insurance companies, to make payment determinations for health-care providers and individual beneficiaries.  42 U.S.C. §§ 1395h, 1395u.  When contractors process Part A claims, they are known as "fiscal intermediaries."  42 C.F.R. § 421.100.  Currently, 28 fiscal intermediaries process $166 billion in claims for about 6,000 hospitals, 15,000 skilled nursing facilities, and other providers of institutional care.  2004 CMS Statistics at 16, 19, 27, 42.  These same contractors usually also process Part B claims in their role as "carriers."  42 C.F.R.

§§ 421.200, 421.5(c).  As a result, the claims load of each intermediary is almost unimaginably heavy.

   **B.  Cost Reports, Intermediary Determinations, Parties to the Intermediary's Determination, and the Functions of Intermediaries.**

   The efficient operation of a program as vast as Medicare requires that health care-providers submit complete claims for reimbursement and call attention to any disputed claims at an early stage.  To facilitate these public-policy imperatives, hospitals that receive Part A payments are required to submit annual cost reports to their designated intermediary.  See 42 C.F.R. §§ 413.20-413.24.  These reports commonly run into the hundreds of pages and contain "thousands of cost items, any one of which may give rise to a reimbursement issue."  67 Fed. Reg. 49,982, 50,100 (Aug. 1, 2002); see also Athens Cmty. Hosp., Inc. v. Shalala, 743 F.2d 1, 3 (D.C. Cir. 1984) ("We are informed that a cost report, when completed, is approximately three-quarters of an inch thick.").  To permit efficient processing of these voluminous reports, the Medicare regulations require health-care providers to "furnish such information to the intermediary as may be necessary" to "[a]ssure proper payment by the program."  42 C.F.R. § 413.20(d)(1)(i).  This includes all "cost, revenue, statistical, and other information pertinent to reimbursement."  42 C.F.R. § 413.20(c)(2).[1]

   On the basis of the cost report submitted by the hospital, the intermediary issues a "determination," also known as a "notice of program reimbursement," of the total amount the

---

   [1] See also 42 C.F.R. § 413.24(c) (provider must furnish "cost information" that is "[a]dequate" to "support payments made for services furnished to beneficiaries"), § 413.20(a) (provider required to "maintain sufficient financial records and statistical data for proper determination of costs payable under the program" and must use "reporting practices that are widely accepted in the hospital and related fields"), § 413.20(c)(1) (provider must have an "adequate ongoing system for furnishing the records needed to provide accurate cost data and other information capable of verification by qualified auditors").

hospital should be reimbursed for the services it rendered to Medicare beneficiaries during the

reporting period. 42 C.F.R. § 405.1803. These determinations commonly take about one or two

years to complete. The "parties to the intermediary's determination are the provider and any

other entity found by the intermediary to be a related organization of the provider," 42 C.F.R.

§ 405.1805, within the meaning of 42 C.F.R. § 413.17.[2] Under this controlling regulatory

definition, the intermediary is not a "party" to the payment determination. The same is true of the

Secretary and CMS.

The "functions to be performed by the intermediary" are enumerated in 42 C.F.R.

§ 421.100. They include making sure that payment is made only for covered services furnished

by health-care providers, 42 C.F.R. § 421.100(a)(1); making sure improperly claimed expenses

are rejected or adjusted, 42 C.F.R. § 421.100(a)(2); making sure disbursements are properly

accounted for, 42 C.F.R. § 421.100(b); conducting audits to the extent "necessary to assure

proper payments," 42 C.F.R. § 421.100(c); establishing approved procedures "to consider and

resolve any disputes that may result from provider dissatisfaction with an intermediary's

determinations concerning provider cost reports," 42 C.F.R. § 421.100(e); and establishing

approved procedures for reconsidering intermediary determinations. 42 C.F.R. § 421.100(f).

The only area in which the intermediary is required to "assist providers" is in the promotion of

efficient utilization practices. 42 C.F.R. § 421.100(d). Except as directed by the Secretary,[3]

---

[2] With certain exceptions, related organizations are entities "related to the provider by common ownership or control." 42 C.F.R. § 413.17(a).

[3] See 42 U.S.C. § 1395h(a)(2)(A) (intermediaries are "to serve as a center for, and communicate to providers, any information or instructions furnished to [them] by the Secretary, and serve as a channel of communication from providers to the Secretary").

intermediaries are not required to give hospitals advice about what should and should not be included in annual cost reports.

**C. Administrative and Judicial Review of Disputed Claims**

In addition to complete cost reports submitted by hospitals, a program that processes as many claims as Medicare requires a meaningful element of finality in order to function. See Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 454-56 (1999). The intermediary's notice of program reimbursement is therefore "final" unless it is either appealed or reopened within the time frames established by Medicare statutes and regulations. 42 C.F.R. § 405.1807. If the amount in controversy is at least $1,000 but less than $10,000, the hospital may demand a hearing before the intermediary itself, 42 C.F.R. § 405.1809, within 180 days of the determination. 42 C.F.R. § 405.1811(a). The "parties to the intermediary hearing" are limited to "the parties to the intermediary's determination and any other entity determined by the intermediary to be a related organization of such provider." 42 C.F.R. § 405.1815. The intermediary and CMS are not "parties" to the hearing. Id.

If the amount in controversy is $10,000 or more, the hospital may demand a hearing before the Provider Reimbursement Review Board ("PRRB" or "the Board"). 42 U.S.C. §§ 1395oo(a)(1)-(2); 42 C.F.R. § 405.1835. The demand for a Board hearing must be made within 180 days after the intermediary's determination is mailed to the provider. 42 U.S.C. § 1395oo(a)(3); 42 C.F.R. § 405.1841(a). The "parties to the Board hearing" are "the provider," "the intermediary (including [CMS] when acting directly as intermediary)," and "any other entity found by the intermediary to be a related organization of such provider." 42 C.F.R. § 405.1843(a). Unless acting as an intermediary, "neither the Secretary nor [CMS] may be made a party" to the Board hearing. 42 C.F.R. § 405.1843(b).

-4-

After its hearing, the Board renders a decision, 42 C.F.R. § 405.1871(a), which the Secretary, in his discretion, may then review.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. After a final decision is reached, the hospital has 60 days to seek judicial review in district court. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.  A hospital that fails to claim reimbursement for an item on its cost report and/or fails to seek administrative review of an adverse intermediary determination ordinarily may not obtain subsequent judicial review of a disputed payment issue. See Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 11-25 (2000); Your Home, 525 U.S. at 454-57; Heckler v. Ringer, 466 U.S. 602, 618-20 (1984); Weinberger v. Salfi, 422 U.S. 749, 765 (1975).

**D.  The Reopening Regulation**

In addition to the potential revisions available through the administrative and judicial avenues of review created by Congress in 42 U.S.C. § 1395oo, the final payment determinations of an intermediary also may be subject to reopening, pursuant to a regulation promulgated "by the grace of the Secretary," Your Home, 525 U.S. at 454, at 42 C.F.R. § 405.1885.  The terms of this reopening regulation must be narrowly construed, however, so as not to "frustrate the statutory purpose" of 42 U.S.C. § 1395oo by, among other things, "permitting requests to reopen to be reviewed indefinitely."  Your Home, 525 U.S. at 454.  Reopening of an otherwise final payment determination is available in three settings.

First, the hospital may ask the intermediary to reopen the determination "within 3 years of the date" of the notice of program reimbursement.  42 C.F.R. § 405.1885(a).  The intermediary "may," in the exercise of its discretion, grant or deny the request.  Id.  A denial of reopening cannot be appealed to the Board and is unreviewable in district court.  Your Home, 525 U.S. at 456-57; Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 811 (D.C. Cir. 2001).

Second, the intermediary may be placed under a mandatory duty to reopen if, within the same three-year period, CMS notifies the intermediary that a payment determination "is inconsistent with the applicable law, regulations, or general instructions" issued by CMS. 42 C.F.R. § 405.1885(b)(1)(i); 42 C.F.R. § 405.1885(b) (2001). Under the current language of the regulation which took effect in 2002, a notice of inconsistency must "[e]xplicitly direct[] the intermediary to reopen and revise the intermediary determination," 42 C.F.R. § 405.1885(b)(1)(ii), and, in any event, "[a] change in legal interpretation or policy by CMS," "whether made in response to judicial precedent or otherwise, is not a basis for reopening an intermediary determination." 42 C.F.R. § 405.1885(b)(2). These caveats do not appear expressly in the language that was in effect prior to 2002, but the Secretary has indicated that such was always his intent. 67 Fed. Reg. at 50,099-100. Under either version of the regulation, the Secretary is under no legal duty to issue a notice of inconsistency. The intermediary's duty to reopen arises "only if [CMS] determines that a prior decision or set of decisions is inconsistent with applicable law." Monmouth, 257 F.3d at 812 (emphasis added). Whether or when to issue a notice of inconsistency is committed to the unreviewable discretion of CMS. See Your Home, 525 U.S. at 457; Monmouth, 257 F.3d at 813.

Finally, "an intermediary determination" or a "decision" rendered after an intermediary or PRRB hearing must "be reopened and revised at any time if it is established that such determination or decision" was "procured by fraud or similar fault of any party to the determination." 42 C.F.R. § 405.1885(d). As was discussed above, the "parties to the intermediary's determination" include only "the provider and any other entity found by the intermediary to be a related organization of the provider," 42 C.F.R. § 405.1805, within the meaning of 42 C.F.R. § 413.17. Neither the intermediary, CMS nor the Secretary is a "party" to

-6-

the intermediary "determination," and therefore nothing they may do in connection with issuance

of an intermediary determination can give rise to a reopening obligation under 42 C.F.R.

§ 405.1885(d).  The only action to which an intermediary (or CMS, when acting as an

intermediary) is a "party" is a Board decision, 42 C.F.R. § 405.1843(a), and thus the only time

"fraud or similar fault" can result in a reopening obligation under 42 C.F.R. § 405.1885(d) on the

basis of conduct by an intermediary (or CMS) is when the intermediary (or CMS) is defending its

own payment determination during a hearing before the PRRB.  Id.  Only when acting as an

advocate for its position is it possible for the intermediary to attempt to procure something from

another decision-maker.

## STATEMENT OF THE CASE

Since 1983, most of the payments that hospitals receive for providing inpatient care to

Medicare beneficiaries have been made on the basis of a prospective-payment formula.  42

U.S.C. § 1395ww(d).  However, hospitals still are reimbursed for a few kinds of expenses, such

as tax assessments, under a previous regime based on "reasonable cost."  42 U.S.C.

§ 1395f(b)(1).  Reasonable cost is defined as "the cost actually incurred," minus any expense

"found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C.

§ 1395x(v)(1)(A).  By regulation, reasonable cost has been interpreted to include "all necessary

and proper costs incurred in furnishing the services, subject to principles relating to specific

items of revenue and cost."  42 C.F.R. § 413.9(a).[4]  Section 2122.1 of the Provider

Reimbursement Manual sets forth general guidelines that intermediaries are instructed to apply in

---

[4] "Necessary and proper costs," in turn, are defined as "costs that are appropriate and
helpful in developing and maintaining the operation of patient care facilities and activities," such
as "costs that are common and accepted occurrences in the field of the provider's activity."  42
C.F.R. § 413.9(b).

determining whether state taxes imposed on hospitals are reimbursable. However, the Secretary has never established any nationwide policy that specifically addresses the treatment of state taxes. In light of the countless possible variations among state taxing schemes, these questions have quite reasonably been left for determination (and, if necessary, administrative adjudication) on a state-by-state basis.

Massachusetts assesses a tax on the private-sector charges of hospitals. Mass. Gen. Laws Ann. Ch. 118G, § 18(e); Complaint ("Compl.") at ¶ 21. The revenue from this tax is placed in an Uncompensated Care Pool ("UCP") and is re-distributed to the hospitals based on their relative share of uncompensated care. Compl. at ¶¶ 22-24. Historically, hospitals in Massachusetts did not consider the UCP tax assessment reimbursable under Medicare and did not claim it on their cost reports. Declaration of Vincent Guarino ("Guarino Dec.") at ¶ 3 (Def. Ex. B at 1); Letter of Robert Baroutas dated November 19, 2002 ("Baroutas Letter") at 1 (Def. Ex. B at 5).

Plaintiffs in this case include three hospitals in Massachusetts that participate in Medicare and were subject to the UCP tax. Compl. at ¶¶ 4, 21. The cost reports submitted by plaintiff Fairview Hospital ("Fairview") were processed by its intermediary, Mutual of Omaha Insurance Company ("Mutual of Omaha"). Declaration of Thomas Bruce ("Bruce Dec.") at ¶ 2 (Def. Ex. A at 1). The cost reports of Tufts-New England Medical Center ("Tufts") and Mount Auburn Hospital ("Mount Auburn") were processed by their intermediary, Associated Hospital Services ("Associated"). Guarino Dec. at ¶ 2.[5]

---

[5] Plaintiffs' complaint incorrectly refers to Mutual of Omaha and Associated as if they were a single intermediary. Compl. at ¶¶ 25, 28, 29, 33, 34, 36, 37, 38.

On August 28, 2002, Fairview asked Mutual of Omaha to reopen the final determinations

for its 1997-1999 cost-reporting years, so that Fairview could obtain reimbursement for the UCP

tax.  Bruce Dec. at ¶ 3.  The letter requesting reopening stated as follows:

> Prior to this time, we had been under the impression that our hospital's gross
> liability to the Massachusetts Uncompensated Care Pool (UCP) was not allowable
> cost that could be included on Worksheet A of our Medicare cost report.  A study
> of the regulations, applicable PRRB decisions, US Court rulings, and other
> pertinent references now leads us to believe that failing to include our annual
> assessment from the UCP was a material error in the statement of our total
> allowable cost.  In fact, it is our understanding that Mutual of Omaha has for
> several years reimbursed other Massachusetts hospitals for these costs.

Letter of Darlene Rodowicz dated August 28, 2002 ("Rodowicz Letter") at 1 (Def. Ex. A at 4).

Fairview's reopening request was granted by the intermediary on October 1, 2002.  Letters of

Jeffrey M. Grabowski dated October 1, 2002 ("Grabowski Letters") at 1 (Def. Ex. A at 48-50).[6]

The final determinations for the 1997-1999 years were revised to include reimbursement for the

UCP tax.  Bruce Dec. at ¶ 4.  With respect to the years 2000 and 2001, Fairview was awarded

UCP reimbursement in the notices of program reimbursement issued by the intermediary.  Id. at ¶

5.  Thus, the only cost-reporting years for which Fairview did not receive UCP reimbursement

were 1985-1996, when the hospital apparently made no attempt of any kind to obtain it.

On June 21, 2002, a non-plaintiff hospital in Massachusetts asked Associated to reopen a

final payment determination for a cost-reporting period in 1997 in order to obtain reimbursement

for the UCP tax in a manner similar to Fairview.  Letter of Larry Seck dated June 21, 2002 at 1-4

(Def. Ex. B at 9-12).  Before issuing a decision on this and "numerous" similar requests for

reopening, Associated sought to have the status of the UCP tax resolved by obtaining a "final

---

[6] Mutual of Omaha took this position without apparent consultation with CMS.  See
Letter of Tina Kilpatrick dated October 17, 2000 ("Kilpatrick Letter") at 1 (Def. Ex. B at 52).

decision" from CMS.  Baroutas Letter at 1.  The November 2002 letter noted that Mutual of

Omaha and Associated had come to hold different opinions about the treatment of the tax for

purposes of Medicare reimbursement.  Id.

In March 2003, CMS concluded that the UCP tax assessments "can be recognized as an

allowable cost."  Memorandum of Robert Baroutas dated March 18, 2003 ("Baroutas Memo")

at 1 (Ex. A attached to Compl.).  In compliance with this opinion, Associated instituted a policy

of including UCP reimbursement for all cost-reporting periods where the claim was supported by

documentary evidence and where either (a) a payment determination was not yet final, (b) an

administrative appeal was pending (regardless of whether the tax issue had been raised in the

appeal), or (c) a decision on a timely reopening request had not yet been made.  Id.  Tufts and

Mount Auburn both benefitted from this policy.

As a result of the resolution of timely administrative appeals, Tufts received UCP

reimbursement for years 1993 through 1996.  Guarino Dec. at ¶ 3.  Tufts received UCP

reimbursement for the years 1997 through 1999 based on timely reopening requests, and was

awarded UCP reimbursement in the final determinations issued by the intermediary for the 2000-

2001 years.  Id.  Thus, the only cost-reporting years for which Tufts did not receive

reimbursement for the tax were 1985-1992, when the hospital apparently made no attempt of any

kind to obtain it.

Mount Auburn received UCP reimbursement as a result of timely reopening requests for

the 1998 and 1999 years and as a result of final determinations for the 2000 and 2001 years.  Id.

at ¶ 4.  An untimely request for reopening for the 1997 year was denied.  Id.  Thus, the only cost-

reporting years for which Mount Auburn did not receive reimbursement for the UCP tax were

-10-

1985-1996, when the hospital made no attempt of any kind to obtain it, and 1997, when the hospital submitted an untimely request for permissive reopening.

All three plaintiffs now seek a writ of mandamus ordering the Secretary to reimburse them for the UCP tax for all cost-reporting years between 1985 and 2001.  Compl. at ¶ 30, pp. 10-11.  They rely on four legal theories.  First, plaintiffs contend that the Secretary owed them a clear and nondiscretionary duty to reimburse them for the UCP tax "upon the issuance" of "initial" notices of program reimbursement, id. at ¶ 33, even though the hospitals themselves did not claim the tax on their cost reports.  The failure to perform this payment duty, plaintiffs claim, is now enforceable by mandamus.  Second, plaintiffs contend that the Secretary has "a clear statutory duty to reopen" final payment determinations for these cost-reporting years, id. at ¶ 36, even though they cannot identify any statute where this putative duty is set forth.  The performance of this alleged statute-based duty, plaintiffs, claim, is now enforceable by mandamus.  Third, plaintiffs contend that the Secretary "wrongfully delayed" issuing an advisory opinion on the UCP tax and this complained-of delay is now redressable by a judicial order forcing the Secretary to reopen final payment determinations.  Id. at ¶ 38.  The complaint, however, identifies no statute or regulation that specifies when CMS advisory opinions must be issued nor does it ask for a mandamus order compelling the Secretary to issue any wrongfully delayed advisory opinion.  Finally, plaintiffs contend that they were "passively and/or actively misled" about the status of the UCP tax, id. at ¶ 37, in some manner that is never identified in the complaint.  This unspecified conduct, plaintiffs claim, triggered an automatic reopening duty under 42 C.F.R. § 405.1885(d) that the Secretary subsequently failed to perform.

## ARGUMENT

Plaintiffs' claims are completely without merit. The "remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances," Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted), where the "right to issuance of the writ is clear and indisputable." Id. (citations omitted); see also Thirteenth Reg'l Corp. v. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980) (mandamus is reserved for only the "clearest and most compelling cases") (citation omitted). To qualify for mandamus relief, a plaintiff must first demonstrate that "the defendant owes him a clear nondiscretionary duty," Ringer, 466 U.S. at 616, that is "so plainly prescribed as to be free from doubt and equivalent to a positive command." Consol. Edison Co. of New York, Inc. v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218-19 (1930)). Second, the plaintiff must show that "he has exhausted all other avenues of relief," Ringer, 466 U.S. at 616, including all possible "administrative" and "judicial" remedies, Power, 292 F.3d at 786, by which he could have secured the desired outcome. Cheney v. U.S. Dist. Ct., 124 S. Ct. 2576, 2587 (2004). Finally, even where exhaustion and a clear duty are shown, a court may decline to grant mandamus relief entirely on equitable grounds, Thirteenth Reg'l Corp., 654 F.2d at 763, including unexplained delay in bringing suit. Id. Plaintiffs here do not meet any of these tests.

### I.   PLAINTIFFS HAVE NO ENTITLEMENT TO DOUBLE REIMBURSEMENT.

At the outset, defendant is at a loss to understand why plaintiffs think they were "under-reimbursed," Compl. at ¶ 30, for the numerous cost-years from 1985 through 2001 in which they received payment for the UCP tax through notices of program reimbursement, successful administrative appeals of payment determinations, or successful requests for reopenings. The statute on which they rely authorizes reimbursement on the basis of "reasonable cost," 42 U.S.C.

§ 1395f(b)(1), which is defined in terms of "the cost actually incurred."  42 U.S.C.

§ 1395x(v)(1)(A).  Double reimbursement is not authorized, let alone mandated in terms "so

plainly prescribed as to be free from doubt and equivalent to a positive command."  Consol.

Edison Co., 286 F.3d at 605 (quoting Kadrie, 281 U.S. at 218-19).  Thus, the claims of Fairview

for the years 1997-2001, the claims of Tufts for the years 1993-2001, and the claims of Mount

Auburn for the years 1998-2001 are completely frivolous.[7]

## II.    THE CORRECTNESS OF INITIAL PAYMENT DETERMINATIONS CANNOT BE CHALLENGED BY MEANS OF MANDAMUS.

With respect to the cost-reporting periods for which plaintiffs did not receive UCP

reimbursement, their first claim – that they were owed an unperformed duty to be reimbursed for

the UCP tax "upon the issuance" of "initial" notices of program reimbursement, Compl. at ¶ 33 –

fails for four reasons.

First, a claim that a hospital has been underpaid in a notice of program reimbursement is

obviously one that can be raised through the regular appeals process in 42 U.S.C. § 1395oo.

Indeed, the claim must be raised through the appeals process before this Court has jurisdiction.

42 U.S.C. § 1395oo(f).  Mandamus does not provide an alternative enforcement mechanism for

hospitals that sleep on those appeal rights.  Ass'n of Am. Med. Colls. v. Califano, 569 F.2d 101,

---

[7] To the extent Mount Auburn claims that it was entitled to have its untimely request to
reopen the 1997 cost-reporting period granted, see Compl. at ¶ 33 (alleging a duty to "reopen and
revise all determinations"), the claim also is frivolous.  An intermediary's decision to deny
reopening is unreviewable, both because it is not within the jurisdiction conferred on federal
courts by 42 U.S.C. § 1395oo and because it is action committed to agency discretion by law.
Your Home, 525 U.S. at 454.  In any event, intermediaries are not authorized to grant reopening
requests that are submitted more than three years after a final determination has been issued.  42
C.F.R. § 405.1885(a).  The intermediary obviously did not have any duty to grant an untimely
request.

111 (D.C. Cir. 1977); Lenox Hill Hosp. v. Shalala, 131 F. Supp. 2d 136, 140 (D.D.C. 2000);

Nat'l Med. Enters. v. Bowen, 725 F. Supp. 1, 9 (D.D.C. 1989).

Second, any mandamus claim based on a theory of underpayment in the initial notice of

program reimbursement would be barred under the six-year limitations period in 28 U.S.C.

§ 2401(a) if the intermediary's determination was issued before May 1999. That circumstance

presumably describes all intermediary determinations for the 1985-1997 years.

Third, any alleged duty to reimburse hospitals for unclaimed UCP tax payments is not

enforceable by means of mandamus because the putative payment duty is not "so plainly

prescribed as to be free from doubt and equivalent to a positive command." Consol. Edison Co.,

286 F.3d at 605 (quoting Kadrie, 281 U.S. at 218-19). A provision of law whose application

requires any degree of interpretative judgment, no matter how slight, is not one that can be

enforced through the extraordinary remedy of mandamus. Kadrie, 281 U.S. at 218-19; see also

United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420 (1931); Work v. United States ex

rel. Rives, 267 U.S. 175, 177 (1925); United States ex rel. Dunlap v. Black, 128 U.S. 40, 48

(1888); Power, 292 F.3d at 786; Consol. Edison, 286 F.3d at 605. The substantive law on which

plaintiffs rely obviously requires some exercise of interpretative judgment to apply.

The relevant statute merely authorizes reimbursement for "reasonable cost," 42 U.S.C.

§ 1395f(b)(1), which is defined as "the cost actually incurred" minus any cost "found to be

unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). By

regulation, reasonable cost has been interpreted to include "all necessary and proper costs

incurred in furnishing the services, subject to principles relating to specific items of revenue and

cost." 42 C.F.R. § 413.9(a). "Necessary and proper costs," in turn, are defined as "costs that are

appropriate and helpful in developing and maintaining the operation of patient care facilities and

-14-

activities," and "are usually costs that are common and accepted occurrences in the field of the provider's activity."  42 C.F.R. § 413.9(b).  Obviously, one must look beyond the express command of the regulation to decide whether the UCP tax was "appropriate and helpful" or if it was "common and accepted," and one must also look beyond the face of the regulation to decide whether the "usual" presumption in favor of reimbursement for common and accepted expenses should necessarily have been applied to the tax.  Nowhere do the statutes and regulation expressly command reimbursement for state taxes on private charges.  Indeed, as noted earlier, the two intermediaries that processed plaintiffs' claims held opposite opinions on the question, prior to the 2003 clarification by CMS.

Finally, even if it were absolutely clear that the UCP tax was reimbursable, intermediaries could not possibly have provided reimbursement without knowing the amount of the tax paid.  And that information could only have come from the hospital.  As was discussed above, the function of intermediaries is to issue determinations on the expenses claimed by hospitals on their cost reports.  They are not required to ferret out possible expenses that the hospitals may have overlooked.  A system that processes $270 billion in claims a year simply could not function if, in addition to performing their own demanding jobs, intermediaries were also legally responsible for doing every hospitals' homework for them with respect to every one of the thousands of expense items that potentially may be claimed on each cost report.

## III.  THERE IS NO SUCH THING AS A "STATUTORY DUTY" TO REOPEN PAYMENT DETERMINATIONS.

Plaintiffs' next claim – that "the Secretary, CMS, and the intermediar[ies] have a clear statutory duty to reopen cost report years" after final determinations have been issued, Compl. at ¶ 36 – is patently without merit.  As the Supreme Court has made clear, whatever opportunity

may exist to obtain a reopening of a final payment determination is "afforded only by regulation and not by the Social Security Act." Your Home, 525 U.S. at 454.  Thus, if plaintiffs thought that the UCP tax assessments "were necessary and proper costs under the Medicare statute" and reimbursement "should have" been awarded with the notices of program reimbursement, Compl. at ¶ 36, their statutory right was to claim the tax on their cost reports and appeal any denial of the claim through the administrative appeals process provided to hospitals by Congress in 42 U.S.C. § 1395oo.  There is no such thing as a "statutory duty" to reopen a final payment determination that was not appealed, Compl. at ¶ 36, and there is certainly no statute wherein such a putative duty is "so plainly prescribed as to be free from doubt and equivalent to a positive command." Consol. Edison Co., 286 F.3d at 605 (quoting Kadrie, 281 U.S. at 218-19).

**IV.   THE SECRETARY WAS UNDER NO DUTY TO ISSUE AN OPINION ON THE TREATMENT OF THE UCP TAX.**

Plaintiffs' next contention – that "the Secretary and CMS wrongfully delayed giving notice that the intermediary's prior interpretation of the law was incorrect," Compl. at ¶ 38 – is meaningless.  At the outset, it is well settled that "[t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare," Heckler v. Cmty. Health Servs. of Crawford County, 467 U.S. 51, 64 (1984), and, in particular, the Secretary has no "statutory duty to promulgate regulations that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement."  Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995).  Rather, it is perfectly permissible for the Secretary to issue regulations and instructions on a broad level of generality, and leave it up to the administrative appeals process to flesh out how those standards should be applied in particular circumstances.  Id. at 96-97.  Since the Secretary was under no

-16-

legal duty to issue an opinion about the UCP tax, it goes without saying that there is no legal yardstick by which to adjudge the opinion he eventually issued to have been "delayed," let alone "wrongfully delayed," Compl. at ¶ 38, because it was rendered four months after the first time anyone asked for it.

In any event, it is hard to see how much more quickly plaintiffs think the Secretary should have taken action. The UCP did not come to the attention of CMS until late November 2002 when Associated requested guidance before it responded to reopening requests submitted by numerous Massachusetts hospitals. Baroutas Letter at 1. CMS issued its opinion four months later. Baroutas Memo at 1. By administrative standards, that is rapid turn-around time.

Plaintiffs' contention that CMS' putative failure to issue an advisory opinion before March 2003 somehow injured them by "curtail[ing]" their ability to invoke the permissive "reopening regulations," Compl. at ¶ 38, is nonsense. Fairview received permissive reopening from Mutual of Omaha five months before the CMS opinion was issued, Bruce Dec. at ¶¶ 3-4 & Def. Ex. A at 48-50, and another (non-plaintiff) hospital for which Mutual of Omaha processed cost reports had received similarly favorable treatment in 2000. Kilpatrick Letter at 1. Furthermore, the CMS opinion itself was issued in response to numerous reopening requests previously submitted to Associated by other hospitals in Massachusetts. Guarino Dec. at ¶ 6; Baroutas Letter at 1. No serious argument can be made that the absence of a CMS opinion interfered with any hospital's ability to seek – indeed, to successfully seek – any statutory or regulatory remedy.

Finally, even if some detriment to plaintiffs' putative interests were shown, plaintiffs do not seek a mandamus order compelling the Secretary to issue a wrongfully withheld opinion, and there is no Medicare statute or regulation that requires him to reopen payment determinations in circumstances where he is alleged to have wrongfully delayed issuing an advisory opinion. There

-17-

is certainly no provision of law that mandates such a reopening in a manner "so plainly prescribed as to be free from doubt and equivalent to a positive command." Consol. Edison Co., 286 F.3d at 605 (quoting Kadrie, 281 U.S. at 218-19). Even the Secretary's discretionary authority to order reopening is limited to a three-year period under 42 C.F.R. §§ 405.1885(a), (b). As was discussed above, the Medicare statutes and regulations place the responsibility squarely on hospitals to research Medicare law for themselves and submit claims for those expenses that they believe in good faith are reimbursable. It is not too much to demand that they exercise this right in a timely manner. Plaintiffs here cannot blame the Secretary for their own failure to research and pursue their rights.

## V.  PLAINTIFFS CANNOT MAINTAIN AN ACTION TO ENFORCE 42 C.F.R. § 405.1885(d).

Plaintiffs' final claim – that the Secretary has a "clear duty to reopen the cost report years at issue" under 42 C.F.R. § 1885(d) because "the Secretary, CMS, and/or the intermediar[ies]" (plaintiffs are not sure which) "passively and/or actively misled" them (plaintiffs are not sure how), Compl. at ¶ 37 – is as frivolous as their other theories. Section 405.1885(d) provides, in pertinent part, that

> an intermediary determination or hearing decision, a decision of the Board, or a decision of the Secretary shall be reopened and revised at any time if it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision.

Id. There are many reasons why this regulation is inapplicable here.

### A.  The Secretary, CMS and Intermediaries Are Not "Parties to the Intermediary's Determination" as Defined by 42 C.F.R. § 405.1805.

The most obvious problem with plaintiffs' fraud-related theory is that neither the Secretary, CMS nor the intermediary is a "party to the determination" issued by the intermediary,

42 C.F.R. § 405.1885(d), as that term of art is defined elsewhere in the regulatory scheme.  As

was discussed above, "[t]he parties to the intermediary's determination are the provider and any

other entity found by the intermediary to be a related organization of the provider under § 413.17

of this chapter."  42 C.F.R. § 405.1805.  This regulatory definition obviously does not include the

Secretary, CMS or the intermediary.  The rule of construction known by the Latin phrase

expressio unius est exclusio alterius counsels that "expressing one item of [an] associated group

or series excludes another left unmentioned."  United States v. Vonn, 535 U.S. 55, 65 (2002); see

also Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003).  At the very least, however, the

regulatory scheme can hardly be deemed to designate the Secretary, CMS and the intermediary to

be parties to the intermediary's determination in a manner "so plainly prescribed as to be free

from doubt and equivalent to a positive command."  Consol. Edison, 286 F.3d at 605 (quoting

Kadrie, 281 U.S. at 218-19).  On the contrary, the Secretary's reading of his own regulations is

entitled to "substantial deference," Guernsey, 514 U.S. at 103; Thomas Jefferson Univ. v.

Shalala, 512 U.S. 504, 512 (1994), unless it is "plainly erroneous or inconsistent with the

regulation."  Id. (citation omitted).

    The deliberate exclusion of the Secretary, CMS and intermediaries from the definition of

parties to the intermediary's determination in 42 C.F.R. § 405.1805 cannot be viewed as an

oversight or fluke.  As a conceptual matter, the Medicare regulations limit the circumstances

where an intermediary is considered to be a "party" to those types of administrative proceedings

in which the intermediary takes off its hat as a decision-maker and puts on the hat of an advocate

for the correctness of its decision.  For instance, an intermediary is not a party to an intermediary

hearing, 42 C.F.R. § 405.1815, where it performs the adjudicatory function of reconsidering its

own determination.  But it is a party to a hearing before the PRRB, 42 C.F.R. § 405.1843(a),

where the intermediary defends its determination before a higher decision-maker.  If it were "established" that an intermediary had "procured" a favorable "decision" from the Board by means of "fraud or similar fault," a duty to reopen the Board's "decision" might arise under 42 C.F.R. § 405.1885(d).  But the regulation simply does not apply to conduct of an intermediary when the intermediary renders its own determination.  And it should not be twisted in that manner now merely to create a new avenue of appeal for hospitals that neglected to exercise the substantial procedural options already afforded to them by Congress and the Secretary.

### B.  An Intermediary Does Not "Procure" Its Own Determination.

Even if one were to ignore the definition of "parties to the intermediary's determination" in the manner urged by plaintiffs, however, the remaining language in the regulatory scheme still does not support their theory of mandamus relief.  To begin with, there is no coherent sense in which the Secretary, CMS or an intermediary could be said to have "procured" from the intermediary a "determination" of the total amount of Medicare reimbursement due to a hospital. The word "procure" means to "get" or "obtain," Bryan A. Garner, A Dictionary of Modern Legal Usage 698 (2d ed. 1995), and "procurement" is "[t]he act of getting or obtaining something." Black's Law Dictionary 1244 (8th ed. 2004); see also Random House Dictionary of the English Language 1543 (2d ed. 1987) (defining "procure" as "to obtain or get by care, effort, or the use of special means" and identifying "gain" and "win" as synonyms).  The only entities that can logically be said to procure a determination from a decision-maker are the ones that ask the decision-maker to render a determination in their favor.  An intermediary can no more be said to be a "party" seeking to "procure" an intermediary determination with respect to a hospital cost

report than this Court could be said to be a "party" seeking to "procure" its own determination on

plaintiffs' claim for relief.  The same is true of the Secretary and CMS.[8]

## C.  A Duty to Reopen Can Potentially Arise Only After Fraud or Similar Fault "Is Established."

Even if plaintiffs' mandamus claim could survive to this point, plaintiffs decline to

explain in what sense they believe that fraud or similar fault was "established," 42 C.F.R.

§ 405.1885(d), such that a duty to reopen (which this Court can be asked to enforce through a

mandamus action) can be said to have been neglected by the Secretary in the past.  Although the

regulation does not say precisely <u>how</u> the fraud or similar fault must be established, <u>someone</u>

must "establish" that fraud or similar fault exists <u>before</u> a duty to reopen under § 405.1885(d)

comes into existence.  Mandamus jurisdiction, in turn, lies only to compel performance of a duty

that a government official has <u>neglected</u> to perform, not to bring an inchoate duty into being and

_____

[8] This straightforward reading of the regulatory scheme is consistent with its history.  It is true that the language originally proposed by the Secretary would have limited subsection (d) exclusively to cases of "fraud or similar fault of the provider," 39 Fed. Reg. 8166, 8170 (Mar. 4, 1974), and the final rule was modified in response to comments that fraud-based reopening should not be "applied only to providers."  39 Fed. Reg. 34,514, 34,514 (Sept. 26, 1974).  But, the <u>way</u> the regulation's scope was broadened beyond providers alone was to make the regulation apply to determinations procured by the actions of providers and related organizations in all settings, and to providers, related organizations and intermediaries in the context of Board decisions.  This scheme carefully limits § 405.1885(d) to the actions of entities trying to influence an administrative proceeding in order to procure a favorable outcome.

In <u>Rochester Methodist Hospital v. Travelers Insurance Co.</u>, 728 F.2d 1006 (8th Cir. 1984), a divided panel of the Eighth Circuit stated, in dicta, that "[w]e do not believe" the definition of "parties to the intermediary's determination" in § 405.1805 "was intended to exclude intermediaries from the operation of § 405.1885(d)."  <u>Id.</u> at 1018 n.12.  But, as was just discussed, intermediaries are not <u>always</u> excluded from the operation of § 405.1885(d).  They are excluded from the ambit of § 405.1885(d) only where they <u>render</u> determinations, 42 C.F.R. § 405.1805, and where they <u>render</u> decisions on their own determinations.  42 C.F.R. § 405.1815.  They most definitely fall within the operation of § 405.1885(d) when they <u>defend</u> their determinations before the PRRB.  42 C.F.R. § 405.1843(a).  In any event, <u>Rochester</u> is not controlling in this Circuit and its summary analysis lacks persuasive force.

only <u>then</u> compel performance.  This Court cannot create its own jurisdiction to enforce, by mandamus, an obligation that can exist, if at all, only after the Court makes its decision to enforce the duty.

It follows, then, that fraud or similar fault must already be "established" (in some minimally appropriate fashion) before a mandamus suit can be filed.  Plaintiffs read § 405.1885(d) as making reopening mandatory where an improper procurement <u>has occurred</u>, not where it "is established" that an improper procurement has occurred.  This approach conflicts with the principle that a court should "give effect, if possible," to "every clause and word" in a regulation.  <u>Role Models Am., Inc. v. White</u>, 317 F.3d 327, 333 (D.C. Cir. 2003) (citation omitted).  The reopening regulation at § 405.1885(d) simply does not exist for the purposes to which plaintiffs try to put it here.

### D. Plaintiffs' Complaint Does Not Allege Any Active or Passive Misrepresentation on Which Justifiable Reliance Was Placed.

For the reasons stated above, it is not even necessary for this Court to address whether any conduct alleged in plaintiffs' complaint constitutes "fraud or similar fault" within the meaning of 42 C.F.R. § 405.1885(d).  But clearly it does not.  To allege that something was "procured" by means of "fraud or similar fault," <u>id</u>., it would be necessary to establish five elements.  First, plaintiffs would have to show that defendant either made a false statement "for use in determining rights," <u>Sotiriades v. Mathews</u>, 546 F.2d 1018, 1020 (D.C. Cir. 1976), or failed to make a statement in circumstances where he had a legal duty to disclose the information.  <u>Chiarella v. United States</u>, 445 U.S. 222, 228 (1980).  Second, "some degree of reliance" would be "required to satisfy the element of causation," <u>Field v. Mans</u>, 516 U.S. 59, 66 (1995), that is "inherent" in phrases like "obtained by," <u>id</u>., or, in this case, "procured by."  42

C.F.R. § 405.1885(d).  Third, plaintiffs would have to establish, as a matter of law, that such

reliance was "justified."  Field, 561 U.S.  at 70-71.  Fourth, plaintiffs would have to show that the

misstatement or omission was one of "material fact," Sotiriades, 546 F.2d at 1020, as opposed to

a mere opinion of law.  Finally, plaintiffs would have to show that the false statement or

omission was made with the necessary degree of culpability.  Id.  Because plaintiffs' complaint

fails the first four tests, it is not necessary to address the fifth.[9]

    With respect to the first test, plaintiffs' complaint identifies only one specific statement

made by the Secretary, CMS or an intermediary, and that was an opinion rendered in March 2003

that the UCP tax "can be recognized as an allowable cost."  Baroutas Memo at 1, cited at Compl.

¶ 26 and attached as Ex. A to the complaint.  That is hardly a statement about which the hospitals

can be heard to complain.  As was discussed earlier, there was no duty to say anything at all

about the treatment of the tax at any time.  Guernsey, 514 U.S. at 96-97; Crawford County, 467

U.S. at 64.  There is, therefore, no statement about which plaintiffs complain and no omission

about which plaintiffs could complain.  There is no case.[10]

---

    [9] The standards described above are derived from the most closely analogous statutory
and regulatory law.  However, similar standards could be borrowed from common-law
misrepresentation, see Lance v. United Mine Workers of America 1974 Pension Trust, 355 F.
Supp. 2d 358, 363 (D.D.C. 2005), or common-law equitable fraud.  Lightning Lube, Inc. v.
Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993).  The latter concept is problematic here, however,
because "equitable estoppel will not lie against the Government as it lies against private
litigants."  OPM v. Richmond, 496 U.S. 414, 420 (1990) (citing cases).

    [10] Plaintiffs' generalized allegation that, "from 1985 until 2003," the Secretary or CMS
"took the position that the UCP Assessment was not an allowable cost," Compl. at ¶ 25, is simply
false.  Prior to 2003, the Secretary and CMS had never addressed the tax.  Baroutas Memo at 1.
In 2000, Mutual of Omaha took the position that the UCP tax was reimbursable.  Kilpatrick
Letter at 1.  Plaintiffs' contention that "[h]ospitals were strictly forbidden from claiming
payments under the UCP," id., is also untrue.  There were three different ways that a hospital
could claim the tax on its cost reports and pursue an appeal, Gaurino Dec. at ¶ 5, even if the
intermediary disagreed with the hospital's legal opinion.  Furthermore, as a matter of law,

With respect to the second and third tests,  plaintiffs do not allege that they relied on any statement or omission, and any hypothetical reliance would not be justified, as a matter of law. Id. at 63-64 (hospital cannot rely on legal opinion of intermediary); see also Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (per curiam) (Social Security claimant cannot rely on legal misstatement of agency official).  With respect to the fourth test, any statement about whether the UCP tax was reimbursable would be an opinion of law, not a statement of material fact.  Lincoln Gen. Hosp. v. Shalala, No. 4:98CV3118, mem. op. at 12 (D. Neb. July 13, 2000) (Def. Ex. C at 12).[11] There is, therefore, no content in plaintiffs' claim that any payment determination was "procured by fraud or similar fault," 42 C.F.R. § 405.1885(d), on the part of the Secretary, CMS or an intermediary.  Once again, plaintiffs are just making excuses for their own negligence.

### E.  Plaintiffs' Complaint Does Not Allege Fraud or Similar Fault with Particularity.

Even if plaintiffs' theory of fraud or similar fault could survive to this point, their complaint does not plead fraud or similar fault with the particularity demanded by Fed. R. Civ. P. 9(b), which requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  To state a claim of fraudulent misrepresentation with the requisite particularlity, "the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given

---

hospitals could not be prevented from claiming an expense that they believed, in good faith, was reimbursable, notwithstanding any opinion of an intermediary.  Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 404-05 (1988).

[11] If an intermediary told a plaintiff hospital that it did not think the UCP tax was reimbursable at a time when the intermediary thought that the tax was not reimbursable, the statement would not be false.  It would merely be a truthful statement about an opinion the legal merit of which was in dispute.

up as a consequence of the fraud," <u>United States ex rel. Joseph v. Cannon</u>, 642 F.2d 1373, 1385

(D.C. Cir. 1981) (citation omitted),[12] and the same standard applies to allegations of fraudulent

omissions.  <u>Mayer v. Dell</u>, 1991 WL 21567 at *4 (D.D.C. Feb. 13, 1991).[13]  In addition, the

complaint must specifically allege "that the plaintiffs reasonably and to their detriment relied on

the false information," <u>In re U.S. Office Prods. Co. Sec. Litig.</u>, 251 F. Supp. 2d 58, 74 (D.D.C.

2003).  The same standards apply to allegations of "negligent" misrepresentation or omission

(<u>e.g.</u>, similar fault).  <u>Id</u>.[14]  A mere allegation that, "upon information and belief," the Secretary or

his agents "passively and/or actively misled Plaintiffs as to whether [UCP tax assessments] were

allowable" costs, Compl. at ¶ 37, obviously does not meet these standards.

    That conclusion is reinforced by consideration of the purposes which underlie the

heightened pleading standard.  First, "the requirements of Rule 9(b) guarantee all defendants

sufficient information to allow for preparation of a response," a safeguard particularly necessary

"because 'fraud' encompasses a wide variety of activities."  <u>Cannon</u>, 642 F.2d at 1385.  Second,

"[t]he rule serves to discourage the initiation of suits brought solely for their nuisance value," <u>id.</u>,

such as arguably exists here.  Third, the rule "safeguards potential defendants from frivolous

accusations" of wrongdoing.  <u>Id.</u>; <u>see also</u> <u>Firestone v. Firestone</u>, 76 F.3d 1205, 1211 (D.C. Cir.

---

[12] <u>See also</u> <u>United States ex rel. Totten v. Bombardier Corp.</u>, 286 F.3d 542, 546 (D.C. Cir. 2002); <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1278 (D.C. Cir. 1994); <u>Anderson v. USAA Cas. Ins. Co.</u>, 221 F.R.D. 250, 254 (D.D.C. 2004); <u>Allen v. Beta Constr.</u>, 309 F. Supp. 2d 42, 45 (D.D.C. 2004).

[13] <u>See also</u> <u>Plotkin v. IP Axess Inc.</u>, 407 F.3d 690, 696 (5th Cir. 2005); <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.</u>, 375 F.3d 168, 188 (2d Cir. 2004).

[14] <u>See also</u> <u>Anderson</u>, 221 F.R.D. at 254; <u>Shields v. Wash. Bancorporation</u>, 1992 WL 88004 at *9 (D.D.C. Apr. 7, 1992); <u>Nelson v. Nationwide Mortgage Corp.</u>, 659 F. Supp. 611, 618 (D.D.C. 1987).

1996) (the "reasons behind the particularity requirement" include "protecting a defendant from reputational harm and 'strike' suits, and providing defendant sufficient information to respond to plaintiff's claims").  The need for the protection from frivolous accusations "is especially acute" where "the principal defendant is [a government] official whose reputation and position are particularly vulnerable to accusations of wrongdoing," Cannon, 642 F.2d at 1385, and where the defendants are "professionals whose reputations in their field of expertise are most sensitive to slander."  Id. n.103 (citation omitted); see also id. ("one purpose of rule 9(b) is to protect reputations of . . . professionals from scurrilous and baseless allegations of fraud") (citation omitted).  These concerns are strongly implicated here, where the reputations of public officials and of insurance companies that act as intermediaries are at stake.  Before hospitals too lazy either to research Medicare law for themselves or to avail themselves of the procedural rights afforded by statute are permitted to impugn the integrity of the Secretary and his fiscal agents, they must do more than vaguely allege that, "upon information and belief," they were "actively and/or passively misled" in some unidentified fashion.  Compl. at ¶ 37.  Indeed, forcing plaintiffs to apply the requisite degree of mental discipline to their case may cause them to give up their claims entirely.

### VI.  PLAINTIFFS ARE NOT ENTITLED TO MANDAMUS RELIEF BECAUSE THEY HAVE NOT EXHAUSTED ALTERNATIVE MEANS OF RELIEF.

Even if plaintiffs' complaint could survive to this point, mandamus jurisdiction does not lie here because the hospitals did not timely attempt to exhaust any of the avenues available to them to receive reimbursement for the UCP tax for any of the cost-reporting periods for which they did not obtain it.  Most obviously, plaintiffs did not exercise their rights to submit a claim for reimbursement to the intermediary, Bethesda Hosp. Ass'n, 485 U.S. at 404-05, to appeal any

adverse intermediary determination to the PRRB, 42 U.S.C. § 1395oo(a)(1)(A)(i), or to seek

judicial review of any adverse decision of the Board. 42 U.S.C. § 1395oo(f)(1). The failure to

take advantage of these available statutory avenues of relief is sufficient, standing alone, to

preclude mandamus relief. Am. Med. Colls., 569 F.2d at 111; Lenox Hill, 131 F. Supp. 2d at

140; Nat'l Med. Enters., 725 F. Supp. at 9.[15]  In addition, plaintiffs failed to do everything they

could to secure relief available by regulation to the extent that they did not submit a request for

permissive reopening as they had a right to do under 42 C.F.R. § 405.1885(a). Under the same

circumstances, every court that has ruled on the question has held that failure to exhaust statutory

remedies under 42 U.S.C. § 1395oo precludes a mandamus claim seeking to compel reopening

under 42 C.F.R. § 405.1885(d). Binghamton Gen. Hosp. v. Shalala, 856 F. Supp. 786, 792-93

(S.D.N.Y. 1994); Loma Linda Univ. Med. Ctr. v. Shalala, 1994 WL 465830 at *2 (C.D. Cal. July

14, 1994). The failure to take timely advantage of either statutory or regulatory remedies is

similarly fatal to plaintiffs' claims here.

### A. Plaintiffs' Claim Is on All Fours with the Mandamus Theory Rejected in Heckler v. Ringer.

To understand why plaintiffs' mandamus claim should be dismissed for failure to exhaust

administrative remedies, it is not necessary to look beyond the decision in Heckler v. Ringer. In

that case, the Supreme Court denied mandamus relief in two settings that were, if anything, far

more sympathetic to the claimants than the one presented by plaintiffs in this case. In Ringer, the

Secretary had issued nationwide instructions to all intermediaries commanding them to deny

---

[15] See also Lifestar Ambulance Serv., Inc. v. Thompson, 365 F.3d 1293, 1297 (11th Cir. 2004), cert. denied, 125 S. Ct. 866 (2005); Hopewell Nursing Home, Inc. v. Heckler, 784 F.2d 554, 557-58 (4th Cir. 1986); Hadley Mem'l Hosp., Inc. v. Schweiker, 689 F.2d 905, 912 (10th Cir. 1982); Total Care, Inc. v. Sullivan, 754 F. Supp. 1097, 1102 (W.D.N.C.), aff'd mem., 952 F.2d 397 (4th Cir. 1991).

Medicare Part A claims for a certain kind of experimental procedure.  466 U.S. at 607.  Claims

for this kind of individual benefit were governed by an administrative appeals process, 42 U.S.C.

§ 1395ff, analogous to the process used to adjudicate the claims of hospitals under 42 U.S.C.

§ 1395oo.  The instruction issued by the Secretary was binding on the intermediaries, but had no

controlling effect in subsequent administrative appeals.  Id. at 607-08.  In fact, the administrative

law judges deciding these appeals consistently rejected the Secretary's position and awarded

benefits to claimants who pursued their appeal rights.  Id.  This led the Secretary to issue a formal

administrative ruling declaring that payment for the disputed procedure was impermissible.  Id. at

608.  The ruling was binding at all levels of the administrative appeals process, id., but had no

controlling effect on district courts reviewing the administrative decisions.

Two sets of plaintiffs brought suit in Ringer.  The first group consisted of three Medicare

beneficiaries who had submitted claims for reimbursement at a time when the intermediaries

were instructed by the Secretary to deny the claims, but before the Secretary had issued the

administrative ruling that bound administrative appeals.  Id. at 613-14.  At the time these

plaintiffs brought suit, they had received denials of their reimbursement claims from the

intermediary, but had not exhausted all levels of administrative appeal.  Id.  Another plaintiff,

Freeman H. Ringer, alleged that he had been unable to obtain the disputed procedure at all

because he could not afford it and the Secretary's policy had made physicians reluctant to accept

the risk of possible non-payment.  Id. at 620.  As a result, he had never submitted a claim for

reimbursement and, if he ever did, the possibility that he could succeed before the intermediary

and in subsequent administrative appeals was totally foreclosed by the Secretary's now-binding

administrative ruling.  Id.  Both sets of plaintiffs sought, among other things, a writ of mandamus

compelling the Secretary to pay for the disputed medical procedure.

The Supreme Court rejected both theories of mandamus relief.  With respect to the first plaintiffs, the Court found that they "clearly have an adequate remedy" for "challenging all aspects of the Secretary's denial of their claims for payment," including "any objections they may have to the instructions or to the ruling if either ultimately should play a part in the Secretary's denial of their claims." Id. at 617.  In this setting, the Supreme Court held that exhaustion of administrative remedies was "in no sense futile," id. at 618, merely because the plaintiffs thought it was unlikely that they would succeed in the face of the legal opinion expressed by the Secretary in his program instructions to intermediaries.  Id. at 619.

With respect to plaintiff Ringer himself, the Court similarly held that, "consistent with our decision with respect to the other three respondents," mandamus was "not available" as one of the "jurisdictional bases for vindicating [his] claim." Id. at 620-21; id. at 620 (finding the "unavailability of mandamus jurisdiction" to be "equally applicable" to plaintiff Ringer).  The Court reached this conclusion even though plaintiff Ringer could not possibly have had his claim for benefits approved by the intermediary or have prevailed in subsequent administrative appeals, because the Secretary's administrative ruling was now binding on all agency actors in the process. Id. at 620.  The possibility of eventual judicial relief, standing alone, was sufficient to defeat mandamus jurisdiction.  See Power, 292 F.3d at 786 ("alternative remedies that might call for refusal to resort to writ of mandamus encompass judicial remedies . . . as well as administrative ones") (citation omitted).

Plaintiffs in this case have less excuse for failing to exhaust statutory remedies than the plaintiffs in Ringer.  Plaintiffs could not possibly have failed to obtain UCP reimbursement if they had claimed the tax on their cost reports and, if necessary, pursued timely administrative appeals.  All they had to do was something more than nothing.

The record demonstrates that one Massachusetts hospital obtained a favorable opinion from Mutual of Omaha in 2000 simply by asking the question. Kilpatrick Letter at 1. Plaintiff Tufts received UCP reimbursement for the 1993-1996 cost-reporting years because it pursued a timely appeal, Guarino Dec. at ¶ 3, even though it did not even raise the UCP issue in its original appeals but was allowed to amend subsequently. There is no reason to suppose that timely appeals for the 1985-1992 years would have been any less successful if the tax <u>had</u> been claimed and a denial by Associated <u>were</u> appealed with specificity. The first time CMS considered the question at all (in response to the reopening requests submitted to Associated in 2002), the agency decided that the tax was reimbursable. Baroutas Memo at 1; Baroutas Letter at 1. There is no reason to think CMS would have reached a different conclusion if it had first considered the question in the context of a timely administrative appeal. <u>See</u> 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. Indeed, Fairview confirms that hospitals in other states that raised similar tax-related issues during the administrative appeals process were uniformly successful in securing reimbursement from the PRRB. Rodowicz Letter at 1. Finally, inasmuch as Associated sought guidance from CMS when the UCP issue was first brought to its attention (in connection with reopening requests), there is no reason to think the intermediary would not similarly have sought guidance if the issue was raised for the first time in connection with a claim for reimbursement on a cost report. There does not appear to be much way that the plaintiff hospitals here could possibly have failed to obtain UCP reimbursement if they had only taken advantage of the procedural avenues available to them. No serious argument, therefore, can be made that administrative and judicial remedies were either foreclosed or futile. <u>See</u> <u>Nat'l Conservative PAC v. FEC</u>, 626 F.2d 953, 957 (D.C. Cir. 1980) (quoting <u>AFGE v. Acree</u>, 475 F.2d 1289, 1292 (D.C. Cir. 1973), and <u>AFGE v. Paine</u>, 436 F.2d 882, 896 (D.C. Cir. 1970)) (for

an administrative remedy to be futile, it must be "clear beyond doubt that the relevant administrative agency will not grant the relief in question." ).

>    **B.    The Decision in <u>Momouth Medical Center v. Thompson</u> Is Distinguishable.**

The decision in <u>Monmouth Medical Center v. Thompson</u> does not support a contrary conclusion.  In that case, a Medicare regulation took a restrictive view of the methodology by which special payments to "disproportionate share hospitals" were determined.  257 F.3d at 809-10.  After four circuits struck down the regulation, the Secretary issued a formal administrative ruling, Administrative Ruling 97-2, which established "a new interpretation more favorable to hospitals."  <u>Id</u>. at 810.  The ruling indicated that the new interpretation was to be applied prospectively only, and the Secretary expressly stated he would not reopen settled payment determinations.  <u>Id</u>.  But the plaintiff hospitals argued, among other things, that language in the administrative ruling acknowledging that the regulation was "contrary to the applicable law in four judicial circuits," <u>id</u>. at 813, was tantamount to an admission that the prior interpretation was "inconsistent with the applicable law," <u>id</u>., and therefore triggered a mandatory obligation to reopen under 42 C.F.R. § 405.1885(b) (2001), notwithstanding the instruction not to reopen.

In an effort to vindicate this theory, the plaintiffs filed an administrative appeal with the PRRB, arguing that Ruling 97-2 was a "final determination" subject to the Board's review under 42 U.S.C. § 1395oo(a)(1)(A)(i).  The Board dismissed the complaint on grounds that it did not have jurisdiction.  <u>Monmouth</u>, 257 F.3d at 810.  In <u>Monmouth</u>, the Court of Appeals upheld that decision, <u>id</u>. at 811 (citing <u>Your Home</u>, 525 U.S. at 454), but went on to hold that the meaning of the administrative ruling was reviewable directly in federal court, pursuant to mandamus jurisdiction.  <u>Id</u>. at 814-15.  In this portion of the analysis, the Court stated that appeals under 42 U.S.C. § 1395oo were either "foreclosed or futile" for the reasons "already shown."  <u>Monmouth</u>,

257 F.3d at 815.  The reasons "already shown," in turn, were the specific reasons that the Board

did not have jurisdiction to review an administrative ruling that was binding on the Board itself

and that the ruling was not a "final determination" within the meaning of 42 U.S.C.

§ 1395oo(a)(1)(A)(i).

Nothing in the decision remotely suggests that exhaustion of remedies under §1395oo is

always foreclosed or futile where a plaintiff seeks to force a reopening of a payment

determination by means of mandamus relief.  It does not even support the proposition that

exhaustion should be frequently excused.  The Court of Appeals merely found exhaustion of

administrative appeals rights foreclosed in the unique factual circumstances before it.  If all a

plaintiff had to do to make sure administrative remedies were deemed, as a matter of law, to be

futile was remember to include a mandamus count in his complaint, decades of Supreme Court

decisions carefully defining the scope of Medicare and Social Security jurisdiction would be

rendered meaningless.  See Illinois Council, 529 U.S. at 10-20; Your Home, 525 U.S. at 454-56;

Ringer, 466 U.S. at 616-21; Mathews v. Eldridge, 424 U.S. 319, 326-32 (1976); Weinberger, 422

U.S. at 765.  Monmouth cannot plausibly be read for such a sweeping proposition.

> **C.  Plaintiffs Failed to Exhaust Available Remedies Because They Did Not Request a Permissive Reopening in a Timely Fashion.**

Even if plaintiffs could somehow be excused for not exhausting their appeal rights under

42 U.S.C. § 1395oo, they still cannot be excused for failing to request a permissive reopening

under 42 C.F.R. § 405.1885(a) in a timely manner.  As the Court of Appeals for this Circuit

pointed out in Monmouth, plaintiffs seeking mandamus relief to force a reopening of Medicare

payment determinations must, at the very least, have "done all they can to vindicate their right to

reopening," 257 F.3d at 815, by timely requesting a permissive reopening for the years in which

they did not receive reimbursement. Every timely reopening request submitted by any plaintiff hospital here was granted, Bruce Dec. at ¶¶ 3-4; Gaurino Dec. at ¶ 3-4, including the request of Fairview decided before the March 2003 opinion of CMS. Grabowski Letters at 1. There is no reason to think reopening requests for earlier cost-reporting years, if timely filed, would not also have been granted. Indeed, the CMS opinion came about only because Associated sought guidance after it received reopening requests in 2002. Reopening requests submitted fifteen years earlier would presumably have been granted through exactly the same sequence of events fifteen years sooner.

For this reason, the decision in In re Medicare Reimbursement Litigation, 414 F.3d 7 (D.C. Cir.), petition for reh'g en banc filed, No. 04-5203 (D.C. Cir. Aug. 15, 2005), is inapposite. In that case, the Court of Appeals for this Circuit held that hospitals did not have to exhaust permissive reopening remedies under 42 C.F.R. § 405.1885(a) in order to seek to enforce the administrative ruling found in Monmouth to have created a duty to reopen under 42 C.F.R. § 405.1885(b). But that was only because, prior to the issuance of the administrative ruling, a regulation precluded the granting of the reopening request, Medicare Reimbursement, 414 F.3d at 11 (quoting Bethseda Hosp. Ass'n, 485 U.S. at 406) ("[n]either the fiscal intermediary nor the [Review] Board has the authority to declare regulations invalid"), and, after issuance of the administrative ruling, reopening was expressly "barred" by the text of the ruling itself. Id. On the basis of this analysis, the Court concluded that there was no time when the hospitals could have "obtained relief by seeking reopening." Id. In this case, by contrast, it is almost certain that the plaintiff hospitals would have obtained a reopening if they had asked for one earlier, either from Mutual of Omaha (through the exercise its own judgment) or from Associated (after it

sought guidance from CMS).  That is how both intermediaries responded to the first requests for reopening that they actually received.

**VII.  MANDAMUS RELIEF SHOULD BE DENIED ON EQUITABLE GROUNDS.**

Finally, even if plaintiffs' complaint could survive to this point, mandamus relief should be denied on equitable grounds.  Hospitals that are "expected to know the law" disqualify themselves from equitable relief when they fail to live up to "the most demanding standards" of the law.  Crawford County, 467 U.S. at 63.  Plaintiffs' complaint should be dismissed for that reason alone.  Plaintiffs knew everything they needed to know to pursue their claim that initial payment determinations impermissibly failed to include reimbursement for the UCP tax when such payment determinations were issued for each cost reporting year from 1985 on.  There is no excuse for delay.  See Thirteenth Reg'l Corp. 654 F.2d at 763 (the complaining party must exercise reasonable promptness in bringing suit to qualify for mandamus relief).  Similarly, plaintiffs knew everything they needed to know to pursue their claim that intermediaries misled them at whatever time plaintiffs think false statements were made or necessary statements were not made.  Again, there is no excuse for delay.  And there is certainly no excuse for failing to research the law, claim the UCP tax in a timely manner, and appeal any hypothetical denial by the intermediary in a timely manner.  Such inattention hardly makes for a compelling equitable case.

## <u>CONCLUSION</u>

For the reasons stated, defendant's motion to dismiss should be granted or, in the

alternative, summary judgment in favor of defendant should be entered.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>OF COUNSEL:<br>PAULA M. STANNARD<br>Acting General Counsel</td><td>PETER D. KEISLER<br>Assistant Attorney General</td></tr>
<tr><td>KATHLEEN H. MCGUAN<br>Associate General Counsel</td><td>KENNETH L. WAINSTEIN<br>United States Attorney</td></tr>
<tr><td>MARK D. POLSTON<br>Acting Deputy Associate<br>General Counsel</td><td>_____<br>SHEILA M. LIEBER<br>PETER ROBBINS<br>Department of Justice</td></tr>
<tr><td>ROBERT BALDERSTON<br>Attorney<br>Department of Health<br>and Human Services</td><td>20 Massachusetts Avenue, N.W., Room 7142<br>Washington, D.C.  20530<br>Tel:  (202) 514-3953<br>Attorneys for Defendant</td></tr>
</table>