IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FAIRVIEW HOSPITAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:05cv01065 (RWR) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>DEFENDANT'S EXHIBIT A</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIRVIEW HOSPITAL, et al.,            )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )        Civ. Action No. 1:05cv01065 (RWR)
                                      )
MICHAEL O. LEAVITT,                   )
                                      )
          Defendant.                  )
_____     )

## DECLARATION OF THOMAS BRUCE

I, Thomas Bruce, declare as follows:

1. I am a Regional Audit Manager for the Medicare Division of Mutual of Omaha Insurance Company ("Mutual of Omaha"). Mutual of Omaha is a private insurance company under contract with the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"). Mutual of Omaha is a fiscal intermediary which, among other things, processes Medicare cost reports submitted by some of the hospitals in Massachusetts. I manage auditors that reimburse providers and audit their Medicare cost reports. This responsibility includes the maintenance of records. The information in this declaration is based on my personal knowledge or records maintained by Mutual of Omaha in the course of its official business.

2. One of the hospitals for which Mutual of Omaha processes cost reports is Fairview Hospital ("Fairview").

3. By letter dated August 28, 2002, Fairview requested that Mutual of Omaha reopen final determinations for cost-reporting periods in 1997 through 1999, so that Fairview could

receive reimbursement for Massachusetts Uncompensated Care Pool ("UCP") tax. A true and correct copy of this letter is appended to this declaration as Exhibit A-1.

4. By letter dated October 1, 2002, Fairview's request to reopen the final payment determination for the 1997-1999 years was granted. A true and correct copy of that letter is appended to this declaration as Exhibit A-2. The payment determinations for the 1997-1999 years were revised to included reimbursement for the UCP tax assessment.

5. Fairview received reimbursement for UCP tax assessment in the notices of program reimbursement issued for cost-reporting periods in 2000 and 2001.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

8/30/05
DATE

THOMAS BRUCE

-2-

002

EXHIBIT 1

# Berkshire
# Health Systems, Inc.

725 North Street
Pittsfield, MA 01201
(413) 447-2000

August 28, 2002

Ms. Diane Haines
Audit Supervisor
Mutual of Omaha Insurance Company
Mutual of Omaha Plaza
Medicare – LL2
Omaha, NE 68175



Dear Ms. Haines:

This letter is to request a reopening of the following Medicare cost reports for Fairview Hospital, Great Barrington, MA, 01230, Provider #22-0038:

### COST REPORTING PERIODS

October 1, 1996 – September 30, 1997
October 1, 1997 – September 30, 1998
October 1, 1998 – September 30, 1999

The Original Notice of Program Reimbursement for these reports are all within three years of the date of this request, which means that we are still within our three-year reopening window.

It has come to our attention that a material error exists in the statement of program cost reported in the above-listed cost reports, which we seek to correct at this time. To substantiate what we feel to be a more accurate statement of program cost, we have provided new and material evidence in support of the following issue.

### Inclusion of hospital's gross annual liability to the Massachusetts Uncompensated Care Pool

Prior to this time, we had been under the impression that our hospital's gross liability to the Massachusetts Uncompensated Care Pool (UCP) was not allowable cost that could be included on Worksheet A of our Medicare cost report. A study of the regulations, applicable PRRB decisions, US Court rulings, and other pertinent references now leads us to believe that failing to include our annual assessment from the UCP was a material error in the statement of our total allowable cost. In fact, it is our understanding that Mutual of Omaha has for several years reimbursed other Massachusetts hospitals for this cost.

To document the annual gross liability to the UCP, and to show that this cost meets the criteria as an allowable tax under <u>PRM 1. 2122. Taxes,</u> we provide new and material evidence in the following Exhibits.

W/P REVIEWED

BY: _____ DATE: _____

004

Exhibit A

UC Pool Final Statement for FY97, Division of Health Care Finance and Policy

The UC Pool Final Settlement notice from Ms. Mary E. Byrnes, Manager, Financial Analysis, Division of Health Care Finance and Policy, provides an audited, final calculation of Fairview's gross liability to the Uncompensated Care Pool for the fiscal years at issue.

Page Three, Line L11, of these letters (highlighted in yellow) inform Fairview of the amount actually paid into the Pool for FY97 and FY 98, and on the tentative settlement amount for FY99. It is this amount that we wish to have included as cost for each of the three years.

Specifically, Line L11 equals the following for the three fiscal years:

- 1997: $600,326.00
- 1998: 453,180.00
- 1999: 504,877.00

We request that these amounts be entered as an adjustment on Worksheet A-8, modifying Worksheet A, Line 6, Column 2.

Exhibit B

General Laws of Massachusetts. Part I. Administration of the Government. Title XVII. Public Welfare. Chapter 118G. Health Care Finance and Policy. Section 18. Uncompensated Care Trust Fund

Section 18. (a) establishes the Uncompensated Care Trust Fund. Section 18 (d) directs the Division of Health Care Financing and Policy to administer an uncompensated care pool, consisting in part of revenues produced by acute hospital assessments. Paragraph (d) gives the Division authority to require payments to the pool from hospitals.

Paragraph (e) gives the mechanism that is used to determine all acute care hospitals' gross liability to the pool. There is a consistent rate and a consistent base, with no means of exemption. Paragraph (g) authorizes the Division of Health Care Finance and Policy to develop methods of enforcement to mandate hospitals' payments to the pool.

Exhibit C

Rulings of the United States Bankruptcy Court for the District of Massachusetts

In re: LUDLOW HOSPITAL SOCIETY, INC., Debtor, Decided December 30, 1997, finds that the hospital's gross liability to the Uncompensated Care Pool is a tax, which confers benefit to the public generally, rather than an individual benefit to an acute care hospital. The Court found that

the money collected (the gross liability) for the pool was imposed for a "public purpose," and as a result the Pool claim was entitled to priority status as a tax.

In re: BOSTON REGIONAL MEDICAL CENTER, Debtor, Decided June 25, 2001, gave the court's position that the hospital's gross annual liability to the Massachusetts Uncompensated Care Pool is a tax, not a fee.


**Exhibit D**

Provider Reimbursement Manual (PRM) 1, 2122, Taxes


PRM 1, 2122, is instructive regarding which forms of tax may be included in the calculation of a hospital's allowable cost. The UCP assessment amount that Fairview is seeking to include at this time does not include fines or penalties, and there is no exemption from this tax to which Fairview can avail itself.

Further, 2122.2 lists taxes that are not allowable as costs. The UCP assessment does not meet any of the criteria listed in that paragraph.


**Exhibit E**

ADMR(PRRB) 90-D61, Florida Group Appeal – Indigent Tax Assessments  and PRRB 04/20/00 2000-D47, St. Joseph Hospital, St. Paul, Minnesota


ADMR(PRRB) 90-D61 and D62 were the "watershed" rulings of the administrator on this issue. They announced the Administrator's policy that the cost became an accounting liability at the moment it became a legal liability, and thus was accruable in the period against which it was assessed.  Further, like the Minnesota cases that were effected by PRRB 2000-D47, the allowable cost amount here was the full amount of the tax: providers were not required to "net down" any receipts from the indigent care pool.

PRRBs 2000-D47, D48, and D49 were all held in favor of Minnesota hospitals that sought to include their payments to the MinnesotaCare Tax (MCT). The Administrator declined to overturn any of these PRRB decisions.

The intermediary originally refused to allow this tax, in part because it was levied upon revenues net of Medicare and Medicaid revenues, and in part because the MinnesotaCare program used the funds to make payments to hospitals for treatment of indigent care. The PRRB held that the basis of taxation did not need to include Medicare revenues for the tax to be allowable under the Medicare program, and the PRRB held that the State's use of the funds to reimburse hospitals for indigent care did not reduce or eliminate the "allowability" of the hospitals' gross payments to the MinnesotaCare Tax.

The Massachusetts UCP is similar to the Minnesota MCT in all aspects that the PRRB considered in deeming the MCT allowable. The UCP tax is to create a pool of revenue to pay for indigents.

It is uniformly applied to all providers. It is a cost of doing business, i.e., an ordinary and necessary business expense. It is reasonable. It is subject to severe sanctions if not paid. It is of no relevance that the tax is not based upon Medicare revenues. It did not need to be reduced by hospitals' receipts from the indigent pool. What the Board deemed relevant is the amount of the tax paid and that it met the statutory, regulatory, and program instruction requirements.

Conclusion

We have documented the hospital's gross liability to the Massachusetts Uncompensated Care Pool tax for fiscal year 1997, and have shown that it is a tax levied by the State of Massachusetts. We've demonstrated that the UCP assessment's status as a tax has been upheld by the United States Court system. PRM 1, 2122 permits such taxes to be included on Medicare cost reports as allowable cost, and we've shown that the UCP tax does not in any way resemble any of the excluded taxes listed in PRM 1, 2122.2.

We then examined a series of PRRB decisions, in which the Board found that Minnesota providers properly included the gross tax amount of the MinnesotaCare Tax as an A&G expense. By highlighting the similarities between the MCT and Massachusetts' UCP tax, we've demonstrated that, per the instructive nature of PRRB decisions, the UCP assessment meets CMS's standards for allowability. Thus, we seek to include our UCP assessment in our Administrative & General cost center as an ordinary and necessary cost of doing business.

I thank you in advance, Ms. Haines, for your consideration of this request. If you have any questions regarding this matter, please direct them to Mr. Joel Goloskie, of Goloskie Consulting Group, Inc., our contracted agent for this purpose. In addition to requesting reopening of our 1997 cost report, this letter serves to authorize Mutual of Omaha to discuss all aspects of this reopening request with Mr. Goloskie or members of his staff. Mr. Goloskie can be reached at 781/749-2760.

Thank you again.

Sincerely,

Darlene Rodowicz
Vice President - Finance

*The Commonwealth of Massachusetts*
*Executive Office of Health and Human Services*

# Division of Health Care Finance and Policy

JANE SWIFT
GOVERNOR

WILLIAM D. O'LEARY
SECRETARY

LOUIS I. FREEDMAN
COMMISSIONER

April 24, 2001

Mr. Michael Cullen
Vice President/Finance
Berkshire Health System -
Fairview Hospital + BMC
29 Lewis Avenue
Great Barrington, MA 01230

Re: UC Pool Final Settlement for FY97 and Preliminary Settlement for FY00

Dear Mr. Cullen:

Enclosed please find a summary page along with the detailed calculation of the Fiscal Year 1997 Uncompensated Care Pool Final Settlement for your hospital, as well as, the Fiscal Year 2000 Preliminary Settlement calculation. These two calculations have been combined to produce one net liability due to your hospital from the Pool. The Final Cost to Charge Ratio calculation for Fiscal Year 1997 is also included for your records.

The Fiscal Year 1997 calculation represents the final version of your hospital's settlement for that year. You may find a change in your hospital's revised calculation, even though your hospital submitted no objections. This occurs because several lines of the calculation rely on statewide information, thus a change to any hospital's data can affect your hospital's calculation.

The preliminary settlement incorporates actual fiscal year data and thereby removes the effects of the rolling average, as well as updates the base year, which is used for the cost to charge ratios.

Your hospital has a net liability due from the Uncompensated Care Pool, which is scheduled for payment to your designated UC Pool Fleet account on April 27, 2001.

Please be advised that Fiscal Year 1998 final settlement is near completion. The Division hopes to finish this calculation, and begin the verification process for Fiscal Year 1999 final settlement very soon. The Fiscal Year 1999 cost to charge ratios and settlement calculation will require verification.

(617) 988-3100 (Phone)      Two Boylston Street, Boston, MA 02116-4704      (617) 727-7662 (Fax)

Recycled Paper

008

Please feel free to contact David Urenas at (617) 988-3207 or me at (617) 988-3180 with any questions on this matter. Thank you for your continued cooperation.


Sincerely,

Mary E. Byrnes
Manager
Financial Analysis

27/03/2002  01:32      413-447-2601

## FINAL CALCULATION

DIVISION OF HEALTH CARE FINANCE AND POLICY
1997 Uncompensated Care Pool Final Settlement
April 10, 2001

FAIRVIEW
(BERKSHIR

O'LEARY
ARY

EEDMAN
ONER

| | | | |
|---|---|---|---|
| L1 | Private Sector Charges (PSC) | | $9,746,63 |
| L2 | Uniform Allowance | | 0.05742 |
| L3 | Gross Liability to the Pool [L1*L2] | | $559,76 |
| | | | |
| L4 | Allowable Uncompensated Care Charges | | $1,068,67 |
| L5 | Cost-to-Charge Ratio | | 55.27 |
| | | | |
| L6 | Allowable Uncompensated Care Costs [L4*L5] | | $601,34 |
| L6a | IGT Recoupment | | $. |
| L6b | Allowable Free Care Costs [L6-L6a] | | $601,34 |
| L7 | Shortfall Allocation | | $174,53 |
| | | | |
| L8 | Gross Liability to the Hospital [L6b - L7] | | $426,806 |
| | | | |
| L9 | REVISED NET ANNUAL LIABILITY TO/(FROM) POOL  [L3-L8] | | $132,958 |
| | | | |
| | *Prior Payment Activity:* | | |
| L10 | Payments From Pool to Hospital through  4/10/01 | | $483,031 |
| L11 | Payments From Hospital (to) Pool through  4/10/01 | | ($600,325 |
| L12 | Transfers (to)/from Pool | | 0 |
| L13 | NET PAYMENTS  (To)/From Pool [L10+L11+L12] | | ($117,295 |
| | | | |
| L14 | Current Surcharges Due to Pool @ 4/10/01 | | . |
| | | | |
| L15 | CURRENT LIABILITY DUE To/(From) POOL [L9+L13+14] | | $15,663 |

R0 - 7

## SHORTFALL CALCULATION

### FIRST ITERATION

| | | | |
|---|---|---|---|
| L16   PATIENT CARE COSTS | | | $13,062,342 |
| PATIENT CARE COSTS RATIO | | | 0.1656% |
| TOTAL PATIENT CARE COSTS | | 7,888,323,261 | 7,888,323,261 |
| TOTAL SHORTFALL | | 104,490,175 | 104,490,175 |
| SHORTFALL ALLOCATION | | | 173,026 |
| | | | ok |

### SECOND ITERATION

| | | | |
|---|---|---|---|
| PATIENT CARE COSTS | | | 13,062,342 |
| PATIENT CARE COSTS RATIO | | | 0.1706% |
| TOTAL PATIENT CARE COSTS | | 7,655,420,075 | 7,655,420,075 |
| TOTAL SHORTFALL | | 102,289,349 | 102,289,349 |
| SHORTFALL ALLOCATION | | | 174,535 |
| | | | ok |

W/P REVIEWED    DATE:

| | |
|---|---|
| First level | ok |
| Second level | 174,535 |
| SHORTFALL | 174,535 |

010

# Exhibit B

General Laws of Massachusetts, Part I,
Administration of the Government, Title XVII,
Public Welfare, Chapter 118G, Health Care Finance
and Policy, Section 18, Uncompensated Care Trust
Fund

W/P REVIEWED
BY: _____ DATE: _____

# GENERAL LAWS OF MASSACHUSETTS

PART I.
ADMINISTRATION OF THE GOVERNMENT

TITLE XVII.
PUBLIC WELFARE

CHAPTER 118G. HEALTH CARE FINANCE AND POLICY

Chapter 118G: Section 18 Uncompensated care trust fund

*[ Text of section effective until September 30, 2002 as provided in 1997, 47, Sec. 36.]*

   Section 18. (a) There is hereby established an Uncompensated Care Trust Fund, which shall be administered by the division. Expenditures from said Trust Fund shall not be subject to appropriation unless otherwise required by law. The purpose of said fund shall be to provide access to health care for low income uninsured and underinsured residents of the commonwealth. The division shall administer said fund using such methods, policies, procedures, standards and criteria that it deems necessary for the proper and efficient operation of said fund and the programs funded thereby in a manner consistent with simplicity of administration, the provisions of this chapter and the best interests of low income uninsured and underinsured persons.

   (b) The Uncompensated Care Trust Fund shall consist of all amounts paid by acute hospitals and surcharge payors for the purposes of the uncompensated care pool pursuant to this section and section 18A; all appropriations for the purpose of uncompensated acute hospital care or uncompensated community health center care; any sums paid by acute hospitals pursuant to section 56 of chapter 495 of the acts of 1991; all property and securities acquired by and through the use of monies belonging to said fund and all interest thereon; less payments therefrom for the purposes of the uncompensated care pool and amounts transferred to the separate MassHealth account established by subsection (c). All interest earned on the amounts in said fund shall be deposited or retained in said fund. The commissioner shall from time to time requisition from said fund such amounts as the commissioner deems necessary to meet the current obligations of the division for the purposes of said fund and estimated obligations for a reasonable future period.

   (c) Within said fund, the division shall establish a separate account for the insurance reimbursement program component of the MassHealth demonstration program established by section 9C of chapter 118E. This separate account shall consist of amounts transferred from the Uncompensated Care Trust Fund, any federal funds transferred from the Children's and Seniors' Health Care Assistance Fund established by section 2FF of chapter 29, and any funds as may be appropriated for deposit into this account. The division shall administer this account and disburse funds from this account for the purposes of said insurance reimbursement program component of said MassHealth program. Funds deposited in this account shall be kept separate and shall not be commingled with funds of the uncompensated care pool. The comptroller is hereby authorized and directed to effect the transfers authorized by this subsection pursuant to a spending plan filed by the division of medical assistance with the secretary of administration and finance and the house and senate committees on ways and means.

   (d) Within said fund, the division shall administer an uncompensated care pool consisting of

revenues produced by acute hospital assessments and the surcharge percentage calculated by the division pursuant to this section and section 18A and all appropriations for the purpose of uncompensated care provided by acute hospitals, or community health centers, including, but not limited to, federal funds made available for uncompensated care payments to certain acute hospitals as may be appropriated from the General Fund or any other fund. For purposes of this subsection, the words ""revenues produced by acute hospital assessments" shall equal the value of and have the same meaning as the words ""acute hospitals' liability to the pool" established pursuant to subsection (e) and the words ""revenues produced by the surcharge percentage" shall equal the value of and have the same meaning as the words ""surcharge payors' liability to the pool" as established pursuant to section 18A. Amounts placed in the Uncompensated Care Trust Fund, except for amounts transferred into the separate MassHealth account established in subsection (c), shall be expended by the division for the purposes of the uncompensated care pool; provided, however, that the division may expend up to $5,000,000 annually for demonstration projects where the division finds that such projects reduce the liability of said pool to acute hospitals and community health centers by at least the amount expended by said pool on such projects. The division shall administer the uncompensated care pool and require payments to the pool and disburse funds from the pool consistent with the surcharge payors' and acute hospitals' liability to the pool and the pool's liability to an acute hospital or a community health center. The division shall specify by regulation appropriate mechanisms that provide for interim determination and payment of a surcharge payor's liability to the pool and an acute hospital's liability to and from the pool during each fiscal year and for final settlement of the pool for each fiscal year. The division may promulgate regulations which authorize the assessment of interest on any unpaid liability at a rate not to exceed an annual percentage rate of 18 per cent and late fees at a rate not to exceed 5 per cent per month. The division may calculate final settlements when it determines that data for a fiscal year are substantially complete and that further refinements would not materially affect the calculation. The division may incorporate final settlement amounts by prospective adjustment of acute hospitals' and surcharge payors' liability rather than by retrospective payments or assessments.

(e) An acute hospital's liability to said pool shall equal the product of (1) the ratio of its private sector charges to all acute hospitals' private sector charges; and (2) the private sector liability to the uncompensated care pool as determined by law less the surcharge payors' liability established pursuant to section 18A. Before October 1 of each year, the division shall establish each acute hospital's liability to the pool using the best data available, as determined by the division. The division shall update each acute hospital's liability to the pool as updated information becomes available. For any fiscal year, an acute hospital's final liability to said pool shall be calculated in accordance with subsection (d). The division shall specify by regulation an appropriate mechanism for interim determination and payment of an acute hospital's liability to and from said pool.

(f) An acute hospital's liability to said pool shall in the case of a transfer of ownership be assumed by the successor in interest to the acute hospital.

(g) The division shall establish by regulation an appropriate mechanism for enforcing an acute hospital's liability to the pool in the event that an acute hospital does not make a scheduled payment to said pool. Such enforcement mechanism may include notification to the division of medical assistance requiring an offset of payments on the Title XIX claims of any such acute hospital, any health care provider under common ownership with the acute hospital or any successor in interest to the acute hospital, from the division of medical assistance in the amount of payment owed to said pool including any interest and late fees, and to transfer the withheld funds into said pool. If the division of medical assistance offsets claims payments as ordered by the division, it shall be deemed not to be in breach of contract or any other obligation for payment of noncontracted

services, and providers to which payment is offset under order of the division shall serve all Title XIX recipients in accordance with the contract then in effect with the division of medical assistance, or, in the case of a noncontracting or disproportionate share hospital, in accordance with its obligation for providing services to Title XIX recipients pursuant to this chapter. In no event shall the division direct the division of medical assistance to offset claims unless an acute hospital has maintained an outstanding obligation to the uncompensated care pool for a period longer than 45 days and has received proper notice that said division intends to initiate enforcement actions in accordance with the regulations of said division.

  (h) Said pool's liability to an acute hospital shall be calculated periodically by the division based on the best data available. Such data shall include, but not be limited to, allowable free care charges as determined by the division and the cost-to-charge ratio, which shall be calculated by the division for each acute hospital. The final settlement of the pool's liability to a hospital shall equal the product of allowable actual free care charges, adjusted for any audit findings, multiplied by its final cost-to-charge ratio. In the case of non-disproportionate share hospitals, such calculation shall represent the ratio of the reasonable actual costs of patient care services, as determined by the division, to gross patient service revenue for the most recent year for which audited financial statements for the hospital are available. In the case of disproportionate share hospitals, such calculation shall represent the ratio of the hospital's reasonable financial requirements, as determined by the division, to gross patient service revenue for the most recent year for which audited financial statements for such hospital are available. The division shall, throughout the year, update each acute hospital's ratio in the event more current audited financial statement information becomes available. Said division shall further establish, for each non-disproportionate share acute hospital for any given fiscal year, a final ratio using the reasonable costs for patient care services and gross patient service revenues as appearing in the audited financial statements for the fiscal year. For disproportionate share hospitals, said division shall establish a final ratio based upon its reasonable financial requirements, as defined by the division, and actual gross patient service revenues as appearing in the audited financial statements for the fiscal year. The final settlement of the pool's liability to an acute hospital shall be calculated in accordance with subsection (d). The pool's liability to a community health center shall be calculated periodically by the division based on the best data available as determined by the division. Such data shall include, but not be limited to, allowable free care charges as determined by the division and the rates established by the division to be paid for free care services. Such rates shall represent the community health center's reasonable financial requirements, as determined by the division.

  (i) The division shall manage said pool in order to encourage maximum efficiency and appropriateness in the utilization of services. The division shall promulgate regulations detailing the definition of free care, including, but not limited to, defining the qualifications of eligible persons and the scope of eligible services, setting standards for reasonable efforts to notify uninsured or underinsured persons of the various insurance options as well as the availability of free care, and setting standards for reasonable efforts to collect costs of emergency care and setting standards to determine medical hardship. Said regulations shall include provision for the review of determinations of eligibility for free care and the establishment of penalties for acute hospitals or community health centers which upon audit show an excessive rate of incorrect eligibility determinations. The division shall adopt regulations prohibiting payments from said pool for non-urgent and non-emergency health care services provided to residents of other states and foreign countries. The division may require utilization review in accordance with section 6. After consultation with consumer representatives and representatives of acute hospitals and community health centers, the division shall develop programs and guidelines to encourage maximum enrollment of pool beneficiaries into health care plans and programs of health insurance offered by public and private sources, and to promote the delivery of care in the most appropriate setting,

through coordination of care and referral of primary care cases to community health centers. Such programs and guidelines shall not deny payments on the ground that services should have been provided in a more appropriate setting if the hospital was required to provide such services pursuant to 42 USC 1395(dd). The division may adopt regulations requiring disproportionate share hospitals to use a portion of payments received from said pool to reimburse physicians for the costs of free care which such physicians provide in such hospitals. In adopting regulations under this subsection, the division shall consult and work cooperatively with representatives of low income uninsured and underinsured persons, health care providers who provide health care to such persons, and organizations representing said persons and providers.

(j) The division shall adopt any other regulations necessary to manage said pool including, but not limited to, regulations: requiring data submissions, setting pool audit standards, establishing enforcement mechanisms consistent with this section, and establishing reasonable controls on utilization. The division shall require acute hospitals and community health centers to submit data that the division determines necessary to efficiently and effectively administer the uncompensated care pool. Said data may include, but shall not be limited to, charge and cost data, patient diagnoses and types of uncompensated service provided, patient demographics, write-off amounts, unique patient identifiers and other such data that would enable the division to conduct analyses, verify eligibility and calculate settlements on a case-by-case basis. The division shall consider all available options for collecting said data, including claims and electronic data submission, and shall implement the most efficient and effective method after consultation with interested parties. If the division finds that hospitals are not complying with the data submission requirements or if the data submitted are not sufficient to enable the division to verify eligibility and calculate settlements on a case-by-case basis, the division may adopt regulations providing for a claims adjudication process for payments from the uncompensated care pool. Such claims adjudication process shall maximize administrative simplicity to the extent practicable and shall not significantly delay cash flow from said pool. The division shall consult with interested parties, including the Massachusetts hospital association, in developing the methodology for such claims adjudication process and shall submit the methodology to the joint committee on health care 90 days in advance of adopting such regulations. The division shall analyze the data collected under this section in conjunction with any other pertinent data to determine the demographic characteristics and the clinical and social needs of uncompensated care recipients. If said analysis indicates that one or more managed care or case management programs would better meet the needs of low income individuals, the division shall consult with representatives of the uninsured and underinsured and the providers who serve them and other interested parties regarding the potential for managed care or case management approaches to improve care provided under said pool. If the division determines that such approaches would improve care, the division may contract with health care delivery or management organizations or to enter interagency service agreements with the division of medical assistance or the department of public health for the purpose of contracts with health care or managed care providers to deliver services to individuals eligible for free care or; provided, however, that no such contract shall be entered into until the division finds that the cost of such contract does not exceed the amounts that would otherwise have been expended on free care for these individuals; and, provided further, that the expenditures for such contracts shall not exceed $5,000,000 in any hospital fiscal year.

(k) The division shall promulgate regulations to develop and implement methods and procedures to verify the eligibility of individuals for free care and to ensure that other coverage options are utilized fully before free care is granted. These systems may include but are not limited to investigation and recovery of third party liabilities, and penalties for noncompliance. The division shall compile and maintain a catalog of program information for all programs of health care coverage for low income persons including those sponsored by public and private organizations.

The catalog shall include, at a minimum, eligibility criteria, benefits and services offered, enrollment procedures and information necessary for contact and follow-up. The division shall ensure that if free care is granted for the copayment and deductible of an eligible person with other coverage, no payments shall be made from the uncompensated care pool which would cause the total payment to the provider to exceed the applicable rates for free care services. The division shall refuse to allow payments or shall disallow payments to acute hospitals and community health centers for free care provided to individuals if reimbursement is available from other public or private sources including, but not limited to, the Medicaid or Medicare program, or if the individual is not eligible for free care. The division shall require acute hospitals and community health centers to screen each free care applicant for other sources of coverage and for potential eligibility for government programs, and to document the results of such screening. If an acute hospital or community health center determines that an applicant is potentially eligible for Medicaid or another government program, said acute hospital or community health center shall assist the applicant in applying for benefits under such program. The division shall audit free care accounts of acute hospitals and community health centers to determine compliance with this section and shall deny pool payment for any audited account for any acute hospital or community health center that fails to document compliance with this section.

(l) The division may enter into interagency agreements with the department of revenue to verify income data for recipients of free care. Such written agreements shall include provisions permitting the division to provide a list of persons receiving or applying for free care, including any applicable members of the households of such recipients or applicants which would be counted in determining eligibility, and to furnish relevant information including, but not limited to, name, social security number, if available, and other data required to assure positive identification. Such written agreements shall include provisions permitting the department of revenue to examine the data available under the wage reporting system established under section 3 of chapter 62E and make positive identification of cases in which recipients or applicants for free care, individually or as part of a household unit, are receiving wages in excess of any threshold eligibility requirements established by the division. The department of revenue is hereby authorized to furnish the division with information on the cases of persons so identified, including, but not limited to, name, social security number and other data to ensure positive identification, name and identification number of employer, and amount of wages received. The division may inform acute hospitals and community health centers only of an individuals eligibility or noneligibility for free care based on information obtained from the department of revenue, but may not release any specific information concerning the individual.

(m) The division shall deposit any amounts received pursuant to chapter 62D in the Uncompensated Care Trust Fund to reimburse the uncompensated care pool for expenditures made for persons who received free care through said pool and who, upon review, was determined to be ineligible for uncompensated care based upon applicable income standards.

(n) The division shall not at any time make payments from said pool for any period in excess of amounts that have been paid into or are available in said pool for such period; provided, however, that the division may temporarily prorate payments from said pool for cash flow purposes. In the event that after making allowable free care payments to community health centers, there exists a shortfall of pool revenue, excluding any revenue in the separate MassHealth insurance reimbursement program account, in any fiscal year to cover allowable free care payments to acute hospitals, the division shall allocate such payments so that those acute hospitals with the greatest proportional requirement for pool income shall receive a greater proportional payment from said pool. In the event that there exists a surplus of pool revenue in any fiscal year over that necessary to cover allowable free care payments, the division shall apply such surplus to allowable free care

payments for any succeeding fiscal year in which there is a shortfall of pool revenue.

*[Subsection (o) as amended by 2001, 177, Sec. 29 effective July 1, 2001 until September 30, 2002.]*

  (o) Within the Uncompensated Care Trust Fund, there shall be established a medical assistance intergovernmental transfer account, administered by the commissioner of the division of medical assistance, consisting of any transfers to the commonwealth from publicly-operated entities providing Title XIX or Title XXI reimbursable services, and federal reimbursements related to medical assistance payments, so called, to publicly-operated entities. All amounts credited to this account shall be held in trust and shall be available for expenditure by the commissioner of the division of medical assistance to be used for medical assistance payments to entities designated and authorized by the general court, or which have contractually agreed to make intergovernmental transfers to said account; provided, however, that any amount in excess of such medical assistance payments may be credited to the General Fund; provided, further, that the amount of all such expenditures shall be subject to annual approval by the general court. The maximum payments and transfers from said account shall not exceed those permissible for federal reimbursement under Title XIX or Title XXI of the Social Security Act or any successor federal statute. The comptroller may make payments, including payments during the accounts payable period, in anticipation of revenues, including receivables due and collectibles during the months of July and August, and shall establish procedures for reconciling overpayments or underpayments from said account to publicly-operated entities; provided, that said procedures shall include, but not be limited to, appropriate mechanisms for refunding intergovernmental transfers and federal reimbursements upon recoupment of any such overpayments. The division of medical assistance shall notify the division of health care finance and policy regarding revenue and expenditure activity within said account and submit to the secretary of administration and finance and the house and senate committees on ways and means a schedule of said payments ten days prior to any expenditures, and no funds shall be expended without an enforceable agreement with or legal obligation imposed upon the recipient public entity to make an intergovernmental transfer in an appropriate amount to said account.

---

Return to:

** Next Section ** Previous Section ** Chapter Table of Contents ** Legislative Home Page

# Exhibit C

Rulings of the United States Bankruptcy Court for
the District of Massachusetts

CRAIG AND MACAULEY PROFESSIONAL CORPORATION
COUNSELLORS AT LAW

CRAIG AND MACAULEY

FIRM OVERVIEW

PRACTICE AREAS

ATTORNEYS

NEWS

PUBLICATIONS

DECISIONS

THE MASSACHUSETTS
BANKRUPTCY PAGE

CONTACT

SITE MAP

DIRECTIONS

In re: LUDLOW HOSPITAL SOCIETY, INC., Debtor

Chapter 7, Case No. 95-40675-HJB

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
MASSACHUSETTS

December 30, 1997, Decided

Counsel: Thomas O. Bean, Esq., for Commonwealth.

Richard Erricola, Chapter 7 Trustee.

United States Trustee.

Judges: Henry J. Boroff, U.S. Bankruptcy Judge.

Author of Opinion:: Henry J. Boroff

MEMORANDUM OF DECISION

Before the Court for determination are cross motions for partial summary judgment with respect to objections filed by the Chapter 7 trustee (the "Trustee") of Ludlow Hospital Society, Inc. (the "Debtor") to claims filed by the Commonwealth of Massachusetts (the "Commonwealth") in this case.

I. Facts and Positions of the Parties

The Debtor operated as an acute hospital n1 in Massachusetts until February 17, 1995, when it filed a voluntary petition in this court under Chapter 7 of the Bankruptcy Code. The Massachusetts Rate Setting Commission (the "Commission"), Division of Medical Security ("DMS"), and Division of Medical Assistance ("DMA") (collectively the "Agencies") have each filed proofs of claim ("Claim Nos. 7, 8, and 191"). At issue is whether certain of those claims are entitled to priority, in whole or in part, under *11 U.S.C. § 507*(a)(8).

n1 Mass. Gen. Laws ch. 118F, § 2 (1988) defines an "acute hospital" as "any hospital which contains a majority of medical-surgical, pediatric, obstetric, and maternity beds as defined by the department of public health."

Claim No. 7, filed by the DMA, constitutes overpayments by the DMA for services rendered by the Debtor to Medicaid recipients. The parties have agreed that Claim No. 7 is an unsecured claim without priority, and its status is not at issue.

Claim No. 8, filed by the DMS, includes an alleged unsecured priority claim in the total amount of $519,298.00 (plus an unliquidated amount), related to the Massachusetts Uncompensated Care Pool (the "Pool") and the Labor Shortage Fund (the "Fund") (together the "DMS Priority Claims"). n2

n2 The remainder of the DMS claim, in the amount of $173,134.00, is for compliance liability. From 1983 through 1991, the state legislature regulated the amount hospitals could charge for services. 1991 Mass. Legis. Serv. ch. 495, § 56 (West). Hospitals which charged more than the amounts allowed were required to pay a portion of the excess to DMS. The parties agree that the compliance liability claim is a general unsecured claim.

Claim No. 191, filed by the Commission, asserts an unsecured priority claim in the amount of $96,645.62 (the "Commission Assessment").

The Trustee objects to the priority status of Claim Nos. 8 and 191, and moves for partial summary judgment. He asserts that the priority claims filed by the Commonwealth should be characterized as "regulatory fees," and should be treated as general unsecured debts. The Commonwealth responds with its own motion for partial summary judgment and argues that the subject claims constitute "excise taxes," and are thus entitled to priority under *11 U.S.C. § 507*(a)(8)(E). After hearing the cross motions for partial summary judgment, the Court took the matter under advisement.

II. Analysis

A. Summary Judgment

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c); *DeNovellis v. Shalala*, 124 F.3d 298, 305 (1st Cir. 1997). Both the Trustee and the Commonwealth have moved for partial summary judgment, and each claims that no genuine issue of material fact exists with respect to the priority of the Agencies' claims.

Where cross motions for summary judgment have been submitted, a court is not required to grant summary judgment as a matter of law for one side or the other side. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). A court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992), aff'd, 9 F.3d 1198 (7th Cir. 1993).

This Court agrees that no genuine issue of material fact exists with respect to the issues to be resolved herein. The issue of priority is one of law.

B. The Claims

In Massachusetts, every hospital must obtain a license to operate from the Department of Public Health. Mass. Regs. Code tit. 105, § 130.100. To maintain a license, hospitals are required to comply with Massachusetts laws governing health facility operations. Mass. Regs. Code tit. 105, §§ 130.130(B), (D), 130.104(A)(1). Massachusetts law requires hospitals to pay amounts due on account of the Pool, the Fund, and the Commission Assessment. Id. As a result, each hospital must pay these monies in order to maintain its license to operate in the Commonwealth.

1. The Pool

The first portion of the DMS's claim, allegedly in the amount of $469,423.00, is for the Debtor's unpaid contributions to the Pool. The Pool claim is based on Massachusetts General Laws ch. 118F, enacted as part of the Health Security Act of 1988. 1988 Mass. Legis. Serv. ch. 23, § 45 (West). n3

n3  Chapter 118F was intended "to promote the accessibility of health care services for the [Commonwealth's] citizens." Mass. Gen. Laws ch. 118F, § 1 (1988). DMS was established to implement a program of insurance coverage for health care services for residents of the Commonwealth who were not otherwise eligible for or covered by a health insurance plan. Id. § 3; see *Mass. Hosp. Ass'n, Inc. v. Dep't of Med. Sec.*, 412 Mass. 340, 342, 588 N.E.2d 679, 681 (1992).

Mass. Gen. Laws ch. 118F, § 15 (1988), which created the Pool, was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 18 (1996). These two statutes are substantially identical. Under Mass. Gen. Laws ch. 118G, § 18, the Division of Health Care Finance and Policy ("DHCFP") is responsible for operating the Pool. The DHCFP is the successor agency to the DMS and the Commission. In this case, the claim for monies due on account of the Pool and the Fund will be discussed in reference to the DMS since the DMS was in existence at the time these claims against the Debtor arose.

Under the statute, the DMS was directed to operate an uncompensated care pool for hospitals "to more equitably distribute the burden of financing uncompensated acute hospital services across all acute hospitals." *General Hosp. Corp. v. Rate Setting Comm'n*, 407 Mass. 227, 227-28, 552 N.E.2d 113, 114 (1990) (citing 1985 Mass. Legis. Serv. ch. 574, § 12 (West), codified at Mass. Gen. Laws ch. 6A, § 75 (1969) (repealed 1988)). Uncompensated care has been defined as "free care furnished to patients by hospitals and bad debts represented by unpaid bills for patient care." *General Hosp. Corp.*, 407 Mass. at 228, 552 N.E.2d at 114. The purpose of the Pool "is to cause each acute care hospital to assume financial responsibility for a percentage of total Statewide uncompensated care equal to the percentage of total Statewide private sector care (costs for the care of patients not insured by governmental programs) provided by that hospital." Id. In other words, hospitals providing proportionally more uncompensated care than the average provided by hospitals in the Commonwealth would receive payments from the Pool, while those providing proportionally less free care would make payments into the Pool. See *City of Boston v. Aetna Life Ins. Co.*, 399 Mass. 569, 583 n.16, 506 N.E.2d 106, 114 (1987) ("The costs of uncompensated care are distributed equitably among the acute care hospitals through a system that works somewhat like an assigned risk pool.").

The Pool is funded from revenues produced by hospital assessments, federal funds, and state revenues appropriated for the purpose of the Pool. Mass. Gen. Laws ch. 118F, § 15(1) (1988). "The statute establishes a complex formula for determining a hospital's liability to the Pool and the liability of the Pool to the hospital." *Massachusetts Hosp. Ass'n, Inc. v. Dep't Of Med. Sec.*, 412 Mass. 340, 343, 588 N.E.2d 679, 682 (citing Mass. Gen. Laws ch. 118F, § 15(2), (3) (1988)). The DMS is then charged with the responsibility of collecting and distributing payments to and from the Pool according to the statutory scheme and regulations developed by the DMS. Id. (citing Mass. Gen. Laws ch. 118F, § 15(4) (1988)).

2. The Fund

The second portion of the DMS claim, allegedly in the amount of $49,875.00, is for the Debtor's liability to the Fund. The Fund was established for the purpose of addressing a perceived critical shortage of health care workers in the Commonwealth. 1988 Mass. Legis. Serv. ch. 23, § 83 (West). The money from the Fund is devoted to finance projects to train health care workers, develop career ladders within the health care professions, and establish day care programs at hospitals and other health care facilities. Id.

Money for the Fund is provided by an assessment on each acute care hospital, in the amount of one-tenth of one percent of gross patient service revenues n4 of each said hospital. 1988 Mass. Legis. Serv. ch. 23, § 83 (West). The money collected from this assessment is placed in a trust fund segregated from the balance of the DMS's funds. 1988 Mass. Legis. Serv. ch. 23, § 83 (West), as amended by 1989 Mass. Legis. Serv. ch. 653, § 1 (West). The DMS was given authority to administer the Fund according to regulations developed by the DMS and approved the by the both the Secretaries of Human Services and of Administration and Finance. Id.

n4 Mass. Gen. Laws ch. 6B, § 1 (1991) defines "gross patient service revenue" as "the total dollar amount of a hospital's charges for services rendered in a fiscal year." Mass. Gen. Laws ch. 6B, § 1 (1991) was repealed and replaced by 1996 Mass. Gen. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 1 (1996). The definition of "gross patient service revenue" under Mass. Gen. Laws ch. 118G, § 1 (1996) remains unchanged.

3. The Commission Assessment

The Commission's alleged priority claim, in the amount of $96,645.52, arises under Mass. Gen. Laws ch. 6B, § 9 (1991). n5 Pursuant to the statute, the Commonwealth, through the Commission, annually assesses hospitals a percentage of the hospitals' approved gross patient service revenues to financially support the estimated expenses of the Commission. Mass. Gen. Laws ch. 6B, § 9 (1991).

n5 Mass. Gen. Laws ch. 6B, § 9 (1991), which created the Commission Assessment, was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 5 (1996). These statutes are very similar.

Under Mass. Gen. Laws ch. 118G, § 5, the assessment collected is to finance the operations of the DHCFP, the successor agency to the Commission. In this case, the claim will be discussed as the Commission Assessment since the Commission was in existence at the time this claim against the Debtor arose. As noted in footnote no. 3, the DHCFP is the successor agency to both the DMS and the Commission.

The Commission has the authority to improve the delivery and financing of health care services in the Commonwealth by establishing rates that governmental units pay to providers of health care services. Mass. Gen. Laws ch. 6A, § 32 (1973). n6 For example, the Commission sets the rates that Medicaid providers, such as local hospitals in Massachusetts, charge for their services. See *Massachusetts Hosp. Ass'n, Inc. v. Dep't of Public Health*, 419 Mass. 644, 647, 646 N.E.2d 1044, 1046 (1995). The Commission also sets rates for general health supplies, rehabilitative services, and accommodations. Mass. Gen. Laws ch. 6A, § 32 (1973). Finally, the Commission acts to ensure that costs being incurred to provide health care services are reasonable and necessary to meet the public needs, and that the money is being spent efficiently and economically. Id.

n6 Mass. Gen. Laws ch. 6A, § 32 (1973), which established the Commission was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 16 (1996).

C. Are the Claims Taxes or Fees?

Section 507(a)(8)(E) provides:

(a) The following expenses and claims have priority in the following order:

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition[.] Id.

The Bankruptcy Code does not define the terms "excise," "tax," or "excise tax." *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 135 L. Ed. 2d 506, 116 S. Ct. 2106, 2111 (1996). Nevertheless, the determination of whether a particular exaction is a "tax" within the meaning of the Bankruptcy Code is a question of federal law. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S. Ct. 1028, 1029, 85 L. Ed. 1333 (1941); New

*Jersey v. Anderson, 203 U.S. 483, 491, 27 S. Ct. 137, 139-40, 51 L. Ed. 284 (1906).* A state statute's characterization of an exaction as a tax is not determinative, and the label designated by the state does not control. Id.; see *In re Park, 212 B.R. 450, 432 (Bankr. D. Mass. 1997).* Rather, analysis of the exaction is necessary to determine whether it has the incidents of a tax within the meaning of § 507(a)(8)(E). *Reorganized CF & I Fabricators of Utah, Inc., 118 S. Ct. at 2110; New Neighborhoods Inc. v. West Virginia Workers' Compensation Fund, 886 F.2d 714, 718 (4th Cir. 1989); see In re Park, 212 B.R. at 432.*

In *Feiring*, the court defined taxes as "those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expense of government or of undertakings authorized by it." *313 U.S. 283, 285, 61 S. Ct. 1028, 1029, 85 L. Ed. 1333 (1941);* see *In re Park, 212 B.R. at 432.* Since *Feiring*, courts have employed tests that are semantically slightly different from, but substantively identical to, the Supreme Court's definition. *Sacred Heart Hosp. v. Pennsylvania Dep't of Labor and Indus. (In re Sacred Heart Hosp.), 209 B.R. 650, 654 (E.D. Pa. 1997).* The United States Court of Appeals for the Ninth Circuit has adopted a four-part test which has been widely accepted by several courts. *County Sanitation Dist. No. 2 of Los Angeles County v. Lorber Indus. of California (In re Lorber Indus. of California), 675 F.2d 1062, 1066 (9th Cir. 1982).* n7 Under the test, a tax for purposes of the Bankruptcy Code consists of: (a) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) imposed by, or under authority of the legislature; (c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) under the police or taxing power of the state. Id. The Sixth Circuit, finding the "public purpose" prong of Lorber too broad, refined that prong by establishing two additional criteria for characterizing a governmental assessment as a "tax." *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.), 36 F.3d 484 (6th Cir. 1994) ("Suburban II").* That court required, first, that the pecuniary obligation to the government be universally applicable to similarly situated entities, thus ensuring that the financial exaction's burden and benefit would inure to the general public welfare and not to a discrete entity; and, second, that according priority treatment to the government's claim not disadvantage private creditors with like claims. *Id. at 488-89;* see *In re Park, 212 B.R. at 434.*

n7 Although the Lorber test was developed for Bankruptcy Act cases, it has been employed by the Bankruptcy Appellate Panel of the Ninth Circuit under the Code. See *In re George, 95 B.R. 718, 720 (B.A.P. 9th Cir.1989); aff'd, 905 F.2d 1540 (9th Cir. 1990).* Thus, the test has continuing viability. See *In re Cassidy, 983 F.2d 161 (10th Cir. 1992); Indus. Comm'n of Arizona v. Camilli (In re Camilli), 94 F.3d 1330 (9th Cir. 1996),* cert. denied,     U.S.     , 136 L. Ed. 2d 840, 117 S. Ct. 953 (1997); *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.), 36 F.3d 484 (6th Cir. 1993); In re Park, 212 B.R. 430 (Bankr. D. Mass.1997); Sacred Heart Hosp. v. Pennsylvania Dep't of Labor and Indus. (In re Sacred Heart Hosp.), 209 B.R. 650 (E.D. Pa. 1997); In re Chateaugay Corp., 177 B.R. 176 (S.D.N.Y. 1995); In re S.N.A. Nut Co., 188 B.R. 392 (Bankr. N.D. Ill. 1995).*

If a governmental assessment is not a "tax," then it may be a "regulatory fee." In distinguishing between a regulatory fee and a tax, the Supreme Court has held that if the agency exacting the charge "bestows a benefit on the applicant, [which is] not shared by members of society," then the charge is a fee. *National Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 340-41, 94 S. Ct. 1146, 1148-49, 39 L. Ed. 2d 370 (1974).* Similarly, courts have uniformly held that a fee, as opposed to a tax, relates to an individual privilege afforded to the payer. *United States v. River Coal Co., Inc., 748 F.2d 1103, 1106 (6th Cir. 1984);* see *Oregon v. Robert K. Morrow, Inc. (In re Belozer), 199 B.R. 720 (B.A.P. 9th Cir. 1996)* (assessments imposed by state commodity on purchaser of fryer chickens were fees since agency used assessment for the primary benefit of payer, rather than general public); *Spiers v. Ohio Dep't Natural Resources (In re Jenny Lynn Mining Co.), 780 F.2d 585 (6th Cir. 1986)* (permit fee for right to engage in strip mining is not a tax), cert. denied, *477 U.S. 905, 106 S. Ct. 3276, 91 L. Ed. 2d 566 (1986); In re Lorber, 675 F.2d 1062 (9th Cir. 1982)* (sewer and water user fees charged in amount proportionate to user's voluntary use of system are not taxes); *In re South Atlantic Packers Ass'n, Inc., 28 B.R. 80 (Bankr. D.S.C. 1983)* (poultry inspection fees are not taxes but merely charges for voluntary governmental services).

Excise taxes, on the other hand, are involuntary payments imposed to serve a public purpose. *United Mine Workers of America v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal, Co.), 99 F.3d 573, 583 (4th Cir. 1996)* (obligation imposed to "restore financial stability to coal miner's benefit plans" is a tax because it serves a public purpose and is an involuntary pecuniary burden); *River Coal Co., Inc., 748 F.2d at 1106* (reclamation fee imposed on strip mine operators is a tax since fee did not confer an individual benefit on the mine operator not enjoyed by the public generally); *Pan American Paper Mills, Inc., 618 F.2d 159, 162 (1st Cir. 1980)* (premiums paid under worker's compensation law are taxes because purpose is to defray governmental expense of reimbursing injured employees from accidents); *In re Sacred Heart Hosp., 209 B.R. at 656* (payments to state in lieu of debtor's contribution under unemployment compensation law are excise taxes because payments are used to benefit public generally).

The Trustee asserts that the above tests should not be relied upon by this Court. Instead, the Trustee argues that the proper test was enunciated by the United States Court of Appeals for the First Circuit in *San Juan Cellular Tel. Co. v. Pub. Serv. of Puerto Rico, 967 F.2d 683 (1st Cir. 1992).* In San Juan Cellular, a case under 28 U.S.C. § 1341 (the "Tax Injunction Act"), the court held that a periodic fee due from private, but not governmentally owned providers of cellular telephone service, was a regulatory fee, rather than a tax. *San Juan Cellular, 967 F.2d at 685.* In distinguishing a "tax" from a "fee," the court recognized that a "classic 'tax' is imposed by a legislature upon many, or all, citizens [ . . . for the purpose of] raising money, contributed to a general fund, and spent for the benefit of the entire community" while a "classic 'regulatory fee' is imposed by an agency upon those subject to its regulation . . . [for] regulatory purposes . . . by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." *Id. at 685 (citing cases).* Further, the court noted:

Courts facing cases that lie near the middle of this spectrum have tended (sometimes with minor differences

reflecting the different statutes at issue) to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides a more narrow benefits to regulated companies or defray's the agency's cost of regulation. Id.

This Court disagrees with the Trustee's assertion that San Juan Cellular represents an approach different from what appears to be a well-settled line of cases commencing with Feiring. Notwithstanding the fact that San Juan Cellular was decided under the Tax Injunction Act, this Court finds the thoughts expressed by the First Circuit in San Juan Cellular virtually indistinguishable from those expressed by the Ninth and Sixth Circuits in Lorber and Suburban II, both decided under the Bankruptcy Code.

Therefore, this Court will apply the test set by Lorber as modified by Suburban II, as mirrored by the distinctions drawn in San Juan Cellular, to determine whether the assessments by the Agencies are excise taxes for bankruptcy purposes. See Indus. Comm'n of Arizona v. Camilli (In re Camilli), 94 F.3d 1330 (9th Cir. 1996), cert. denied, ___ U.S. ___, 136 L. Ed. 2d 840, 117 S. Ct. 953 (1997); Suburban II, 36 F.3d 484; In re Sacred Heart Hosp., 209 B.R. 650; In re Park, 212 B.R. 430; In re Olga Coal Co., 194 B.R. 741 (Bankr. S.D.N.Y. 1996); In re S.N.A. Nut Co., 188 B.R. 392 (Bankr. N.D. Ill. 1995).

### F. Application to Present Case

The Trustee argues that the Debtor voluntarily chose to do business as a hospital in the Commonwealth, and, as a result, privately enjoyed the benefit of the services provided by the DMS and the Commission. The Commonwealth contends that the obligation to pay fees due under the Pool, the Fund, and the Commission Assessment is mandatory and the money collected by the assessments serves a public purpose by helping to increase the availability and quality of healthcare services in the Commonwealth. n8

n8 The Commonwealth asks this Court to specifically note for support Judge Feeney's action in the case of In re Winthrop Hospital, Inc., 92-14034 (Bankr. D. Mass. 1995). In Winthrop Hospital, Judge Feeney ordered that "DMS's claims against the Debtor arising under the Uncompensated Care Pool and Labor Shortage Fund are entitled to priority under Bankruptcy Code section 507(a)(8)." Judge Feeney's ruling cannot be relied upon as precedent for this case. The Winthrop Hospital "decision" referred to by the Commonwealth is merely an order approving the parties' motion to compromise. As a result, Winthrop Hospital has no precedential value.

That the assessments are imposed by the authority of the legislature and created under the police or taxing power of the state is beyond dispute. Therefore, the second and fourth prongs of the Lorber test are met. The first prong of the Lorber test (involuntariness) is met as well, since all hospitals are required to comply with the mandates of the Pool, the Fund, and the Commission Assessment. See Mass. Regs. Code tit. 105, §§ 130.130 (B),(D), 130.104(A)(1); see also In re Camilli, 94 F.3d at 1333 (debtor's obligation to reimburse state for worker's compensation paid to debtor's uninsured employee was an involuntary pecuniary burden under Lorber because obligation to reimburse state was a statutorily created obligation); In re Suburban Motor Freight, 134 B.R. 617, 622 (Bankr. S. D. Ohio 1991) aff'd, 156 B.R. 790 (S. D. Ohio 1992) aff'd, 998 F.2d 338 (6th Cir. 1993) (obligation for workman's compensation premiums was involuntary under Lorber since assessment is mandatory and noncomplying employer is subject to a state lien); In re Sacred Heart Hosp., 209 B.R. at 656 (payments to state in lieu of debtor's contribution to state unemployment compensation law was involuntary under Lorber since all employers must pay). Therefore, the remaining issue is whether the obligations of the Pool, the Fund, and the Commission Assessment are imposed for a public purpose or to provide a private benefit to hospitals.

### 1. The Pool

The Pool delivers an unmistakable benefit enjoyed by all taxpayers. Its enabling statute provided that its purpose was to "promote the accessibility of health care services for all of [the Commonwealth's] citizens, a public purpose for which public money may be expended." Mass. Gen. Laws ch. 118F, § 1 (1988) (emphasis added). As set forth by the Commonwealth, reimbursing hospitals for uncompensated care reduces the chance that people without access to health insurance will make demands on Medicaid and the Commonwealth's welfare systems, and thus all taxpayers. See In re Sacred Heart Hosp., 209 B.R. at 656. Therefore, the assessments under the Pool confer a benefit to the public generally, rather than an individual benefit to an acute hospital.

Further, the assessments under the Pool satisfy the two "public purpose" factors articulated by the Sixth Circuit in Suburban II. See In re Sacred Heart Hosp., 209 B.R. at 656. The obligation to the Pool is universally imposed on all acute hospitals in the Commonwealth, and there are no private creditors with claims sufficiently similar to the Agencies who would suffer any disadvantage by conferring priority treatment to a Pool claim. n9 Id.

n9 In a recent case decided in this district, Judge Queenan held that a claim for reimbursement of worker's compensation benefits paid by the Commonwealth to an injured employee of an uninsured employer did not qualify for priority status as an excise tax. In re Park, 212 B.R. 430 (Bankr. D. Mass. 1997). The court found that in Massachusetts all employers were required to pay premiums to the workers' compensation system, but only uninsured employers were subject to reimbursement liability. Id. In applying the Suburban II criteria, the court determined that the reimbursement burden was not universally applied to similarly situated constituents, since all employers were not required to pay reimbursement claims. Id. Therefore, Judge Queenan found that the claim for reimbursement was not entitled to priority under the Code. This Court agrees with the result of that case.

In view of the foregoing, this Court finds that the money collected for the Pool is imposed for a public purpose, and as a result, the Pool claim is entitled to priority status under § 507(a)(8)(E).

2. The Fund

The Fund was established by 1988 Mass. Legis. Serv. ch. 23, § 83 (West), an act to make health security available to all citizens of the Commonwealth and to improve hospital financing. Although the enabling legislation states that its purpose was to address a critical labor shortage facing hospitals, there is no legislative indication as to whether the Fund was established solely to assist hospitals or whether it was also intended to serve the purpose of hiring more workers to provide health care services to the public at large. n10

n10 In 1989, section 83 creating the Fund was amended. 1989 Mass. Legis. Serv. ch. 695, § 1 (West). Among other changes, the amendment provided that the Fund "revenues shall be received impressed with a trust for the benefit of hospitals, other health care providers, and present and future health care workers." Id. Nevertheless, this additional language does not conclusively determine whether the Fund's purpose was solely to benefit hospitals or also to serve a benefit to the public.

In support of its motion for summary judgment, the Commonwealth has submitted the affidavit of John Daley, Executive Secretary of the Commission, and now its successor agency, the Division of Health Care Finance and Policy (the "Affidavit"). n11 In his Affidavit, Daley details how money collected by the Pool, the Fund, and the Commission Assessment are administered to help support the Commonwealth. Daley avers that such funding improves the availability and quality of health care services, controls the cost of health insurance premiums, and allows the Agencies to operate and assist in the formulation of health care policy in the Commonwealth. Daley Aff. P 15. Daley's Affidavit further defines certain problems that have been and would be encountered by the Commonwealth without the collection of such monies, including increases in the cost of health care, lack of trained health care workers, and an increase in the spread of disease. Daley Aff. P 10.

n11 The Trustee does not directly contest the assertions in Daley's affidavit. Rather, the Trustee requests that the Affidavit be stricken because it offers conclusions on the ultimate issue of law presented in this case. Under Rule 56(e) of the Federal Rule of Civil Procedure, an affidavit may be presented to support a motion for summary judgment. The affidavit must: (1) be made on personal knowledge, (2) set forth such facts as would be admissible in evidence, and (3) show affirmatively that the affiant is competent to testify to the matters stated therein. *Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668, 681 (1st Cir. 1994); Paton v. La Prade, 524 F.2d 862, 871 (3d Cir. 1975).* A court may consider testimony that would be admissible at trial and disregard the rest. *Fidler v. Central Cooperative Bank (In re Fidler), 210 B.R. 411, 422 (Bankr. D. Mass. 1997).* Accordingly, a court must disregard an expert affidavit that is essentially conclusory and lacks specific facts. Id. (citing *Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1144 (3d Cir. 1990)).* Statements that embody conclusions will not be treated as evidencing facts to support a motion for summary judgment. *In re Farley, Inc., 203 B.R. 681, 683 (Bankr. N.D. Ill. 1997).*

With these admonitions in mind, this Court finds that the Daley Affidavit is appropriate for reliance by this Court. Daley has served as Executive Secretary of the Commission for thirty-two years. Daley Aff. P 1. Daley's duties include operation of the Commission, management of its financial affairs, and fulfillment of the Commission's statutorily mandated programs. Daley Aff. P 2. The staff under Daley's direction are responsible for processing funds received and expenditures made at the agency level, and for administering funds, including the Fund and the Pool, in conformance with applicable law. Id. Therefore, it is indisputable that Daley's affidavit is based on his personal knowledge and that he is competent to testify to the issues stated herein.

The assertion that Daley's affidavit is conclusory is itself not convincing. The facts averred to by Daley attempt to explain the purpose behind the statutory programs the agency is responsible for administering. A court should defer to an agency's expertise so long as its averment is supported by substantial evidence and is reasonable. See *Northeast Utilities Serv. Co. v. Fed. Energy Regulatory Comm'n, 993 F.2d 937, 944 (1st Cir. 1993);* see also *Chevron USA v. Natural Defense Resources Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984).* It is well-settled that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. See *Chevron USA v. Natural Defense Resources Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984).* Moreover, an agency's interpretation should be deferred to whenever a decision as to the meaning and reach of a statute involves reconciling conflicting policies, and a full understanding of the force of the statutory policy depends upon more ordinary knowledge respecting the matters subjected to agency regulation. Id. But see *In re J.F.D. Enterprises, Inc., 183 B.R. 342, 349-51(Bankr. D. Mass. 1995)* (where the surrounding circumstances mandated the opposite conclusion).

The facts averred to by Daley are consistent with the underlying statute. Moreover, Daley does not attempt to give a legal analysis or conclude that the governmental assessments at issue are excise taxes. Therefore, Daley's affidavit cannot be said to decide the law and may be relied upon by the Agencies to support its motion for summary judgment.

In Daley's affidavit, he avers that in the late 1980's, there was a shortage of trained health care workers in the Commonwealth. Daley Aff. P 4. That shortage increased the cost of health care, and therefore health insurance premiums, by driving up wages for health care workers, and by requiring hospitals to expend money recruiting employees from places outside the Commonwealth. Id. The higher cost of health care was particularly felt by the Commonwealth because it is the largest employer in the state and because it funds the Medicaid program which

provides health care to low-income persons. Id. Daley avers that the increased costs also impaired the public's ability to obtain access to such health care by delaying hospital admissions and even out-patient care due to the shortage of hospital personnel. Id.

An increase in health care workers serves a benefit not only to the hospitals but to the public generally. The health care industry by its very nature promotes a public purpose by ensuring that all citizens gain access to health care. Moreover, the Court determines it reasonable to find, as Daley avers, that a shortage of qualified workers limits the public's access to health care services and increases the costs to the Commonwealth to fund public health services. The money collected from the Fund, therefore, serves a public purpose in defraying the costs the Commonwealth would be required to spend to provide health care services to its residents.

Further, the Fund satisfies the requirements of Suburban II. First, the obligation is universally imposed on all acute hospitals in the Commonwealth. See In re Sacred Heart Hosp., 209 B.R. at 656. Second, granting priority to the Commonwealth's claim under the Fund does not disadvantage private creditors since there are no private creditors with claims sufficiently similar to that of the Agencies. Id.

In view of the foregoing, this Court finds that the money collected for the Fund is imposed for a public purpose, and as a result, the Fund claim is entitled to priority status under § 507(a)(8)(E).

3. The Commission Assessment

The Commission Assessment is different in character from the Pool claim and the Fund claim. The purpose of the assessment was to pay the expenses of the Commission, whose primary function is rate-setting. n12

- n12 In addition to setting rates, the Commission also "collects, analyzes and disseminates health care data to assist in the formation of health care policy." Daley Aff. P 15.

Several courts have held that where an exaction is imposed to fund a regulating government agency, the public purpose element is not met if the benefit conferred by the agency is not generally shared. For example, in In re Jenny Lynn Mining, 780 F.2d 585, 589 (6th Cir. 1986), the Sixth Circuit determined that a "permit fee" did not involve a "public benefit" despite the fact that a portion of the funds were used to fund a regulating government agency. Id. at 589. The court stated that "one purpose of most governmentally imposed fees is to support the agency that administers the program under which the fee is charged, presumably serving some public purpose. If this were the deciding factor, all such fees would be 'taxes' for bankruptcy purposes." Id.

Similarly, in In re S.N.A. Nut Co., 188 B.R. 392, the court found that the California Walnut Commission, although a governmental agency, was like a trade association which promoted its own interests, and not the interests of the public at large. In re S.N.A. Nut Co., 188 B.R. at 396. The Commission was established by the Legislature to maintain and expand the walnut industry in California, and to provide information to the public regarding the beneficial qualities of walnuts, and the production and distribution costs necessary to make them available. Id. at 392. The court determined that the assessments imposed on the walnut producers to defray the costs of operating the commission clearly served a private purpose. The court found that "the assessment funds are utilized to create a common pool fund for the advertisement, marketing, and promotion of walnuts–activities which bestow a discrete, private benefit to the walnut industry." Id. at 395; see also In re Belozer Farms, Inc., 199 B.R. at 726 (assessments imposed on debtor by state fryer commission were collected in the interest of the general welfare of the producers of the commodity, not the interests of the public).

This Court finds the Commission different in character from bodies which have regulated primarily private enterprises and only incidentally promoted the public interest. As the First Circuit noted in San Juan Cellular, not all assessments can be neatly categorized as a "classic tax" or a "classic regulatory fee." San Juan Cellular, 967 F.2d at 684. In this case, with the authority to set rates that governmental units pay to the providers of health care services, the Commission plays an important role with respect to the delivery and financing of health care services for all citizens. Notwithstanding the assessment's overriding purpose to "defray the agency's cost of regulation," Id., the regulation itself promotes the public interest.

And finally, as with the Pool and Fund claims, the Commission Assessment satisfies the requirements of Suburban II. First, the obligation is universally imposed on all acute hospitals in the Commonwealth. See In re Sacred Heart Hosp., 209 B.R. at 656. Second, granting priority to the Commonwealth's claim under the Fund does not disadvantage private creditors since there are no private creditors with claims sufficiently similar to that of the Agencies. Id.

In view of the foregoing, this Court finds that the Commission Assessment is imposed for a public purpose, and, as a result, the Commission claim is entitled to priority status under § 507(a)(8)(E).

III. Conclusion

Based on the foregoing analysis, this Court finds and rules that each of the Pool, Fund and Commission claims, in such amounts as this Court shall ultimately allow, are entitled to priority status under § 507(a)(8)(E). Accordingly, the Commonwealth's motion for partial summary judgment is allowed and the Trustee's motion for partial summary judgment is denied. An order will be issued in conformity herewith.

Dated: December 30, 1997

By the Court,

Henry J. Boroff

U.S. Bankruptcy Judge

ORDER

For the reasons set forth in this Court's Memorandum of Decision issued this date, the Court allows the motion for partial summary judgment filed by the Commonwealth of Massachusetts and denies the motion for partial summary judgment filed by the Chapter 7 trustee; in that the Court deems the claim filed by the Massachusetts Division of Medical Security on account of the Uncompensated Care Pool and the Labor Shortage Fund and the claim filed by the Massachusetts Rate Setting Commission to be all claims entitled to priority, pursuant to 11 U.S.C. § 507(a)(8).

Dated: December 30, 1997

By the Court,

Henry J. Boroff

U.S. Bankruptcy Judge

A service of Craig and Macauley. All rights reserved.  Privacy Statement
Use of this site constitutes your acceptance of these  Terms of Use.
Site by: NIMZ Communication Technologies

026















CONTACT

SITE MAP

DIRECTIONS

In re BOSTON REGIONAL MEDICAL CENTER, Debtor

Chapter 11, Case No. 99-10860-CJK

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
MASSACHUSETTS, EASTERN DIVISION

*264 B.R. 222; 2001 907; 38 Bankr. Ct. Dec. 26*

June 25, 2001, Decided

June 25, 2001, Entered on Docket

**DISPOSITION:**

Debtor's objection to the priority of the claim of the Massachusetts Division of Health Care Finance and Policy under G. L. c. 118G, § 18 (the "Uncompensated Care Pool Claim") overruled; Division's Uncompensated Care Pool Claim ALLOWED as a priority excise tax claim under *11 U.S.C. § 507(a)(8)(e)* in the agreed amount of $ 1,702,714.00; Division's Compliance Liability Claim ALLOWED as a nonpriority unsecured claim in the amount of $ 123,866.00. Balance of the Claim of the Massachusetts Division of Health Care Finance and Policy DISALLOWED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** After confirmation of its liquidating Chapter 11 plan, debtor hospital filed an objection to state creditor's claim, which claimed amounts owing by the hospital under Mass. Gen. Laws ch. 118G, § 18, to the state's Uncompensated Care Pool (Pool). Debtor asserted the amounts were not properly deemed excise taxes within the meaning of *11 U.S.C.S. § 507(a)(8)(e)* and thus were not entitled to priority.

**OVERVIEW:** The court found that the obligation was involuntary. The assessment was primarily for the public welfare, not for the benefit of the hospital. It taxed private sector revenues to pay for free care. The purpose was public. The fact that two hospitals having the same financial profiles for a given year would have the same liability, was enough for it to be universally applicable to similarly situated entities. The assessment established a debt due in some amount, and specified a formula for determining the amount. The fact that the amount was contingent on variables was not disqualifying, nor was the lack of an automatic lien. Also, the statute did give a lien in the form of a right to an offset of payments on Medicaid claims. The tax character of the debt was not dependent on how badly the claimant required priority classification. It was a tax, not a fee. A fee would normally be a charge whose purpose was to defray the governmental expense of regulating a particular entity. While the assessments were used only to fund acute care hospitals, and that benefit differed in kind from any that passed through to the general public, the assessment did not thereby become a fee.

**OUTCOME:** The debtor's objection to the priority of the creditor state's claim was overruled. The claim was allowed as a priority excise tax claim.

Counsel:

D. Ethan Jeffrey, Esq., for Debtor.

Daniel J. Hammond, Esq., for Massachusetts Division of Health Care Finance and Policy.

United States Trustee.

**Judges:** Carol J. Kenner, United States Bankruptcy Judge.

**Author of opinion:** Carol J. Kenner

MEMORANDUM OF DECISION ON DEBTOR'S OBJECTION TO CLAIM OF MASSACHUSETTS DIVISION OF HEALTH CARE FINANCE AND POLICY

The issue presented by the Debtor's objection to claim is whether amounts owing by the Debtor hospital under Massachusetts law, G. L. c. 118G, § 18, to the Commonwealth's Uncompensated Care Pool are properly deemed excise taxes within the meaning *11 U.S.C. § 507 (a)(8)(e)*. For the reasons set forth below, the Court holds that the obligation is an excise tax and therefore enjoys priority under § 507(a)(8)(e).

### Facts And Procedural History

Before it commenced this bankruptcy case, Boston Regional Medical Center ("the Debtor") owned and operated a 195-bed private, acute-care hospital in Stoneham, Massachusetts. The Debtor filed its petition for relief under Chapter 11 on February 4, 1999, then discontinued operations, began liquidating its assets, and obtained confirmation of a liquidating Chapter 11 plan.

On December 15, 1999, the Commonwealth of Massachusetts, by its Division of Health Care Finance and Planning ("the Division"), timely filed a proof of claim in this case for $ 2,440,260.49 plus additional unliquidated amounts, with at least $ 2,223,817 of the claim having priority status under 11 U.S.C. § 507(a)(8). The Debtor, as liquidating agent under the confirmed plan, objected to the amount and priority of the claim. After discovery, the parties now agree on the amount of the claim: $ 1,702,714 for obligations under G.L. c. 118G, § 18, to the Commonwealth's Uncompensated Care Pool (the "Uncompensated Care Pool Claim") n1; and $ 123,866 for an obligation that the parties refer to as "Compliance Liability." The parties agree that the Compliance Liability portion of the claim is a nonpriority, unsecured claim, and that the amount of this portion of the claim will increase to the extent that the Debtor succeeds in avoiding and recovering for the estate under 11 U.S.C. § 547 a prepetition payment on the Compliance Liability debt.

The parties agree that the claim in its entirety arose prepetition.

The Debtor has filed a still-pending complaint under § 547 to avoid a prepetition payment of $ 20,644.36 by the Debtor to the Commonwealth on the Compliance Liability debt.

The only issue remaining in dispute concerns the priority of the Uncompensated Care Pool Claim: whether the obligation is an excise tax within the meaning of § 507(a)(8)(E) or, as the Debtor contends, only a nonpriority unsecured claim. The issue is entirely one of law, the parties having stipulated to the facts and submitted the matter for adjudication on the facts presented in their stipulation.

The Court held an evidentiary hearing on February 8, 2001; however, neither party adduced evidence at that time because no facts were in dispute. See Evidentiary Stipulation filed February 7, 2001.

### The Uncompensated Care Pool

The Uncompensated Care Pool is a creature of Massachusetts law. Since 1996, the Pool has been governed by G.L. c. 118G, § 18 n4 and administered by the Division of Health Care Finance and Policy. The Pool is part of the Uncompensated Care Trust Fund, whose purpose is "to provide access to health care for low income uninsured and underinsured residents of the Commonwealth." G.L. c. 118G, § 18(a). The Pool furthers this goal by equitably redistributing the burden of financing uncompensated acute hospital services among all acute care hospitals ("the hospitals") in the Commonwealth. n5 To make a complex statute simple: section 18 creates a fund, the Pool, in part with periodic assessments against the hospitals' private sector charges" n6 and in part with other governmental monies and assessments n7; and then it distributes this fund among the hospitals in proportion to the amount of otherwise-uncompensated care each provides. n8 A hospital's liability to the Pool— that is, the assessment against its private sector charges—is equal to "the product of (1) the ratio of its private sector charges to all acute hospitals' private sector charges; and (2) the private sector liability to the uncompensated care pool as determined by law less [certain surcharges]." G.L. c. 118G, § 18(e). Each hospital's total assessment for a fiscal year is setoff against the Pool's liability to the hospital for uncompensated care during the same period, resulting in either a net liability to the Pool or a net distribution from the Pool. Thus the Pool charges the hospitals' collective private sector revenue to pay for the hospitals' collective burden of uncompensated care, resulting, at bottom, in a net transfer of revenue from those hospitals that provide less uncompensated care (as a proportion of the hospitals' total patient service charges) to those that provide more.

G.L. c. 118G, § 18 was added by St. 1996, c. 151, § 275, which repealed and replaced an earlier and substantially identical version of the same law, which was codified at G.L. c. 118F, § 15 (added by St. 1988, c.23, § 45). The debt at issue in this case relates to calendar years 1996 through 1999. The Commonwealth cites G.L. c. 118G, § 18 as the basis for the entire amount of its claim, so I conclude that the claim is governed entirely by that statute and not by an earlier version of the law.

See General Hospital Corp. v. Rate Setting Comm'n, 407 Mass. 227, 228, 552 N.E.2d 113 (1990), stating, with respect to an earlier version of the Massachusetts Uncompensated Care Pool law, that the purpose of the Pool is "to more equitably distribute the burden of financing uncompensated acute hospital services across all acute hospitals."

"Private Sector Charges" is defined as gross patient service revenue attributable to all patients less the portion thereof that is attributable to Medicare, Medicaid, other publicly aided patients, free care, and bad debt. G.L. c. 118G, § 1.

G.L. c. 118G, § 18(d).

See G.L. c. 118G, § 18(h) and (k) for the manner in which the Pool's liability to each hospital is to be calculated.

The amounts collected by the Uncompensated Care Pool must be expended for the Pool's own purposes, G.L. c. 118G, § 18(d), and therefore may not be used to fund other governmental programs or to defray the costs

of state government.

Section 18 does not provide for an automatic lien to secure payment of amounts owed to the Uncompensated Care Pool. However, it does permit the Division to establish appropriate mechanisms for enforcing a hospital's liability to the Pool, including by offset of payments on the "Title XIX" claims of any hospital. n9 G.L. c. 118G, § 18(g).

In G.L. c. 118G, "Title XIX" means Title XIX of the Social Security Act, *42 U.S.C. § 1396 et seq.*, entitled "Grants to States for Medical Assistance Programs" and known as Medicaid. G.L. c. 118G, § 1, definition of "Title XIX."

## Discussion: What is an Excise Tax?

Section 507(a)(8)(E) of the Bankruptcy Code gives priority to an allowed unsecured claim of a governmental unit to the extent that such claim is for an "excise tax" on certain transactions. n10 Here, the Debtor objects to the priority of the claim on the basis that a debt to the Uncompensated Care Pool is not an "excise tax" within the meaning of § 507(a)(8)(E). n11 In addressing this precise objection in another case, Judge Boroff in this District held that obligations to the Pool are excise taxes and thus entitled to priority status under § 507(a)(8)(E). *In re Ludlow Hospital Society, Inc., 216 B.R. 312, 318-320 (Bankr.D.Mass. 1997).* I agree with his reasoning and conclusion and write further here only to address those of the Debtor's arguments that the *Ludlow Hospital* opinion does not expressly address, including the Debtor's challenges to its reasoning. In doing so, I am mindful that, because priority contravenes the fundamental bankruptcy principle of equality of distribution among creditors, the claimant bears the burden of proving its entitlement to priority, *In re Hemingway Transport, Inc., 954 F.2d 1, 4-5 (1st Cir.1992),* and that courts construe the priority provisions of the Bankruptcy Code narrowly. *Woods v. City National Bank & Trust Co. of Chicago, 312 U.S. 262, 268, 61 S. Ct. 493, 85 L. Ed. 820 (1941).*

Section 507(a)(8)(E) states:

(a) The following expenses and claims have priority in the following order: ...

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

11 U.S.C. § 507(a)(8)(E).

The Debtor denies only that this type of obligation is an excise tax. The Debtor does not dispute that the transactions from which the obligations arise are of a kind specified in § 507(a)(8)(E)(i) or (ii).

As for the meaning of tax in § 507(a)(8), I follow the same approach as I set forth in a earlier memorandum of decision in this same case: *In re Boston Regional Medical Center, Inc., 256 B.R. 212, 220 (Bankr.D.Mass. 2000).*

### (i) Involuntary Pecuniary Burden

In order for an obligation to qualify as a tax, it must, among other things, be an "involuntary" obligation. The Debtor argues that a hospital's liability to the Uncompensated Care Pool is not involuntary because a hospital can regulate its liability to the pool by controlling the amount of free care it provides. The Court disagrees. By this reasoning, the federal income tax would not be a tax because an individual can minimize and even avoid his or her tax liability, such as by earning more or less income (or none at all) and taking advantage of various deductions, exemptions, and credits. Similarly, local real estate taxes would not be taxes because they are assessed against property owners, and home ownership is voluntary. As I have ruled elsewhere, Congress plainly cannot have meant the definition of "tax" to incorporate so expansive a standard of voluntariness; the Debtor's standard would exclude virtually every obligation we know as a tax. *In re Boston Regional Medical Center, Inc., 256 B.R. at 220-221.* It suffices that, under the statute, a hospital having a net liability to the Pool has no option but to pay it. The obligation at issue is not optional but involuntary.

### (ii) Primarily for the General Welfare

To constitute a tax, an assessment must be levied primarily for the general public welfare, not primarily for the benefit of the obligor. The Debtor argues that the primary beneficiaries of payments to the Uncompensated Care Pool are the hospitals that fund the pool: they benefit by allocating the risk of free care among all acute care

hospitals and by creating a source of payment for the free care they provide. Only the hospitals may receive disbursements from the Pool; the public does not share in these funds.

The Court agrees with Judge Boroff that the purpose of this assessment is primarily for the public welfare, not for the benefit of the paying hospital. It is true that the assessment benefits the Commonwealth's acute care hospitals as a group by redistributing the burden of free care among them, but it is not true that the assessment benefits the hospital against whom it is levied. A hospital having a net liability to the Pool for any given fiscal year is, by definition, one to whom the Pool will not make a distribution for that year. Funds paid into the Pool do not return to or benefit the payor hospital. Moreover, the Pool's ultimate and intended beneficiaries are the low income uninsured and underinsured residents of the Commonwealth who need free care, especially at hospitals where free care constitutes a disproportionate—and therefore financially threatening—share of the hospital's patient care. The Uncompensated Care Pool assessment essentially taxes private sector revenues in one part of the state's network of acute care hospitals to pay for free care in another. For these reasons, the purpose of this assessment is not private but public in the way that taxes need be.

### (iii) Universally Applicable to Similarly Situated Entities

Another requirement of a tax is that it be universally applicable to similarly situated entities. n13 The Debtor argues that the Uncompensated Care Pool does not apply equally to all similarly situated acute care hospitals because, in various ways, it favors those hospitals for whom free care constitutes a disproportionate share of the hospital's patient care. The flaw in this argument is that hospitals are *not* similarly situated precisely insofar as they have different ratios of private sector charges to free care. Under the statute in question, the assessment varies with this ratio (among other variables). But virtually every tax applies differently to different entities, the amount of the tax being a function of one or more variables, so this characteristic of the obligation is not disqualifying. See *In re Boston Regional Medical Center, Inc., 256 B.R. at 224.* Under the statute in question, two hospitals having the same financial profiles for a given year will have the same liability to the Pool. That is enough.

*Suburban Motor Freight, Inc., 36 F.3d 484, 488-489; New Jersey v. Anderson, 203 U.S. 483, 492, 51 L. Ed. 284, 27 S. Ct. 137 (1906)* (a yearly license fee on corporations was deemed a tax for purposes of priority under the Bankruptcy Act because, among other things, it was imposed on all corporations); *Workers' Compensation Trust Fund v. Saunders, 234 B.R. 555, 565* (claim of Commonwealth's Workers' Compensation Trust Fund against estate of uninsured employer for reimbursement of payments made to injured worker was discretionary, not universally applicable and therefore not a tax under § 507(a)(8)).

### (iv) Amount Fixed By Statute

The Debtor next argues that liability to the Uncompensated Care Pool is not a tax because its amount is, in part, contingent on the extent of Medicare and Medicaid payments for services that would otherwise qualify as free care. The Pool need not reimburse hospitals for services paid for by Medicare and Medicaid; therefore the level of the assessment needed to fund the reimbursement is contingent on the extent of Medicare and Medicaid payments for otherwise free care. Thus the liability, argues the Debtor, is not fixed by statute and cannot be a tax.

In order to qualify as a tax, an assessment must be fixed by statute, but it need not be fixed absolutely. Almost every tax is fixed as a percentage of a variable (such as income, sales price, or property value) or a function of many variables (as with the federal income tax), so the statute need not specify the absolute amount of the tax. Rather, it need only (1) establish that an obligation shall be due in some amount and (2) specify a formula by which the amount can be determined. See *In re Boston Regional Medical Center, Inc., 256 B.R. at 224.* The statute does these things. The fact that the amount of the tax is contingent on variables is not disqualifying.

### (v) Statutory Lien

The Debtor argues that the obligation at issue is not a tax because the Uncompensated Care Pool statute does not provide for an automatic lien (such as secures local property taxes in Massachusetts) to secure payment of the obligation, as tax statutes sometimes do. This Court has held that the lack of an automatic lien is not necessarily disqualifying, depending on the nature of the assessment at issue. See *In re Boston Regional Medical Center, Inc., 256 B.R. at 221 n. 5.* But I need not determine the disqualifying effect that lack of a lien might have in this instance because this statute does give the Division a lien in the form of a right to an offset of payments on the Medicaid claims of any hospital. See G.L. c. 118G, § 18(g).

In relevant part, G.L. c. 118G, § 18(g) provides:

The division shall establish by regulation an appropriate mechanism for enforcing an acute hospital's liability to the pool in the event that an acute hospital does not make a scheduled payment to said pool. Such enforcement mechanism may include notification to the division of medical assistance requiring an offset of payments on the Title XIX claims of any such acute hospital ... from the division of medical assistance in the amount of payment owed to said pool including any interest and late fees, and to transfer the withheld funds into said pool.

### (vi) Effect of Nonpriority Treatment on Policy Goals

The Debtor next argues that the Uncompensated Care Pool obligation should not be deemed a tax because, in essence, the functioning and purposes of the Pool will not be much compromised if the claim is not accorded priority. The Court rejects this argument for two reasons. First, the Uncompensated Care Pool depends on its assessments to achieve its purposes. The fact that it specifies how to deal with shortfalls does not mean that shortfalls have no effect. More importantly, this consideration is simply not germane to determining whether an obligation is a tax. The tax character of the obligation is not dependent on how badly the claimant requires priority classification.

(vii) Risk-Sharing Plan Imposed as a Regulatory Fee?

The principal thrust of the Debtor's argument is that the Uncompensated Care Pool is a risk-sharing plan, the liability to which is imposed as a regulatory fee, and, because regulatory fees and taxes are mutually exclusive categories, the obligation is not a tax. In support of this theory, the Debtor relies on two characteristics of the Pool obligation: (1) that, under Massachusetts regulations, payment of obligations to the Pool is (the Debtor argues) a requirement that acute care hospitals must satisfy to obtain and maintain their hospital licenses; and (2) that the assessments are used only to fund acute care hospitals, not the state government generally or the general public, and thus the assessments secure for the hospitals a kind of benefit that the general public does not share. I will address these in turn.

First, although the cited regulations are unclear as to whether payment of Uncompensated Care Pool obligations is a condition of hospital licensure, n15 this condition would only amount to an enforcement mechanism. When courts distinguish fees from taxes, the fees they have in mind are charges whose purpose is to defray the governmental expense of regulating a particular entity; the fee secures a benefit for that entity alone. Driver's license and automobile registration fees are well known examples. The Debtor does not argue, and could not seriously contend, that the Uncompensated Care Pool assessment serves to pay the cost to the Commonwealth of overseeing and regulating a licensed hospital. Its purpose is wholly different.

The Debtor cites the following regulations on hospital licensure:

The Department may refuse to renew, or revoke a license, either wholly or with respect to a specific service or specific services, or a part or parts thereof, for cause. Cause shall include but shall not be limited to the following:

(B) Lack of responsibility and suitability to operate a hospital, as determined pursuant to 105 CMR 130.104; or

...

(O) Violation of any state statute pertaining to hospital licensure.

105 CMR § 130.130(B) and (D).

(A) In determining whether an applicant is responsible and suitable to be granted a hospital license, the Department shall consider all relevant information including, but not limited to, the following:

(1) The applicant's history of prior compliance with Massachusetts state laws governing health facility operation, and 105 CMR. Assessment of this factor shall include the ability and willingness of the applicant to take corrective action when notified by the Department of regulatory violations; and

105 CMR 130.104(a)(1).

Second, while it is true that the assessments are used only to fund acute care hospitals, and that this benefit differs in kind from any that passes through to the general public, the assessment does not thereby become a fee. As I explained above, the assessment does not benefit the payor hospital; rather, it funds payments to other hospitals, so the benefit is not private. And the payment directly serves the larger and clearly public purposes of the Uncompensated Care Pool: to help ensure the continued availability of free care to the low-income uninsured and underinsured, and to ensure the financial viability of those hospitals who provide a disproportionate share of that care. The fact that the operative mechanism is a form of "risk sharing plan" does not make the assessment's purpose or function any less public.

For these reasons, I conclude that the Debtor's obligation to the Uncompensated Care Pool is an excise tax, which has priority under § 507(a)(8)(E). A separate order will enter overruling the Debtor's objection to the priority of this claim.

Date: 6/25/01

Carol J. Kenner

United States Bankruptcy Judge

ORDER ON DEBTOR'S OBJECTION TO CLAIM OF MASSACHUSETTS DIVISION OF HEALTH CARE FINANCE AND POLICY

For the reasons set forth in the separate memorandum of decision issued today, the Court hereby ORDERS as follows:

1. The Debtor's objection to the priority of the claim of the Massachusetts Division of Health Care Finance and Policy under G. L. c. 118G, § 18 (the "Uncompensated Care Pool Claim") is overruled;

2. The Division's Uncompensated Care Pool Claim is ALLOWED as a priority excise tax claim under *11 U.S.C. § 507(a)(8)(e)* in the agreed amount of $ 1,702,714.00;

3. The Division's Compliance Liability Claim is ALLOWED as a nonpriority unsecured claim in the amount of $ 123,866.00, except that the amount of this portion of the claim will increase to the extent that the Debtor succeeds in avoiding and recovering for the estate under *11 U.S.C. § 547* a prepetition payment on the Compliance Liability debt; and

4. The balance of the Claim of the Massachusetts Division of Health Care Finance and Policy is hereby DISALLOWED.

Date: 6/25/01

Carol J. Kenner

United States Bankruptcy Judge

A service of Craig and Macaulay. All rights reserved. Privacy Statement
Use of this site constitutes your acceptance of these Terms of Use.
Site by: NIMZ Communication Technologies

# Exhibit D

Provider Reimbursement Manual (PRM) 1, 2122,
Taxes

PRM1 2122. Taxes

PRM1 Taxes

PRM1 2122. Taxes

PRM1 2122.1. General Rule.--The general rule is that taxes assessed against the provider, in accordance with the levying enactments of the several States and lower levels of government and for which the provider is liable for payment, are allowable costs. Tax expense should not include fines and penalties.

    [Rev. 205]        [21-14.7]

Whenever exemptions to taxes are legally available, the provider is expected to take advantage of them. If the provider does not take advantage of available exemptions, the expenses incurred for such taxes are not recognized as allowable costs under the program.

PRM1 2122.2 Taxes Not Allowable As Costs.--Certain taxes which are levied on providers are not allowable costs. These taxes are:

A. Federal income and excess profit taxes, including any interest or penalties paid thereon (see Sec. 1217).

B. State or local income and excess profit taxes (see Sec. 1217).

C. Taxes in connection with financing, refinancing, or refunding operations, such as taxes on the issuance of bonds, property transfers, issuance or transfer of stocks, etc. Generally, these costs are either amortized over the life of the securities or depreciated over the life of the asset. They are not, however, recognized as tax expense.

D. Taxes from which exceptions are available to the provider.

E. Special assessments on land which represent capital improvements such as sewers, water, and pavements should be capitalized and depreciated over their estimated useful lives.

F. Taxes on property which is not used in the rendition of covered services.

G. Taxes, such as sales taxes, levied against the patient and collected and remitted by the provider.

H. Self-employment (FICA) taxes applicable to individual proprietors, partners, members of a joint

venture, etc.

PRM1 2122.3 Employment-Related Taxes--Provider-Based Physicians.--Employment-related taxes, i.e., FICA, Workers' Compensation and Unemployment Compensation, which are paid by a provider on behalf of a provider-based physician, are considered business expenses of the employer and not fringe benefits (Sec. 2108.3C1). Hence, they are includable in their entirety as part of the administrative cost of the provider, without allocation to the physician's professional component, and reimbursable to the provider on a reasonable cost basis.

PRM1 2122.4 Franchise Taxes.--A franchise tax is a periodic assessment levied by a State or local taxing authority on the operation of a business with-in the borders of that governmental entity. The basis used to compute the amount of the franchise tax varies among taxing authorities. Where the amount of the franchise tax is based upon the net income of the provider, with a minimum amount stated, the following criteria will be used to determine whether and in what amount a franchise tax is an allowable cost:

[Rev. 215]         [21-15]

A. Where a provider has not net income but is required to pay a minimum franchise tax, the franchise tax is an allowable cost.

B. Where a provider realized net income which is not sufficient to incur a tax in excess of the minimum tax and the minimum tax is levied, then only the difference between the minimum franchise tax and the tax computed on net income is an allowable cost. For example, if the minimum tax is $500 and the tax computed on net income is $400, then the $400 is an income tax and only the excess ($500 - $400) or $100 is an allowable cost.

C. Where a provider has net income sufficient to incur a tax greater then the minimum franchise tax, the entire tax is considered an income tax and no part of the tax is an allowable cost. For example, if the minimum tax is $500 and the tax computed on income is $600, then the entire $600 is a nonallowable cost.

D. Where the amount of the franchise tax is based upon several criteria, one of which is net income, the amount of the franchise tax computed on net income is not an allowable cost. For example, if the minimum tax is $500, the tax computed on net income is $400, and the tax levy on capital stock is $600, then $400 remains an income tax and only the excess ($600 - $400) or $200 is an allowable cost.

PRM1 2122.5 Unemployment Compensation Insurance Costs for Nonprofit Providers Under Public Law 91-373.--

A. General.--Under P.L. 91-373, most nonprofit providers and State hospitals are required to cover certain employees under their respective State unemployment compensation laws.

This Federal law also provides that each nonprofit provider must be permitted by State law the option of (1) paying regular State unemployment compensation taxes, or (2) reimbursing the State

direct, on a dollar-for-dollar basis, for unemployment compensation benefits paid to former employees attributable to service with the provider--a form of self-insurance. Those providers which elect to pay benefits direct by self-insuring must also be allowed to participate in a joint program with other nonprofit organizations to establish a pool for reimbursing the State. See Sec. 2162ff for provisions governing pool arrangements for unemployment compensation and workers' compensation insurance coverage.

B. Payment of the State Tax.--Where a nonprofit provider elects to pay regular State unemployment compensation taxes, such payments are recognized as an allowable cost.

[21-15.1]          [Rev. 215]

C. Self-Insurance Program.--Where a nonprofit provider chooses to self-insure by establishing its own reserve account, contributions to this reserve account are not allowable costs under the Medicare program. Where a nonprofit chain organization (or related organization) centrally operates an unemployment insurance reserve fund for some or all of its member (related) providers, the fund is considered a self-insurance program and payments made to it by the participating providers are not allowable costs under the Medicare program. This is because such a fund is simply an arrangement among related providers with the chain maintaining control over the fund. Thus, payments to the fund are not actually incurred costs, but rather a provision for establishing a central reserve from which unemployment costs are met as they are incurred. Moreover, any income earned from investment of the funds of the reserve account must be used to offset a provider's allowable interest expense under the Medicare program.

Certain costs associated with a self-insurance program are allowable, whether paid from the fund or directly by the provider. They are:

1. Any amounts paid to reimburse the State for unemployment compensation payments actually made by the State to the former employees of the provider.

2. Any premium costs for the purchase of commercial insurance which protects against catastrophic loss, provided the type, extent, and cost of coverage are not substantially out of line with those of other similar institutions in the same area.

3. The fees paid to an outside individual or firm (if any) to administer the program, to the extent such fees are considered reasonable for the services rendered. Such administration may consist of completing the claims forms from the State unemployment office, representing the provider at the appeals level, etc.

4. Any other reasonable administrative costs incurred by the provider in establishing and administering the program.

These costs are allowable for a chain organization program to the extent the costs are properly allocated among the providers which incurred them, e.g., unemployment compensation payments should be directly allocated to the provider whose unemployed employees were paid. (See Sec. 2162ff for other self-insurance provisions.)

PRM1 2122.6 Self-Insurance Program for Unemployment Compensation and Workers'

Compensation Insurance Using a Reserve for Funding.--Where a provider or a group of providers, whether proprietary or nonprofit and whether related or not, chooses to self-insure against unemployment compensation and/or workers' compensation risks by establishing its own reserve account, the provisions of preceding Sec. 2122.5C apply. See Sec. 2162.7 which explains the self-insurance requirements that must be met before payments made into a trust can be included in allowable costs.

[Rev. 221]          [21-15.2]