# Exhibit D

Morton Hospital & Medical Center – FYE 9/30/97

Provider Reimbursement Manual (PRM) 1, 2122, Taxes

## PRM1 2122. Taxes

PRM1 Taxes

**PRM1 2122. Taxes**

**PRM1 2122.1. General Rule.**--The general rule is that taxes assessed against the provider, in accordance with the levying enactments of the several States and lower levels of government and for which the provider is liable for payment, are allowable costs. Tax expense should not include fines and penalties.

    [Rev. 205]          [21-14.7]

Whenever exemptions to taxes are legally available, the provider is expected to take advantage of them. If the provider does not take advantage of available exemptions, the expenses incurred for such taxes are not recognized as allowable costs under the program.

**PRM1 2122.2 Taxes Not Allowable As Costs.**--Certain taxes which are levied on providers are not allowable costs. These taxes are:

A. Federal income and excess profit taxes, including any interest or penalties paid thereon (see Sec. 1217).

B. State or local income and excess profit taxes (see Sec. 1217).

C. Taxes in connection with financing, refinancing, or refunding operations, such as taxes on the issuance of bonds, property transfers, issuance or transfer of stocks, etc. Generally, these costs are either amortized over the life of the securities or depreciated over the life of the asset. They are not, however, recognized as tax expense.

D. Taxes from which exceptions are available to the provider.

E. Special assessments on land which represent capital improvements such as sewers, water, and pavements should be capitalized and depreciated over their estimated useful lives.

F. Taxes on property which is not used in the rendition of covered services.

G. Taxes, such as sales taxes, levied against the patient and collected and remitted by the provider.

H. Self-employment (FICA) taxes applicable to individual proprietors, partners, members of a joint

venture, etc.

**PRM1 2122.3 Employment-Related Taxes**--Provider-Based Physicians.--Employment-related taxes, i.e., FICA, Workers' Compensation and Unemployment Compensation, which are paid by a provider on behalf of a provider-based physician, are considered business expenses of the employer and not fringe benefits (Sec. 2108.3C1). Hence, they are includable in their entirety as part of the administrative cost of the provider, without allocation to the physician's professional component, and reimbursable to the provider on a reasonable cost basis.

**PRM1 2122.4 Franchise Taxes.**--A franchise tax is a periodic assessment levied by a State or local taxing authority on the operation of a business with-in the borders of that governmental entity. The basis used to compute the amount of the franchise tax varies among taxing authorities. Where the amount of the franchise tax is based upon the net income of the provider, with a minimum amount stated, the following criteria will be used to determine whether and in what amount a franchise tax is an allowable cost:

[Rev. 215]          [21-15]

A. Where a provider has not net income but is required to pay a minimum franchise tax, the franchise tax is an allowable cost.

B. Where a provider realized net income which is not sufficient to incur a tax in excess of the minimum tax and the minimum tax is levied, then only the difference between the minimum franchise tax and the tax computed on net income is an allowable cost. For example, if the minimum tax is $500 and the tax computed on net income is $400, then the $400 is an income tax and only the excess ($500 - $400) or $100 is an allowable cost.

C. Where a provider has net income sufficient to incur a tax greater then the minimum franchise tax, the entire tax is considered an income tax and no part of the tax is an allowable cost. For example, if the minimum tax is $500 and the tax computed on income is $600, then the entire $600 is a nonallowable cost.

D. Where the amount of the franchise tax is based upon several criteria, one of which is net income, the amount of the franchise tax computed on net income is not an allowable cost. For example, if the minimum tax is $500, the tax computed on net income is $400, and the tax levy on capital stock is $600, then $400 remains an income tax and only the excess ($600 - $400) or $200 is an allowable cost.

**PRM1 2122.5 Unemployment Compensation Insurance Costs for Nonprofit Providers Under Public Law 91-373.--**

A. General.--Under P.L. 91-373, most nonprofit providers and State hospitals are required to cover certain employees under their respective State unemployment compensation laws.

This Federal law also provides that each nonprofit provider must be permitted by State law the option of (1) paying regular State unemployment compensation taxes, or (2) reimbursing the State

direct, on a dollar-for-dollar basis, for unemployment compensation benefits paid to former employees attributable to service with the provider--a form of self-insurance. Those providers which elect to pay benefits direct by self-insuring must also be allowed to participate in a joint program with other nonprofit organizations to establish a pool for reimbursing the State. See Sec. 2162ff for provisions governing pool arrangements for unemployment compensation and workers' compensation insurance coverage.

B. Payment of the State Tax.--Where a nonprofit provider elects to pay regular State unemployment compensation taxes, such payments are recognized as an allowable cost.

[21-15.1]          [Rev. 215]

C. Self-Insurance Program.--Where a nonprofit provider chooses to self-insure by establishing its own reserve account, contributions to this reserve account are not allowable costs under the Medicare program. Where a nonprofit chain organization (or related organization) centrally operates an unemployment insurance reserve fund for some or all of its member (related) providers, the fund is considered a self-insurance program and payments made to it by the participating providers are not allowable costs under the Medicare program. This is because such a fund is simply an arrangement among related providers with the chain maintaining control over the fund. Thus, payments to the fund are not actually incurred costs, but rather a provision for establishing a central reserve from which unemployment costs are met as they are incurred. Moreover, any income earned from investment of the funds of the reserve account must be used to offset a provider's allowable interest expense under the Medicare program.

Certain costs associated with a self-insurance program are allowable, whether paid from the fund or directly by the provider. They are:

1. Any amounts paid to reimburse the State for unemployment compensation payments actually made by the State to the former employees of the provider.

2. Any premium costs for the purchase of commercial insurance which protects against catastrophic loss, provided the type, extent, and cost of coverage are not substantially out of line with those of other similar institutions in the same area.

3. The fees paid to an outside individual or firm (if any) to administer the program, to the extent such fees are considered reasonable for the services rendered. Such administration may consist of completing the claims forms from the State unemployment office, representing the provider at the appeals level, etc.

4. Any other reasonable administrative costs incurred by the provider in establishing and administering the program.

These costs are allowable for a chain organization program to the extent the costs are properly allocated among the providers which incurred them, e.g., unemployment compensation payments should be directly allocated to the provider whose unemployed employees were paid. (See Sec. 2162ff for other self-insurance provisions.)

**PRM1 2122.6 Self-Insurance Program for Unemployment Compensation and Workers'**

**Compensation Insurance Using a Reserve for Funding.**--Where a provider or a group of providers, whether proprietary or nonprofit and whether related or not, chooses to self-insure against unemployment compensation and/or workers' compensation risks by establishing its own reserve account, the provisions of preceding Sec. 2122.5C apply. See Sec. 2162.7 which explains the self-insurance requirements that must be met before payments made into a trust can be included in allowable costs.

[Rev. 221]          [21-15.2]

# Exhibit E

Morton Hospital & Medical Center – FYE 9/30/97

PRRB 04/20/00 2000-D47, St. Joseph Hospital, St. Paul, Minnesota

Case 1:05-cv-01065-RMR   Document 12-5   Filed 09/07/2005   Page 7 of 25

COURT & ADMINISTRATIVE DECISIONS                                    Page 1
PROVIDER REIMBURSEMENT REVIEW BOARD DECISIONS
PRRB 2000 DECISIONS
PRRB 04/20/00 2000-D47 ST. JOSEPH HOSPITAL ST. PAUL, MINNESOTA

# PRRB 04/20/00 2000-D47 ST. JOSEPH HOSPITAL ST. PAUL, MINNESOTA

**PRRB 04/20/00 2000-D47 ST. JOSEPH HOSPITAL ST. PAUL, MINNESOTA**

**PROVIDER REIMBURSEMENT REVIEW BOARD HEARING DECISION**

2000-D 47

**PROVIDER**--St. Joseph Hospital St. Paul, Minnesota Provider No. 24-0063 vs.
**INTERMEDIARY**--Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Minnesota

**DATE OF HEARING**--August 18, 1999

Cost Reporting Period Ended--August 31, 1993

**CASE NO. 96-0644**

*[handwritten: MCT is allowable — ADMR didn't overturn. 2000-D 47- St. Joseph's 48 - Bethesda Lutheran 49 - Devine Redeemer]*

**Issue:**

Was the Intermediary's adjustment to disallow the Minnesota Care Tax correct?

**Statement of Case and Procedural History:**

St. Joseph Hospital ("Provider") is a 336-bed nonprofit urban health facility located in St. Paul, Minnesota and is part of the HealthEast chain of health care facilities. For the fiscal year ended August 31, 1993, the Provider incurred $598,695 of MinnesotaCare Tax ("MCT"), which was included in the Administrative and General ("A&G") cost center. This cost was included in the filed Medicare cost report for Program reimbursement. The Intermediary excluded all MCT expense from allowable costs. This resulted in a reduction in Medicare reimbursement of approximately $13,000.

All health care providers in Minnesota, including this provider, are subject to an annual legislated tax assessment by the state of Minnesota. There are no available exemptions to this tax levy. This tax money is collected by the state and becomes part of the general fund of the state of Minnesota. This state-mandated obligated tax is described by the following selected excerpts from the MinnesotaCare Tax Booklet, which contains instructions for calculation and payment of the MinnesotaCare Tax: [1]

[1] See Provider Exhibit P-11.

1. The MinnesotaCare Tax is a tax on payments received by hospitals and surgery centers for

## Findings of Fact, Conclusions of Law and Discussion:

The Board, after considering the law, regulations, program instructions, facts, parties' contentions and evidence finds and concludes that the MCT is an allowable cost. The Board finds that this is a tax whose legislative intent was to help providers by creating a pool of revenue to pay for indigents. It is uniformly applied to all providers. It is a cost of doing business, i.e., an ordinary and necessary business expense. It is also subject to severe sanctions if not paid. The Board notes that the calculation of the tax was based on non-Medicare and Medicaid revenue. However, the calculation in and of itself is not relevant. What is relevant is the amount of the tax paid and whether it meets the statutory, regulatory and program instruction requirements.

The tax meets the statute and regulatory requirements of § 1861(v)(1)(A) of the Social Security Act and 42 C.F.R. § 413.9, respectively. The Intermediary misapplies the statute. There is nothing unreasonable about this tax. It is a proper and necessary expense which is related to patient care. Further, the MCT meets the requirement of HCFA Pub. 15-1 § 2122.1. It is a tax that was enacted by a state government (Minnesota) for which the Provider was liable. It also meets the requirements of HCFA Pub. 15-1 §2122.2 which lists various taxes that are not allowable. The MCT is not a specifically listed tax. Further, the nature of the MCT is such that it does not meet the type of taxes listed in the nonallowable cost section. Those taxes are essentially based on income or are collected for special assessments that are capital in nature.

The Board finds that the Provider properly classified the MCT as an A&G expense. Since the tax has an impact on the entire operations of the hospital, it is appropriate to include it in an expense pool which is distributed to all operations of the facility. Further, the MCT is analogous to malpractice insurance expense which HCFA ruled via Ruling 91-1 was an A&G cost. Previous to that ruling, HCFA had attempted to directly assign malpractice insurance costs to Medicare beneficiaries based on a provider's actual Medicare loss experience. The ruling corrected this mistreatment of the malpractice costs.

### Decision and Order:

The MCT is an allowable cost under Medicare law, regulations and program instructions. The Intermediary's adjustment is reversed.

Board Members Participating:

Irvin W. Kues
Henry C. Wessman, Esq.
Martin W. Hoover, Jr. Esq.
Charles R. Barker

For The Board

APR 20 2000

Irvin W. Kues
Chairman

046



# MORTON HOSPITAL AND MEDICAL CENTER

88 WASHINGTON STREET—TAUNTON, MASSACHUSETTS 02780-2499
TEL. (508) 828-7000 • FAX (508) 824-6941 • WEBSITE: www.mortonhospital.org

Mr. Robert Baroutas
Director, Audit & Reimbursement
Associated Hospital Service of Maine
50 Salem Street
Lynnfield, MA 01940



June 14, 2002

Dear Mr. Baroutas:

This letter is to request a reopening of the following Medicare cost report for Morton Medical Center, Taunton, MA, 01201, Provider #22-0073:

### COST REPORTING PERIOD

October 1, 1996 – September 30, 1997

The Original Notice of Program Reimbursement for this report was dated June 21, 1999, which means that we are still within our three-year reopening window.

It has come to our attention that a material error exists in the statement of program cost reported in the above-listed cost report, which we seek to correct at this time. To substantiate a more accurate statement of program cost, we have provided new and material evidence in support of the following issue.

### Inclusion of hospital's gross annual liability to the Massachusetts Uncompensated Care Pool

Prior to this time, we had been under the impression that our hospital's gross liability to the Massachusetts Uncompensated Care Pool (UCP) was not allowable cost that could be included on Worksheet A of our Medicare cost report. A study of the regulations, applicable PRRB decisions, US Court rulings, and other pertinent references now leads us to believe that failing to include our annual assessment from the UCP was a material error in the statement of our total allowable cost. In fact, it is our understanding that Mutual of Omaha has for several years reimbursed other Massachusetts hospitals for this cost.

To document the annual gross liability to the UCP, and to show that this cost meets the criteria as an allowable tax under PRM 1, 2122, Taxes, we provide new and material evidence in the following Exhibits.

JOSEPH I. QUINN, *Chairman, Board of Trustees* • THOMAS C. PORTER, *President*

047

**Exhibit A**

UC Pool Final Statement for FY97, Division of Health Care Finance and Policy

This April 24, 2001, notice from Ms. Mary E. Byrnes, Manager, Financial Analysis, Division of Health Care Finance and Policy, provides an audited, final calculation of Morton's gross liability to the Uncompensated Care Pool for fiscal year 1997.

Page Three, Line L3, of this letter (highlighted in yellow) informs Morton of its final settled Gross Liability to the Pool for FY97. That gross liability amount was $2,895,921.

**Exhibit B**

General Laws of Massachusetts, Part I. Administration of the Government, Title XVII. Public Welfare, Chapter 118G, Health Care Finance and Policy, Section 18. Uncompensated Care Trust Fund

Section 18. (a) establishes the Uncompensated Care Trust Fund. Section 18 (d) directs the Division of Health Care Financing and Policy to administer an uncompensated care pool, consisting in part of revenues produced by acute hospital assessments. Paragraph (d) gives the Division authority to require payments to the pool from hospitals.

Paragraph (e) gives the mechanism that is used to determine all acute care hospitals' gross liability to the pool. There is a consistent rate and a consistent base, with no means of exemption. Paragraph (g) authorizes the Division of Health Care Finance and Policy to develop methods of enforcement to mandate hospitals' payments to the pool.

**Exhibit C**

Rulings of the United States Bankruptcy Court for the District of Massachusetts

In re: LUDLOW HOSPITAL SOCIETY, INC., Debtor, Decided December 30, 1997, finds that the hospital's gross liability to the Uncompensated Care Pool is a tax, which confers benefit to the public generally, rather than an individual benefit to an acute care hospital. The Court found that the money collected (the gross liability) for the pool was imposed for a "public purpose," and as a result the Pool claim was entitled to priority status as a tax.

In re: BOSTON REGIONAL MEDICAL CENTER, Debtor, Decided June 25, 2001, gave the court's position that the hospital's gross annual liability to the Massachusetts Uncompensated Care Pool is a tax, not a fee.

**Exhibit D**

Provider Reimbursement Manual (PRM) 1, 2122, Taxes

PRM 1, 2122, is instructive regarding which forms of tax may be included in the calculation of a hospital's allowable cost. The UCP assessment amount that Morton is seeking to include at this time does not include fines or penalties, and there is no exemption from this tax to which Morton can avail itself.

Further, 2122.2 lists taxes that are not allowable as costs. The UCP assessment does not meet any of the criteria listed in that paragraph.

**Exhibit E**

PRRB 04/20/00 2000-D47, St. Joseph Hospital, St. Paul, Minnesota

PRRBs 2000-D47, D48, and D49 were all held in favor of Minnesota hospitals that sought to include their payments to the MinnesotaCare Tax (MCT). The Administrator declined to overturn any of these PRRB decisions.

The intermediary originally refused to allow this tax, in part because it was levied upon revenues net of Medicare and Medicaid revenues, and in part because the MinnesotaCare program used the funds to make payments to hospitals for treatment of indigent care. The PRRB held that the basis of taxation did not need to include Medicare revenues for the tax to be allowable under the Medicare program, and the PRRB held that the State's use of the funds to reimburse hospitals for indigent care did not reduce or eliminate the "allowability" of the hospitals' gross payments to the MinnesotaCare Tax.

The Massachusetts UCP is similar to the Minnesota MCT in all aspects that the PRRB considered in deeming the MCT allowable. The UCP tax is to create a pool of revenue to pay for indigents. It is uniformly applied to all providers. It is a cost of doing business, i.e., an ordinary and necessary business expense. It is reasonable. It is subject to severe sanctions if not paid. It is of no relevance that the tax is not based upon Medicare revenues. It did not need to be reduced by hospitals' receipts from the indigent pool. What the Board deemed relevant is the amount of the tax paid and that it met the statutory, regulatory, and program instruction requirements.

Conclusion

We have documented the hospital's gross liability to the Massachusetts Uncompensated Care Pool tax for fiscal year 1997, and have shown that it is a tax levied by the State of Massachusetts. We've demonstrated that the UCP assessment's status as a tax has been upheld by the United States Court system. PRM 1, 2122 permits such taxes to be included on Medicare cost reports as allowable cost, and we've shown that the UCP tax does not in any way resemble any of the excluded taxes listed in PRM 1, 2122.2.

We then examined a series of PRRB decisions, in which the Board found that Minnesota providers properly included the gross tax amount of the MinnesotaCare Tax as an A&G expense. By highlighting the similarities between the MCT and Massachusetts' UCP tax, we've demonstrated that, per the instructive nature of PRRB decisions, the UCP assessment meets CMS's standards for allowability. Thus, we seek to include our UCP assessment in our Administrative & General cost center as an ordinary and necessary cost of doing business.

I thank you in advance for your consideration of this request. If you have any questions regarding this matter, please direct them to Mr. Joel Goloskie, of Goloskie Consulting Group, Inc., our contracted agent for this purpose. In addition to requesting reopening of our 1997 cost report, this letter serves to authorize AHS of Maine to discuss all aspects of this reopening request with Mr. Goloskie or members of his staff. Mr. Goloskie can be reached at 781/749-2760.

Thank you again.

Sincerely,

Larry Seck
Sr. Vice President/Finance & Treasurer

ATTACHMENT 2 OF
EXHIBIT 1



**MEDICARE**
Part A Intermediary
Phone 402-351-5381

October 17, 2000

*MOO LTR*

SUBJECT: Massachusetts Uncompensated Care Pool Assessment Expense (Revised)

Dear Jerry:

This is in response to your letter dated September 14, 2000. I apologize for the delay in getting you a formal response regarding the Medicare treatment for Massachusetts uncompensated care pool assessment expense (also known as indigent care tax). I appreciate you bringing this to my attention as I had thought it had been resolved.

I have reviewed the additional information you have shared with me and I also had Tom Bruce, Appeals Supervisor, review the information. Based on our review, we have determined this expense to be allowable for Medicare purposes (PRM 15-I, Section 2300 and 2122). This determination is still subject to audit, for each year your facility claims this expense. To remain allowable for Medicare purposes, our review should determine that the tax is:

1. Levied by the State against designated provider types,
2. Providers are liable for payment of the tax,
3. Not one of the taxes specifically prohibited by PRM 15-I, Section 2122 (e.g., income taxes),
4. Not based on some contingency, such as increase in Federal matching funds.

Should you have any questions regarding this letter, please do not hesitate to contact me at (402) 351-4998.

Sincerely,


Tina Kilpatrick
Regional Manager
Mutual of Omaha
Medicare Audit & Reimbursement

cc:    George Pietri, Field Audit Manager – Hartford Field Office (Permanent File Information)
       Matt Pleggenkuhle, Supervisor, Audit


 **Mutual of Omaha Insurance Company** • Medicare Area • P.O. Box 1604, Omaha, NE 68101 • A HCFA CONTRACTED INTERMEDIARY

J11x1

052

ATTACHMENT 3 OF
EXHIBIT 1

# OVERVIEW OF UNCOMPENSATED CARE POOL PAYMENT SYSTEM

Below is a chronological list detailing the Uncompensated Care Pool transactions and how they relate to MMARS (the State's payment/accounting system). During the course of the Hospital Fiscal Year (October-September) the U.C. Pool collects two hundred and fifteen million dollars ($215 million) from the Acute Care Hospitals and one hundred million from Surcharge Payers (Insurance Cos., etc.). The State adds an appropriation of thirty million dollars ($30 million) bringing the total U.C. Pool to three hundred forty-five million dollars ($345 million). Due to the fact that the U.C. Pool pays hospitals prior to receiving the hospitals payments, and also only collects payments from hospitals in net amounts, the Commonwealth advances the U.C. Pool a separate thirty million dollars ($30 million) at the beginning of the State Fiscal Year. The stipulation is that the money must be returned to the General Fund by June 30th.

The proceeds are paid out to Acute Care Hospitals, Community Health Centers and to Other Qualified Providers of health care for Demonstration Projects. During the ongoing hospital fiscal year, Acute Hospitals are reimbursed monthly on an estimated basis for the Free Care they provide; and they are billed for their estimated liability to the Pool. The amount the hospitals receive during the year equals the total pool less amounts withheld for payments to Community Health Centers for Free Care, estimated Demo-project payments and Reserves for doubtful accounts and expenses. Upon final settlements unspent amounts withheld and reserves are released to the hospitals.

The gross proceeds paid to Hospitals represent Federal Financial Participation (FFP) Funds, which are reimbursed to the State at a level of 50%.

**Note #1:** Since 1993 the UC Pool payment calculation utilizes a gross payment to and from the Pool process. The actual payments to and from the hospitals take place on a net basis.

## Acute Care Hospitals

- Monthly, the Division collects Private Sector, Free Care and Emergency Bad Debt charge data from each Acute Care Hospital. Reported Allowable Free Care and E. R. Bad Debt charges are netted to cost by applying a cost to charge ratio. Using a 12-month rolling average of the data, the calculation is done on the Uncompensated Care Reimbursement System. The calculation generates both a Gross Liability From the Pool and a Gross Liability To the Pool. The hospitals are invoiced for the Gross liability to the Pool. This is the amount for the Receivable Events (**RE's**).

- From the calculation we prepare a Service Contract (**SC**) to encumber the amount of projected participation in the appropriate MMARS system account.

- The Hospitals deposit the difference of their Gross liability to the Pool and their Gross liability from the Pool. This net amount is deposited into the individual hospital's U.C. Pool account at Fleet Bank.

- The Uncompensated Care Pool transfers the Gross liability from the Pool into the individual hospital's U.C. Pool account. This is the amount of the Payment Voucher (**PV**).

- The Uncompensated Care Pool transfers the Gross liability to the Pool from the individual hospital accounts. This is the total of the hospitals initial net deposit plus the U.C. Pools transfer from the Pool to the individual hospital. This total is the amount of the Cash Transfers (**CT's**).

- Hospitals that are net receivers will have the net funds they are entitled to in their Fleet account at the end of the monthly cycle.

The Commonwealth collects FFP funds on the Gross Liability from the Pool. Prior to Surcharge Payers' responsibility for $100,000,000 of the Pool, on a monthly basis there are approximately ten to twelve (10-12) of the 75-ish Acute Care Hospitals that **actually receive** any payments from the U.C. Pool. Now the number of "net receivers" totals approximately thirty (30).

<u>Note #2</u>:  Since 1989 the amount of provided free care at hospitals has been larger than the Pool funds, creating a shortfall.  Since FY 1994 the shortfall has been allocated to Free Care costs on a more or less proportional basis using patient care costs.  The shortfall increased steadily through FY 1996 to a high of $166,000,000.  As of the November 1999 calculation, it has dropped to nearly 32,000,000.  The two main reasons are Mass Health expansion and a direct annual inter-governmental transfer (IGT) of funds directly to Boston Medical Center and Cambridge Hospital.  Their allowable free care is directly reduced as part of the calculation.

**Final Settlements**

- Data sources are chosen in order to determine levels of final liability to the Pool and from the Pool.

- Data verifications are sent to Hospitals based on latest data. Final Net Liability To or From the Pool is calculated and previous payments during the fiscal year are incorporated.

- Hospitals owing to the Pool are billed.  Once all funds are received the hospitals due payments from the Pool are reimbursed.

055

### Community Health Centers

- Monthly, CHC's report the free care they provide and funds are encumbered to reimburse them.

- The CHC's have **PV's** processed on a monthly basis.

### Demo-Projects

- Demo-projects are processed and approved by **HSMIG**.    Funds are encumbered by Administration/Finance Department through the **SC** process.

- **PV's** from the approved Providers are submitted through **HSMIG** with supporting documentation describing expenses incurred.

- Payments to the Providers are processed on an as presented basis.

### Accounting System

- All applicable transactions are entered into a standard internal accounting software system (Peachtree Accounting), and reconciled monthly with MMARS records.

G:\PRICING\UCPOOL\POOLPROC.doc

2

# Uncompensated Care Pool

**Authority:**
The Uncompensated Care Pool (UC Pool) was established in 1986. Chapter 23 of the Acts of 1988, The Health Security Act, transferred administrative responsibility for the UC Pool from Rate Setting Commission to the Department of Medical Security. Legislative authority for the continuation of the UC Pool was established by Chapter 495 of the Acts of 1991, Improving Health Care Access and Financing. (M.G.L. c. 118F, § 15)

**Background:**
The UC Pool a.k.a. Free Care Pool ensures equitable financing of free care by compensating hospitals and community health centers for the services which qualify as free care. An assessment funded by insurers, ERISA plans and private payers is redistributed to reimburse acute care hospitals and community health centers for free care provided. By reimbursing for free care, the UC Pool ensures access to quality health care to individuals unable to pay.

Each acute care hospital has both a liability to the UC Pool and a liability from the UC Pool.

**Liability to the UC Pool.** Since Hospital Fiscal Year (HFY) 1993, the UC Pool consists of two funding sources. Ninety-five percent of the revenue necessary to run the UC Pool is collected from the Commonwealth's 85 acute care hospitals. Each hospital's liability to the UC Pool is based upon a mathematical formula set forth in M.G.L. c. 118F, § 15 (2). Each hospital's private sector charges are divided by the all hospitals' private sector charges. This ratio is multiplied by the level of private sector liability established by the legislature.

The private sector liability is set by the legislature and in recent years it has been $315 million. Additionally, a state appropriation may be funded as a public sector contribution to the UC Pool. This amount is also set by the legislature and is now $15 million. Combining these two amounts arrives at a UC Pool cap of $330 million.

Liability to the UC Pool:

$$\frac{\text{Individual Hospital Private Sector Charges}}{\text{All Hospitals' Private Sector Charges}} \times \frac{\text{Private Sector}}{\text{Liability}} = \frac{\text{Hospital Liability}}{\text{to the UC Pool}}$$

**Liability from the UC Pool.** Free care compensation from the UC Pool is based on a mathematical formula composed of free care charges, cost to charge ratio

and UC Pool shortfall. Total free care charges consists of two components. The first component relates to hospital services provided to individuals who meet the Department's income criteria, qualifying them for free care. This component is made up of full free care, partial free care and medical hardship.

| CATEGORY | INCOME LEVEL |
|---|---|
| Full Free Care | Less than 200% of the Federal Poverty Income Guidelines |
| Partial Free Care | 200% to 400% of the Federal Poverty Income Guidelines |
| Medical Hardship | Hospital discretion based on income and expenses |

The second major component of free care is qualifying bad debt. The UC Pool reimburses hospitals for the bad debt resulting from emergency care provided to uninsured individuals where diligent collection actions have failed.

Each hospital's reported free care charges are added to emergency bad debt yielding the total free care charges. The product of this sum and the cost to charge ratio is designated as the total allowable free care charges. Because the total allowable free care charges for all hospitals exceeds the $330 million UC Pool, a shortfall adjustment is made, resulting in the adjusted allowable free care charges.

Liability from the UC Pool:

| Step 1: | Free Care Charges | + | Emergency Bad Debt | = | Total Free Care Charges |
|---|---|---|---|---|---|
| Step 2: | Total Free Care Charges | x | Cost to Charge Ratio | = | Total Allowable Free Care Charges |
| Step 3: | Total Allowable Free Care Charges | - | Shortfall Allocation | = | Adjusted Allowable Free Care Charges |

The Commonwealth collects Federal Financial Participation (FFP) on payments made from the UC Pool to disproportionate share hospitals. For FY96, the FFP match estimate is $146 million. Without the UC Pool, this federal revenue will be lost.

## COMPLIANCE LIABILITY

**Authority:**
Section 56 of Chapter 495 of the Acts of 1991 directs the Rate Setting Commission (RSC) to determine hospital's revenue compliance with the provisions of M.G.L. c. 6A, §78 to 100 for fiscal years prior to HFY92. Hospitals which are in non-compliance are issued a five year amortization schedule by RSC and the funds are deposited into the UC Pool trust. RSC has determined 32 hospitals to be subject to Section 56. Of these hospitals, two have received a waiver from RSC.

**Progress to Date:**
The Department has entered into five year payment plans with 30 hospitals. Eleven hospitals elected to pay the liability in full. As of the close of State Fiscal Year (SFY) 1995, the Department collected $11.67 million. The graph below represents the projected revenue for SFYs 1996 through 2000.



DEPARTMENT OF MEDICAL SECURITY
COMPLIANCE LIABILITY PROJECTED REVENUE



CHC "Free Care" Reimbursement
1995 Monthly Average (Jan – Sep)
Under the new "per visit" calculation method for 1995, includes Dental

(Thousands)

Boston Evening Medical Center
Brockton Neighborhood Health Center
Dimock Community Health Center
Fall River Comm. Dev. Service Center
Family Health & Social Service Center
Fenway Community Health Center
Geiger-Gibson Community Health Center
Great Brook Valley Health Center
Greater Lawrence Family Health Center
Grtr New Bedford Community Health Ctr
Harvard Street Neighborhood Health Ctr
Hilltown/Worthington Health Center
Holyoke Health Center Inc.
Joseph M. Smith Community Health Ctr
Lowell Community Health Center
Lynn Community Health Center
Manet Community Health Center
Mattapan Community Health Center
Neponset Health Center
North End Community Health Center
North Shore Community Health Center
Outer Cape Health Services Inc.
Roxbury Comp. Community Health Center
South Cove Community Health Center
South End Community Health Center
Springfield Southwest Community Health
Stanley Street Treatment & Resources
Uphams Corner Community Health Center
Whittier Street Community Health Clr

partment of Medical Security

060

# CHC "Free Care" Reimbursement

### under the new "per visit" calculation method for 1995

| HEALTH CENTERS | Old Method Projected Payment | JANUARY PAYMENT | FEBRUARY PAYMENT | MARCH PAYMENT | APRIL PAYMENT | MAY PAYMENT | JUNE PAYMENT | JAN-JUNE DENTAL PAYMENT | JULY PAYMENT | AUG PAYMENT | SEP PAYMENT | Total YTD PAYMENT | New Avg Monthly Payment | Monthly Difference Old to New |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Boston Evening Medical Center | $88,112.13 | $13,841.10 | $10,720.02 | $12,383.14 | $9,526.07 | $11,183.63 | $13,353.39 | | $12,145.23 | $18,734.16 | 18,015.30 | $119,901.04 | $13,322 | 14,210 |
| Brockton Neighborhood Health Center | 8,549.00 | 23,016.84 | 19,105.62 | 24,573.58 | 20,148.70 | 25,504.59 | 32,960.02 | n/a | 22,194.13 | 28,979.17 | 30,322.59 | $214,813.24 | 23,868 | 15,323 |
| Dimock Community Health Center | 337,614.80 | 21,344.29 | 22,878.54 | 29,871.89 | 21,289.22 | 23,004.81 | 32,172.59 | 15,604.15 | 26,466.24 | 39,063.68 | 32,304.73 | $263,830.04 | 29,314 | (8,300) |
| Fall River Comm. Dev. Service Center | 9,998.15 | 9,094.16 | 9,722.10 | 9,843.08 | 8,928.24 | 18,704.62 | 18,685.25 | 36,689.05 | 17,324.81 | 39,093.68 | 21,323.34 | $167,317.67 | 18,591 | (306) |
| Family Health & Social Services Center | 118,976.89 | 88,204.17 | 81,724.29 | 81,037.99 | 81,216.13 | 84,822.08 | 87,045.59 | 39,935.60 | 85,381.82 | 97,078.91 | 82,130.08 | $826,666.61 | 91,852 | (18,392) |
| Fenway Community Health Center | 119,201.78 | 6,559.16 | 4,753.13 | 4,561.42 | 4,290.54 | 4,710.84 | 6,418.21 | | 8,272.36 | 4,898.31 | 3,716.62 | $47,478.39 | 5,276 | (13,926) |
| Geiger-Gibson Community Health Center | 51,653.10 | 26,041.98 | 23,300.71 | 61,099.49 | 21,777.40 | 27,645.00 | 26,376.72 | 21,470.30 | 26,906.17 | 34,111.45 | 28,832.69 | $229,471.07 | 33,164 | (610) |
| Great Brook Valley Health Center | 51,962.86 | 62,266.03 | 58,130.05 | 87,870.60 | 83,976.64 | 67,425.80 | 42,703.59 | 0.00 | 70,161.49 | 83,834.03 | 76,312.51 | $611,680.94 | 68,076 | 16,123 |
| Greater Lawrence Family Health Center | 72,271.34 | 73,211.34 | 82,852.04 | 60,402.10 | 134,341.93 | 94,047.38 | 120,067.65 | | 102,942.45 | 98,353.57 | 130,261.54 | $889,700.00 | 98,822 | 26,571 |
| Greater New Bedford Community Health Center | 101,832.02 | 101,525.45 | 94,538.73 | 80,045.64 | 102,537.93 | 72,985.95 | 43,125.75 | 17,178.85 | 69,778.00 | 51,744.59 | 54,732.50 | $681,316.40 | 75,680 | 10,804 |
| Harvard Street Neighborhood Health Center | 16,082.31 | 27,093.19 | 21,470.29 | 39,194.34 | 31,265.75 | 38,965.26 | 39,632.17 | 24,767.15 | 69,678.00 | 36,658.08 | 45,141.70 | $342,128.74 | 38,015 | 21,963 |
| Hilltown/Worthington Health Center | 5,961.49 | 2,211.46 | 4,324.35 | 4,159.63 | 4,839.08 | 5,614.56 | 5,812.56 | 52,898.15 | 6,150.40 | 45,839.31 | 7,555.89 | $84,054.98 | 9,339 | 48 |
| Holyoke Health Center Inc. | 7,881.77 | 8,084.92 | 5,724.84 | 12,210.71 | 9,694.32 | 7,755.00 | 12,191.98 | 2,544.20 | 11,699.35 | 6,504.00 | 10,659.34 | $92,051.12 | 10,228 | 2,347 |
| Joseph M. Smith Community Health Center | 33,555.09 | 35,716.66 | 28,812.10 | 35,231.19 | 33,547.31 | 32,559.44 | 38,176.38 | | 43,722.14 | 11,176.48 | 43,317.67 | $395,496.55 | 43,944 | 10,385 |
| Lowell Community Health Center | 29,950.07 | 29,960.07 | 27,344.88 | 28,628.25 | 22,738.98 | 38,683.32 | 27,262.29 | n/a | 29,284.24 | 51,119.45 | 42,774.10 | $285,666.22 | 31,763 | 23,563 |
| Lynn Community Health Center | 119,419.22 | 10,447.07 | 10,609.33 | 52,054.12 | 28,172.11 | 26,348.24 | 29,967.87 | | 11,696.99 | 39,222.49 | 25,800.53 | $203,226.74 | 22,803 | 3,563 |
| Martet Community Health Center | 29,834.38 | 47,605.07 | 45,780.90 | 52,563.64 | 45,193.30 | 58,244.43 | 69,179.02 | 12,166.85 | 72,968.69 | 18,811.74 | 73,293.13 | $537,947.34 | 59,772 | 3,300 |
| Mattapan Community Health Center | 217,640.91 | 16,591.62 | 21,972.75 | 21,918.27 | 18,574.72 | 13,044.98 | 7,076.53 | | 10,860.45 | 72,120.86 | 20,532.59 | $162,755.52 | 18,084 | (3,006) |
| Neponset Health Center | 30,315.63 | 98,943.82 | 73,319.27 | 125,764.11 | 58,193.18 | 77,278.91 | 66,460.77 | | 63,015.38 | 23,146.81 | 63,015.38 | $855,650.65 | 95,051 | 27,000 |
| North End Community Health Center | 33,346.00 | 25,615.60 | 23,325.79 | 47,256.54 | 30,570.45 | 23,678.32 | 17,035.96 | 5,747.70 | 80,091.43 | 70,091.43 | 20,583.33 | $503,626.57 | 55,961 | (4,506) |
| North Shore Community Health Center | 116,178.07 | 9,392.39 | 11,661.17 | 28,596.72 | 10,428.84 | 13,973.42 | 13,587.90 | | 8,455.69 | 35,766.01 | 14,757.39 | $128,183.30 | 14,243 | (4,506) |
| Outer Cape Health Services Inc. | 34,947.08 | 10,661.98 | 8,051.36 | 13,711.60 | 10,950.78 | 17,910.90 | 47,088.82 | 24,787.15 | 20,568.70 | 17,309.78 | 37,628.21 | $164,394.99 | 18,266 | (13,015) |
| Roxbury Comp. Community Health Center | 32,058.04 | 40,623.53 | 58,214.44 | 29,385.25 | 43,321.76 | 33,546.40 | 45,538.26 | 31,206.50 | 25,086.61 | 17,309.78 | 50,728.74 | $520,773.39 | 57,864 | 22,817 |
| South Cove Community Health Center | 44,140.09 | 21,196.06 | 18,322.72 | 65,138.58 | 49,838.96 | 59,937.21 | 64,582.16 | 25,688.77 | 63,062.27 | 48,514.65 | 53,956.55 | $271,019.60 | 30,113 | 16,641 |
| South End Community Health Center | 59,097.89 | 57,900.50 | 2,060.28 | 5,668.61 | 5,462.64 | 6,916.69 | 8,539.59 | 4,117.75 | 48,737.48 | 11,228.57 | 47,727.98 | $359,565.57 | 35,951 | 11,801 |
| Springfield Southwest Community Health Center | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 10,490.37 | n/a | 8,741.95 | $60,311.70 | 7,539 | n/a |
| Harbor Street Treatment & Resources (ISTAR) | | n/a | n/a | n/a | n/a | n/a | n/a | 113,036.10 | n/a | 9,120.22 | 9,256.44 | $18,376.66 | 9,188 | n/a |
| Uphams Corner Community Health Center | 59,097.89 | 39,516.30 | 23,279.09 | 64,700.02 | 54,343.106 | 58,256.28 | 59,157.19 | | n/a | 0.00 | 68,715 | $412,292.52 | 68,715 | 6,716 |
| Whittier Street Community Health Center | 16,902.32 | 11,476.90 | 9,449.69 | 10,405.96 | 11,042.19 | 14,341.89 | 13,446.30 | 11,241.15 | 10,719.58 | 22,454.34 | 0.00 | $132,962.08 | 14,774 | (4,129) |
| **MONTHLY PAYMENTS** | | $921,722.43 | $859,760.19 | $1,155,671.11 | $965,498.69 | $991,061.68 | $978,746.39 | $394,773.70 | $941,064.01 | $1,084,824.27 | $1,057,723.33 | $8,342,145.00 | $1,089,908 | $2,021,460 |

ANNUALIZED PROJECTION OF PAYMENTS (Oct - Dec): $10,804,683.43

IT PROJECT CENTERS (Oct - Dec 1994)

** 0.00 = report still due from CHC

$12,826,891   $2,021,460

# CHC "Free Care" Reimbursement
## Comparison of Old to New Calculation Methods

| HEALTH CENTERS | Old Method Projected Monthly Payment | New Method Average Monthly Payment | Average Monthly Difference Old to New | 1995 YTD (Jan - Sep) Cumulative Payments | 1995 YTD (Jan - Sep) Cumulative Difference |
|---|---|---|---|---|---|
| Boston Evening Medical Center | $9,112.13 | $13,322.34 | $4,210 | $119,901 | $37,892 |
| Brockton Neighborhood Health Center | $5,546.00 | $23,868.14 | $18,322 | $214,813 | $164,899 |
| Dimock Community Health Center * | $37,614.60 | $29,314.45 | ($8,300) | $263,830 | ($74,701) |
| Fall River Comm. Dev. Service Center * | $18,976.58 | $18,590.85 | ($386) | $167,318 | ($3,472) |
| Family Health & Social Service Center * | $110,243.57 | $91,851.85 | ($18,392) | $826,667 | ($165,525) |
| Fenway Community Health Center | $19,201.78 | $5,275.38 | ($13,926) | $47,478 | ($125,338) |
| Geiger-Gibson Community Health Center | $31,553.10 | $33,163.54 | $1,610 | $298,472 | $14,494 |
| Great Brook Valley Health Center * | $51,952.66 | $68,075.66 | $16,123 | $612,681 | $145,107 |
| Greater Lawrence Family Health Center * | $72,951.45 | $98,522.22 | $25,571 | $886,700 | $230,137 |
| Greater New Bedford Community Health Center * | $62,676.00 | $73,479.60 | $10,804 | $661,316 | $97,232 |
| Harvard Street Neighborhood Health Center * | $16,062.31 | $38,015.42 | $21,953 | $342,139 | $197,578 |
| Hilltown/Worthington Health Center | $5,961.49 | $6,007.22 | $46 | $54,065 | $412 |
| Holyoke Health Center Inc. | $7,881.17 | $10,227.90 | $2,347 | $92,051 | $21,121 |
| Joseph M. Smith Community Health Center | $33,558.68 | $43,944.06 | $10,385 | $395,460 | $93,468 |
| Lowell Community Health Center * | $8,200.14 | $31,762.91 | $23,563 | $285,866 | $212,065 |
| Lynn Community Health Center * | $19,419.22 | $22,802.97 | $3,384 | $205,227 | $30,454 |
| Manet Community Health Center * | $26,834.38 | $59,760.82 | $32,926 | $537,847 | $296,338 |
| Mattapan Community Health Center * | $21,769.51 | $18,083.95 | ($3,686) | $162,756 | ($33,170) |
| Neponset Health Center * | $50,316.53 | $77,316.74 | $27,000 | $695,851 | $243,002 |
| North End Community Health Center | $33,346.00 | $28,841.09 | ($4,505) | $259,570 | ($40,544) |
| North Shore Community Health Center | $19,178.97 | $14,240.37 | ($4,939) | $128,163 | ($44,447) |
| Outer Cape Health Services Inc. | $31,281.20 | $18,266.11 | ($13,015) | $164,395 | ($117,136) |
| Roxbury Comp. Community Health Center * | $34,947.08 | $57,863.71 | $22,917 | $520,773 | $206,250 |
| South Cove Community Health Center | $32,058.84 | $30,113.32 | ($1,946) | $271,020 | ($17,510) |
| South End Community Health Center * | $44,180.09 | $55,980.73 | $11,801 | $503,827 | $106,206 |
| Springfield Southwest Community Health Center | n/a | $7,538.96 | n/a | $60,312 | n/a |
| Stanley Street Treatment & Resources (SSTAR) | n/a | $9,188.33 | n/a | $18,377 | n/a |
| Uphams Corner Community Health Center * | $59,997.81 | $68,715.42 | $8,718 | $412,293 | $78,458 |
| Whittier Street Community Health Center | $18,902.32 | $14,773.56 | ($4,129) | $132,962 | ($37,159) |
| **MONTHLY TOTALS** | $883,723.61 | $1,068,907.62 | $168,457 | YTD Total $9,342,165 | YTD Difference $1,516,110 |
| **ANNUALIZED PROJECTION OF PAYMENTS:** | $10,604,683.32 | $12,826,891.44 | $2,021,481 | | |

* PILOT PROJECT CENTERS (Oct - Dec 1994)

062

# Department of Medical Security

## YEAR TO DATE REIMBURSEMENTS TO CHCs FOR FREE CARE SERVICES PROVIDED (BEGINNING IN JANUARY)

### September, 1995

| Center | Medical Doctor | NP/PA | Dentist | Psychologist | L.I.C.S.W. | Laboratory | Xrays | Misc. | Free Care Income | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Boston Evening Medical Center | $90,045.02 | $0.00 | $0.00 | $20,782.08 | $9,598.48 | $6,806.34 | $920.00 | $2,184.32 | ($10,425.20) | $119,901.04 |
| Brockton Neighborhood Health Center | $169,277.88 | $41,221.36 | $0.00 | $0.00 | $9,268.00 | $6,806.34 | $0.00 | $3,357.75 | ($15,079.88) | $214,813.24 |
| Chinook Community Health Center | $129,086.43 | $61,832.04 | $0.00 | $0.00 | $9,794.93 | $9,794.03 | $0.00 | $38,663.10 | ($1,989.01) | $263,830.04 |
| Fall River Comm. Service Center | $122,327.92 | $26,797.05 | $0.00 | $929.28 | $3,717.12 | $9,794.93 | $0.00 | $0.00 | ($4,708.82) | $167,317.67 |
| Family Health & Social Service Center | $437,639.07 | $70,713.49 | $75,133.10 | $1,816.32 | $8,870.40 | $68,482.07 | $20,498.12 | $10,445.00 | ($22,597.07) | $826,666.61 |
| Fenway Community Health Center | $34,210.35 | $226,379.60 | $0.00 | $0.00 | $1,250.32 | $6,629.12 | $0.00 | $3,357.75 | ($15,079.88) | $47,478.39 |
| Geiger-Gibson Community Health Center | $183,468.84 | $18,161.06 | $0.00 | $6,842.88 | $5,617.92 | $18,588.69 | $0.00 | $21,428.97 | ($33,726.71) | $298,471.87 |
| Great Brook Valley Health Center | $320,732.59 | $39,869.84 | $56,381.50 | $0.00 | $34,467.84 | $23,634.85 | $0.00 | $12,514.75 | ($60,798.04) | $612,680.94 |
| Greater Lawrence Family Health Center | $691,640.36 | $197,635.33 | $68,798.10 | $15,755.52 | $7,711.00 | $56,327.75 | $0.00 | $5,142.00 | ($25,842.97) | $886,700.00 |
| Greater New Bedford Community Health Center | $517,559.25 | $208,049.61 | $0.00 | $0.00 | $3,633.32 | $17,178.54 | $0.00 | $0.00 | ($27,143.67) | $661,316.40 |
| Harvard Street Neighborhood Health Center | $280,355.93 | $110,934.75 | $0.00 | $3,336.96 | $1,605.12 | $620.86 | $7,255.50 | $7,255.50 | ($5,989.00) | $342,188.74 |
| Hilltown/Worthington Health Association | $23,313.72 | $28,044.04 | $41,357.55 | $0.00 | $8,490.24 | $1,950.65 | $0.00 | $121.50 | ($4,708.82) | $54,064.98 |
| Holyoke Health Center Inc. | $64,112.73 | $14,807.78 | $11,529.70 | $0.00 | $0.00 | $2,699.75 | $0.00 | $321.97 | ($8,561.08) | $92,051.12 |
| Joseph M. Smith Community Health Center | $259,463.82 | $128,128.51 | $6,398.35 | $0.00 | $0.00 | $4,035.78 | $0.00 | $7,060.63 | ($129,012.77) | $395,496.68 |
| Lowell Community Health Center | $220,210.66 | $93,768.87 | $161,496.28 | $0.00 | $0.00 | $2,596.98 | $0.00 | $126.90 | ($5,989.00) | $285,866.22 |
| Lynn Community Health Center | $86,412.81 | $51,019.88 | $0.00 | $4,899.84 | $10,653.12 | $4,035.78 | $0.00 | $750.80 | ($16,733.98) | $205,226.74 |
| Mattapan Community Health Center | $380,368.41 | $115,808.37 | $0.00 | $0.00 | $380.16 | $24,690.43 | $0.00 | $17,221.54 | ($24,568.77) | $537,847.34 |
| Manet Community Health Center | $134,729.65 | $140,135.73 | $0.00 | $2,069.76 | $14,784.00 | $65,594.65 | $0.00 | $3,915.25 | ($7,767.00) | $162,755.52 |
| Neponset Health Center | $457,996.34 | $0.00 | $21,032.20 | $28,343.04 | $65,594.65 | $63,395.50 | $0.00 | $17,925.09 | ($49,312.75) | $695,850.65 |
| North End Community Health Center | $141,233.84 | $162,520.28 | $0.00 | $9,968.64 | $35,143.68 | $3,506.00 | $0.00 | $27,522.13 | ($48,150.00) | $259,569.83 |
| North Shore Community Health Center | $64,366.14 | $63,943.79 | $25,340.00 | $0.00 | $240.77 | $1,206.72 | $0.00 | $1,206.72 | ($35,648.67) | $128,163.10 |
| Older Cape Health Services Inc | $85,568.11 | $67,998.35 | $0.00 | $0.00 | $14,171.06 | $2,828.00 | $1,206.72 | $43.75 | ($37,468.18) | $164,394.99 |
| Roxbury Comp. Community Health Center | $279,511.23 | $99,262.25 | $49,919.80 | $0.00 | $24,051.50 | $3,302.00 | $2,828.00 | $32,499.75 | ($48,220.00) | $520,773.39 |
| South Cove Community Health Center | $191,915.84 | $119,018.23 | $0.00 | $33,623.04 | $24,051.50 | $4,568.25 | $0.00 | $4,568.25 | ($41,689.97) | $271,019.88 |
| South End Community Health Center | $311,440.89 | $45,867.21 | $43,901.55 | $212,678.40 | $30,708.48 | $18,648.39 | $0.00 | $7,288.10 | ($81,788.94) | $503,826.57 |
| Springfield Southwest Community Health Center | $29,311.09 | $0.00 | $4,751.25 | $0.00 | $2,102.50 | $2,102.50 | $0.00 | $1,086.25 | ($739.00) | $600,311.70 |
| Stanley Street Treatment & Resource | $12,021.72 | $28,550.86 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($524.96) | $18,376.66 |
| Uphams Corner Community Health Center | $187,602.87 | $6,879.90 | $0.00 | $4,604.16 | $3,505.92 | $3,505.92 | $0.00 | $2,342.06 | ($18,494.00) | $412,292.52 |
| Whittier Street Community Health Center | $89,622.67 | $98,154.14 | $127,080.10 | $0.00 | $6,379.08 | $7,748.19 | $0.00 | $2,342.06 | ($51,178.17) | $132,662.08 |
| **TOTAL** | **$5,996,561.18** | **$2,105,758.80** | **$828,269.92** | **$347,592.96** | **$187,466.80** | **$466,857.79** | **$28,609.87** | **$228,447.31** | **($847,389.63)** | **$9,342,165.00** |

6839FEFAPOOL_CHICHANGA