# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____
:
BRADLEY MEMORIAL HOSPITAL          :
81 Meriden Avenue                  :
Southington, CT 06489-3297         :
:
BRISTOL HOSPITAL                   :   Case No: 1:04c00416 (EGS)
PO Box 977, Brewster Road          :
Bristol, CT 06011-0977             :
:
CHARLOTTE HUNGERFORD HOSPITAL :
40 Litchfield Street, PO Box 988   :
Torrington, CT  06790-0988         :
:
THE GRIFFIN HOSPITAL               :
130 Division Street                :
Derby, CT 06418-1326               :
:
HARTFORD HOSPITAL                  :
80 Seymour Street                  :
Hartford, CT 06102-5037            :
:
JOHN DEMPSEY HOSPITAL              :
The University of Connecticut Health Center :
263 Farmington Avenue              :
Farmington, CT  06030              :
:
JOHNSON MEMORIAL HOSPITAL          :
201 Chestnut Hill Road, PO Box 860 :
Stafford Springs, CT  06076-0860   :
:
LAWRENCE & MEMORIAL HOSPITAL  :
365 Montauk Avenue                 :
New London, CT  06320-4769         :
:
MANCHESTER MEMORIAL HOSPITAL  :
Eastern Connecticut Health Network, Inc.  :
71 Haynes Street                   :
Manchester, CT  06040-4188         :
:

MIDSTATE MEDICAL CENTER          :
435 Lewis Avenue                 :
Meriden, CT  06451-2101          :
                                 :
MILFORD HOSPITAL                 :
300 Seaside Avenue               :
Milford, Connecticut 06460-4603  :
                                 :
NEW BRITAIN GENERAL HOSPITAL     :
100 Grand Street                 :
New Britain, CT  06052-2017      :
                                 :
NORWALK HOSPITAL ASSOCIATION     :
34 Maple Street                  :
Norwalk, CT  06850-3894          :
                                 :
ROCKVILLE GENERAL HOSPITAL       :
31 Union Street                  :
Vernon Rockville, CT 06066-3160  :
                                 :
ST. FRANCIS HOSPITAL & MEDICAL   :
CENTER                           :
114 Woodland Street              :
Hartford, CT 06105-1208          :
                                 :
ST. FRANCIS HOSPITAL & MEDICAL   :
CENTER d/b/a MOUNT SINAI HOSPITAL :
114 Woodland Street              :
Hartford, CT  06105-1208         :
                                 :
ST. JOSEPH'S MEDICAL CENTER      :
The Stamford Hospital            :
Shelburne Road at West Broad Street :
PO Box 9317                      :
Stamford, CT  06904-9317         :
                                 :
THE DAY KIMBALL HOSPITAL         :
320 Popmfret Street              :
Putnam, CT  06260-0901           :
                                 :
THE NEW MILFORD HOSPITAL         :
21 Elm Street                    :
New Milford, CT  06776-3029      :
                                 :
                                 :
                                 :

THE STAMFORD HOSPITAL       :
Shelburne Road at West Broad Street  :
PO Box 9317        :
Stamford, CT  06904-9317    :
    :
THE WILLIAM W. BACKUS HOSPITAL  :
326 Washington Street    :
Norwich, CT 06360-2733    :
    :
WINDHAM COMMUNITY MEMORIAL  :
HOSPITAL    :
112 Mansfield Avenue    :
Willimantic, CT  06226-2040    :
    :
WATERBURY HOSPITAL HEALTH  :
CENTER    :
64 Robbins Street    :
Waterbury, CT  06708-2600    :
    :
HOSPITAL OF SAINT RAPHAEL  :
1450 Chapel Street    :
New Haven, CT 06511    :
    :
YALE-NEW HAVEN HOSPITAL  :
20 York Street    :
New Haven, CT 06504    :
    :
GREENWICH HOSPITAL    :
5 Perryridge Road    :
Greenwich, CT 06830    :
    :
BRIDGEPORT HOSPITAL    :
267 Grant Street    :
Bridgeport, CT 06610-0120    :
    :
     Plaintiffs,    :
    :
   v.    :
    :
MICHAEL O. LEAVITT, Secretary of the  :
United States Department of Health and  :
Human Services    :
200 Independence Avenue, S.W.  :
Washington, D.C. 20201    :
     Defendant.  :
    :
_____

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, state the following by way of their first amended complaint against Michael O. Leavitt, Secretary of the Department of Health and Human Services ("the Secretary"):

## NATURE OF THE CASE

1.  This action arises from the Secretary's failure to reopen certain of the Plaintiffs' cost reports, reclassify payments made by the Plaintiffs under Connecticut's Gross Earnings Tax ("GET tax") as reimbursable costs, and make such payments as called for by the recalculation, either directly or through the Secretary's intermediary. These payments are due and owing under the Medicare statute. The Plaintiffs bring this action for mandamus to compel the Secretary to perform his non-discretionary duty to reopen the Plaintiff's cost reports in order to recalculate and issue those payments.

## JURISDICTION

2.  This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq. ("the Medicare statute"). The United States District Court for the District of Columbia has jurisdiction in this matter pursuant to 28 U.S.C. §1361 because (i) the hospital has exhausted all available remedies related to this issue within the meaning of the statute (by either filing the appropriate requests for reopening and/or appeals or because such remedies are either unavailable as a matter of law or futile) and (ii) the Defendant has a clear, non-discretionary duty to act in this case.

## VENUE

4

3.    Venue is proper in this district court, pursuant to 28 U.S.C. §1391 and 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1877(f).

## **THE PARTIES**

4.    The Plaintiffs consist of the following hospitals, all of which furnish inpatient and outpatient hospital services to, inter alia, patients entitled to benefits under the Medicare program:

(a)    Bradley Memorial Hospital, a Medicare Provider located at 81 Meriden Avenue, Southington, Connecticut 06489-3297, assigned provider number 07-0009;

(b)    Bristol Hospital, a Medicare Provider located at Brewster Road, Bristol, Connecticut 06011-0977, assigned provider number 07-0029;

(c)    Charlotte Hungerford Hospital, a Medicare Provider located at 40 Litchfield Street, Torrington, Connecticut 06790-0988, assigned provider number 07-0011;

(d)    The Griffin Hospital, a Medicare Provider located at 130 Division Street, Derby, Connecticut 06418-1326, assigned provider number 07-0031;

(e)    Hartford Hospital, a Medicare Provider located at 80 Seymour Street, Hartford, Connecticut 06102-5037, assigned provider number 07-0025;

(f)    John Dempsey Hospital, a Medicare Provider located at The University of Connecticut Health Center, 263 Farmington Avenue, Farmington, Connecticut 06030, assigned provider number 07-0036;

(g)     Johnson Memorial Hospital, a Medicare Provider located at 201 Chestnut Hill Road, Stafford Springs, Connecticut 06076-0860, assigned provider number 07-0008;

(h)     Lawrence & Memorial Hospital, a Medicare Provider located at 365 Montauk Avenue, New London, Connecticut 06320-4769, assigned provider number 07-0007;

(i)     Manchester Memorial Hospital, a Medicare Provider located at Eastern Connecticut Health Network, Inc., 71 Haynes Street, Manchester, Connecticut 06040-4188, assigned provider number 07-0027;

(j)     Midstate Medical Center, a Medicare Provider located at 435 Lewis Avenue, Meriden, Connecticut 06450-1009, assigned provider number 07-0017;

(k)     Milford Hospital, a Medicare Provider located at 300 Seaside Avenue, Milford, Connecticut 06460-4603, assigned provider number 07-0019;

(l)     New Britain General Hospital, a Medicare Provider located at 100 Grand Street, New Britain, Connecticut 06052-2017, assigned provider number 07-0035;

(m)     Norwalk Hospital Association, a Medicare Provider located at 34 Maple Street, Norwalk, Connecticut 06850-3894, assigned provider number 07-0034;

(n)     Rockville General Hospital, a Medicare Provider located at 31 Union Street, Vernon Rockville, Connecticut 06066-3160, assigned provider number 07-0012;

(o)     St. Francis Hospital & Medical Center, a Medicare Provider located at 114 Woodland Street, Hartford, Connecticut 06105-1208, of which the assigned provider number is 07-0002. Mt. Sinai Hospital was a Medicare Provider and a

predecessor through merger with respect to St. Francis Hospital & Medical Center, and was assigned provider number 07-0013;

(p)     St. Joseph's Medical Center, assigned provider number 07-0030, predecessor-in-interest to The Stamford Hospital, assigned provider number 07-0006 (see below).

(q)     The Day Kimball Hospital, a Medicare Provider located at 320 Pompfret Street, Putman, Connecticut 06260-0901,  assigned provider number 07-0003;

(r)     The New Milford Hospital, a Medicare Provider located at 21 Elm Street, New Milford, Connecticut 06776-3029,  assigned provider number 07-0015;

(s)     The Stamford Hospital,  a Medicare Provider located at Sheburne Road at West Broad Street, Stamford, Connecticut 06904-9317, assigned provider number 07-0006 and, in addition, as successor-in-interest to St. Joseph's Medical Center, assigned provider number 07-0030.

(t)     The William W. Backus Hospital, a Medicare Provider located at 326 Washington Street, Norwalk, Connecticut 06360-2733, assigned provider number 07-0024;

(u)     Windham Community Memorial Hospital, a Medicare Provider located at 112 Mansfield Avenue, Willimantic, Connecticut 06226-2040, assigned provider number 07-0021;

(v)     Waterbury Hospital Health Center, a Medicare Provider located at 64 Robbins Street, Waterbury, Connecticut 06708-2600, assigned provider number 07-0005;

(w)     Hospital of Saint Raphael, 1450 Chapel Street, New Haven, Connecticut 06511, assigned provider number 07- 0001;

(x)     Yale-New Haven Hospital, 20 York Street New Haven, Connecticut 06504, assigned provider number 07-0022;

(y)     Greenwich Hospital, 5 Perryridge Road, Greenwich, Connecticut 06830, assigned provider number 07-0018; and

(z)     Bridgeport Hospital, 267 Grant Street Bridgeport, Connecticut 06610-0120, assigned provider number 07-0010.

## FACTS

### A.     Background Facts: Medicare Reimbursement In General

5.     Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965.  As originally enacted, Medicare was a health insurance program that furnished health benefits to participating individuals once they reached the age of 65.

6.     Among the benefits provided under Medicare are hospital services. For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis.  42 U.S.C. § 1395f(b).

7.     In 1983, Medicare began reimbursing hospitals using the prospective payments system ("PPS").  42 U.S.C. § 1395www(d).  Under PPS, hospitals are paid a fixed amount for each of approximately 490 diagnosis-related groups ("DRGs"), subject to certain payment adjustments.

8.     The Secretary (or one or more of his predecessors, hereinafter collectively referred to simply as "the Secretary") has delegated much of the responsibility for administering the Medicare Program to the Centers for Medicare and Medicaid Services

("CMS"), formerly known as the Health Care Financing Administration (hereinafter collectively referred to as "CMS").

9.      The Secretary, through CMS, contracted out many of Medicare's audit and payment functions to entities known as fiscal intermediaries.

10.      In order for a hospital to obtain Medicare reimbursement, it must, at the close of each fiscal year, submit to its intermediary a "cost report" showing both the costs incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare.  42 C.F.R. §§ 413.20(b), 413.24(f).

11.      The intermediary then audits the cost report and informs the hospital of its final determination of the amount of Medicare reimbursement through a notice of program reimbursement ("NPR").  42 C.F.R. § 405.1803.

12.      A provider dissatisfied with its intermediary's determination may, in certain circumstances, file an appeal with the Provider Reimbursement Review Board ("PRRB" or "Board") within 180 days of the date of the determination.  42 U.S.C. § 1395oo(a).

13.      In addition to filing appeals, providers may, in certain circumstances, obtain relief through an intermediary's reopening of its cost report, without the involvement of the PRRB.  There are three types of re-openings set forth in the regulations.

14.      Under the first type of reopening, a dissatisfied provider may file a reopening request with the intermediary, asking the intermediary to reopen and revise a settled cost report within three years of the date that the determination was issued.  42 C.F.R. § 405.1885(a).  Jurisdiction for reopening a decision under 42 C.F.R.

§405.1885(a) rests with the administrative body that rendered the last determination or decision.  42 C.F.R. § 405.1885(c).

15.     The second type of reopening is mandatory and occurs when an intermediary's determination is required to be reopened under 42 C.F.R. § 405.1885(b) because CMS, within the three-year period in which reopenings are permitted, notifies the intermediary that the initial determination or settlement was inconsistent with applicable law.  The version of 42 C.F.R. §405.1885(b) in effect at all times referenced in this complaint stated that an intermediary's decision "shall be reopened and revised by the intermediary if, within the aforementioned 3-year period, the Centers for Medicare & Medicaid Services notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Centers for Medicare & Medicaid Services. . . "  See 67 Fed. Reg. 50096 (August 1, 2002).[1]

16.     The third type of reopening is also mandatory, and requires that "an intermediary's determination "shall be reopened and revised at any time if it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision."  42 C.F.R. 405.1885(d).

## B.     Reimbursable Tax Payments Under the Medicare Program

17.     The Medicare statute requires intermediaries to reimburse providers for the reasonable and necessary cost of providing services to Medicare beneficiaries:

---

[1] All citations to 42 C.F.R. § 405.1885 in this complaint, unless otherwise noted, refer to the version of the regulation that was in effect prior to August 1, 2002 and which applies to the claims in this complaint.

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services . . .

42 U.S.C. § 1395x(v)(1)(A).

18.     The Medicare regulations amplify the statute, stating that reasonable costs include those costs that are "appropriate and helpful in developing and maintaining the operation of patient care facilities" and that are "common and accepted occurrences in the field of the provider's activity":

> (a) Principle.  All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.  Reasonable cost includes all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and cost.
>
> * * *
>
> (b)(2) Necessary and proper costs.  Necessary and proper costs are costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities.  They are usually costs that are common and accepted occurrences in the field of the provider's activity.

42 C.F.R. § 413.9.

19.     The Provider Reimbursement Manual, in accordance with the foregoing principles, contains a general rule stating that all taxes levied by the states upon providers are allowable costs:

> § 2122.1 General Rule
> .
> The general rule is that taxes assessed against the provider, in accordance with the levying enactments of the several States and lower levels of government and for which the provider is liable for payment, are allowable costs.  Tax expense should not include fines and penalties.

Provider Reimbursement Manual § 2122.1.

20.     Connecticut imposed the GET tax on hospitals from April 1, 1994 through April 1, 2000.  The tax was imposed from April 1, 1994, through September 30, 1996, at a rate of 11%;  from October 1, 1996, through September 30, 1997, at a rate of 9.25%; from October 1, 1997, through September 1, 1998, at a rate of 8.25%; from October 1, 1998 through September 30, 1999, at a rate of 7.25%; and from October 1, 1999, through April 1, 2000, at a rate of 4.25%.

21.     The Connecticut statute imposing the GET tax stated in relevant part:

> The hospital gross earnings of each hospital in this state shall not be subject to the provisions of this chapter with respect to calendar quarters commencing on or after April 1, 2000.  Each hospital shall, on or before the last day of January, April, July and October of each year, render to the Commissioner of Revenue Services a return, on forms prescribed or furnished by the Commissioner of Revenue Services and signed by one of its principal officers, stating specifically the name and location of such hospital, and the amounts of its hospital gross earnings, its net revenue and its gross revenue for the calendar quarter ending the last day of the preceding month.  Payment shall be made with such return.
>
> * * * *
>
> If any hospital fails to pay the amount of tax reported to be due on its return within the time specified under the provisions of section 12-263b, there shall be imposed a penalty equal to ten percent of such amount due and unpaid, or fifty dollars, whichever is greater. . . .

C.G.S.A. §§ 12-263b ("Tax on gross earnings.  Rate.  Tax not applicable after April 1, 2000."), 12-263c ("Failure to pay tax when due.  Penalty provisions.  Waiver.").

22.     Pursuant to the foregoing statutory provision, the GET tax was abolished, on a prospective basis, on April 1, 2000.

23.     The Secretary, CMS, and/or the intermediary, from 1994 until 2001, took the position that the GET tax was not an allowable cost.  Connecticut Hospitals were strictly forbidden from claiming payments under the GET tax on their cost reports.

24.     From 1989 until 1998, Douglas Payne worked as the Manager of the Medicare Audit and Reimbursement Department for Blue Cross and Blue Shield of Connecticut, a fiscal intermediary for Medicare providers in the State of Connecticut acquired by Anthem in or around 1997.

(a)     Mr. Payne's duties included, but were not limited to, overseeing the work of all of the Medicare cost report auditors and implementing Medicare reimbursement and cost reporting policies.

(b)     Mr. Payne attended regional meetings of intermediaries in or around 1995 which included representatives of fiscal intermediaries from New England, New Jersey, New York, Pennsylvania and West Virginia.  According to Mr. Payne, the purpose of such meetings was to help develop and articulate consistent Medicare policies.  One of the policies discussed in the meetings was how intermediaries should deal with state assessments and/or taxes that were imposed by States on hospitals in conjunction with statewide "uncompensated care pools" (i.e. programs under each State's Medicaid Disproportionate Share Hospital or "Medicaid DSH" program).  According to Mr. Payne, Each of the intermediaries agreed that the Medicare policy was that such assessments and taxes should not be treated as allowable costs for hospitals.

(c)     According to Mr. Payne, it was the Medicare policy of successive fiscal intermediaries in Connecticut (Blue Cross and Blue Shield of Connecticut and Anthem) to classify the GET Tax as a non-allowable cost.  Mr. Payne understood the GET Tax to function in the same manner as the New York Hospital Tax.  According to Mr. Payne, it was the policy of the intermediary, from the inception of the GET Tax in or around 1994,

up through the time he left the intermediary in 1998, that the GET Tax was not an allowable cost for the Connecticut Hospitals.

(d)  Mr. Payne is also aware that one of the intermediary's auditors, in the context of auditing a cost report submitted by St. Vincent's Medical Center, noted that the GET Tax was being disallowed because of the "not-for-profit" status of the hospital. According to Mr. Payne, the policy of disallowing the GET Tax had nothing to do with whether a hospital was "for profit" or not-for-profit" hospital.  According to Mr. Payne, that fact was simply irrelevant to the policy because during the time period 1994 through 1997, all of the acute care hospitals in the State of Connecticut were "not-for-profit" institutions.

25.  From 1980 until 1998, Maureen Joslin worked as a Senior Auditor first for Blue Cross and Blue Shield of Connecticut and later Anthem.

(a)  Ms. Joslin audited Medicare cost reports filed by Connecticut hospitals and reviewed the Medicare audit work and desk reviews performed by the team of auditors she supervised.

(b)  Ms. Joslin was copied on agenda items and correspondence in 1995 dealing with the issue of GET from a regional meeting of intermediaries which included representatives of fiscal intermediaries from New England, New Jersey, and New York. The purpose of such regional meetings was to help develop and articulate consistent interpretation and application of Medicare regulations.  The documents Ms. Joslin received addressed how intermediaries should deal with state assessments and/or taxes imposed by States in order to fund statewide "uncompensated care pools".  The consensus was that such assessments and taxes should not be treated as allowable costs.

(c)     Ms. Joslin also assisted in promoting consistent policies of the intermediary in the context of auditing (and supervising the auditing of) Medicare cost reports for Connecticut hospitals.  According to Ms. Joslin, during the time of her employment as senior auditor, it was the policy of successive fiscal intermediaries in the State of Connecticut (Blue Cross and Blue Shield of Connecticut and Anthem) to classify the GET Tax as an uncompensated care pool tax and consider payments made under the tax as a non-allowable cost.  According to Ms. Joslin, documentation relative to these policies exist, including contemporaneous writings reflecting the fact that the intermediary's policy in the State of Connecticut was that the GET Tax was a non-allowable cost.

26.     William Macintyre, the Director of Budgets and Reimbursement for Griffin Hospital in Connecticut since 1995, oversees the submission of the hospital's Medicare cost report and handles cost report issues throughout the audit adjustment process.  According to Mr. Macintyre, prior to 2002, the auditing staff at Empire Medicare Services, a fiscal intermediary for Medicare providers located in the State of Connecticut, informed him that the GET Tax was not an allowable cost and thus should not be included on the Medicare cost report of Griffin Hospital.

27.     Rose Cambino was a lead auditor for Empire Medicare Services from 1999 through 2002.  She was employed by Empire's predecessor, Anthem Blue Cross and Blue Shield of Connecticut, from 1997 until 1999.  Ms. Cambino is now a Regulatory and Reimbursement Specialist with St. Vincent's Medical Center in Connecticut.

(a)     During the time that she worked as an auditor for Anthem, it was her understanding that the GET Tax was considered to be a non-allowable and non-reimbursable cost.  This treatment of the GET Tax did not change when Empire took over as fiscal intermediary for Connecticut in the summer of 1999.  In fact, the policy did not change until early 2002.  Empire kept several of Anthem's auditors when it became the intermediary in 1999.  According to Ms. Cambio, Warren Willis was hired as a manager by Anthem in late calendar year 1998 and continued as a manager when Empire took over in 1999.

(b)     According to Ms. Cambino, St. Vincent's Medical Center did not initially appeal the disallowance of its GET Tax payments upon receipt of its NPR for fiscal year 1995.  It did, however, file an appeal regarding other, unrelated costs report issues.  It was not until 2003, after Empire had already changed its reimbursement policy so as to consider the GET Tax allowable, that St. Vincent's added the GET Tax issue to its fiscal year 1995 Medicare cost report appeal.  Ms. Cambino added the issue by way of correspondence that she sent in 2003.  Up until that time, St. Vincent's fiscal year 1995 did not reference the GET Tax.

28.     Rex Shera, a principal at Ernst & Young LLP, worked with twenty-seven Medicare providers located in the State of Connecticut, as detailed in the following paragraphs, in their efforts to get the Secretary and Empire Medicare Services to recognize the GET Tax as an allowable, reimbursable cost for purposes of Medicare reimbursement.

(a)     By letter dated August 31, 2001 to Thomas Talbott, Acting Director of the Division of Cost Reporting at CMS, Mr. Shera stated a case that the GET Tax was an

allowable cost and requested that CMS issue a statement to that effect.

(b)     By way of letter dated December 14, 2001, Mr. Talbott responded to Mr. Shera conceding that the GET tax was an allowable cost and ordered that it be reimbursed by the fiscal intermediary: "[A]s administered, the tax assessments on hospital gross earnings would constitute allowable Medicare costs."

(c)     Mr. Shera informed Empire Medicare Services managers Warren Willis and George Porette that CMS reversed its policy of non-reimbursement. Mr. Willis expressed concern regarding CMS's change in policy and stated that he would contact CMS and attempt to have the agency reconsider the issue and reinstate the policy of non-reimbursement. Empire Medicare Services was not successful in its efforts to have CMS reinstate the policy of non-reimbursement.

(d)     Empire Medicare Services proceeded to reopen the closed cost reports for the vast majority of the hospitals working with Ernst & Young LLP for fiscal years that had been the subject of an NPR issued in the preceding three years. Empire Medicare Services added the GET Tax as an allowable cost, recalculated the amount due to the hospital, and paid the hospitals the additional reimbursement.

(e)     According to Mr. Shera, neither Empire Medicare Services nor CMS objected to the reopening of these cost reports based upon the fact that hospitals did not claim the GET Tax as an allowable cost in the Provider's cost report as originally filed.

(f)     According to Mr. Shera, later in 2002, Mr. Willis informed him that even hospitals that were not working with Ernst & Young LLP on the GET Tax issue had been contacted by Empire Medicare Services and provided the opportunity to reopen their cost

17

reports retrospectively on the GET Tax issue, irrespective of whether or not they had claimed GET Tax payments on their cost reports as originally filed.

(g)     According to Mr. Shera, none of the 27 hospitals working with Ernst & Young were allowed to claim GET Tax payments as allowable costs prior to 2002, until CMS reversed its policy of non-reimbursement.

29.     The position stated in the December 2001 letter is consistent with the law, as the GET tax is a tax on hospitals that, in accordance with the Medicare statute, is a necessary and proper expense incurred by the hospital for which it should be reimbursed.

30.     Shortly after receiving CMS's correspondence dated December 14, 2001, the Plaintiffs sent reopening requests to the intermediary requesting: (i) that the intermediary reopen all of the cost report years from the inception of the tax up through the date of the reopening request and (ii) that the intermediary provide the hospitals with the additional reimbursement owed to them under the Medicare statute.

31.     The intermediary granted the reopening requests in part, reopening only those NPR's that had been issued to the hospitals during the three years preceding CMS's December 2001 declaration that payments made under the GET tax were allowable costs.

32.     CMS failed to instruct the intermediary to reopen cost report years 1994, 1995, and 1996.[2]  As a result, the intermediary has under-reimbursed the Plaintiffs, collectively, in an amount exceeding $17,000,000.00.


## COUNT I

33.     Plaintiffs incorporate by reference paragraphs 1-32 herein.

_____

[2] Except that certain Plaintiffs received additional reimbursement for fiscal year 1996.

34.    The Secretary's failure to treat GET tax payments as an allowable cost during the foregoing time periods violates the Medicare statute. The reasonable cost of Medicare services shall be "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."[3] The classification of such costs as allowable is mandatory and non-discretionary on the part of the Secretary and CMS.

35.    The Secretary, CMS, and the intermediary had an affirmative, non-discretionary duty to (i) correctly reimburse the plaintiffs upon the issuance of the initial NPR, (ii) reopen and revise all determinations and hearing decisions, including but not limited to all NPR's and all amended and/or revised NPR's, irrespective of whether Plaintiffs requested reopening, and (iii) thereafter issue payment to the Plaintiffs reflecting the reimbursement owed by the intermediary for each of the affected years.

36.    As set forth above, the intermediary violated the Medicare statute by issuing initial NPR's and/or corrected NPR's to Plaintiffs that failed to classify the GET tax as an allowable cost and failed to reimburse the hospitals for payments under the GET tax.

37.    Plaintiffs are entitled to mandamus on a number of separate grounds, including but not limited to those which are detailed in the following paragraphs and also alluded to above.

(a)    First, the Secretary, CMS, and the intermediary have a clear statutory duty to reopen the cost report years at issue and reimburse the Plaintiffs because the GET tax payments were necessary and proper costs under the statute and should have been, but

---

[3] Provider Reimbursement Manual § 2122.1.

were not, classified by the Secretary, CMS, and/or the intermediary as allowable. The Plaintiffs are therefore entitled to relief under mandamus.

(b)     Second, the Secretary, CMS and the intermediary have a clear duty to reopen the cost report years at issue and reimburse the Plaintiffs under 42 C.F.R. § 405.1885(d) because the Secretary, CMS, and/or the intermediary unlawfully and wrongfully classified GET tax payments as non-allowable costs and passively and actively misled the Plaintiffs as to whether they were allowable. CMS, by letter dated June 28, 1995, informed the intermediary that a nearly identical tax in the State of New York was properly the subject of reimbursement: "[T]hese costs are allowable under existing regulations and authority. We must therefore reverse our earlier determination and direct you to consider this item an allowable cost. . . ." The intermediary should have begun to reimburse the Connecticut hospitals for GET payments beginning at or around that time. Through the fault of the Secretary, CMS, and/or the Intermediary, the Connecticut hospitals did not receive reimbursement for tax costs of the kind that had already been deemed as allowable costs. This as an additional and independent ground upon which Plaintiffs are entitled to relief under mandamus.

(c)     Third, despite the determination made in June of 1995 regarding reimbursement for the New York tax, the Secretary and CMS wrongfully delayed giving notice that the intermediary's prior interpretation of the law with regard to the Connecticut facilities was incorrect, resulting in the retrospective, three year window for reopening prescribed by 42 C.F.R. § 405.1885(b) being too narrow to cover all of the cost report periods for which the intermediary should have reimbursed the Plaintiffs for GET payments. The intermediary, charged with the knowledge of the CMS policy reversal, as

a matter of law, fraudulently withheld such information from Plaintiffs. Thus, to the extent the Plaintiffs' administrative remedies were curtailed under the reopening regulations, it was a result of matters not reasonably within their control. This as an additional and independent ground upon which Plaintiffs are entitled to relief under mandamus.

The Plaintiffs have no remedy available to them, other than mandamus, to obtain reimbursement for payments which they made under the GET tax.

**WHEREFORE**, Plaintiffs request that the Court enter an order and issue a writ of mandamus:

(i) directing the Secretary and/or its intermediary to reopen Plaintiffs' cost reports covering the time periods referenced in Plaintiffs' complaint and to reclassify the payments made under the GET tax as allowable costs and pay Plaintiffs the additional amounts determined through the reopening process, together with an award of both pre-judgment and post-judgment interest on the additional amounts determined throughout the reopening process;

(ii) stating that this Court retains jurisdiction in this matter until the Secretary and/or the intermediary  have completed the reopening process, up to and including issuing revised NPR's where applicable;

(iii) requiring the Secretary to submit for the Court's prior approval any further instructions provided to the intermediary with regard to implementing this Court's ruling;

(iv) awarding Plaintiffs attorney's fees and costs, as permitted by law; and

(v) awarding such other monetary and equitable relief as this Court deems just and appropriate or is necessary to effectuate any aspect of the Court's award.

Respectfully submitted,

_____/s/_____
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC  20005
(202) 414-9200
(202) 414-9299 Facsimile
JBennett@ReedSmith.com

Steven B. Roosa (*pro hac vice*)
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ  08540
(609) 987-0050

Attorneys for the Plaintiffs

Of Counsel:

Murray J. Klein
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ  08540
(609) 987-0050

Dated:  January 31, 2005