IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRADLEY MEMORIAL HOSPITAL, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:04cv00416 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

OF COUNSEL:

ALEX M. AZAR II
General Counsel

ROBERT P. JAYE
Acting Associate General Counsel

MARK D. POLSTON
Acting Deputy Associate General
Counsel

LAWRENCE M. MEISTER
Attorney
Department of Health
and Human Services

PETER D. KEISLER                    .
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W., Room 7142
Washington, D.C.  20530
Tel:  (202) 514-3953
Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The Medicare Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  Cost Reports, Intermediary Determinations, and the Parties to the
        Intermediary's Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.  Administrative Hearings and the Parties to Hearing Decisions . . . . . . . . . . . . . . . . . . . 3

    D.  The Reopening Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.  The Legal Status of Manual Instructions and Intermediary Advice . . . . . . . . . . . . . . . . 7

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Plaintiffs' Failure to Claim the GET Tax as a Medicare Expense . . . . . . . . . . . . . . . . . 9

    B.  The 2001 Opinion of CMS on the GET Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.  Plaintiffs' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.  Plaintiffs' Theory of "Active" Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    E.  Plaintiffs' Theory of "Passive" Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

LEGAL OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.  PLAINTIFFS ARE NOT ENTITLED TO MANDAMUS RELIEF BECAUSE
       THEY HAVE NOT EXHAUSTED ALTERNATIVE MEANS OF RELIEF . . . . . . . . . 18

         A.  Plaintiffs' Claim Is on All Fours with the Mandamus Theory
            Rejected in <u>Heckler v. Ringer</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         B.  The Decision in <u>Monmouth Memorial Hospital v. Thompson</u> Does Not
            Excuse the Failure to Exhaust Statutory Appeals Here . . . . . . . . . . . . . . . . . . . . 26

         C.  Plaintiffs Also Failed to Exhaust Available Remedies Because They
            Did Not Request a Permissive Reopening in a Timely Fashion . . . . . . . . . . . . . 29

II. PLAINTIFFS' MANDAMUS CLAIMS SHOULD BE DISMISSED
BECAUSE THE SECRETARY OWES THEM NO DUTY TO REOPEN . . . . . . . . . . 31

   A. There Is No Such Thing as a Statutory Duty to Reopen . . . . . . . . . . . . . . . . . . . 32

   B. The Secretary Has No Duty to Extend the Reopening Granted
under 42 C.F.R. § 405.1885(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   C. The Secretary Owes Plaintiffs No Duty to Reopen under
42 C.F.R. § 405.1885(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      1. CMS and intermediaries are not "parties to the intermediary's
determination" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      2. An intermediary does not "procure" its own determination . . . . . . . . . . 38

      3. The Secretary's reading of § 405.1885(d) comports with its history . . . . 39

      4. Fraud or similar fault was not "established" . . . . . . . . . . . . . . . . . . . . . . 41

      5. Plaintiffs allege no facts showing any "active" or "passive"
misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III. MANDAMUS RELIEF SHOULD BE DENIED ON EQUITABLE GROUNDS . . . . . 45

IV. THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
ALLEGE FRAUD OR SIMILAR FAULT WITH PARTICULARITY . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## INTRODUCTION

In this action, sophisticated hospitals seek to blame the federal government for their own mistakes.  Plaintiffs are twenty-seven hospitals in Connecticut that did not claim a certain state tax as a reimbursable expense when they submitted cost reports to the "fiscal intermediary" that processes Medicare claims on behalf of the Secretary of Health and Human Services.  An accounting firm hired by the hospitals noticed the omission in 2001 and brought it to the attention of the Centers for Medicare & Medicaid Services ("CMS").  After reviewing the legal arguments raised by the accounting firm, CMS concluded that the tax was reimbursable.  Pursuant to its discretionary authority under 42 C.F.R. § 405.1885(b), the agency generously ordered the intermediary to reopen and revise final payment determinations for the three prior years, the maximum reopening period permitted by the regulation.  Plaintiffs now seek an extraordinary writ of mandamus to force the Secretary to reopen payment determinations for earlier cost-reporting periods in 1994, 1995 and 1996.  The claim is patently without merit and should be dismissed.

## STATUTORY AND REGULATORY BACKGROUND

### A. The Medicare Program

Title XVIII of the Social Security Act, commonly known as the "Medicare Act," establishes a program of health insurance for the elderly and disabled.  Medicare Part A provides coverage for inpatient-hospital and related care.  42 U.S.C. §§ 1395c-1395i-5.  Part B covers outpatient care.  42 U.S.C. §§ 1395j-1395w-4.  Part C provides Medicare benefits for services provided through health management organizations.  42 U.S.C. §§ 1395w-21-1395w-29.  Part D establishes a prescription-drug benefit that goes into effect on January 1, 2006.  42 U.S.C. §§ 1395w-101-1395w-152.  The entire program is administered by the Secretary through CMS.

Medicare currently processes almost a billion claims per year, 2004 CMS Statistics 43 (HHS October 2004), resulting in annual payments of more than $270 billion. Id. at 26. To make it possible to handle this staggering volume, the Secretary hires contractors, usually insurance companies, to make payment determinations for health-care providers and individual beneficiaries. 42 U.S.C. §§ 1395h, 1395u. When contractors process Part A claims, they are known as "fiscal intermediaries." 42 C.F.R. § 421.100. Currently, 28 fiscal intermediaries process $166 billion in claims for about 6,000 hospitals, 15,000 skilled nursing facilities, and other providers of institutional care. 2004 CMS Statistics at 16, 19, 27, 42. These same contractors usually also process Part B claims in their role as "carriers." 42 C.F.R. §§ 421.200, 421.5(c). As a result, the claims load of each intermediary is almost unimaginably heavy.

### B. Cost Reports, Intermediary Determinations, and the Parties to the Intermediary's Determination

A program that processes as many claims as Medicare requires a meaningful element of finality in order to function. Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 454-56 (1999). The efficient operation of the program also requires that the health care-providers submit complete claims for the reimbursement and call attention to any disputed claims at an early stage. To facilitate these public-policy imperatives, hospitals that receive Part A payments are required to submit annual cost reports to their designated intermediary. See 42 C.F.R. §§ 413.20-413.24. These reports commonly run into the hundreds of pages and contain "thousands of cost items, any one of which may give rise to a reimbursement issue." 67 Fed. Reg. 49,982, 50,100 (Aug. 1, 2002); see also Athens Cmty. Hosp., Inc. v. Shalala, 743 F.2d 1, 3 (D.C. Cir. 1984) ("We are informed that a cost report, when completed, is approximately three-quarters of an inch thick."). To permit efficient processing of these voluminous reports, the

-2-

Medicare regulations require health-care providers to "furnish such information to the intermediary as may be necessary" to "[a]ssure proper payment by the program." 42 C.F.R. § 413.20(d)(1)(i). This includes <u>all</u> "cost, revenue, statistical, and other information pertinent to reimbursement." 42 C.F.R. § 413.20(c)(2).[1]

On the basis of the cost report submitted by the hospital, the intermediary makes a "determination," also known as a "notice of program reimbursement," of the total amount the hospital should be reimbursed for the services it rendered to Medicare beneficiaries during the reporting period. 42 C.F.R. § 405.1803. The "parties to the intermediary's determination are the provider and any other entity found by the intermediary to be a related organization of the provider," 42 C.F.R. § 405.1805, within the meaning of 42 C.F.R. § 413.17.[2] Under this controlling regulatory definition, the intermediary is not a "party" to the payment determination. The same is true of the Secretary and CMS.

## C. Administrative Hearings and the Parties to Hearing Decisions

The intermediary's notice of program reimbursement is "final" unless it is either appealed or reopened within the time frames established by Medicare statutes and regulations. 42 C.F.R. § 405.1807. If the amount in controversy is at least $1,000 but less than $10,000, the hospital may demand a hearing before the intermediary itself, 42 C.F.R. § 405.1809, within 180 days of

---

[1] <u>See also</u> 42 C.F.R. § 413.24(c) (provider must furnish "cost information" that is "[a]dequate" to "support payments made for services furnished to beneficiaries"), § 413.20(a) (provider required to "maintain sufficient financial records and statistical data for proper determination of costs payable under the program" and must use "reporting practices that are widely accepted in the hospital and related fields"), § 413.20(c)(1) (provider must have an "adequate ongoing system for furnishing the records needed to provide accurate cost data and other information capable of verification by qualified auditors").

[2] With certain exceptions, related organizations are entities "related to the provider by common ownership or control." 42 C.F.R. § 413.17(a).

-3-

the determination.  42 C.F.R. § 405.1811(a).  The "parties to the intermediary hearing" are

limited to "the parties to the intermediary's determination and any other entity determined by the

intermediary to be a related organization of such provider."  42 C.F.R. § 405.1815.  The

intermediary and CMS are not "parties" to the hearing.  Id.

     If the amount in controversy is $10,000 or more, the hospital may demand a hearing

before the Provider Reimbursement Review Board ("PRRB" or "the Board").  42 U.S.C.

§§ 1395oo(a)(1)-(2); 42 C.F.R. § 405.1835.  The demand for a Board hearing must be made

within 180 days after the intermediary's determination is mailed to the provider.  42 U.S.C.

§ 1395oo(a)(3); 42 C.F.R. § 405.1841(a).  The "parties to the Board hearing" are "the provider,"

"the intermediary (including [CMS] when acting directly as intermediary)," and "any other entity

found by the intermediary to be a related organization of such provider."  42 C.F.R.

§ 405.1843(a).  Unless acting as an intermediary, "neither the Secretary nor [CMS] may be made

a party" to the Board hearing.  42 C.F.R. § 405.1843(b).

     After its hearing, the Board renders a decision, 42 C.F.R. § 405.1871(a), that the

Secretary, in his discretion, may then review.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875.

After a final decision is rendered, the hospital has 60 days to seek judicial review in district court.

42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.  A hospital that fails to claim reimbursement

for an item on its cost report and/or fails to seek administrative review of an adverse intermediary

determination ordinarily may not obtain subsequent judicial review of a disputed payment issue.

See Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 11-25 (2000); Your Home,

525 U.S. at 454-57; Heckler v. Ringer, 466 U.S. 602, 618-19 (1984).

### D. The Reopening Regulation

In addition to the potential revisions available through the administrative and judicial avenues of review created by Congress in 42 U.S.C. § 1395oo, the final payment determinations of an intermediary also may be subject to reopening, pursuant to a regulation promulgated "by the grace of the Secretary," Your Home, 525 U.S. at 454, at 42 C.F.R. § 405.1885.  In some settings, reopening is permissive.  42 C.F.R. §  405.1885(a).  In others, it is mandatory.  42 C.F.R. §§ 405.1885(b), (d).  The Secretary is never under any statutory duty to reopen an otherwise final payment determination, however, because the "right of a provider to seek reopening" is "afforded only by regulation and not by the Social Security Act itself."  Your Home, 525 U.S. at 454.  And the terms of that regulation must be narrowly construed, so not to "frustrate the statutory purpose" of 42 U.S.C. § 1395oo by, among other things, "permitting requests to reopen to be reviewed indefinitely."  Your Home, 525 U.S. at 454.

Reopening of an otherwise final payment determination of an intermediary is available in three settings.  First, the hospital may ask the intermediary to reopen the determination "within 3 years of the date" of the notice of program reimbursement.  42 C.F.R. § 405.1885(a).  The intermediary "may," in the exercise of its discretion, grant or deny the request.  Id.  A denial of reopening cannot be appealed to the Board and is unreviewable in district court.  Your Home, 525 U.S. at 456-57; Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 811 (D.C. Cir. 2001).

Second, the intermediary may be placed under a mandatory duty to reopen if, "within the aforementioned 3-year period," CMS "notifies" it that a payment determination "is inconsistent with the applicable law, regulations, or general instructions" issued by CMS.  42 C.F.R. § 405.1885(b)(1).  CMS, however, is under no legal duty to issue a notice of inconsistency.  The intermediary's duty to reopen arises "only if [CMS] determines that a prior decision or set of

decisions is inconsistent with applicable law." Monmouth, 257 F.3d at 812 (emphasis added).

Whether or when to issue a notice of inconsistency is committed to the unreviewable discretion

of CMS. See Your Home, 525 U.S. at 457; Monmouth, 257 F.3d at 813.[3]

Finally, "an intermediary determination" must "be reopened and revised at any time if it is

established that such determination" was "procured by fraud or similar fault of any party to the

determination." 42 C.F.R. § 405.1885(d). A reopening is also mandatory "if it is established"

that an intermediary "hearing decision," a "decision of the Board," or a "decision of the

Secretary" was "procured by fraud or similar fault of any party to the . . . decision." Id. As was

discussed above, the "parties to the intermediary's determination" include only "the provider and

any other entity found by the intermediary to be a related organization of the provider," 42 C.F.R.

§ 405.1805, within the meaning of 42 C.F.R. § 413.17. Neither the intermediary, CMS nor the

Secretary is a "party" to the intermediary "determination," and therefore nothing they may do in

connection with issuance of an intermediary determination can give rise to a reopening obligation

under 42 C.F.R. § 405.1885(d). The same is true with respect to an intermediary's hearing

decision. 42 C.F.R. § 405.1815. The only action to which an intermediary (and sometimes

CMS) is a "party" is a Board decision. 42 C.F.R. § 405.1843(a). Thus, the only time "fraud or

similar fault" can result in a reopening obligation under 42 C.F.R. § 405.1885(d) on the basis of

the conduct by an intermediary (or CMS) is when the intermediary (or CMS) is defending its

own payment determination during a Board hearing.

---

[3] Subsection (b) of the reopening regulation was revised in 2002. 67 Fed. Reg. at 50,110-11. The version in effect when the payment determinations in this case were issued was published at 42 C.F.R. § 405.1885(b) (2001). The relevant language is identical, however, and therefore it is not necessary to determine which version applies to this case.

**E.  The Legal Status of Manual Instructions and Intermediary Advice**

Medicare is "a massive, complex health and safety program . . . embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts." Illinois Council, 529 U.S. at 13.  Congress therefore has give the Secretary a "broad delegation of authority" to decide how best to administer the program.  Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995). As the Supreme Court has repeatedly explained, "[t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare." Heckler v. Cmty. Health Servs. of Crawford County, 467 U.S. 51, 64 (1984). In particular, the Secretary has no "statutory duty to promulgate regulations that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement." Guernsey, 514 U.S. 87, 96 (1995).  It is perfectly permissible for the Secretary to issue regulations and instructions on a broad level of generality, and leave it up to the administrative appeals process to flesh out how those standards should be applied in particular circumstances.  Id. at 96-97.  The Secretary has wide latitude to determine which claims issues should be decided by broad policy and which should be decided through the "elaborate adjudicative structure which includes the right to review by the Provider Reimbursement Review Board and, in some instances, the Secretary, as well as judicial review in federal district court of final agency action." Id. (citing Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 400-01 (1988)).

Regulations and formal administrative rulings issued by the Secretary have the force of law and are binding throughout the administrative review process.  See Ringer, 466 U.S. at 608-09; 42 C.F.R. §§ 405.1829, 405.1867.  Instructions to intermediaries set forth in manual

provisions and other less formal documents have no such binding effect during the administrative appeals process. See Ringer, 466 U.S. at 607-08 (discussing decisions by administrative law judges in individual-benefits cases that rejected the positions taken in an intermediary manual). Mere statements by intermediaries about Medicare policy have even less force. The Supreme Court has long held that the Secretary cannot "be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of sums of money" by the health-care providers. Crawford County, 467 U.S. at 64. Nor are intermediaries under any legal duty to provide hospitals with advice on Medicare policy. Rather, "[a]s a participant in the Medicare program," each hospital has "a duty to familiarize itself with the legal requirements for cost reimbursement" and to be "acquainted with the nature of and limitations on the role of a fiscal intermediary." Id. at 64 (emphasis added). Entities that "deal with the Government," particularly businesses as sophisticated as the plaintiff hospitals here, "are expected to know the law and may not rely on the conduct of Government agents contrary to law." Id. at 63.[4]

## STATEMENT OF THE CASE

This is a case about a group of hospitals in Connecticut whose managements let them down by failing to familiarize themselves with Medicare law, submit timely claims for reimbursement for a particular tax-related cost, and, if necessary, pursue any disputed claims for that cost through the avenues for administrative and judicial review available to them under 42

---

[4] See also Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (per curiam) (Social Security Administration cannot be forced to pay benefits even though claimant was misinformed about her eligibility); Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 385 (1947) (government cannot be forced to pay insurance benefits even though policy holders were falsely told they were eligible). This principle would appear to apply with special force in the case of plaintiff Yale-New Haven Hospital, which presumably has some access o legal expertise.

U.S.C. § 1395oo.  As a result of their inattentiveness, plaintiffs failed to obtain reimbursement

that might otherwise have been available to them for cost-reporting periods in 1994, 1995 and

1996.  Am. Compl. at ¶ 32.  The hospitals now seek to recover the money by blaming the

Secretary, CMS and his fiscal agents for allegedly misleading them.

### A.  Plaintiffs' Failure to Claim the GET Tax as a Medicare Expense

From 1994 to 2000, the State of Connecticut operated a program designed to help defray

the costs of providing uncompensated hospital care to the indigent.  The program was funded by

two kinds of taxes.  See Am. Compl. at ¶¶ 20-22; Def. Ex. A at 5-7, 45-214.[5]  The first tax was a

sales tax that was paid by patients and merely collected by the hospitals.  Id. at 6, 49-214.  The

second tax was a gross earnings tax ("GET") on the hospitals themselves.  Id. at 5-6, 45-48.  The

revenue from both taxes was placed in a single pool and distributed to hospitals according to

their relative volume of uncompensated care.  Id. at 6.  Because much of the uncompensated-care

program was funded by the sales tax on patients, each hospital presumably got back more from

the revenue pool than it paid in.  For purposes of cost accounting, the hospitals might therefore

have thought of the entire program as a revenue-producer, rather than thinking of the GET tax as

an expense reimbursable by Medicare.

Whether for this or another reason, plaintiffs in this case did not claim the GET tax on the

portion of their annual cost reports where they were supposed to identify expenses reimbursable

by Medicare.  Def. Ex. A at 7.  Instead, following "the accepted industry practice," they lumped

the GET tax together with various other items and reported the total as a single item on a portion

---

[5] Unless otherwise noted, all referenced exhibits are attached to defendant's motion to dismiss plaintiffs' original complaint or, in the alternative, for summary judgment.  (Def. Mem.) (Doc. 8).  To conserve computer space on the Court's electronic filing system, these lengthy exhibits have not been refiled here, but are incorporated by reference.

of the cost report dealing with hospital revenues.  Id.  This particular line item was not used for

determining the amount of Medicare reimbursement.[6]  As a result, plaintiffs not only failed to

claim the GET tax as a reimbursable expense, but the tax was not even mentioned anywhere on

the cost report as an individualized expense.  An intermediary employee reading the cost reports

would not necessarily have known that the GET tax existed and could not possibly have known

how much money a particular hospital paid in GET taxes during any cost-reporting year.

### B.  The 2001 Opinion of CMS on the GET Tax

The Medicare Act contains no provision that deals specifically with the treatment of state

taxes on hospitals for purposes of reimbursement.  The relevant statute merely provides for

reimbursement to hospitals on the basis of "reasonable cost," 42 U.S.C. § 1395f(b)(1), which is

defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be

unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A).  By

regulation, the term "[r]easonable cost" has been interpreted to include "all necessary and proper

costs incurred in furnishing the services, subject to principles relating to specific items of revenue

and cost."  42 C.F.R. § 413.9(a).  "Necessary and proper costs," in turn, are defined as "costs that

are appropriate and helpful in developing and maintaining the operation of patient care facilities

and activities," such as "costs that are common and accepted occurrences in the field of the

provider's activity."  42 C.F.R. § 413.9(b).

Section 2122.1 of the Provider Reimbursement Manual sets forth general guidelines that

intermediaries are instructed to apply in determining whether state taxes imposed on hospitals are

---

[6] A copy of Form G-3, on which hospital revenues are reported, is attached as Def. Ex. B. The GET tax was included in the lump-sum figure that appears on line 2.  There is no place on the cost report where the items that comprise the sum total on line 2 are broken out individually.

reimbursable.  However, the Secretary has never established any nationwide policy that specifically addresses the treatment of state taxes on gross earnings, gross revenues, gross receipts or the like.  In light of the countless possible variations among state taxing schemes, these questions have quite reasonably been left for determination (and, if necessary, administrative adjudication) on a state-by-state basis.

On August 31, 2001, an accounting firm representing hospitals in Connecticut wrote to CMS for advice on whether the sales tax and the GET tax used to fund Connecticut's (by-then expired) uncompensated-care program could be claimed as a reimbursable Medicare expense. Am. Compl. at ¶ 28(a); Def. Ex A at 5-8.  The accounting firm explained why the hospitals felt each tax met the standards for reimbursement under Medicare law, id. at 6-7, attaching a copy of § 2122.1 of the Provider Reimbursement Manual.  Def. Ex A at 40.  The firm argued that the Connecticut taxes were similar to taxes in New York, Florida, Minnesota and Ohio that hospitals had successfully claimed as allowable expenses.  Id. at 7.  In support of its position, it attached publicly available copies of the relevant opinion letters and PRRB decisions.  Id. at 215-32.  The firm did not say why the hospitals had waited so long to make this inquiry, however.

On December 14, 2001, CMS responded by advising the accounting firm that the sales tax was not reimbursable, but the GET tax was.  Def. Ex. A at 3-4.  To defendant's knowledge, the 2001 letter represented the first time CMS had ever expressed an opinion as to the correct treatment of the GET tax.  On the basis of this conclusion, CMS ordered the intermediary to reopen cost determinations for the previous three years and revise them to include reimbursement for the GET tax.  Def. Ex. A at 1-2.[7]

_____

[7] In addition to the reopenings ordered by the Secretary, some intermediary determinations rendered during periods outside the scope of the order were reopened in response

### C.  Plaintiffs' Complaint

This action seeks a writ of mandamus to compel the Secretary to reopen final payment determinations for cost-reporting years in 1994, 1995 and 1996, Am. Compl. at ¶ 32, which were beyond the three-year scope of the reopening order.  The notices of program reimbursement for these years were issued between 1996 and 1998.  Declaration of George E. Porette ("Porette Dec.") at ¶ 3(a) (Def. Ex. 1) (attached to this memorandum).  Plaintiffs contend that these earlier payment determinations should be reopened for three reasons.

First, they claim that the Secretary has a "clear statutory duty to reopen," Am. Compl. at ¶ 37(a), even though the Supreme Court has held no such statutory duty exists.  Your Home, 525 U.S. at 454.  Second, plaintiffs claim that the Secretary had a duty under 42 C.F.R. § 405.1885(b) to reopen payment determinations more than three years old, Am. Compl. at ¶ 37(c), even though there is only a "three-year reopening period for reopenings under § 405.1885(b)."  Monmouth, 257 F.3d at 813.  Finally, plaintiffs claim that they have a right to reopening without time limit based on the alleged "fraud or similar fault" of the Secretary, CMS or the intermediary, Am. Compl. at ¶ 37(b), even though none of these actors are "parties to the intermediary's determination" under the controlling definition in 42 C.F.R. § 405.1805.  In support of this fraud-related theory, plaintiffs allege that "the Secretary, CMS and/or the intermediary passively and actively misled" the hospitals as to whether the GET tax was a reimbursable cost.  Am. Compl. at ¶ 37(b).

---

to timely requests made by the hospitals themselves pursuant to the separate reopening provision in 42 C.F.R. § 405.1885(a).  These "permissive" reopenings included two intermediary determinations for the 1995 cost-reporting year and thirteen for the 1996 cost-reporting year. Each of the plaintiff hospitals requested permissive reopening for the 1997 fiscal year, but these determinations were all covered already under the Secretary's reopening order.

Plaintiffs' original complaint was filed on March 15, 2004.  Defendant moved to dismiss, and plaintiffs cross-moved for summary judgment.  As the briefing neared an end, plaintiffs became concerned that their fraud-related theory had not been plead with sufficient particularity to survive defendant's motion to dismiss under Fed. R. Civ. P. 9(b).  In a putative effort to "moot" that problem, Pl. Reply[8] at 3, plaintiffs filed an amended complaint on January 31, 2005.  This Court then dismissed the pending dispositive motions without prejudice.  The new allegations intended to rescue plaintiffs' "fraud or similar fault" theory are set forth below.

### D.  Plaintiffs' Theory of "Active" Misrepresentation

From 1994 to 2000 when the GET tax was in effect, plaintiffs aver that three successive intermediaries processed Medicare cost reports for Connecticut hospitals.  The intermediary that processed cost reports in 1994 was Blue Cross and Blue Shield of Connecticut ("Blue Cross").  Am. Compl. at ¶ 24.  Sometime "around" 1997, plaintiffs aver that Blue Cross was acquired by an intermediary called Anthem.  Id.  Plaintiffs aver that Empire Medicare Services ("Empire") took over from Anthem sometime in "the summer of 1999."  Id. at ¶ 27(a).[9]

Sometime "in or around 1995," plaintiffs aver that Blue Cross participated in "regional meetings" of intermediaries from New York, New England, New Jersey, Pennsylvania and West Virginia.  Id. at ¶ 24(b).  According to plaintiffs, the purpose of these meetings was to "develop and articulate consistent Medicare policies."  Id.  One topic discussed at these meetings was how to treat state taxes imposed on hospitals in connection with "uncompensated care pools."  Id.

---

[8] Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Summary Judgment (Doc. 18).

[9] Although for purposes of this motion, the averments in the amended complaint are taken as true, in fact, they are not.  At various times between 1994-2000, the cost reports of six plaintiff hospitals were processed by two other intermediaries.

According to plaintiffs, each of the participating intermediaries "agreed that the Medicare policy was that such assessments and taxes should be not be treated as allowable costs for hospitals." Id. On the basis of these meetings, plaintiffs aver, it became "the policy" of Blue Cross "that the GET tax was not an allowable cost for Connecticut Hospitals." Id. at ¶ 24(c). Plaintiffs further aver that that "policy" was continued by Anthem and Empire. Id. at ¶¶ 25(c), 27(a).

As noted above, each of the hospitals in this case followed an "accepted industry practice" of neither claiming the GET tax as a reimbursable Medicare expense nor even reporting the amount of the tax as an identifiable item on its cost reports. Def. Ex. A at 7. Accordingly, it is undisputed that Blue Cross, Anthem and Empire never had an occasion to deny a claim for reimbursement for the GET tax as to any plaintiff hospital for any cost-reporting year at issue here. The only hospital that plaintiffs allege did submit a claim for the GET tax (non-plaintiff St. Vincent Hospital) had the claim denied for a reason that the plaintiffs admit had nothing to do with the policy the intermediaries allegedly adopted. Am. Compl. at ¶ 24(d). Thus, whatever putative policy is alleged to have been adopted by Blue Cross, Anthem and Empire, it was never enforced to the detriment of any plaintiff hospital, and the one time it apparently was enforced with respect to another hospital, the policy was incorrectly applied.

Plaintiffs do not allege that Blue Cross, Anthem or Empire communicated their opinions about the GET tax to plaintiffs in any systematic way. Indeed, the amended complaint identifies only one plaintiff that communicated with an intermediary about the GET tax at all. The amended complaint alleges that, sometime "prior to 2002," a senior employee at plaintiff Griffin Hospital spoke with "the auditing staff at Empire," who "informed him that the GET Tax was not an allowable cost and thus should not be included on the Medicare cost report." Id. at ¶ 26. Plaintiffs do not allege, however, that Griffin Hospital ever paid any attention to this advice. Nor

do they explain why they think the hospital could justifiably rely on the say-so of an intermediary employee as the final word on Medicare law.  And plaintiffs certainly do not contend that Griffin Hospital relied on Empire's statements in connection with cost reports for the 1994, 1995 and 1996 years at issue in this case.

In fact, such reliance would have been impossible.  Griffin Hospital submitted its cost reports for the relevant years between 1995 and 1997, Porette Dec. at ¶ 3(b), and the resulting notices of program reimbursement issued in 1996 to 1998.  Id.  However, plaintiffs aver that Empire did not acquire processing duties in Connecticut until 1999.  Am. Compl. at ¶ 27.  Thus, Griffin Hospital could not possibly have relied on the complained-of statements of Empire auditors (apparently made sometime between 1999 and 2002) when it decided (between 1995 and 1997) not to claim the GET tax on the cost reports at issue here or when it decided (between 1996 and 1998) not to pursue administrative appeals of the notices of program reimbursement for those cost-reporting years.  Thus, it is difficult to fathom how any alleged "fault" of Empire staff could have caused Griffin "to not receive reimbursement" for the GET tax for the relevant cost-reporting periods.  Id. at ¶ 37(b).  The amended complaint also does not explain how plaintiffs believe Blue Cross or Anthem could have "procured" payment determinations issued in 1995-1997, 42 C.F.R. § 405.1885(d), based on any advice given by Empire in 1999 or later.

**E.  Plaintiffs' Theory of "Passive" Misrepresentation**

If plaintiffs' theory of "active" misrepresentation makes no sense, its theory of "passive" misrepresentation, Am. Compl. at ¶ 37(b), is even more tenuous.  The amended complaint provides no explanation for this legal theory.  In a reply memorandum plaintiffs filed earlier, however, the hospitals contended that "CMS advised Empire in 1995" that an entirely different gross-receipts tax imposed on hospitals by the State of  New York was reimbursable as a

-15-

Medicare expense. Pl. Reply at 15. Plaintiffs do not allege that Blue Cross, which processed

cost reports in Connecticut at that time, knew anything about the opinion sent by CMS to Empire

(which, at the time, processed claims for New York hospitals).

Still, plaintiffs insist that Blue Cross was negligent, to a point similar to fraud, for

"accepting cost reports from Connecticut hospitals" without informing those hospitals about the

favorable treatment of an arguably similar tax on gross revenues in New York. Id. at 17.

Plaintiffs further allege that Blue Cross, Anthem and Empire were also negligent, to a point

similar to fraud, because they "all should have taken steps" to inform hospitals in Connecticut

about CMS's ruling on the New York tax in 1995, id. at 16, even though only Empire received

the opinion, the opinion applied only to New York, and Empire did not have anything to do with

processing of cost reports in Connecticut until 1999. Finally, plaintiffs allege that CMS was at

fault, to a degree similar to fraud, for "failing to issue a directive to Connecticut in the same

manner as it did in New York in 1995," id., even though no plaintiff hospital ever claimed the

GET tax and no hospital in Connecticut had ever asked CMS for such an opinion until 2001.

## LEGAL OVERVIEW

The "remedy of mandamus is a drastic one, to be invoked only in extraordinary

circumstances," Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted), where

the "right to issuance of the writ is clear and indisputable." Id. (citations omitted); see also

Thirteenth Reg'l Corp. v. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980) (mandamus is

reserved for only the "clearest and most compelling cases") (citation omitted). To qualify for

mandamus relief, a plaintiff must first show that "he has exhausted all other avenues of relief,"

Ringer, 466 U.S. at 616, including all possible "administrative" and "judicial" remedies. Power

292 F.3d at 786. The plaintiff must then demonstrate that "the defendant owes him a clear

-16-

nondiscretionary duty," <u>Ringer</u>, 466 U.S. at 616, that is "so plainly prescribed as to be free from

doubt and equivalent to a positive command." <u>Consol. Edison Co. of New York, Inc. v.</u>

<u>Ashcroft</u>, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting <u>Wilbur v. United States ex rel. Kadrie</u>,

281 U.S. 206, 218-19 (1930)).  Finally, even where exhaustion and a clear duty are shown, a

court may decline to grant mandamus relief entirely on equitable grounds.  <u>Thirteenth Reg'l</u>

<u>Corp.</u>, 654 F.2d at 763.

      The Supreme Court has never ruled on whether mandamus may ever be invoked to

compel agency action under the Medicare statutes.  <u>See</u> <u>Your Home</u>, 525 U.S. at 457 n.3; <u>Ringer</u>,

466 U.S. at 616.  However, the Court has made clear that mandamus is not a substitute remedy

for parties who have overlooked less drastic means of getting the result they desire from the

federal government.  <u>Cheney v. U.S. Dist. Ct.</u>, 124 S. Ct. 2576, 2586 (2004); <u>see also</u> <u>Haneke v.</u>

<u>HEW</u>, 535 F.2d 1291, 1296 n.15 (D.C. Cir. 1976) (courts "have no <u>general</u> supervisory powers

over the executive branches or over their officers, which may be invoked by writ of mandamus")

(emphasis added).  A hospital therefore cannot invoke mandamus to vindicate a substantive

claim for payment if the claim could have been pursued through the administrative and judicial

processes established by Congress in 42 U.S.C. § 1395oo.  <u>See, e.g.</u>, <u>Ass'n of Am. Med. Colls. v.</u>

<u>Califano</u>, 569 F.2d 101, 111 (D.C. Cir. 1977); <u>Lenox Hill Hosp. v. Shalala</u>, 131 F. Supp. 2d 136,

140 (D.D.C. 2000); <u>Nat'l Med. Enters. v. Bowen</u>, 725 F. Supp. 1, 9 (D.D.C. 1989).

      The Court of Appeals for this Circuit has made clear that mandamus is available in the

Medicare context only to secure performance of some <u>procedural</u> aspect of the claims-

determination <u>process</u>.  <u>Monmouth</u>, 257 F.3d at 815; <u>Am. Med. Colls.</u>, 569 F.2d at 114; <u>see also</u>

<u>Ganem v. Heckler</u>, 746 F.2d 844, 853 (D.C. Cir. 1984).  And this distinction between substance

and procedure applies with full force where Medicare claimants either failed to exhaust available

-17-

administrative and judicial appeals after receiving a notice of a denial of benefits, Ringer, 466

U.S. at 616-17, or decided not to make a claim for benefits in the first place because they knew it

would be denied by the intermediary. Id. at 620-21. Mandamus is not a substitute way to claim

reimbursement for expenses that a hospital neglected to include on its Medicare cost report.

## ARGUMENT

## I. PLAINTIFFS ARE NOT ENTITLED TO MANDAMUS RELIEF BECAUSE THEY HAVE NOT EXHAUSTED ALTERNATIVE MEANS OF RELIEF.

At the outset, mandamus relief is defeated here because plaintiffs did not attempt to

exhaust any of the avenues available to them to receive reimbursement for the GET tax as a

Medicare expense. Most obviously, they did not exercise their rights to submit a claim for

reimbursement to the intermediary, Bethesda Hosp. Ass'n, 485 U.S. at 404-05, to appeal any

adverse intermediary determination to the PRRB, 42 U.S.C. § 1395oo(a)(1)(A)(i), or to seek

judicial review of any adverse decision of the Board. 42 U.S.C. § 1395oo(f)(1). The failure to

take advantage of these available statutory avenues of relief is sufficient, standing alone, to

preclude mandamus relief. Am. Med. Colls., 569 F.2d at 111; Lenox Hill, 131 F. Supp. 2d at

140; Nat'l Med. Enters., 725 F. Supp. at 9.[10] In addition, plaintiffs failed to do everything they

could to secure relief available by regulation because they did not submit a request for permissive

reopening as they had a right to do under 42 C.F.R. § 405.1885(a). Monmouth, 257 F.3d at 815.

---

[10] See also Lifestar Ambulance Serv., Inc. v. Thompson, 365 F.3d 1293, 1297 (11th Cir. 2004), cert. denied, 125 S. Ct. 866 (2005); Hopewell Nursing Home, Inc. v. Heckler, 784 F.2d 554, 557-58 (4th Cir. 1986); Hadley Mem'l Hosp., Inc. v. Schweiker, 689 F.2d 905, 912 (10th Cir. 1982); Total Care, Inc. v. Sullivan, 754 F. Supp. 1097, 1102 (W.D.N.C.), aff'd mem., 952 F.2d 397 (4th Cir. 1991).

### A.  Plaintiffs' Claim Is on All Fours with the Mandamus Theory Rejected in Heckler v. Ringer.

To understand why plaintiffs' mandamus claim should be dismissed for failure to exhaust administrative remedies, it is not necessary to look beyond the decision in Heckler Ringer.  In that case, the Supreme Court denied mandamus relief in two settings that were, if anything, more sympathetic to the claimants than that presented by plaintiffs.  The Secretary had issued nationwide instructions to all intermediaries commanding them to deny Medicare Part A claims for a certain kind of experimental procedure.  466 U.S. at 607.  Claims for this kind of individual benefit were governed by an administrative appeals process, 42 U.S.C. § 1395ff, analogous to the process used to adjudicate the claims of hospitals under 42 U.S.C. § 1395oo.  The instruction issued by the Secretary was binding on the intermediaries, but had no controlling effect in subsequent administrative appeals.  Id. at 607-08.  In fact, the administrative law judges deciding these appeals consistently rejected the Secretary's position and awarded benefits to claimants who pursued their appeal rights.  Id.  This led the Secretary to issue a formal administrative ruling declaring that payment for the disputed procedure was impermissible.  Id. at 608.  The ruling was binding at all levels of the administrative appeals process, id., but had no controlling effect on district courts reviewing the administrative decisions.

Two sets of plaintiffs brought suit in Ringer.  The first group consisted of three Medicare beneficiaries who had submitted claims for reimbursement at a time when the intermediaries were instructed by the Secretary to deny the claims, but before the Secretary had issued the administrative ruling that bound administrative appeals.  Id. at 613-14.  At the time these plaintiffs brought suit, they had received denials of their reimbursement claims from the intermediary, but had not exhausted all levels of administrative appeal.  Id.  Another plaintiff,

-19-

Freeman H. Ringer, alleged that he had been unable to obtain the disputed procedure at all because he could not afford it and the Secretary's policy had made physicians reluctant to accept the risk of possible non-payment.  Id. at 620.  As a result, he had never submitted a claim for reimbursement and, if he ever did, the possibility that he could succeed before the intermediary and in subsequent administrative appeals was totally foreclosed by the Secretary's now-binding administrative ruling.  Id.  Both sets of plaintiffs sought, among other things, a writ of mandamus compelling the Secretary to pay for the disputed medical procedure.

The Supreme Court rejected both theories of mandamus relief.  With respect to the first plaintiffs, the Court found that they "clearly have an adequate remedy" for "challenging all aspects of the Secretary's denial of their claims for payment," including "any objections they may have to the instructions or to the ruling if either ultimately should play a part in the Secretary's denial of their claims."  Id.  at 617.  In this setting, the Supreme Court held that exhaustion of administrative remedies was "in no sense futile," id. at 618, merely because the plaintiffs thought it was unlikely that they would succeed in the face of the legal opinion expressed by the Secretary in his program instructions to intermediaries.  Id. at 619.

With respect to plaintiff Ringer himself, the Court similarly held that, "consistent with our decision with respect to the other three respondents," mandamus was "not available" as one of the "jurisdictional bases for vindicating [his] claim."  Id. at 620-21; id. at 620 (finding the "unavailability of mandamus jurisdiction" to be "equally applicable" to plaintiff Ringer).  The Court reached this conclusion even though plaintiff Ringer could not possibly have had his claim for benefits approved by the intermediary or have prevailed in subsequent administrative appeals, because the Secretary's administrative ruling was now binding on all agency actors in the process.  Id. at 620.  The possibility of eventual judicial relief, standing alone, was sufficient to defeat

mandamus jurisdiction.  See Power, 292 F.3d at 786 ("alternative remedies that might call for refusal to resort to writ of mandamus encompass judicial remedies . . . as well as administrative ones") (citation omitted).[11]

The only reason that plaintiffs have ever given for not submitting claims and pursuing them through the administrative process is futility, but the analysis in Ringer makes short work of their argument.  Indeed, their contention that "there was no opportunity to obtain an administrative remedy" of any kind, Pl. Mem.[12] at 31, because the intermediaries allegedly "maintained a policy" that the GET "was not an allowable cost," id. at 34, is not even true at the first level of intermediary review.  Unlike the situation in Ringer, plaintiffs' amended complaint does not allege that the Secretary had issued any instructions to intermediaries concerning whether the GET tax was reimbursable.  Rather, plaintiffs merely allege that the intermediaries had come to that opinion on their own say-so, based on discussions with other intermediaries across the country.  Am. Compl. at ¶¶ 24(a)-(c), 25, 27(a).[13]  Plaintiffs offer no excuse for why they did not at least try to convince the intermediary to change its mind by submitting a claim for reimbursement, accompanied perhaps by a letter setting forth a reasoned argument why the intermediary's "policy" was wrong.  If, as plaintiffs aver, intermediaries met to discuss the treatment of state taxes, they obviously were willing to listen to reasoned arguments.

---

[11] Plaintiffs' "detailed analysis of the facts and holding" in Ringer, Pl. Reply at 24, neglects to mention that plaintiff Ringer even exists.

[12] Plaintiffs' Opposition to Motion to Dismiss of, in the Alternative, for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment (Doc. 13).

[13] Plaintiffs do not even allege that CMS participated in these meetings, and they certainly do not allege that the Secretary issued any instructions that were binding on the intermediary.

In any event, it has long been settled that even the most opinionated intermediary cannot prevent a hospital from submitting a disputed claim for reimbursement in order to lay the groundwork for a subsequent administrative appeal under 42 U.S.C. § 1395oo, see Bethesda Hosp. Ass'n, 485 U.S. at 404-05, and any competently managed hospital in Connecticut would have known that.  See Declaration of Warren A. Willis at ¶ 4 (Ex. A to Def. Opp.[14]).  Thus, even the one hospital administrator who claims to have had some awareness (at some unknown, but apparently later, time) of the intermediary's purported position on the GET tax, Am. Compl. at ¶ 26, had no excuse for not pursuing the matter further.  If any plaintiff hospitals thought they "were strictly forbidden from claiming payments under the GET tax on their cost reports," id. at ¶ 23 (emphasis added), it was because they themselves had voluntarily adopted this self-prohibition as part of their "accepted industry practice."  Def. Ex. A at 7.

Plaintiffs do not even bother to offer a "dog ate my homework" excuse failing to have appealed the GET-tax issue through the administrative process to the PRRB, which is not bound by any opinions of the intermediary when it conducts its review.  42 C.F.R. § 405.1867.  Indeed, the whole purpose of the administrative review process is to give the Secretary "greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts."  Illinois Council, 529 U.S. at 13 (emphasis added); see also Ringer, 466 U.S. at 619 n.12; Weinberger v. Salfi, 422 U.S. 749, 765 (1975); see

---

[14] Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Reply in Support of his Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 16).

generally McCarthy v. Madigan, 503 U.S. 140, 145 (1992); McKart v. United States, 395 U.S. 185, 193-95 (1969). [15]

Indeed, plaintiffs' own previous filings in this action nicely illustrate how effective the administrative process was when timely invoked by other hospitals. They helpfully point out that hospitals in Minnesota successfully appealed an intermediary's denial of reimbursement for a gross receipts tax, a tax which plaintiffs believe was analytically indistinguishable from the tax on gross earnings at issue here. Pl. Mem. at 6-7. The submission of their accounting firm to the Secretary confirmed that hospitals in New York, Florida and Ohio had enjoyed similar administrative success, Def. Ex. A at 7, and plaintiffs' representative provided the Secretary with publicly available copies of the relevant opinion letters and PRRB decisions. Id. at 215-32. It is hard to fathom why the side that always won thinks it would have been pointless to try again here. Indeed, plaintiffs themselves admit that St. Vincent Hospital – the only Connecticut hospital which actually bothered to claim the GET tax on its cost report and pursue its administrative appeal rights – ultimately obtained reimbursement as a result of the appeal. Declaration of Rex A. Shera ("Shera Dec.") at ¶¶ 11-12 (Pl. Ex. 1). Had plaintiffs here done the same thing in the same time frame as this non-plaintiff hospital, they presumably would have

---

[15] Contrary to plaintiffs' view, exhaustion of the administrative remedies is not a mere "technical" requirement, Pl. Mem. at 1, but an indispensable element of the Medicare program. As the Supreme Court has consistently made clear, "Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year." Ringer, 466 U.S. at 627; see also Illinois Council, 529 U.S. at 13. "If the balance is to be struck anew, the decision must come from Congress and not from this Court." Ringer, 466 U.S. at 627.

achieved the same result.  It is hard to imagine an administrative process more "viable," Pl. Mem. at 1, than one guaranteed to end in success.[16]

Even if defeat before the PRRB were a foregone conclusion, however, plaintiffs forget that the CMS Administrator also would have had the authority, pursuant to 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1875, to review any adverse decision of the Board.  At this stage of the appeals process, the Administrator would not have been bound by the opinion of either the intermediary or the Board, and plaintiffs admit that the first time they submitted legal arguments on the subject to CMS (in 2001), the agency agreed with their position.  Pl. Mem. at 7-10.  Again, it is a mystery why plaintiffs assume the same arguments would have been rejected if they had appeared in a hospital memorandum submitted in a timely-filed administrative appeal, rather than in an informal letter written a year after the GET tax had been discontinued.

Finally, even if plaintiffs could show that they faced absolutely certain defeat before both the Board and the CMS Administrator, they still forget that hospitals have a right to judicial review under 42 U.S.C. § 1395oo(f)(1).  Plaintiffs can hardly be heard to argue that the statutes and regulations which they have previously argued mandate reimbursement for the GET tax, Pl. Mem. at 15-18, could not have been construed the same way by a reviewing court years earlier as mandating the same result.  As noted above, the availability of potential judicial relief through

---

[16] Plaintiffs observe that St. Vincent did not challenge the GET tax expressly in its administrative appeal, but was later allowed to amend its appeal to correct the omission.  Pl. Reply at 6.  But that is a distinction without a difference.  There is no reason in law or logic why St. Vincent <u>had</u> to rely on what plaintiffs characterize as "dumb luck" to get the issue raised.  <u>Id</u>. It could have made Board review a sure thing by submitting a timely appeal on the GET tax issue in the first place.  If a hospital that did not even challenge a denial of payment for the GET tax initially could, with a modicum of diligence, secure a favorable administrative ruling on the treatment of the tax, it goes without saying that a hospital, alert enough to raise the GET issue expressly in an appeal, could have secured the same favorable outcome without relying on luck.

alternative means is sufficient, standing alone, to defeat mandamus jurisdiction.  <u>Ringer</u>, 466 U.S. at 620-21.

In their last filing with this Court, plaintiffs all but openly conceded that there is no coherent way to distinguish <u>Ringer</u> from this case.  Their rendition of the holding – that "the <u>Heckler</u> Court rejected the plaintiffs' futility argument in that case specifically because the plaintiffs, had they pursued their administrative remedies, would most likely have been successful in obtaining complete reimbursement for the procedure," Pl. Reply at 24 – ignores plaintiff Ringer, who could not possibly succeed during the administrative process because the Secretary had issued a binding administrative ruling precluding payment.  His only chance of success was at the judicial level.  And the possibility of that remedy, standing alone, defeated mandamus relief.

Plaintiffs also misstate the holding with respect to the other three <u>Ringer</u> plaintiffs.  Contrary to plaintiffs' view, the Court's futility analysis did not turn on some ad hoc analysis of the relative likelihood of the claimant's success on administrative appeal.  It turned on the fact that Congress had established an "administrative procedure" through which the claimants <u>could</u> have obtained relief, <u>Ringer</u>, 466 U.S. at 619, whether at the administrative or judicial level.  For an administrative remedy to be futile, it must be "clear beyond doubt that the relevant administrative agency will not grant the relief in question."  <u>Nat'l Conservative PAC v. FEC</u>, 626 F.2d 953, 957 (D.C. Cir. 1980) (quoting <u>AFGE v. Acree</u>, 475 F.2d 1289, 1292 (D.C. Cir. 1973), and <u>AFGE v. Paine</u>, 436 F.2d 882, 896 (D.C. Cir. 1970)).  A mandamus rule that demanded exhaustion only where there was a statistically demonstrated likelihood of success (whatever that might be) on administrative review would have the perverse effect of awarding mandamus jurisdiction to the claimants with the weakest arguments.  In any case, however, plaintiffs fail to

explain why the unbroken string of success enjoyed by hospitals in other states, Pl. Mem. at 6-7;

Def. Ex. A at 7, 215-32, fails to satisfy even their own garbled version of the <u>Ringer</u> holding.

Indeed, the fact that CMS agreed with plaintiffs the first time the issue of the GET tax was

brought to its attention in 2001 refutes any assumption that plaintiffs would have been

unsuccessful making the same argument a few years earlier in the context of timely

administrative appeals.

####    B.  The Decision in <u>Monmouth Medical Center v. Thompson</u> Does Not Excuse the Failure to Exhaust Statutory Appeals Here.

In accord with the reasoning in <u>Ringer</u>, it has long been settled in this Circuit that, where

administrative and judicial review of an issue of Medicare statutory construction is "plainly

authorized" by 42 U.S.C. § 1395oo, a plaintiff "may not rely upon the mandamus statute as a

predicate for federal-court jurisdiction." <u>Am. Med. Colls.</u>, 569 F.2d at 111; <u>see also</u> <u>Lenox Hill</u>,

131 F. Supp. 2d at 140; <u>Nat'l Med. Enters.</u>, 725 F. Supp. at 9.  Similarly, every court that has

addressed the question has held that it is necessary for a plaintiff to exhaust available remedies

under 42 U.S.C. § 1395oo before attempting to assert a claim for mandamus relief under 42

C.F.R. § 405.1885(d) based on a theory of fraud or similar fault on the part of the Secretary or his

agents.  <u>Binghamton Gen. Hosp. v. Shalala</u>, 856 F. Supp. 786, 792-93 (S.D.N.Y. 1994); <u>Loma</u>

<u>Linda Univ. Med. Ctr. v. Shalala</u>, 1994 WL 465830 at *2 (C.D. Cal. July 14, 1994).  The same

result obtains here.  As the Court of Appeals for this Circuit has stated, "[r]eopening is only

permitted to hear new <u>evidence</u> – not new <u>claims</u>."  <u>St. Mary of Nazareth Hosp. Ctr. v.</u>

<u>Schweiker</u>, 741 F.2d 1447, 1449 (D.C. Cir. 1984) (per curiam) (emphasis in original).

Plaintiffs' contention that the decision in <u>Monmouth Medical Center v. Thompson</u>

requires a general departure from the principles in <u>Ringer</u>, <u>see</u> Pl. Reply at 21-23, misconstrues

the very limited nature of its holding.  In <u>Monmouth</u>,  a Medicare regulation took a restrictive

view of the methodology by which special payments to "disproportionate share hospitals" were

determined.  257 F.3d at 809-10.  After four circuits struck down the regulation, the Secretary

issued a formal administrative ruling, Administrative Ruling 97-2, which established "a new

interpretation more favorable to hospitals."  <u>Id</u>. at 810.  The ruling indicated that the new

interpretation was to be applied prospectively only, and the Secretary expressly stated he would

not reopen settled payment determinations.  <u>Id</u>.  But the plaintiff hospitals argued, among other

things, that language in the administrative ruling acknowledging that the regulation was "contrary

to the applicable law in four judicial circuits," <u>id</u>. at 813, was tantamount to an admission that the

prior interpretation was "inconsistent with the applicable law," <u>id</u>., and therefore triggered a

mandatory obligation to reopen under 42 C.F.R. § 405.1885(b) (2001), notwithstanding the

instruction not to reopen.

       In an effort to vindicate this theory, the plaintiffs filed an administrative appeal with the

PRRB, arguing that Ruling 97-2 was a "final determination" subject to the Board's review under

42 U.S.C. § 1395oo(a)(1)(A)(i).  The Board dismissed the complaint on grounds that it did not

have jurisdiction.  <u>Monmouth</u>, 257 F.3d at 810.  In <u>Monmouth</u>, the Court of Appeals upheld that

decision, <u>id</u>. at 811 (citing <u>Your Home</u>, 525 U.S. at 454), but went on to hold that the meaning of

the administrative ruling was reviewable directly in federal court, pursuant to mandamus

jurisdiction.  <u>Id</u>. at 814-15.  In this portion of the analysis, the Court stated that appeals under 42

U.S.C. § 1395oo were either "foreclosed or futile" for the reasons "already shown."  <u>Monmouth</u>,

257 F.3d at 815.  The reasons "already shown," in turn, were the specific reasons that the Board

did not have jurisdiction to review an administrative ruling that was binding on the Board itself

and that the ruling was not a "final determination" within the meaning of 42 U.S.C.

§ 1395oo(a)(1)(A)(i).  Nothing in the decision remotely suggests that exhaustion of remedies

under §1395oo is <u>always</u> foreclosed or futile where a plaintiff seeks to force a reopening of a

payment determination by means of mandamus relief.  The Court merely found exhaustion of

administrative appeals rights foreclosed in the unique factual circumstances before it.

In this case, it is undisputed that the Secretary issued a document, in the form of a letter

dated December 14, 2001, which ordered the intermediary to reopen for the prior three year

period.  Def. Mem. at 12-13.  But, unlike <u>Monmouth</u>, here the meaning of the letter itself is not

in dispute.  It is therefore irrelevant whether plaintiffs have a viable means (through the

administrative process) to determine the meaning of the Secretary's letter and its legal import.

What plaintiffs seek here is to force the Secretary to make reimbursements for cost-reporting

years that fall <u>outside</u> the scope of the reopening mandated by the Secretary's letter.  To receive

reimbursement for those years, all plaintiffs had to do was to timely claim the disputed GET tax

as a reimbursable expense on their cost reports and, if necessary, challenge any denial through

the administrative process available under 42 U.S.C. § 1395oo.  That <u>Monmouth</u> found

Medicare's administrative avenues inadequate for the <u>specific</u> purpose of challenging the text of

an administrative ruling does not mean that it found Medicare's administrative avenues

inadequate for <u>all</u> purposes.

If all a plaintiff had to do to make sure administrative remedies were deemed, as a matter

of law, to be futile was remember to include a mandamus count in his complaint, decades of

Supreme Court decisions carefully defining the scope of Medicare and Social Security

jurisdiction would be rendered meaningless.  <u>See</u> <u>Illinois Council</u>, 529 U.S. at 10-20; <u>Your

Home</u>, 525 U.S. at 454-56; <u>Ringer</u>, 466 U.S. at 616-21; <u>Mathews v. Eldridge</u>, 424 U.S. 319, 326-

32 (1976); <u>Weinberger</u>, 422 U.S. at 765.  Claims that are supposed to be resolved on the basis of

-28-

an administrative record developed through an adversary hearing procedure would be resolved on

the basis of the kind of "he said, she said" recollections of self-interested hospitals and former

intermediary employees proffered  years after the fact.  Plaintiffs' success in this case would turn

Medicare administrative law on its head.

Plaintiffs' last filing with this Court all but openly admits that they have no answer to this

argument.  Pl. Reply at 22-23.  In fact, the only relevant portion of their discussion concedes that

the hospitals "could have claimed the GET Tax as an allowable cost and later filed an appeal or

reopening request" and gotten the very Medicare reimbursement they now seek from this Court.

Id. at 23.  As was discussed above, however, the difference between this case and Monmouth is

that the ruling which the Court of Appeals held the plaintiffs in that case were really seeking – a

decision on what HCFA Ruling 97-2 really meant – is not something they could have gotten from

the PRRB.  A decision on what plaintiffs here really want – reimbursement for the expense of a

state-tax – is exactly something the Board could have granted (and, indeed, almost certainly

would have granted if the appeal had been properly submitted).  Plaintiffs' contention that they

"had no basis for a potential claim until after the government announced a change in policy," Pl.

Reply at 23-24, is just plain wrong.  The basis for a challenge to an intermediary's denial of

reimbursement for the GET tax would have been the very statutes, regulations, program guidance

and Board decisions that the hospitals ultimately relied upon in 2001 when they convinced the

Secretary that their interpretation of Medicare law was correct.

### C.  Plaintiffs Also Failed to Exhaust Available Remedies Because They Did Not Request a Permissive Reopening in a Timely Fashion.

Even if plaintiffs could somehow be excused for not exhausting their appeal rights under

42 U.S.C. § 1395oo, they still cannot be excused for failing to request a permissive reopening

under 42 C.F.R. § 405.1885(a) in a timely manner.  As the Court of Appeals for this Circuit

pointed out in <u>Monmouth</u>, plaintiffs seeking mandamus relief to force a reopening of Medicare

payment determinations must, at the very least, have "done all they can to vindicate their right to

reopening," 257 F.3d at 815, by timely requesting a permissive reopening.  In this case, the only

cost-reporting years at issue are ones for which the hospitals admit that they did not timely

request a permissive reopening.  Their contention that it would have been futile to do so because

the intermediary (allegedly) had a policy of not reimbursing the GET tax misses the point.  The

point of asking for permissive reopening is to exhaust avenues by which plaintiffs <u>might</u> have

convinced the intermediary to <u>change</u> its mind.  Plaintiffs need not have been guaranteed in

advance that the effort would have been successful.

Moreover, the facts of this case render implausible any hypothesis that a request for

permissive reopening would necessarily have been denied.  It is undisputed that plaintiffs wrote a

letter to the CMS in August 2001 explaining the reasons why they thought reimbursement for the

Connecticut GET tax was appropriate.  Def. Ex. A at 5.  It is undisputed that CMS wrote back in

December 2001 agreeing with plaintiffs' position.  <u>Id.</u> at 3-4.  Now imagine that the same letter

had been written to the intermediary in the form of a timely request for permissive reopening,

pursuant to 42 C.F.R. § 405.1885(a), within three years of the issuance of a payment

determination for the 1994-1996 cost-reporting years.  Imagine further that plaintiffs sent a copy

of the letter to CMS as well and suggested that the intermediary consult with CMS before

making its decision on the request.  It is difficult to imagine the consultation with CMS

producing a result other than the intermediary's granting of the request for permissive reopening.

Plaintiffs themselves later admitted that, if the intermediary had been asked to review the

treatment of the GET tax in the first instance (such as in connection with a reopening request),

"we believe the Intermediary would likely seek guidance from the CMS Central Office."  Def.

Ex. A at 5.  Assuming that CMS would have given the same guidance in 1996 as it did in 2001, it

can be reasonably presumed that a request for permissive reopening submitted for the 1994-1996

years would have been successful.  Indeed, every plaintiff hospital that requested permissive

reopening for a particular cost-reporting year in a timely manner received the reopening.  Once

again, an administrative process almost certainly guaranteed to produce successful results cannot

plausibly be characterized as futile.[17]

## II.  PLAINTIFFS' MANDAMUS CLAIMS SHOULD BE DISMISSED BECAUSE THE SECRETARY OWES THEM NO DUTY TO REOPEN.

Even if plaintiffs could be deemed to have exhausted all alternate avenues for obtaining

reimbursement for the GET tax or for obtaining a permissive reopening of the payment

determinations at issue here, the remedy of mandamus still is unavailable because they cannot

show that the Secretary owes them a duty to reopen that is "so plainly prescribed as to be free

from doubt and equivalent to a positive command."  Consol. Edison Co., 286 F.3d at 605

(quoting Kadrie, 281 U.S. at 218-19).  Plaintiffs identify no statute or regulation that arguably,

much less plainly, commands reopening of the payment determinations at issue in this case.

---

[17] The possibility of a successful request for permissive reopening distinguishes this case from In re Medicare Reimbursement Litigation, 309 F. Supp. 2d 89 (D.D.C.), appeal docketed, No. 04-5203 (D.C. Cir. May 28, 2004).  In that case, this Court held that a request for permissive reopening was futile precisely because Ruling 97-2 "expressly stated that the Secretary would not reopen past [payment determinations] on the basis of her changed statutory interpretation."  309 F. Supp. 2d at 98.  No instructions not to reopen were given here.  On the contrary, the whole purpose of the Secretary's December 2001 letter was to order a reopening for the full period authorized by regulation.

### A.  There Is No Such Thing as a Statutory Duty to Reopen.

At the outset, plaintiffs' continued insistence that the Secretary has "a clear statutory duty

to reopen the cost reports at issue," Am. Compl. at ¶ 37(a) (emphasis added), is puzzling.  In

defendant's previous opening memorandum, he demonstrated that there is no such thing as a

statutory duty to reopen because reopening is exclusively a creature of regulation.  Your Home,

525 U.S. at 454.  In their opening memorandum, plaintiffs appeared to concede the point and

argued instead that the duty mandated by Medicare statutes was the payment of reimbursement

for the GET tax.  Pl. Mem. at 15-18.

In response to this second argument, defendant pointed out that it had long been settled

that substantive Medicare payment obligations could not be enforced by means of mandamus, but

only through the administrative process in 42 U.S.C. § 1395oo.  Def. Opp. at 19-20 (citing, inter

alia, Am. Med. Colls., 569 F.2d at 111).  In addition, he demonstrated that the general language

in 42 U.S.C. §§ 1395f(b)(1) and 1395x(1)(A) and in 42 C.F.R. § 413.9(b) does not create a

mandatory payment obligation with the extraordinary precision necessary to be enforceable by

means of mandamus.  Def. Opp. at 20-23 (citing, inter alia, United States ex rel. McLennan v.

Wilbur, 283 U.S. 414, 420 (1931), Kadrie, 281 U.S. at 218-19, Power, 292 F.3d at 785, and

Consol. Edison, 286 F.3d at 605).  Finally, he noted that the six-year statute of limitations in 28

U.S.C. § 2401(a) has also run out on any claim that the Secretary had a mandatory duty to make

payments for the 1994, 1995 and 1996 cost-reporting years.  Def. Opp. at 23.

In their final reply memorandum, plaintiffs conceded this second argument, as well, and

asserted that the only source that supports their reopening claim is the regulation at 42 C.F.R.

§ 405.1885.  Pl. Reply at 7-10.  If plaintiffs admit that no Medicare statute creates a procedural

right to reopening, and they admit that no substantive right to Medicare payment can be enforced

by means of mandamus, it is hard to see what is left of plaintiffs' theory that the Secretary has "a clear statutory duty to reopen the cost report years at issue" in this case.  Am. Compl. at ¶ 37(a). Plaintiffs have merely uncritically re-alleged a claim that they themselves have demonstrated cannot be defended on any terms.

### B.   The Secretary Has No Duty to Extend the Reopening Granted under 42 C.F.R. § 405.1885(b).

Plaintiffs' next mandamus theory – that the Secretary owes them a duty under 42 C.F.R. § 405.1885(b) to extend the 2001 reopening beyond the three-year time limit imposed by 42 C.F.R. § 405.1885(b), Am. Compl. at ¶ 37(c) – is as nonsensical as it sounds.  And the process of death and rebirth this claim underwent in briefing did nothing to improve its intellectual rigor.

In his previous opening memorandum, defendant pointed out the obvious:  that a regulation which merely <u>authorizes</u> the Secretary to instruct intermediaries to reopen payment determinations "<u>within</u> 3 years of the date" of the intermediary determination, 42 C.F.R. § 405.1885(a) (incorporated in 42 C.F.R. § 405.1885(b)) cannot possibly be construed to <u>require</u> him to reopen payment determinations that are <u>more</u> than three years old.  Def. Mem. at 31.  In response, plaintiffs quibbled over whether subsection (b) "prohibit[s]" reopenings beyond three years, Pl. Mem. at 19, but they did not dispute that the regulation at least does not <u>mandate</u> indefinite reopenings.  Plaintiffs' mandamus theory therefore seemed dead.

In their reply memorandum, however, plaintiffs tried two new tacks.  First, they accused the Secretary of something they characterized as "wrongful delay" in not ordering the 2001 reopening sooner.  Pl. Reply at 21.  At the outset, it is a bit difficult to even take this argument seriously, even on its own terms.  The CMS letter was issued four months after the question was raised for the first time by plaintiffs' accounting firm on August 31, 2001.  In any event, a duty

(on the part of intermediaries, not CMS) to take action under 42 C.F.R. § 405.1885(b) arises "only if [CMS] determines that a prior decision or set of decisions is inconsistent with applicable law." Monmouth, 257 F.3d at 812 (emphasis added). The regulation does set forth any standards that limit CMS's discretion with respect to whether and, if so, when to issue the notice of inconsistency. Those matters are committed to unreviewable agency discretion by law. See Your Home, 525 U.S. at 457; Monmouth, 257 F.3d at 813. It would have been perfectly within the discretion of the agency, for instance, not to answer the 2001 letter from plaintiffs' accounting firm at all and simply leave them to suffer the consequences of their failure to submit timely claims. Plaintiffs' suggestion that CMS "wrongfully" failed to rescue them sooner brings to mind the adage about no good deed going unpunished.

Although it is not entirely clear, plaintiffs' reply memorandum also may have been trying to hint at a second theory premised on the issuance of CMS's 1995 advisory letter to Empire concerning the New York tax. The gravamen of this theory appears to be that the alleged similarities between the New York tax on gross receipts and the Connecticut tax on gross earnings make the letter about the New York tax something akin to a notice that prior determinations involving the Connecticut tax were "inconsistent with the applicable law" within the meaning of 42 C.F.R. § 405.1885(b). See Pl. Reply at 20-21. If such is plaintiffs' new theory, however, it is absurd for numerous reasons.

For openers, the New York letter was issued in 1995, a year before any payment determinations were issued in Connecticut for periods for which the GET tax was in effect. CMS could not possibly have issued a notice that determinations that had not yet been made had been made incorrectly. In any event, the letter to which plaintiffs refer was not sent to Blue Cross, which according to plaintiffs was then processing claims in Connecticut. Am. Compl. at

-34-

¶ 24.  If CMS had been trying to notify Blue Cross that Connecticut determinations had been

wrong, it would not have sent the letter to Empire.

Any possible argument that a CMS opinion about a New York tax (rendered in 1995)

constituted an implied notice to the intermediary that any payment determinations in Connecticut

were "inconsistent with the applicable law, regulations, or general instructions," 42 C.F.R.

§ 405.1885(b)(1), also is refuted by the plain language of the opinion.  The letter states:

> In determining whether the tax is allowable for Medicare purposes under the
> current regulation and manual provisions, [CMS] must focus on the impact of the
> tax on services provided by providers, not on the other third parties that may or
> may not share the tax burden.  The application of these criteria to the specific New
> York State tax assessment in question makes that assessment reimbursable under
> Medicare.

Letter of Anthony J. Seubert dated June 26, 1995 ("Seubert Letter") at 1 (emphasis added).[18]

Contrary to plaintiffs' view, nothing in that text suggests that "gross receipts taxes were

reimbursable, period."  Pl. Mem. at 23.  The letter says exactly the opposite:  that state tax

schemes must be individually scrutinized to determine their specific impact on providers.  No

reasonable person could read that language and conclude that any previous payment

determinations in Connecticut were inconsistent with Medicare law, particularly when the

hospitals had not even claimed the GET tax as an expense themselves.

### C.  The Secretary Owes Plaintiffs No Duty to Reopen under 42 C.F.R. § 405.1885(d).

Plaintiffs' third mandamus theory – that the Secretary owes them a duty to reopen

payment determinations without regard to time limits under 42 C.F.R. § 405.1885(d) – remains

as meritless as its other claims.  Section 405.1885(d) provides, in pertinent part, that

---

[18] The letter is attached as Ex. D to the Declaration of Rex A. Shera, which was submitted
as Ex. 1 to plaintiffs' motion for summary judgment).

> an intermediary determination or hearing decision, a decision of the Board, or a
> decision of the Secretary shall be reopened and revised at any time if it is
> established that such determination or decision was procured by fraud or similar
> fault of any party to the determination or decision.

Id. At the outset, plaintiffs' new attempt in the amended complaint to identify some

governmental conduct that could be characterized as "fraud or similar fault," id., do nothing to

solve their threshold problem that neither CMS nor an intermediary is a "party" to the

intermediary's "determination," id., as the term of art "parties to the intermediary's determination"

is plainly defined in 42 C.F.R. § 405.1805. Nor have plaintiffs ever tried to explain in what

sense an intermediary determination can be "procured" by the entity that makes the decision. 42

C.F.R. § 405.1885(d). Nor do plaintiffs' new allegations address the problem that the duty to

reopen arises after "it is established" (by some means other than this lawsuit) that "fraud or

similar fault" occurred. 42 C.F.R. § 405.1885(d). Finally, the acts that plaintiffs now attempt to

characterize as active and passive misrepresentation, Am. Compl. at ¶ 37(b), are nothing of the

kind. Plaintiffs' theory of mandamus based on this regulation is therefore patently without merit.

### 1. CMS and intermediaries are not "parties to the intermediary's determination."

The most obvious reason why plaintiffs cannot rely on 42 C.F.R. § 405.1885(d) to

support a right to reopening here is that neither CMS nor an intermediary is a "party to the

determination" of the intermediary within the meaning of the regulation. As was discussed above

and in defendant's previous briefings, the meaning of the term "any party to the intermediary

determination" is not open to argument. The Medicare regulations expressly provide that "[t]he

parties to the intermediary's determination are the provider and any other entity found by the

intermediary to be a related organization of the provider under § 413.17 of this chapter." 42

C.F.R. § 405.1805. That regulatory definition does not include CMS or the intermediary. The

rule of construction known by the Latin phrase <u>expressio unius est exclusio alterius</u> counsels that

"expressing one item of [an] associated group or series excludes another left unmentioned."

<u>United States v. Vonn</u>, 535 U.S. 55, 65 (2002); <u>see also</u> <u>Barnhart v. Peabody Coal Co.</u>, 537 U.S.

149, 168 (2003). The entities listed in § 405.1805 can therefore be deemed to be the only entities

that the Secretary intended to list in § 405.1805.

Contrary to plaintiffs' view, this Court cannot simply pretend that the phrase "any party to

the determination" in 42 C.F.R. § 405.1885(d) is not "limited to "the provider and related

organizations,"" Pl. Mem. at 25, as the definition in § 405.1805 demands. As plaintiffs

themselves admit, "the Secretary and CMS are perfectly capable of using the words 'provider and

related organizations' when it desires [sic] to limit the application of a regulation to only those

entities." Pl. Mem. at 25. And that is precisely what the Secretary did in § 405.1805 when he

defined the term "parties to the intermediary's determination" as being the "provider" and "related

organizations." This is not even a matter of choosing a permissible "narrow interpretation" over a

permissible broader interpretation. Pl. Mem. at 25. It is a matter of applying an unambiguous

regulatory definition that leaves no room for argument. At the very least, however, plaintiffs'

apparent admission that "a narrow interpretation" is possible, <u>id.</u>, concedes that their broader

reading is not "so plainly prescribed as to be free from doubt and equivalent to a positive

command." <u>Consol. Edison</u>, 286 F.3d at 605 (quoting <u>Kadrie</u>, 281 U.S. at 218-19). The

Secretary's reading of his own regulations is entitled to "substantial deference," <u>Guernsey</u>, 514

U.S. at 103; <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994), unless it is "plainly

erroneous or inconsistent with the regulation." <u>Id</u>. (citation omitted).

As was discussed earlier in this memorandum, the Medicare regulations carefully limit

the circumstances where an intermediary is considered to be a "party" to those types of

-37-

administrative proceedings in which the intermediary takes off its hat as a decision-maker and

puts on the hat of an advocate for the correctness of its decision.  For instance, an intermediary is

not a party to an intermediary hearing, 42 C.F.R. § 405.1815, where it performs the adjudicatory

function of reconsidering its own determination.  But it is a party to a hearing before the PRRB,

42 C.F.R. § 405.1843(a), where the intermediary defends its determination before a higher

decision-maker.  See Pl. Reply at 11 (noting that the intermediary is identified as a party in the

Board's case caption).  If it were "established" that an intermediary had "procured" a favorable

"decision" from the Board by means of "fraud or similar fault," a duty to reopen the Board's

"decision" might arise under 42 C.F.R. § 405.1885(d).  But the regulation simply does not apply

to conduct of an intermediary when the intermediary renders its own determination.

## 2.  An intermediary does not "procure" its own determination.

Even if one were to ignore the definition of "parties to the intermediary's determination"

in the jarring manner urged by plaintiffs, however, the remaining language in the regulatory

scheme still does not support their theory.  Despite two previous chances, plaintiffs remain

unable to explain in what sense they think an intermediary can be said to have "procured" its own

determination of the total amount of Medicare reimbursement due to a hospital.  As defendant

explained in his opening memorandum, the word "procure" means to "get" or "obtain," Bryan A.

Garner, A Dictionary of Modern Legal Usage 698 (2d ed. 1995), and "procurement" is "[t]he act

of getting or obtaining something."  Black's Law Dictionary 1244 (8th ed. 2004); see also Random

House Dictionary of the English Language 1543 (2d ed. 1987) (defining "procure" as "to obtain

or get by care, effort, or the use of special means" and identifying "gain" and "win" as synonyms).

The only entities that can logically be said to procure a determination from a decision-maker are

the ones that ask the decision-maker to render a determination in their favor.  An intermediary

can no more be said to be a "party" seeking to "procure" an intermediary determination with

respect to a hospital cost report than this Court could be said to be a "party" seeking to "procure"

its own determination on plaintiffs' claim for relief here.

### 3. The Secretary's reading of § 405.1885(d) comports with its history.

Contrary to plaintiffs' view, nothing in the rulemaking history of § 405.1885(d) suggests

that the regulation was intended to apply to actions by entities other than those defined as "parties

to the intermediary's determination" in § 405.1805.  It is certainly true that the language

originally proposed by the Secretary would have limited subsection (d) exclusively to cases of

"fraud or similar fault of the provider."  39 Fed. Reg. 8166, 8170 (Mar. 4, 1974).  Defendant has

no quarrel with the proposition that the final rule was revised so that it would not "apply only to

the provider,"  Pl. Mem. at 26, in all settings.  But, as defendant previously explained, the way

the Secretary broadened the scope of § 405.1885(d) was not to make the regulation applicable to

CMS and intermediaries in all settings.  It was to make the regulation applicable to the actions of

providers and provider-related organizations in all circumstances, and applicable to the actions of

intermediaries in circumstances where the intermediary is seeking to procure a favorable ruling

from the PRRB in defense of its payment determination.  Compare 42 C.F.R. §§ 405.1805,

405.1815, 405.1843, 405.1885(d).  At the very least, however, nothing in the rulemaking history

suggests that the regulatory scheme must be read in a more expansive fashion than its plain

language allows.

In light of the foregoing analysis, plaintiffs' uncritical reliance on dicta in Rochester

Methodist Hospital v. Travelers Insurance Co., 728 F.2d 1006 (8th Cir. 1984), remains

unpersuasive.  In Rochester, a divided panel of the Eighth Circuit merely expressed the view, in

passing, that "[w]e do not believe" the definition of "parties to the intermediary's determination"

in § 405.1805 "was intended to exclude intermediaries from the operation of § 405.1885(d)." Id.

at 1018 n.12. But defendant has never said that intermediaries are always excluded from the

operation of § 405.1885(d). As was discussed earlier, intermediaries are excluded from the

operation of § 405.1884(d) only where they render determinations, 42 C.F.R. § 405.1805, and

when they render decisions on their own determinations. 42 C.F.R. § 405.1815. They most

definitely fall within the operation of § 405.1885(d) when they defend their determinations

before the PRRB. 42 C.F.R. § 405.1843(a). Only when the intermediary performs an advocacy

role is there any potential chance that a "decision" can be "procured" through something that the

intermediary says or does. 42 C.F.R. § 405.1885(d). This more complete analysis suggests that

the "summar[y]" approach that plaintiffs mistake for a virtue in the Rochester dicta, Pl. Reply at

12, is not an example this Court would be well counseled to imitate.[19]

---

[19] The passing reference to § 405.1885(d) in St. Vincent Health Center v. Shalala, 937 F. Supp. 496 (W.D. Pa. 1995), aff'd mem., 96 F.3d 1434 (3d Cir. 1996), contains no analysis and has no persuasive force. The court merely assumed, arguendo, that "[r]eopening is mandatory" where it has been established that an intermediary engaged in "fraud or similar fault." Id. at 506-07. There is nothing in the decision that indicates that the Court was even presented with any "interpretation" of the Secretary on this point, let alone "rejected it." Pl. Reply at 12. Plaintiffs' contention that the Secretary's approval of the Rochester and St. Vincent decisions can be inferred from his failure to rewrite § 405.1885(d) when he revised § 405.1885(b) in 2002, Pl. Reply at 12-13, is just plain nonsense. The scope of subsection (d) was not at issue in the rulemaking, and, since neither Rochester nor St. Vincent has ever been relied upon by any court for the propositions urged by plaintiffs here, the dicta in those cases hardly represented a pressing programmatic concern. Finally, defendant's argument also does not require the straw-man conclusion "that the Secretary is not required by the Medicare regulations to refrain from engaging in fraud and other similar fault." Pl. Mem. at 1. It merely requires the conclusion that the Secretary, CMS and intermediaries are not "parties to the intermediary's determination" within the meaning of 42 C.F.R. § 405.1805, and therefore neither of them is a "party to the determination" of an intermediary within the meaning of 42 C.F.R. § 405.1885(d).

#### 4.  Fraud or similar fault was not "established."

Even if plaintiffs' reading of § 405.1885(d) could survive to this point, it founders on the fact that the duty to reopen which plaintiffs ask this Court to enforce can arise only where procurement of an intermediary determination by means of fraud or similar fault "is established," 42 C.F.R. § 405.1885(d), not where procurement of an intermediary determination by means of fraud or similar "occurred."  Contrary to plaintiffs' view, it does not require any special "rule of grammar," Pl. Reply at 13, to see that there is a difference between the two scenarios.  In the latter case, the duty to reopen arises when the ill-procured determination is rendered.  In the former, the duty arises only when it is established that the determination was procured by improper means.  This Court, in turn, potentially has mandamus jurisdiction only to compel the government to perform a duty that is currently owed the plaintiffs, not to create a duty by ruling on a predicate issue and only then enforcing the duty the Court has brought into being.  At the very least, the waiver of sovereign immunity in 28 U.S.C. § 1361, like all waivers of sovereign immunity, "is to be strictly construed, in terms of its scope, in favor of the sovereign," Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999), and all "ambiguities" must be resolved "in favor of immunity."  Lane v. Pena, 518 U.S. 187, 192 (1996) (quoting United States v. Williams, 514 U.S. 527, 531 (1995)).[20]

---

[20] Contrary to plaintiffs' view, this argument does not require the conclusion that fraud or similar fault must be established "as part of a court hearing or proceeding," Pl. Reply at 13, before reopening would be permissible under 42 C.F.R. § 405.1885(d).  Misfeasance could be established by an informal inquiry of the Secretary, CMS, the intermediary or the Inspector General.  Defendant's position also does not mean that "no tribunal could ever hear a subsection (d) claim on behalf of the intermediary or the hospital."  Pl. Reply at 14 n.4.  Say, for instance, the Secretary terminated the contract of an intermediary for committing fraud during a PRRB proceeding, but refused to reopen the relevant payment determinations on behalf of the affected hospital.  In those circumstances, the hospital could arguably bring a mandamus action demanding that the Secretary fulfill a mandatory duty to reopen under 42 C.F.R. § 405.1885(d).

Plaintiffs' contention that no court has ever ruled on the meaning of the words "is established" in 42 C.F.R. § 405.1885(d) is cleverly, but irrelevantly, true.  Pl. Reply at 13 & n.3. Every court that has ruled on a mandamus claim brought by a provider pursuant to 42 C.F.R. § 405.1885(d) has dismissed it <u>before</u> reaching this point in the analysis.  <u>Lincoln Gen. Hosp. v. Shalala</u>, No. 4:98CV3118, mem. op. at 12 (D. Neb. July 13, 2000) (Def. Ex. C); <u>Binghamton</u>, 856 F. Supp. at 792-93; <u>Loma Linda</u>, 1994 WL 465830 at *2.  The two decisions on which plaintiffs rely, <u>Rochester</u> and <u>St. Vincent</u>, merely discussed the regulation in passing <u>dicta,</u> a setting where it would be surprising to find a thorough examination of every nuance of the text.

### 5. Plaintiffs allege no facts showing any "active" or "passive" misrepresentation.

With so many threshold barriers to plaintiffs' "fraud or similar fault" theory, it is almost anti-climactic to note that their amended complaint alleges no facts that could remotely demonstrate that the hospitals were "passively and actively misled" in any way that cheated them out of Medicare reimbursement.  Am. Compl. at ¶ 37(b).  As defendant has previously explained, the phrase "fraud or similar fault" is not defined in the reopening regulation, and it is risky to try to transpose the definition of "fraud" from common law to regulatory law or from one regulatory scheme to another.  In the context of Social Security claims, however "fraud" has been at least been said to exist "when a person makes or causes to be made a false statement or misrepresentation of a material fact for use in determining rights" to payment.  <u>Sotiriades v. Mathews</u>, 546 F.2d 1018, 1020 (D.C. Cir. 1976) (citation omitted).  "Similar fault" has been said to exist "when a person makes an incorrect or incomplete statement" of material fact or "material information is concealed," but not necessarily with "fraudulent intent."  <u>Id</u>.  Under any standard, "some degree of reliance" also has been found to be "required to satisfy the element of causation

inherent in the phrase 'obtained by," Field v. Mans, 516 U.S. 59, 66 (1995), which appears to be at least similar to the words "procured by" used in 42 C.F.R. § 405.1885(d). It is not necessary to resolve any possible nuance in the meaning of the term "fraud or similar fault" here, however, to conclude that nothing alleged in plaintiffs' complaint comes remotely close to being fraud or similar fault.

The only allegation that any of the plaintiff hospitals were "actively" misled, Am. Compl. at ¶ 37(b), consists of the lone averment of a management employee at Griffin Hospital. He merely alleges that, sometime between 1999 and 2002, he "was informed" by an unidentified member of the "auditing staff" at Empire that Empire thought "the GET Tax was not an allowable cost and thus should not be included on the Medicare cost report." Id. at ¶ 26. But plaintiffs themselves aver that, from 1994 to 2001, Empire and its predecessors consistently held that opinion. Id. at ¶¶ 24(c), 25(c), 27(a). On its face, then, there is nothing factually inaccurate about the statement. Armed with this truthful information about Empire's position, Griffin Hospital could have researched the law for itself, made its own independent judgment about whether the position was legally correct, submitted a claim for reimbursement, and, if necessary pursued the anticipated denial through the administrative appeals process to get a more conclusive answer. Even if it later turns out to be wrong, a "good faith effort to interpret [a] statute" cannot, as a matter of law, be considered fraud or similar fault within the meaning of 42 C.F.R. § 405.1885(d). Lincoln, mem. op. at 12.

Any element of detrimental reliance also is lacking. By plaintiffs' own account, the conversation between the Griffin official and the Empire auditor could not have happened until after Griffin had submitted its costs reports for the 1994-1996 fiscal years at issue here and after the intermediaries (not Empire) which processed them had rendered determinations. Griffin

-43-

could not be tricked into doing things it had already done.  And, in any event, Griffin had a duty "to familiarize itself with the legal requirements for cost reimbursement" and to be "acquainted with the nature of and limitations on the role of the intermediary."  <u>Crawford County</u>, 467 U.S. at 64.  Someone who is under a legal duty not to take another's statement at face value cannot be heard to complain that he was misled into doing so.

Plaintiffs' fraud-related theory of passive concealment fares no better.  At a minimum, the concept of fraudulent or negligent concealment connotes a failure "to  disclose a material fact" under circumstances where there is "a duty to do so."  <u>Chiarella v. United States</u>, 445 U.S. 222, 228 (1980) (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).  Plaintiffs fail that test at the outset because an opinion about Medicare law is not a material fact.  In any event, plaintiffs have identified no statute or regulation that requires either CMS or intermediaries to give hospitals unsolicited advice about Medicare law.  Rather, hospitals themselves "are expected to know the law and may not rely on the conduct of Government agents [alleged to be] contrary to law."  <u>Crawford County</u>, 467 U.S. at 63.  If plaintiffs believe that CMS or its fiscal agents had a legal obligation "to issue a directive to Connecticut" about the GET tax merely because CMS had rendered an opinion about an arguably similar state tax in New York, Pl. Reply at 17, their quarrel is with the Supreme Court.[21]  This Court has no meaningful standard by which to second guess the wisdom of letting state-tax issues percolate through the administrative appeals process on a state-by-state basis, <u>Guernsey</u>, 514 U.S. at 96-97, particularly when development of

---

[21] <u>See</u> <u>Guernsey</u>, 514 U.S. at 96 (finding no "basis for suggesting that the Secretary has a statutory duty" to issue directives "that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement'); <u>Crawford County</u>, 467 U.S. at 64 ("There is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare.").

nationwide policy would present the daunting task of trying to anticipate the endless variations in

taxing schemes the fifty states could create, the District of Columbia, and the territories.

Plaintiffs cannot manufacture "fraud or similar fault" merely by substituting their own notions of

what constitutes efficient administration for the better informed view of the Secretary.

In addition, it is hard to see which intermediary plaintiffs believe owed them the

explanation in 1995 about the treatment of New York gross-receipts taxes.  Plaintiffs do not

allege that the intermediary which they say was processing cost reports in Connecticut at the time

(Blue Cross) knew about the New York opinion.  The intermediary which knew about the New

York opinion (Empire) was not processing Connecticut cost reports at the time.  The Medicare

statutes and regulations on which such opinions are based have not been concealed from

plaintiffs.  They are published for anyone to see, and plaintiffs are under a legal obligation to be

familiar with them.  The hospitals' claim of  "fraud or similar fault," 42 C.F.R. § 405.1885(d), is

merely a pretext to cover up the apparent failure of their management personnel to live up to their

own obligations to their employers.

### III.  MANDAMUS RELIEF SHOULD BE DENIED ON EQUITABLE GROUNDS.

Even if plaintiffs' amended complaint could survive to this point, mandamus relief should

be denied on equitable grounds.  To the extent that plaintiffs are claiming a right to mandamus

relief based solely on substantive Medicare statutes and regulations, they had all of the

information they needed to make the claim when they submitted their cost reports and when the

ensuing determinations for their 1994, 1995 and 1996 cost-reporting years were issued.  To the

extent that they claim that 42 C.F.R. § 405.1885(b) compelled the Secretary to reopen payment

determinations more than three years old, they had all the information they needed to bring the

claim in 2002, when a three-year reopening was ordered.  To the extent that plaintiffs claim that

42 C.F.R. § 405.1885(d) mandates a reopening for fraud or similar fault, all the information they needed to make that claim was available to them in 2001, when CMS issued an opinion that the GET tax was reimbursable.  Plaintiffs proffer no reason why they waited until now to bring suit.

Moreover, the only reason plaintiffs did not receive reimbursement for the GET tax for the 1994, 1995 and 1996 cost-reporting years is because they did not claim the tax as an expense on their cost reports and, if necessary, appeal any denial by the intermediary through the administrative process created for them by Congress in 42 U.S.C. § 1395oo.  By plaintiffs' own account, every other hospital that followed that route obtain the sought-after reimbursement for similar kinds of state taxes.  Equity should not reward the grasshopper along with the ant.

## IV.  THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE FRAUD OR SIMILAR FAULT WITH PARTICULARITY.

Finally, even if plaintiffs could otherwise survive a motion to dismiss, their amended complaint still falls woefully short of the averments necessary to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).  As defendant previously explained, where fraudulent misrepresentations are alleged, "the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud."  United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981).[22]  Similarly, "[p]arties pleading fraudulent concealment 'must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish that they used due diligence in trying to uncover the facts.'"  Firestone, 76 F.3d at 1211 (quoting Larson v. Northrop

---

[22]  See also United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 546 (D.C. Cir. 2002); Firestone v. Firestone, 76 F.3d 1205 (D.C. Cir. 1996) (per curiam); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994); Anderson v. USAA Cas. Ins. Co., 221 F.R.D. 250, 254 (D.D.C. 2004); Allen v. Beta Constr., 309 F. Supp. 2d 42, 45 (D.D.C. 2004).

Corp., 21 F.3d 1164, 1173 (D.C. Cir. 1994)).  In addition, the complaint must set forth

"allegations that the plaintiff reasonably relied on the alleged misrepresentation."  In re U.S.

Office Prods. Co. Sec. Litig., 251 F. Supp. 2d 58, 74 (D.D.C. 2003).  The same standards apply

to allegations of "negligent misrepresentation" (e.g., similar fault).  Id.[23]  Plaintiffs' amended

complaint still does not come close to these standards.

    With respect to active misrepresentation, "prior to 2002," Am. Compl. at ¶ 26, hardly

constitutes the "date" on which the complained-of conversation between Griffin Hospital and

Empire supposedly took place.  The place of the putative conversation also is not given.

Although plaintiffs give a cursory account of the contents of the conversation, id., Griffin

Hospital does not allege that it relied on – or, for that matter, even trusted – the legal opinion of

Empire.  Moreover, the complaint does not explain how a conversation that allegedly occurred

between 1999 and 2002 could have influenced the submission of cost reports in 1998 and before.

    With respect to negligent concealment, plaintiffs not only fail to identify any factual

information that CMS and the intermediaries were under a duty to disclose, they deny that

fraudulent or negligent concealment even requires a "legal obligation to speak."  Pl. Reply at 15

(quoting Def. Opp. at 31).  In addition, plaintiffs allege no facts showing that they made any

effort to undercover whatever "facts" they think were wrongfully concealed.  Nor does the

complaint explain how concealment could have injured them when they already "are expected to

know the law and may not rely on the conduct of Government agents contrary to law."  Crawford

County, 467 U.S. at 63.  The amended complaint still fails to meet the standards of Rule 9(b).

---

[23] See also Anderson, 221 F.R.D. at 254; Shields v. Wash. Bancorporation, 1992 WL 88004 at *9 (D.D.C. Apr. 7, 1992); Nelson v. Nationwide Mortgage Corp., 659 F. Supp. 611, 618 (D.D.C. 1987).

## <u>CONCLUSION</u>

For the reasons stated, defendant's motion to dismiss should be granted.

Respectfully submitted,

OF COUNSEL:
ALEX M. AZAR II                         PETER D. KEISLER
General Counsel                         Assistant Attorney General

ROBERT P. JAYE                          KENNETH L. WAINSTEIN
Acting Associate General Counsel        United States Attorney

MARK D. POLSTON                         _____
Acting Deputy Associate
General Counsel for Litigation          SHEILA M. LIEBER
                                        PETER ROBBINS
                                        Department of Justice
LAWRENCE M. MEISTER                     20 Massachusetts Avenue, N.W., Room 7142
Attorney                                Washington, D.C.  20530
Department of Health                    Tel:  (202) 514-3953
and Human Services                      Attorneys for Defendant