IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FAIRVIEW HOSPITAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:05cv01065 (RWR) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRADLEY MEMORIAL HOSPITAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04cv00416 (EGS) |
| | ) | |
| TOMMY G. THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION
TO PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Preliminary Statement ..........................................................................................1

Argument .................................................................................................................3

    I.       No Genuine Issue of Material Fact Remains ............................................3

    II.     The Secretary's Contention That the Hospitals Are Litigating the
           Substance of the GET Tax as an Allowable Cost is Incorrect ....................7

    III.    The Secretary's Statute of Limitations Argument Fails ............................9

    IV.   Mandamus Should be Granted Under 42 C.F.R. § 405.1885(d) ..............10

          A.    The Intermediary is a Party to the NPR and is Therefore a
               "Party" to the Determination Under 42 C.F.R. § 405.1885(d) ......11

          B.    No "Prior Proceeding " Requirement Exists..................................13

          C.    The Secretary Misrepresents the Elements of "Similar Fault" ......14

          D.    The Elements of "Similar Fault" Have Been Satisfied in
               this Case ........................................................................................15

          E.    Reimbursement Policies as Not "Pure Questions of Law"............17

    IV.   Mandamus is Also Appropriate Under 42 C.F.R. § 405.1885(b)..............19

          A.    Mandatory Reopenings are Not Granted Through "Grace" ..........19

          B.    A Reopening Under 42 C.F.R. § 405.1885(b) Should Encompass
               NPR's Issued to the Hospitals' Beginning in July of 1995 ..........20

          C.    The Hospitals' Remedies Were Futile ..........................................21

          D.    The Secretary's Reliance on Heckler v. Ringer is Misplaced .......24

Conclusion ...............................................................................................................25

## **TABLE OF AUTHORITIES**

Case                                                                                          Page(s)

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)...................................................................................7

Automated Salvage Transport, Inc. v. NV,
  106 F. Supp. 2d 606 (D.N.J. 1999) ...........................................................15

Bethesda Hosp. v. Bowen,
  485 U.S. 399 (1998)...................................................................................8

BCCI Holdings (Luxembourg), S.A. v. Clifford,
  964 F. Supp. 468 (D.D.C. 1997) ...............................................................18

Ganem v. Heckler,
  746 F.2d 844 (D.C. Cir. 1984) ...................................................................8

Haneke v. HEW,
  535 F.2d 1291 (D.C. Cir. 1976) .................................................................8

Heckler v. Ringer,
  466 U.S. 602 (1984).............................................................................24, 25

In re Medicare Reimbursement Litigation, Baystate v. Thompson,
  309 F. Supp. 2d 89 (D.D.C. 2004),
  appeal docketed, No. 04-5203 (D.C. Cir. May 28, 2004)...................... passim

Monmouth Med. Ctr. v. Thompson,
  257 F.3d 807 (D.C. Cir. 2001)................................................................ passim

Rochester Methodist Hosp. v. Travelers Ins. Co.,
  728 F.2d 1006 (8th Cir. 1984) ...........................................................12, 13

St. Joseph Hosp. v. Blue Cross Blue Shield Of Minnesota,
  Case No. 96-0644 (PRRB Dec. No. 2000-D47, Apr. 20, 2000)......................11

St. Vincent Health Ctr. v. Shalala,
  937 F. Supp. 496 (W.D. Pa. 1995),
  aff'd, 96 F.3d 1434 (3[d] Cir. 1996)........................................................12, 13

Toner v.Allstate Ins. Co.,
  829 F. Supp 695 (D. Del. 1993).................................................................15

United States v. Sun Diamond Growers of California,
  964 F. Supp. 486 (D.D.C. 1997) ....................................................................18

Williams v. Mordkofsky,
  901 F.2d 158 (D.C. Cir. 1990) ........................................................................9

Your Home Visiting Nurse Servs. v. Shalala,
  525 U.S. 449 (1999) .......................................................................................19

STATUTES AND REGULATIONS

42 U.S.C. §  1395(h) .........................................................................................11

42 C.F.R. § 405.1803 ........................................................................................11
        § 405.1885(b) ................................................................... passim
        § 405.1885(d) ................................................................... passim

67 Fed. Reg. 50,096 (Aug. 1, 2002) ..............................................................13, 20

OTHER SOURCES

Black's Law Dictionary, 1122 (6th ed. 1990) ...................................................11

Supplemental Security Ruling, SSR 85-23 ......................................................14

**Preliminary Statement**

The present matter is much closer to the <u>Monmouth</u> and <u>Medicare Litigation</u> cases than the Secretary is willing to admit.  In order to avoid an honest and straightforward analysis of the present matter in light of those cases, the Secretary tries to mislead the Court on the facts and the law.  This reply brief sets the record straight on both fronts.

With respect to the facts, the Secretary claims that Empire's predecessors (and indeed Empire itself) did not maintain a policy that the GET Tax was a non-allowable cost.  This is the only factual issue in this case, and the Declaration of Warren Willis, submitted by the Secretary, lends no support to the Secretary's position.  Willis simply states that he is "unaware" of any such policy, but never categorically denies that one existed.  The Willis Declaration relies on self-avowed ignorance, not personal knowledge.  Indeed, Willis apparently worked only for Empire and does not provide any evidence regarding the policies of Empire's predecessors, which are the intermediaries that would have served Connecticut hospitals during the time period covered by the complaint in this case (1994, 1995, and 1996).  Since Willis did not have sufficient knowledge to support the Secretary's position, it was incumbent upon the Secretary to undertake a measure of due diligence and ascertain the facts.  After all, the policies in question were those maintained and enforced by the Secretary's own agents.

The Hospitals have submitted the following affirmative declarations establishing not only that Empire maintained a policy of disallowing the GET Tax, but also that all of its predecessors maintained the same policy:

- Douglas A. Payne, Medicare Audit Manager for Blue Cross and Blue Shield of Connecticut and Anthem, Ex. 1;

- Maureen Jocelyn, Senior Auditor for Blue Cross and Anthem, Ex. 2;

1

- Rose Cambino, former Auditor for Anthem and Empire, Original Declaration attached to Plaintiffs' Motion for Summary Judgment, Ex. 2 and Supplemental Decl. attached hereto as Ex. 3;

- William Macintyre, Director of Budgets, Griffin Hospital, Ex. 4.

No genuine issue of fact remains with respect to the intermediary's policy regarding the GET Tax.  The Hospitals have conclusively established that both Empire and its predecessors considered the GET Tax to be a non-allowable cost.  For all of the Secretary's strident assertions to the contrary, he offers nothing in the way of evidentiary support.  The Secretary boldly states that had the hospitals simply filed a timely reopening request, the intermediary would have allowed the hospital to treat the item as an allowable cost.  Def. Mem. 17.   Based on the unequivocal declarations of Payne, Jocelyn, and Cambino, it is clear that this assertion is untrue.  The Secretary has not proffered a single current or former employee of the intermediary who will actually certify to the Secretary's contentions in this case.

As to the New York State Hospital Tax, once again only the Hospitals have submitted competent evidence.  Payne, in his Declaration, testifies that the intermediary viewed the New York State Hospital Tax, for purposes of reimbursement, to be the same as the GET Tax.  Ex. 1 at ¶ 5.  The Hospitals also produced a letter that CMS sent to Empire in 1995, in which CMS directs Empire to reverse its policy of disallowing the New York State Hospital tax.  Declaration of Rex A. Shera attached as Ex. 1 to Plaintiffs' Motion for Summary Judgment (hereinafter "Shera Decl.") at Ex. 1-D .  Finally, the Hospitals also produced a memo that CMS sent to Empire in 2002, noting that the taxes were similar and should be accorded similar treatment.  Shera Delc. at Ex. 1-C.

The Secretary, in contrast, has not offered even a scintilla of countervailing evidence regarding the intermediary's understanding of the two taxes. Instead, the Secretary makes speculative state-of-mind arguments about what the intermediary could (or could not) comprehend about the two taxes "as a matter of law." Those arguments, as explained below, are unpersuasive, especially coming from a party whose former agent (Payne) testifies at length on the issue, revealing the Secretary to be incorrect. Here again, there is no genuine issue.

All of the foregoing declarations are encompassed within the Hospitals' First Amended Complaint that will be filed presently. At that time, the Secretary's ancillary argument, that "fraud" has not been pled with sufficient particularity, will be moot and should be withdrawn. The rest of the issues should remain in the motion proceedings and should be resolved by way of summary judgment in favor of the Hospitals.

<u>**Argument**</u>

## I.      **No Genuine Issue of Material Fact Remains.**

The Secretary argues that Rose Cambino's Declaration was unpersuasive because she was not employed by either Anthem or Empire during 1994, 1995, and 1996, the years which are the focus of the Hospitals' complaint in this matter. Def. Mem. 14-15. The Secretary also contends that Cambino's Declaration should be discounted because she was employed by Empire, and Empire did not become Connecticut's fiscal intermediary until 1999. <u>Id.</u> As to the audit adjustment report from Saint Vincent's Medical Center, the Secretary argues that the intermediary's disallowance of the GET Tax is rendered meaningless because of a notation suggesting that the hospital was not liable for the tax because of its not-for-profit status. Def. Mem. 18, n13. As to Rex

Shera's Declaration, the Secretary claims that Shera does not have personal knowledge of the intermediary's policy.  Def. Mem. 16-17.  Finally, the Secretary also contends that the intermediary could not have made any meaningful comparisons of the New York Hospital Tax (which was deemed allowable beginning in 1995) to the GET Tax (which was not deemed allowable until 2002).  Def. Mem. 18, n.13.

The Secretary repeats all of the foregoing factual arguments throughout his entire brief, asking the Court to grant summary judgment or, in the alternative, dismissal.  The Secretary, in his opposition, defies the Hospitals to produce a witness with a more compelling account than those offered by Cambino and Shera.  Although the Hospitals certainly believe that the Declarations of Cambino and Shera are more than sufficient to cause the Hospitals to prevail on their motion for summary judgment as well as to defeat both of the Secretary's "alternative" motions, the Hospitals have nevertheless endeavored to answer the Secretary's challenge.

That challenge is answered through the Declaration of Douglas A. Payne, Manager of the Medicare Audit and Reimbursement Department, from 1989 through 1998, for Empire's predecessors, Blue Cross and Blue Shield of Connecticut and Anthem.  Ex. 1 at ¶ 2.  Payne's duties involved overseeing all of the Medicare cost report auditors that worked for the intermediary.  Id.  It was also his job to implement Medicare reimbursement and cost reporting policies.  This included making and overseeing the intermediary's determinations as to which items could be claimed as allowable costs on Medicare cost reports and which could not.  Id. at ¶ 3.

Payne attended regional meetings with intermediaries from Maryland, New England, New Jersey, New York, Pennsylvania, Virginia and West Virginia.  Id. at ¶ 4.

One of the policies discussed in these meetings was how intermediaries should deal with hospital assessments and/or taxes that were associated with state "uncompensated care pools" (i.e. programs under each state's Medicaid Disproportionate Share Hospital or "Medicaid DSH" program). Id. Each of the intermediaries agreed, at least until 1995, that such assessments and taxes should not be treated as allowable costs. Id.

Payne testified that it was the policy of fiscal intermediaries in Connecticut (specifically Blue Cross and Blue Shield of Connecticut and Anthem) to consider the GET Tax as related to Connecticut's Medicaid DSH program and therefore to be a non-allowable cost with respect to Connecticut hospitals. Id. at ¶ 5. Payne certifies that, for the entire period spanning the inception of the GET tax in 1994 up through when he left the intermediary in 1998, it was the policy of the intermediaries that the GET Tax was not an allowable cost for Connecticut hospitals. Id. at ¶ 6. All of the foregoing is also buttressed by the Declaration of Maureen Jocelyn, a senior auditor that worked for the same intermediaries during the same time period. Ex. 2. Through Payne's Declaration, the Hospitals have dispensed the suggestion that a Connecticut hospital could obtain reimbursement for the GET Tax by simply including it on the hospital's cost report or by filing a reopening request with the intermediary.

The Secretary's contention that the audit adjustment report for St. Vincent's Medical Center is insignificant is also erroneous. Def. Mem. 18, n.13. Payne is aware that one of the intermediary's auditors, in the context of auditing a cost report submitted by St. Vincent's Medical Center, noted that the GET Tax was being disallowed because of the "not-for-profit" status of the hospital. Ex. 1 at ¶ 7. That notation was apparently made in error. Payne testifies that the policy of disallowing the GET Tax was entirely

5

unrelated to a hospital's status as "for profit" or "not-for-profit." Id. That distinction was simply irrelevant to the intermediary's policy. Id. Moreover, during the time period 1994 through 1997, all of the acute care hospitals in the State of Connecticut were "not-for-profit" institutions. Id. Thus, if the GET Tax were only collectible against "for profit" hospitals, as suggested by the Secretary, it would have yielded zero tax dollars.

Another error by the Secretary relative to St. Vincent's Medical Center's 1995 appeal is worth noting. The Secretary is incorrect in claiming that a hospital could have obtained reimbursement for the GET Tax, for older years, by simply appealing the issue in the same manner as did St. Vincent's Medical Center. Def. Mem. 5. St. Vincent's, through dumb luck, happened to have a pending appeal open in 2002 (on a different issue) for its fiscal year ending in 1995. See Rose Cambino's Supplemental Declaration, Ex. 3 at ¶ 2. In 2003, long after the intermediary changed its GET Tax policy, St. Vincent's added the GET Tax issue to its appeal for fiscal year 1995. Id. It was not an item that St. Vincent's initially appealed. Only those hospitals that happened to have an appeal on other issues pending as of 2002 could have benefited from St. Vincent's approach.

Finally, the Secretary argues that the change in reimbursement policy that made the New York Hospital Tax an allowable cost in 1995 did not put CMS, Empire, and others on notice that the GET Tax should have been considered to be an allowable cost as well. The Secretary suggests that this is simply beyond the ken of the intermediary and would involve the analysis of a "pure question of law." Def. Mem. 32. Payne dispels this false notion, testifying that the two taxes were considered by the intermediary to be the functional equivalent of one another for purposes of reimbursement, "the GET Tax

functioned in the same manner as the New York Hospital Tax," as both were taxes associated with each state's Medicaid DSH program.  Ex. 1 at ¶ 5.  Based on all of the foregoing, no genuine issue of fact remains (i) regarding the intermediary's policy of non-reimbursement regarding the GET Tax prior to 2002 and (ii) that the Secretary, CMS, and the intermediary should have changed that policy as early as 1995.

A non-moving party such as the Secretary must establish more than the "mere existence of a scintilla of evidence" in support of its position.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Furthermore, by pointing to the absence of evidence proffered by the non-moving party, a moving party may also succeed on summary judgment.  Id. at 249-50.  Here, the Secretary has not submitted any probative evidence.  In accordance with the holding in Liberty Lobby, the Hospitals' motion for summary judgment should be granted and both of the Secretary's motions should be denied.

## II.  The Secretary's Contention That Hospitals Are Litigating the Substance of the GET Tax as an Allowable Cost is Incorrect.

The present case is equivalent to Monmouth Med. Ctr. v. Thompson, 257 F.3d 807 (D.C. Cir. 2001) and Medicare Reimbursement Litigation, Baystate v. Thompson, 309 F. Supp. 2d 89 (D.D.C.) (hereinafter, "Baystate"), appeal docketed, No. 04-5203 (D.C. Cir. May 28, 2004) because the Hospitals ask the Court to properly enforce the Secretary's own regulations governing reopening, as opposed to make a judgment call about a substantive reimbursement decision.  Monmouth and Baystate allow for mandamus in precisely the narrow circumstance that is presented here: to vindicate a right to reopening that had been wrongfully denied by the Secretary and his agents.  Id.

Even the Secretary admits that mandamus can be used to protect procedural rights.  Def. Mem. 19.

The Secretary argues that the present matter is a substantive challenge on the issue of whether the GET Tax is an allowable cost and that this makes the remedy of mandamus inappropriate.  Def. Mem. 4, 5, 19, 20.  The reason the Secretary seeks to characterize the case as substantive is to trigger that line of cases which prohibit substantive challenges through mandamus.[1]

The reason the present matter is procedural and not substantive is because the Secretary has already conceded the substantive reimbursement issue.  CMS conceded the merits twice: first when it changed its payment policy regarding the New York Hospital Tax in 1995 and second when it changed its policy regarding the GET Tax in 2002.  With respect to the GET Tax, CMS also issued a formal directive under the mandatory reopening provision found in 42 C.F.R.§ 405.1885(b), admitting that the intermediary had applied the law incorrectly by disallowing the GET Tax.  Id.; Def. Mem. 1.  Accordingly, the Hospitals do not require a judicial declaration that the GET Tax is an allowable cost.  CMS has already done that for them.  At no point will this Court be required to rule on the issue of whether the GET Tax is allowable.  This is a suit akin to the Monmouth and Baystate, which sought to enforce and clarify a right to reopening under 42 C.F.R. § 405.1885.  This is a case about procedure, not substantive policy.  Mandamus is therefore appropriate.

---

[1] Including, among others, Bethesda v. Bowen, 485 U.S. 399 (1988); Ganem v. Heckler, 746 F.2d 844 (D.C. Cir. 1984); Haneke v. HEW, 535 F.2d 1291 (D.C. Cir. 1976).

**III.    The Secretary's Statute of Limitations Argument Fails.**

The Secretary mentions in passing that the Hospitals' case has been brought beyond the statute of limitations.  Def. Mem. 23.  That argument should be rejected for several reasons.  First, it has not been properly raised.  The Secretary did not move on that issue in either his motion to dismiss or in his motion for summary judgment.  It can hardly be raised as an affirmative ground for decision in his reply brief.  Second, it has no factual predicate.  The Secretary has submitted no evidence and no legal argument on the issue.  Finally, the statute of limitations only begins to run once a plaintiff's claim has accrued.  A claim only accrues for purposes of the statute of limitations when a party is put on notice of the facts sufficient to bring suit.  Williams v. Mordkofsky, 901 F.2d 158, 162 (D.C. Cir.1990).

In the present matter, the earliest point in time that the Hospitals' were put on notice of a potential claim of "fraud or similar fault" under 42 C.F.R. § 405.1885(d), or "inconsistent" application of the law under 42 C.F.R. § 405.1885(b), was when CMS directed Empire to change its policy in 2002.  The Hospitals have filed suit well within six years of that date.  The statute cannot begin to run before the date that the reimbursement policy changed.  It does not run from the date of the NPR's.  See Baystate, 309 F. Supp. 2d at 99.[2]  Beyond that, the reopening regulations themselves govern which fiscal years can be reopened (subsection (d) allows for a reopening at any time and subsection (b) has a retrospective reopening period of three years).  The statute

---

[2] In Baystate, the hospitals were not put on notice of their right to sue until the Monmouth case was decided.

of limitations argument, which has been neither properly raised nor supported, should be rejected.

**IV.      Mandamus Should be Granted Under 42 C.F.R. § 405.1885(d).**

The mandatory reopening provision based upon "fraud or similar fault," 42 C.F.R. § 405.1885(d), requires that a Notice of Program Reimbursement ("NPR") be reopened if "it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision." Id. It is undisputed that, if there is fraud or similar fault, no cost report year is beyond the provision's reach. The provision, on its face, applies to "any determination" and does not contain any time limit on its application as does the other reopening provisions. Id.

Importantly, the Secretary does not argue that a reopening request or administrative appeal is necessary in order to trigger the application of subsection (d). Nor does subsection (d), on its face, require such action. The Secretary's arguments regarding exhaustion do not apply to the subsection (d) argument. To the extent the Secretary may take a different approach during oral argument, the issue of exhaustion is addressed in separate point headings below.

The Secretary's sole argument against mandamus in this context is based upon the erroneous notions that: (i) neither the Secretary, CMS, nor the Intermediary is a party to the NPR's at issue in this case, (ii) fraud or similar fault must be the subject of a judicial or administrative finding in a prior proceeding in order to be actionable under mandamus, and (iii) the intermediary did not consider the New York Hospital Tax and the GET Tax to be equivalent from the perspective of reimbursement.

**A.** **The Intermediary is a Party to the NPR and is Therefore a "Party" to the Determination Under 42 C.F.R. § 405.1885(d).**

The Secretary would have the Court believe that the intermediary's involvement with the cost report process is limited to the role of a hands-off arbiter or Court. Def. Mem. 27. This comparison is inapt. The intermediary's role is not that of an impartial tribunal, but rather that of a participant in the process. In the context of issuing NPR's, the intermediary's partisan role is highlighted by the significant payment obligation that is created through the issuance of the NPR documents. See 42 C.F.R. § 405.1803; 42 U.S.C. § 1395h. Although reimbursement is paid with funds from the federal government, the intermediary is the conduit for those funds and the NPR fixes the intermediary's obligation to pay. Id. If the reimbursement becomes contested, both the hospital and the intermediary are reflected as parties in the caption of the case. See e.g. St. Joseph Hosp. v. Blue Cross and Blue Shield of Minnesota, Case No. 96-0644 (PRB-Dec. No. 2000-D47, Apr. 20, 2000).

In contrast, a court, when it fixes payment obligations through judgments and awards, does not create payment obligations for itself, but rather only for others. The court's situation could not possibly be more different from that of the intermediary. An intermediary cannot issue an NPR and then not render the payment that is due. The process is bilateral. The Intermediary's rights are impacted by the NPR just as much as the hospital's. When one's rights are impacted, and one's name appears in an operative document or in a proceeding, one is a party. Black's Law Dictionary, 1122 (6th ed. 1990).

The Secretary, mindful that this is the default definition of the term "party" that pervades every corner of our legal system, realizes that in those instances in which he

wishes to make the intermediary a non-party, he must do so with a specific regulatory

exclusion.  These regulatory provisions have been enumerated by both the Secretary and

the Hospitals.  Def. Mem. 27.  The reopening regulation under subsection (d), however, is

an instance in which the Secretary has not sought to limit the definition of the word

"party."  The Secretary's construction of subsection (d) asks the Court to discount the

fact, that in all other instances in which the Secretary has sought to exclude the

intermediary from the definition of who is a "party," he has done so through specific

language.

The regulatory history of subsection (d) further illuminates the scope of the term

"party."  Both sides admit that CMS, when it first proposed the regulation, excluded the

intermediary from the definition of who is a "party," but then removed that exclusionary

language in the final regulation.  No rational jurist could interpret the removal of that

language as an attempt to keep that very exclusion.  Indeed, none has.  The two federal

courts that have considered the language of the final regulation have both found that it

applied to intermediaries as well as to providers.  Rochester Methodist Hosp. v. Travelers

Ins. Co., 728 F.2d 1006, 1018 (8th Cir. 1984); St. Vincent Health Ctr. v. Shalala, 937 F.

Supp. 496, 506-07 (W.D. Pa. 1995), aff'd, 96 F.3d 1434 (3[d] Cir. 1996).  The Secretary

dismisses the discussion of the provision in each of these cases as "dicta."  Def. Mem. 28.

Although it is true that subsection (d) was not the basis upon which those cases were

decided, it is also true that the court, in each case, considered the Secretary's

interpretation and then summarily rejected it.  Id.

This raises another fundamental flaw in the Secretary's argument.  The Secretary

was a named party in the second case and the Secretary's agent was a named party in the

12

first.  Id.  If the Secretary truly disagreed with these Court decisions, he has had 10 years

to amend subsection (d) to comport with his current position.  Indeed, the Secretary had a

perfect opportunity to do so in 2002 when he promulgated comprehensive amendments to

42 C.F.R. § 405.1885 in response to the Monmouth decision.  See 67 Fed. Reg. 50,096

(August 1, 2002).  It follows that none of the hospitals' arguments on this point have been

refuted.  An "intermediary" is a party within the meaning of subsection (d).  The

Hospitals' motion should be granted and the Secretary's motions should be denied.

**B.      No "Prior Proceeding" Requirement Exists.**

The Secretary's argument that a finding of "fraud or similar fault" must be

entered in a prior proceeding in order to be "established" is false.  It is a legal position cut

entirely from whole cloth.  First, the express language of 42 C.F.R. § 405.1885 (d) does

not require a prior proceeding in order to establish fraud or similar fault.  Nor have any of

the courts that have reviewed the provision elected to graft upon it the requirement that

fraud or similar fault first be "established" in a prior proceeding.[3]  Importantly, the

Secretary offers no decision, principle of statutory construction, or even rule of grammar,

for that matter, that would support its construction of the provision.

The Secretary's recitation of the code section, in addition to being wrong, is also

inconsistent.  Putting "the shoe on the other foot," certainly the Secretary does not

contend, in those instances in which subsection (d) is invoked against hospitals, that

"fraud or similar fault" must first be "established" against the hospital, as part of a prior

court hearing or proceeding, before either CMS or the intermediary will proceed with a

---

[3] Rochester Methodist Hosp. v. Travelers Ins. Co., 728 F.2d 1006, 1018 (8th Cir. 1984);
St. Vincent Health Ctr. v. Shalala, 937 F. Supp. 496, 506-07 (W.D. Pa. 1995), aff'd, 96
F.3d 1434 (3[d] Cir. 1996).

reopening. The notion that a different set of rules should apply when the issue is raised against an intermediary makes no sense.[4]

### C.     The Secretary Misrepresents the Elements of "Similar Fault."

The Secretary suggests that the Hospitals must show all the elements of common law fraud in order for there to be a mandatory reopening under subsection (d). This is false. Def. Mem. 31. The regulatory text is disjunctive. In order for subsection (d) to apply, there can either be "fraud" <u>or</u> "similar fault." 42 C.F.R. § 405.1885(d). The Secretary intentionally mixes up the two concepts, acting as if the only way to show "similar fault" is to demonstrate that the intermediary made a knowing misrepresentation upon which the hospital relied. Def. Mem. 31. Those are the elements of fraud, in particular common law fraud. Those are not the elements of similar fault.

The Secretary is well aware that "similar fault" is more expansive than fraud and can consist of negligent omission or concealment as well as negligent misrepresentation. Indeed, his own agency has ruled that the term is defined as "an action proceeding from an inexcusable <u>negligence</u> or <u>ignorance</u> that is considered nearly equal to fraud." Supplemental Security Income Ruling SSR 85-23 (emphasis added).

---

[4] The Secretary's position also contains an obvious logical flaw. Requiring a prior proceeding would mean that no tribunal could ever hear a subsection (d) claim on behalf of the intermediary or the hospital. If there were a requirement of a "prior proceeding," as urged by the Secretary, then no tribunal, administrative or judicial, could ever be the first tribunal to hear the case. In each instance, the first tribunal to hear the case, whether it be the Provider Reimbursement Review Board or the United States District Court, would be required to dismiss the case because there had been no "prior proceeding." At some point, some tribunal must be the first to hear the case. There is no room for that to happen under the Secretary's interpretation of the regulation.

"Similar fault" is akin to equitable fraud, which is defined as "a false representation, usually not one of fact, made by defendant innocently, <u>negligently</u>, with reckless indifference to the truth. . ." <u>Toner v. Allstate Ins. Co.</u>, 829 F. Supp. 695, 703 (D. Del. 1993) (citing <u>Gaffin v. Teledyne, Inc.</u>, 611 A.2d 467, 472 & n.4 (Del. 1992)) (emphasis added). Equitable fraud does not require knowledge and intent. <u>Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT</u>, 106 F. Supp. 2d 606, 624 n.27 (D.N.J. 1999) (stating "[i]n equitable fraud, unlike legal fraud, a plaintiff need not prove scienter – that is, he need not prove (1) knowledge and (2) intent"). Based on the foregoing, it is plainly evident that "similar fault" does not require the existence of knowing misrepresentations or a "legal obligation to speak" as argued by the Secretary. Def. Mem 31.

### D.   The Elements of "Similar Fault" Have Been Satisfied in this Case.

The Secretary attempts to recast the hospitals' argument, suggesting that the only, or even most important, "fraud" or "similar fault" in this case consists of the intermediary's conduct in maintaining a policy that the GET Tax should be disallowed. This is incorrect. The "similar fault" of Blue Cross and Blue Shield of Connecticut, Anthem, and then Empire, occurred when (i) they maintained the policy that the GET Tax was non-allowable even though, as early as 1995, the New York Hospital Tax had been deemed to be an allowable cost, (ii) they omitted this fact from their discussions with the hospitals during the audit adjustment process, and (iii) they misrepresented to hospitals that the GET Tax was a non-allowable cost.

As explained at length in the Hospitals' first brief, CMS advised Empire in 1995 that it had changed its policy regarding the New York Hospital Tax and that the new

15

policy was that the tax would be considered to be an allowable cost.  Dec. of Shera at Ex.

1-D.  Payne confirms that the prior intermediaries in Connecticut (Blue Cross and Blue

Shield of Connecticut and Anthem) knew that the New York Hospital Tax and the GET

Tax were equivalent taxes.  Ex. 1 at ¶ 5.[5]

CMS confirms this fact once again in 2002.  In a memo to Empire dated March

26, 2002, CMS states that, "based on everyone's opinion that the Gross Earnings Tax is

similar to the New York assessment, which was allowable, we agreed that the

Connecticut Gross Earnings tax also is allowable."  See Def. Ex. A at 2.  CMS,

Connecticut Blue Cross and Blue Shield, Anthem, and Empire all should have taken steps

to reveal the change in policy that began in 2002 when they first became aware of it in

1995.  Had they done so, the Hospitals would have claimed the GET Tax for all of the

years at issue in the Hospitals' complaint.

Instead of revealing the change in policy, the intermediary's actively and

passively led Connecticut hospitals to believe that the GET Tax was not an allowable

cost.  The Secretary's claim that Empire never informed a hospital that the GET Tax was

non-allowable is utterly false.  For example, Empire made this very misrepresentation to

William Macintyre of Griffin Hospital.  See Ex. 4.  Empire's predecessor made the same

_____

5  Douglas Payne, the Manager of Medicare Audit and Reimbursement Department for
   the Medicare fiscal intermediaries that preceded Empire (Connecticut Blue Cross and
   Blue Shield and then Anthem, covering the years 1989 through 1998) states in his
   Declaration that the intermediaries for various states, including New York,
   Pennsylvania, New Jersey, West Virginia, and all of the New England States including
   Connecticut, would periodically meet to discuss various Medicare reimbursement
   issues.  Ex. 1 at ¶ 4.  One such issue was whether taxes associated with a state's
   Medicaid DSH program should be treated as allowable costs.  Id.  Payne noted that,
   from the standpoint of reimbursement, the intermediary considered the New York
   Hospital Tax and the GET Tax to be functional equivalents as early as 1995, as each
   was a provider-related tax associated with the state's Medicaid DSH program.

16

misrepresentation to St. Vincent's Medical Center when it denied reimbursement of the

GET Tax for fiscal year 1995.  See Decl. of Shera at Ex. 1-D.  The intermediary's

"similar fault" also consisted of accepting cost reports from Connecticut hospitals under

the existing policy of disallowance while remaining silent about the change in policy by

CMS.  CMS's similar fault consists of failing to issue a directive to Connecticut in the

same manner as it did in New York in 1995.  Based on the foregoing, the Hospitals'

motion for summary judgment should be granted and the Secretary's motions denied.

### E.      Reimbursement Policies are not "Pure Questions of Law."

The Secretary argues that whether the GET Tax or New York Hospital Tax is an

allowable cost is a "pure question of law" and not a "fact."  Def. Mem 32.  The Secretary

misses the point.  It is true that the taxes themselves are laws, and some of their attributes

are legal.  Reimbursement policies, however, are facts.  Empire's policy of reimbursing

the New York Hospital Tax, beginning in 1995, is a fact.  Likewise, the position held by

Blue Cross and Blue Shield of Connecticut as well as Anthem, that the New York

Hospital Tax and the GET Tax were functionally equivalent (taxes associated with

Medicaid DSH programs), is also a fact.  These facts are capable of being

misrepresented, concealed, or omitted and are therefore properly the subject of a

subsection (d) claim.

The Connecticut intermediaries considered the New York Hospital Tax and the

GET Tax to be the same for purposes of reimbursement.  See Ex. 1 at ¶ 5.  Douglas

Payne, the intermediary's audit manager, attests that this was the case in 1995.  Id. at ¶ 6

CMS confirmed this fact by specific reference to the New York Hospital Tax in its 2002

memorandum to Empire regarding the GET Tax.  See Def. Ex. A at 2.  It was not an

analytical failure on the part of CMS, the Secretary, or the intermediary, that precluded the GET Tax from being treated as an allowable cost sooner. Rather, it was omission and inaction. The intermediary knew of the contradictory treatment, but did nothing. These are not abstract issues of law, as argued by the Secretary, they are facts.

Finally, CMS and the Secretary are charged with the same knowledge regarding the two taxes that was possessed by their agent, the intermediary. United States v. Sun-Diamond Growers of California, 964 F. Supp. 486, 490, 491, n.10 (D.D.C. 1997) (holding that knowledge obtained by an organization's agent, acting within the scope of his employment, is imputed to the organization); BCCI Holdings (Luxembourg), S.A. v. Clifford, 964 F. Supp. 468, 478 (D.D.C. 1997) (holding that "[a]s a general rule, knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself . . . This is true whether the officer or agent has actually disclosed the information to the corporation."). CMS and the Secretary knew or should have known about the contradictory treatment of the taxes, and they did nothing as well. Therefore, their conduct can also be addressed by subsection (d).

No genuine issues of fact remain with respect to the applicability of 42 C.F.R. § 405.1885(d). The intermediary is a party to the NPR's at issue in this case. The intermediary's conduct in omitting, concealing, and misrepresenting the allowability of the GET Tax, even if not rising to the level of fraud, does nevertheless constitute "similar fault." Accordingly, the three cost report years at issue in this litigation should be reopened.

**IV.     Mandamus is Also Appropriate Under 42 C.F.R. § 405.1885(b).**

In 2002, the Secretary ordered a mandatory reopening of the Hospitals' cost reports under 42 C.F.R. § 405.1885(b). The Secretary should have ordered a mandatory reopening under that subsection in 1995. As explained below, for the fiscal years at issue in this case, the delay rendered the Hospitals' other potential remedies futile. This is a separate and alternative ground for summary judgment.

**A.     Mandatory Reopenings are not Granted Through "Grace."**

The Secretary states that CMS "generously instructed the intermediary to reopen payment determinations issued during the previous three years . . . under 42 C.F.R. § 405.1885(b)." Def. Mem. 1. The Secretary, as if to impute a sense of charity to itself, characterizes the reopenings as having been bestowed through "grace." Id. The Secretary borrows the word "grace" from the Supreme Court's decision in Your Home Visiting Nurse Servs. v. Shalala, 525 U.S. 449, 454 (1999). The Secretary, however, has failed to read the Supreme Court's decision closely. The Court's use of the term "grace" only applied to permissive reopenings requested by the hospital under 42 C.F.R. § 405.1885(a), not to mandatory reopenings commanded by CMS under 42 C.F.R. § 405.1885(b), such as the one at issue in this case. Id.

The Secretary also errs by suggesting that CMS had a choice as to the number of years that would be covered by the mandatory reopening under subsection (b). He suggests that CMS elected to have the reopening cover "the maximum reopening permitted under 42 C.F.R. 405.1885(b)." Def. Mem. 1. The regulation in effect at the time, however, mandated a retroactive reopening period of three (3) years. Neither the Secretary nor the intermediary could change the number of years covered by the

subsection (b) reopening.  Although the regulation was amended at the end of 2002, the provision in effect when CMS ordered the reopening mandated the 3-year period.  See 67 Fed. Reg. 50,096 (August 1, 2002) (quoting 42 C.F.R. § 405.1855(b)).

Subsection (b), by its terms, does not require the filing of a reopening request and does not operate through "grace" or "good deeds" as suggested by the Secretary.6  Id. Indeed, subsection (b) does not even permit reopenings based upon a hospital's negligence or, as the Secretary contends, "managerial errors."  Def. Mem. 1.  The sole function of subsection (b) is to retroactively correct for the unlawful conduct of the intermediary, i.e. conduct which is "inconsistent with the applicable law."  42 C.F.R. § 405.1885(b).  Only the intermediary's conduct can trigger the application of subsection (b), nothing else.  Id.  Reopening requests are not required in order for a hospital to avail itself of a reopening under this provision.  Baystate, 309 F. Supp. 2d 89.  Based on the foregoing, the Secretary cannot argue that the Hospitals' claims in this case should be barred merely because the Secretary has no more "grace" to dispense.

**B.      A Reopening Under 42 C.F.R. § 405.1885(b) Should Encompass NPR's Issued to the Hospitals' Beginning in July of 1995.**

The only genuine legal issue with respect to applying subsection (b) in this case is whether reopenings should have been retroactive for three years beginning in 2002, or beginning with an earlier date, because both CMS and the intermediary were aware that the policy had changed in 1995, as evidenced by CMS's directive regarding the New York Hospital Tax.  Empire itself has changed the policy in Connecticut when it became the intermediary in 1999 (the three-year window would cover NPR's issued in (1996,

_____

6  The Secretary suggests, obliquely, that this case somehow arises under 42 C.F.R. § 405.1885(a).  It does not, in even the smallest way, relate to that subsection.

1997, and 1998).  It was already the intermediary in New York at that point.  At that

point, as explained above, Empire already considered an equivalent tax, the New York

Hospital Tax, to be an allowable cost.

There was a seven year delay between CMS taking the position that the New

York Hospital Tax was allowable and notifying Connecticut hospitals in 2002 that the

GET Tax was allowable.  This delay caused the Hospitals' administrative remedies, with

respect to the GET Tax, to expire for multiple years before the Hospitals even knew there

was a viable issue.  The government's seven year delay in reversing its GET Tax policy

means that the retrospective three-year window under 42 C.F.R. § 405.1885(b) had

expired for multiple cost report years, through no fault of the Hospitals.  Instead of going

back to 1996, the three-year window only went back as far as 1998 and, in some cases,

1997.  Decl. of Shera.  Likewise, the ability to file administrative appeals within the

required 180-day time limit also expired for those years, solely as a result of the

government's wrongful delay.

### C.    The Hospitals' Remedies Were Futile.

The Secretary argues that mandamus is not an appropriate remedy because the

Hospitals have supposedly failed to exhaust their administrative remedies.  The Hospitals

have analogized their situation to that faced by certain hospitals in Monmouth Med. Ctr.

and Baystate.  The Secretary, by way of response, has tried to create a distinction

between those two cases, and the present matter, that does not exist.

First, the Secretary asserts in the present matter that the plaintiffs in Monmouth

and Baystate were not required to exhaust their administrative remedies by filing an

administrative appeal and/or reopening requests.  Def. Mem. 13.  The Secretary argues

that the hospitals had already perfected their rights by submitting data relative to the

Medicare Disproportionate Share Hospital ("DSH") Adjustment.[7]  The Secretary,

however, says that exactly the opposite is true in the briefs he submitted in <u>Baystate</u>.[8]  In

those briefs, he claims that the hospitals, even though they had already "raised" the DSH

issue by submitting DSH data in their initial cost report, should nevertheless be barred

from recovery because they did not appeal or seek reopening.[9]  One is left to ask the

Secretary, which of his positions is correct?

      The Secretary's second purported distinction between the instant matter, on the

one hand, and <u>Monmouth</u> and <u>Baystate,</u> on the other, is premised upon the Secretary's

faulty assertion that the latter two cases involved challenges to an administrative order,

whereas the Hospitals in the instant matter seek "a remedy for a complete failure to claim

an expense on their costs reports."[10]  Def. Mem. 13.  Again, the Secretary makes a

contrary representation to the Court in <u>Baystate</u>, arguing instead that the plaintiffs in both

<u>Monmouth</u> and <u>Baystate</u> were challenging their DSH payment directly.[11]  The Secretary

hardly needs an adversary, he is willing to impugn his own arguments at every turn.

      In actuality, in both of the foregoing cases and the present one, the hospitals did

not perfect judicial review of any particular cost report items that were later the subject of

---

[7]  <u>See</u> Def. Mem. 13, n.7.  If the Secretary's argument were true, it would apply with
even greater force to the hospitals in the present matter because they claimed the GET
Tax as a cost on their cost reports, just not an allowable cost.

[8]  <u>See</u> the Secretary's brief in support of dismissal in <u>Baystate</u> attached as Ex. 5; his reply
is attached as Ex. 6, and his appellate brief is attached as Ex. 7.

[9]  <u>See</u> Ex. 5 at pp. 7-8 ; Ex. 6 at pp. 3-4, 6, 34; Ex. 7, at pp. 17-18, 25, 28-29, 49-50.

[10]  <u>See</u> Def. Mem.13, n.7.

[11]  <u>See</u> Ex. 5 at p. 5; Ex. 6 at p. 7; and Ex. 7 at p. 28.

mandamus. The hospitals in <u>Baystate</u> did not seek to have eligible but unpaid Medicaid days included in their DSH calculation when they filed their cost reports, but nevertheless succeeded in obtaining mandamus.[12] In theory, they could have claimed the days on their cost reports when they filed them. Furthermore, contrary to the Secretary's representation, a significant number of hospitals for whom summary judgment was granted in <u>Baystate</u>, at the time they filed their cost reports, had not submitted any data at all and therefore had not "raised" the DSH issue. The issue must not have mattered to the Court, because nowhere does it mention that the submission of data, one way or the other, in its decision. <u>Baystate</u>, 309 F. Supp. 2d 89. The court permitted the plaintiff hospitals to obtain mandamus relief because 42 C.F.R. § 405.1885 (b) did not require a DSH claim to be made on the cost report, any DSH data to be submitted by either the hospital or the state, or the subsequent submission of a reopening request in order to perfect a mandatory reopening under that provision. <u>Id.</u> Additionally, the Court noted that such a submission or reopening request would have been rejected or denied in any event and was therefore futile. <u>Id.</u> at 97-98.

The Hospitals in this case are no different. As a matter of simple mechanics, they could have claimed the GET Tax as an allowable cost and later filed an appeal or reopening request, just like the hospitals in <u>Baystate</u> and <u>Monmouth</u> could have claimed eligible days. The Courts have not held that fact against the hospitals, deciding instead that subsections (b) and (c) of the reopening regulation do not require the submission of initial data, or a reopening request, when such remedies would be fruitless. <u>Id.</u> at 97-98. Additionally, the hospitals had no basis for a potential claim until after the government

---

12  <u>See</u> Roosa Declaration, Ex. 8, ¶ 2.

23

announced a change in policy.  Here, that did not occur, solely because of the

government's delay, until 2002.  Because of sheer delay, all of the hospitals'

administrative remedies were destroyed by CMS and the intermediary.  The exhaustion

requirement has therefore been satisfied in this case.

### D.      The Secretary's Reliance on <u>Heckler v. Ringer</u> is Misplaced.

In his opposition brief, the Secretary continues to misconstrue the Supreme

Court's decision in <u>Heckler v. Ringer</u>, 466 U.S. 602 (1984).  Def. Mem. 7.  The Hospitals

previously set forth a detailed analysis of the facts and holding of <u>Heckler</u>.  In short, the

<u>Heckler</u> Court rejected the plaintiffs' futility argument in that case specifically because

the plaintiffs, had they pursued their administrative remedies, would most likely have

been successful in obtaining complete reimbursement for the procedure.  <u>Id.</u> at 619.  The

Court held, therefore, that "exhaustion of administrative remedies is in no sense futile for

these [plaintiffs], and they, therefore, must adhere to the administrative procedure which

Congress has established for adjudicating their Medicare claims."  <u>Id.</u>[13]

The Secretary also argues that Plaintiffs have attempted to distinguish <u>Heckler</u>

from the facts of the instant matter on the ground that <u>Heckler</u> "dealt with the

administrative/judicial remedies available to hospitals under 42 U.S.C. § 1395ff and that

this case involves administrative/judicial remedies available to hospitals under 42 U.S.C.

§ 1395oo."  Df. Mem. 8.  Plaintiffs never attempted to distinguish the cases along such

lines, and Plaintiffs are at a loss as to why the Secretary has made this false assertion.

─────────────────

[13]  The <u>Heckler</u> Court did not fault the plaintiffs for having a low opinion of their
chances.  Instead, the Court's rejection of the plaintiffs' futility argument was premised
upon the Court's finding that an adequate administrative remedy was most likely
available to the plaintiffs had they chosen to pursue the "lengthy administrative review
process."  <u>Heckler v. Ringer</u>, 466 U.S. 602, 619 (1984).

In <u>Heckler</u>, the plaintiffs would most likely have obtained the relief they were requesting if they simply pursued their administrative remedies.  In fact, "in every one of the 170 claims filed with ALJs between the time of the Secretary's instructions to her intermediaries and the filing of the [plaintiffs' lawsuit]. . ., ALJs allowed recovery for [the procedure in question]." <u>Heckler</u>, 466 U.S. at 619.  As noted in the preceding point heading, the facts of the instant matter are just the reverse.  Like the hospitals in <u>Monmouth</u> and <u>Baystate</u>, Plaintiffs' administrative avenues were both foreclosed and futile.

<u>**Conclusion**</u>

The Hospitals' motion for summary judgment should be granted and the Secretary's motions for summary judgment/dismissal should be denied.

<u>    /s/Jacqueline E. Bennett    </u>
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC 20005
(202) 414-9200
(202) 414-9299 Facsimile
JBennett@ReedSmith.com

Attorney for the Plaintiff

Of Counsel:

Murray J. Klein
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
(609) 987-0050

Dated:  January 12, 2005