IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIRVIEW HOSPITAL, et al.,            )
                                      )
            Plaintiffs,               )
                                      )
        v.                            )        Civ. Action No. 1:05cv01065 (RWR)
                                      )
MICHAEL O. LEAVITT,                   )
                                      )
            Defendant.                )
_____)

**DEFENDANT EXHIBIT B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRADLEY MEMORIAL HOSPITAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04cv00416 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT AND
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Preliminary Statement ............................................................................................... 1

Statement of Facts .................................................................................................... 4

I.    The Medicare Payment System ................................................................... 4

II.   CMS Provides Notice that the New York Hospital Assessment is an Allowable Cost ................................................................................................................. 6

III.  As Early As 1995, The Connecticut Intermediaries Were On Notice That A Hospital Tax On Gross Receipts Constitutes An Allowable Cost. Yet, They Maintained Their Position That The GET Tax Was A Non-Allowable Cost Until 2002 ............................................. 7

      A.    The Hospitals' Representatives ..................................................... 9

      B.    The Intermediaries' Personnel ..................................................... 9

            1.  Douglas Payne ................................................................. 9

            2.  Maureen Joslin ............................................................... 10

            3.  Rose Cambino ................................................................ 11

IV.  CMS Concedes Its Error and Reverses Its Position on the GET Tax ................ 12

Argument ............................................................................................................... 15

I.    Plaintiffs Are Entitled To Mandamus Relief Under 42 C.F.R. § 405.1885(d), Based Upon "Fraud or Similar Fault" By the Connecticut Intermediaries ............................ 15

      A.    The Plaintiff Hospitals Have a Clear Right to Relief ........................... 16

      B.    The Secretary Has a Clear Duty to Reopen the Cost Reports in Question Pursuant to Section 405.1885(d) ...................................... 17

            1.    The Acts And Failure To Act By CMS And Empire Constitute "Similar Fault ................................................. 17

            2.    CMS And Empire Are "Parties" For Purposes Of 42 C.F.R. § 405.1885(d) and Mandamus Is Therefore Appropriate ............. 20

            3.    The Secretary's Contention That To Be "Established" A Finding Of Fraud Or Similar Fault Must Be Made In A Proceeding or Inquiry Independent Of This Litigation Is Incorrect ................................... 23

            4.    Reimbursement Policies are "Facts." ...................................... 24

C.    No Other Adequate Remedies are Available ....................................... 25

D.    The Plaintiff Hospitals Have Met Their Burden, and a Writ of
      Mandamus Should Issue......................................................................... 26

II.    Plaintiffs Are Entitled To Mandamus Because All Avenues Of Administrative
       Relief  Were Both Foreclosed And Futile................................................... 26

A.    The Secretary's Factual Argument Regarding Exhaustion of Remedies Is
      Incorrect .................................................................................................... 27

B.    The Secretary's Legal Argument Regarding Exhaustion Of Remedies
      Is Incorrect................................................................................................. 27

III.   The Plaintiff Hospitals' Suit Is Timely ......................................................... 34

Conclusion     ................................................................................................... 36

## TABLE OF AUTHORITIES

CASES                                                                    Page(s)

Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT,
    654 F.2d 758 (D.C. Cir. 1980) ................................................................ 18

BCCI Holdings (Luxembourg), S.A. v. Clifford,
    964 F. Supp. 468 (D.D.C. 1997) ............................................................. 25

Bethesda Hosp. Ass'n v. Bowen,
    485 U.S. 399 (1988) ............................................................................... 13

Heckler v. Ringer,
    466 U.S. 602 (1984) .................................................................... 32, 33, 34

In Re Medicare Reimbursement Litigation,
    309 F. Supp. 2d 89 (D.D.C. 2004) .......................................... 16, 29, 30, 35

Little Co. of Mary v. Shalala,
    24 F. 3d 984 (7th Cir. 1994) .................................................................... 13

Monmouth Med. Ctr. v. Thompson,
    257 F.3d 807 (D.C. Cir. 2001) ..................................................... 27, 28, 29

Rochester Methodist Hosp. v. Travelers Ins. Co.,
    728 F.2d 1006 (8th Cir. 1984) ............................................................ 22, 23

Saint Vincent Health Ctr. v. Shalala,
    937 F. Supp. 496 (W.D. Pa. 1995),
    aff'd., 96 F.3d 1434 (3rd Cir. 1996) ........................................................ 23

Toner v. Allstate Ins. Co.,
    829 F. Supp. 695 (D. Del. 1993) ............................................................ 18

United States v. Sun-Diamond Growers of California,
    964 F. Supp. 486 (D.D.C. 1997) ............................................................. 25

Your Home Visiting Nurse Services v. Shalala,
    535 U.S. 449 (1999) ................................................................................. 5


STATUTES, RULES, & REGULATIONS                                           Page(s)

28 U.S.C. § 1361 ........................................................................................ 16

42 U.S.C. § 1395oo(a)................................................................................... 5

    § 1395ww(d) ..................................................................................... 4

Conn. Gen. Stat. Ann. § 12-263b ............................................................... 8

N.Y. Pub. Health Law § 2807-d .................................................................. 6

42 C.F.R. § 405.1803 .................................................................................. 5

    § 405.1815 ...................................................................................... 21

    § 405.1843(b) ................................................................................. 21

    § 405.1885(a) ................................................................................... 5

    § 405.1885(b) ................................................................................ 3, 5

    § 405.1885(c) ................................................................................... 5

    § 405.1885(d) ................................................................. 6, 17, 21, 23

    § 413.9(b)(2)................................................................................... 16

    § 413.20(b) ....................................................................................... 4

    § 413.24(f) ........................................................................................ 4

39 Fed. Reg. 8,170 (Mar. 4, 1974) ............................................................ 21

39 Fed. Reg. 34, 519 (Sept. 26, 1974)....................................................... 21

67 Fed. Reg. 50,096 (Aug. 1, 2002) ........................................................ 5 - 6

## OTHER SOURCES

Supplemental Security Income Ruling SSR 85-23, available at
http://www.ssa.gov/OP_Home/rulings/ssi/07/SSR85-23-ssi-07.html .................................. 17 - 18

Plaintiffs oppose Defendant Michael O. Leavitt's Motion to Dismiss Plaintiffs' First Amended Complaint and move this Court for the entry of summary judgment on their behalf for the reasons that follow.

**<u>Preliminary Statement</u>**

The Plaintiff Hospitals in this case are entitled to mandamus relief pursuant to 42 C.F.R. § 405.1885(d) because of the "fraud or similar fault" (hereinafter "similar fault")[1] engaged in by the agents of the Secretary of Health and Human Services (the "Secretary"). The Secretary's agents who engaged in this conduct are private insurance companies, known as fiscal intermediaries ("intermediaries"), who reimburse hospitals for the reasonable cost of health care services provided to Medicare beneficiaries.

Specifically, three intermediaries in Connecticut, Blue Cross and Blue Shield of Connecticut ("Connecticut Blue Cross"), Anthem Blue Cross and Blue Shield of Connecticut ("Anthem"), and Empire Medicare Services ("Empire") (collectively referred to as the "Connecticut Intermediaries"), knew, as early as 1995, that taxes on hospitals' gross receipts qualified as allowable costs under the Medicare reimbursement scheme.[2] Despite this knowledge, between 1995 and 2002, the Connecticut Intermediaries maintained a position of non-reimbursement with respect to the Connecticut Gross Earnings Tax (the "GET Tax").[3] Their

---

[1] While the conduct of the Secretary's intermediary may not amount to "fraud," as discussed below, it clearly rises to the level of level of "similar fault."

[2] In 1995, the intermediary in Connecticut was Connecticut Blue Cross. Anthem became the intermediary in Connecticut in or around 1997. Empire, the intermediary in New York since 1995, acquired the fiscal intermediary contract from Anthem in or around 1999.

[3] The Plaintiff Hospitals recognize that the term GET Tax (Gross Earning Tax Tax) is redundant. However, because "GET Tax" is the term most often used by the

Continued on following page

conduct was not passive.  On the contrary, the Connecticut Intermediaries, on various occasions, misrepresented that the GET Tax did not constitute an allowable cost.

The "similar fault" began in 1995 when the agency that administers the Medicare program on behalf of the Secretary, now known as the Centers for Medicare and Medicaid Services ("CMS"), notified Empire, the intermediary in New York, that the New York State Hospital Assessment (the "New York Tax"), a gross receipts tax imposed upon hospitals in New York, was an allowable cost.  Between 1995 and 1997, representatives from Connecticut Blue Cross and Anthem attended meetings with the New York intermediary and other intermediaries in the region to specifically discuss whether gross receipts taxes qualified as allowable costs.  Although Connecticut Blue Cross and Anthem understood that the GET Tax and the New York Tax were equivalent for purposes of Medicare reimbursement, and that the intermediary in New York was reimbursing New York Hospitals for payments made under the New York Tax, they continued to represent to Connecticut hospitals that the GET Tax was a non-allowable cost.

Then, in 1999, Empire, the intermediary in New York which had been reimbursing New York hospitals for gross receipts taxes since 1995, acquired the fiscal intermediary contract from Anthem and became the intermediary in Connecticut.  Empire, instead of immediately reimbursing Connecticut hospitals for the GET Tax, continued to take the position that the GET Tax was a non-allowable cost, and that the tax should not be included as an allowable cost on the hospitals' Medicare cost reports.  In fact, Empire was so wedded to its wrongful reimbursement

_____

Continued from previous page

 intermediary and hospitals, the Plaintiff Hospitals will continue to use it for the sake of consistency.

position that, in 2001, when CMS formally announced that the GET Tax was an allowable cost, Empire initially refused to accept CMS's decision.

Following the admission of the intermediaries' error, CMS, pursuant to 42 C.F.R. § 405.1885(b),[4] ordered Empire to reopen any and all cost report years (regardless of whether the hospitals had filed reopening requests) that were settled within three years preceding December 14, 2001, and to revise the applicable cost reports to include reimbursement for the GET Tax.[5]  It should also be noted that it was not until after the GET Tax was abolished that CMS conceded that the Medicare statute and regulations required that the Connecticut hospitals be reimbursed for these payments.

At issue in this case is whether the Secretary, as a result of the "similar fault" of his agents, should now be compelled, pursuant to 42 C.F.R. § 405.1885(d), to go beyond the three year reopening window provided for in 42 C.F.R. § 405.1885(b), and reopen all cost reporting periods in which the Plaintiff Hospitals were not reimbursed for the GET Tax.  These cost report periods include fiscal years 1994, 1995 and 1996.

While the relationship between an intermediary and a hospital may at times be adversarial, the function of the intermediary is to work with hospitals to further Medicare's reimbursement policies, and not to mislead Connecticut hospitals with respect to whether the GET Tax was a reimbursable expense.  The evidence in this case demonstrates that the

---

[4]     Under the version of 42 C.F.R. § 405.1885(b) that applies to the instant matter, an intermediary must reopen a hospital's cost report if, within three years of the cost report's settlement, CMS notifies the intermediary that the settlement was inconsistent with applicable law.  See 67 Fed. Reg. 50,096 (Aug. 1, 2002).

[5]     See Exhibit "A" to Def.'s Motion to Dismiss or, in the Alternative, for Summary Judgment, filed on July 30, 2004 ("Def. Ex. A") at 1-2.  See also Def.'s Motion to Dismiss Plaintiffs' First Amended Complaint at 1&11.

intermediaries engaged in "similar fault" when they knew or reasonably should have known that the GET Tax was an allowable cost, and nevertheless maintained a position of non-reimbursement with respect to the tax. This evidence is overwhelming and uncontroverted. Even if the misrepresentations were made without a specific intent to defraud, their conduct in disallowing the GET Tax still rises to the level of "similar fault" under Section 405.1885(d).

Based upon the foregoing, as well as the factual recitation and legal argument that follows, the Secretary's motion to dismiss should be denied and the Plaintiff Hospitals' cross-motion for summary judgment should be granted.

## Statement of Facts

The Secretary, in his Memorandum in Support of his Motion to Dismiss, provides some partial background on the Medicare payment system.[6] That material will not be reiterated here. The additional background set forth in this brief will cover the gaps left by the Secretary in his memorandum. Further, the Secretary's version of events with respect to CMS's position on the GET Tax is wholly inaccurate and will be addressed at length below.

## I.    The Medicare Payment System

In 1983, Medicare began reimbursing hospitals using what became known as the "prospective payments system" ("PPS"). 42 U.S.C. § 1395ww(d). Under PPS, hospitals are paid a fixed amount for each of approximately 490 diagnosis-related groups ("DRGs"), subject to certain payment adjustments. In order for a hospital to obtain Medicare reimbursement, it must, at the close of each fiscal year, submit to its intermediary a "cost report" showing both the costs incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare. 42 C.F.R. §§ 413.20(b), 413.24(f). The intermediary then audits the

---

[6] See Sec. Mem. at 1-8.

cost report and informs the hospital of its final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803. A provider dissatisfied with its intermediary's determination may, in certain circumstances, file an appeal with the Provider Reimbursement Review Board ("PRRB" or "Board") within 180 days of the date of the determination. 42 U.S.C. § 1395oo(a).

In addition to filing appeals, a provider may, in certain circumstances, obtain relief through an intermediary's reopening of its cost report, without the involvement of the PRRB. There are three types of reopenings set forth in the regulations. Under the first type, a dissatisfied provider may file a reopening request with the intermediary, asking the intermediary to reopen and revise a settled cost report within three years of the date that the determination was issued. 42 C.F.R. § 405.1885(a). Jurisdiction for reopening a decision under 42 C.F.R. § 405.1885(a) rests with the administrative body that rendered the last determination or decision, is final, and not subject to judicial review. Your Home Visiting Nurse Services v. Shalala, 525 U.S. 449 (1999); 42 C.F.R. § 405.1885(c).

The second type of reopening is mandatory and occurs when an intermediary's determination is required to be reopened under 42 C.F.R. § 405.1885(b) because CMS, within the three-year period in which reopenings are permitted, notifies the intermediary that the initial determination or settlement was inconsistent with applicable law. The version of 42 C.F.R. §405.1885(b) in effect at all relevant times in this action stated that an intermediary's decision "must be reopened and revised by the intermediary if, within the aforementioned 3-year period, the Centers for Medicare & Medicaid Services notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Centers for Medicare & Medicaid Services. . . ." See 67 Fed. Reg. 50,096 (Aug. 1, 2002)

(citation omitted). It is this Section of the reopening regulations on which the Secretary relied to provide limited retroactive relief to the hospitals, thereby conceding a misapplication of the law to Connecticut hospitals.

The third type of reopening is also mandatory, and requires that an intermediary's determination "shall be reopened and revised at any time if it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision." 42 C.F.R. § 405.1885(d). The Plaintiff Hospitals seek mandamus relief under this Section of the reopening regulations to obtain reimbursement they are entitled to for 1994, 1995 and 1996.

## II.    CMS Provides Notice that the New York Hospital Assessment is an Allowable Cost

The New York State Hospital Assessment (the "New York Tax") is a straightforward levy on a hospital's gross receipts:

### § 2807-d. Hospital Assessments

1. (a) Hospitals, as defined in this article . . . . are charged assessments on their gross receipts received from all patient care services and other operating income . . . .

N.Y. Pub. Health Law § 2807-d. In 1994, the same year that the GET Tax was implemented, CMS indicated that the New York Tax, "levied on provider cash operating receipts[,] was not an allowable cost under Medicare reimbursement policy."[7]

As early as July 5, 1995, however, CMS corrected its position. On that date, CMS formally notified the intermediary in New York that CMS was reversing its position regarding the New York Tax, and that CMS would now consider the tax to be an allowable cost:

June 28, 1995

---

[7]    See the Rex Shera Declaration ("Shera Dec.") attached hereto as Exhibit 1 at Ex. 1-D.

Dear Ms. Adam:

An April 23, 1994 letter directed to your office advised that the New York State tax assessment levied on provider cash operating receipts was not an allowable cost under Medicare reimbursement policy. When this matter was presented to the Division of Cost Principles and Reporting in HCFA Central Office, that office determined the costs to be reimbursable. In order to resolve the difference of opinion, the issue was referred to the Office of General Counsel (OGC) for legal advice.

The OGC opinion, in summary, states that legally imposed taxes represent common and accepted operating costs for Medicare providers. In determining whether the tax is allowable for Medicare purposes under the current regulation and manual provisions, HCFA must focus on the impact of the tax on services provided by providers, not on the other third parties that may or may not share the tax burden. The application of these criteria to the specific New York State tax assessment in question, makes that assessment reimbursable by Medicare. The OGC opinion is not releasable because it constitutes privileged, confidential information but it clearly advises that these costs are allowable under existing regulations and authority. We must therefore reverse our earlier determination and direct you to consider this item an allowable cost. . . .

Sincerely,
Anthony J. Subvert, Chief
Payment and Recovery Section[8]

As explained below, although the Connecticut Intermediaries knew that the New York Tax on hospitals was deemed to be an allowable cost in 1995, they maintained that the GET Tax was not reimbursable until 2002. By this time, the State of Connecticut had already abolished the GET Tax.

**III.    As Early As 1995, The Connecticut Intermediaries Were On Notice That A Hospital Tax On Gross Receipts Constitutes An Allowable Cost, Yet They Maintained Their Position That The GET Tax Was A Non-Allowable Cost Until 2002.**

---

[8]      See id.

Connecticut imposed the GET tax on hospitals from April 1, 1994 through April 1, 2000.[9]  The statute imposing the GET tax placed a mandatory, direct levy on the gross receipts of Connecticut hospitals:

> **§ 12-263b.  Tax on gross earnings.  Rate.**
> . . . . There is hereby imposed on the hospital gross earnings of each hospital in this state a tax (1) at the rate of eleven percent of its hospital gross earnings in each taxable quarter
> . . . .

Conn. Gen. Stat. Ann. § 12-263b.  The GET tax was abolished, on a prospective basis, on April 1, 2000.

CMS's June 28, 1995 correspondence to the New York intermediary demonstrates that, as early as 1995, Empire was treating taxes on gross receipts as allowable costs.  CMS and Empire have even admitted that the New York Tax and the GET Tax are equivalent for purposes of Medicare reimbursement.[10]  The taxing statutes are quoted above.  Each is a straightforward tax, levied directly on hospitals, based on their gross receipts.

Despite CMS' correction of its position regarding the New York Tax in 1995, the Connecticut Intermediaries continued to maintain the position that the GET Tax was a non-allowable cost until 2002.  The declarations attached hereto establish not only that Empire maintained a position of disallowing the GET Tax, but also that all of its predecessors maintained the same position.  A summary of the facts set forth within those declarations is detailed below.

---

[9]    The tax was imposed from April 1, 1994, through September 30, 1996, at a rate of 11%; from October 1, 1996, through September 30, 1997, at a rate of 9.25%; from October 1, 1997, through September 1, 1998, at a rate of 8.25%; from October 1, 1998 through September 30, 1999, at a rate of 7.25%; and from October 1, 1999, through April 1, 2000, at a rate of 4.25%.

[10]    See Def. Ex. A at 2.

## A. The Hospitals' Representatives

As explained above, the Connecticut Intermediaries took the position, up until 2002, that the GET Tax was a non-allowable cost, i.e., that it could not be claimed by the hospitals on their cost reports and could not be reimbursed by Medicare.  This fact is further confirmed through the declarations offered by hospital representatives.  By way of example, Saint Vincent's Medical Center in Bridgeport, Connecticut, claimed the GET Tax as an allowable cost on its 1995 cost report.  The cost was promptly disallowed by Connecticut Blue Shield.[11]  In addition, William Macintyre, the Director of Budgets and Reimbursement for Griffin Hospital in Connecticut since 1995, stated that, prior to 2002, the auditing staff at Empire informed him that the GET Tax was not an allowable cost and thus should not be included on the Medicare cost report of Griffin Hospital.[12]

## B. The Intermediaries' Personnel

### 1. Douglas Payne

From 1989 until 1998, Douglas Payne worked as the Manager of the Medicare Audit and Reimbursement Department for Connecticut Blue Cross, and later for Anthem.[13]  Mr. Payne attended regional meetings of intermediaries in or around 1995 which included representatives of fiscal intermediaries from New England, New Jersey, New York, Pennsylvania and West Virginia.  One of the policies discussed in the meetings was how intermediaries should deal with state assessments and/or taxes that were imposed by States on hospitals in conjunction with

---

[11]    See Ex. 1, Shera Dec. at ¶¶ 11 and 12.

[12]    See the Declaration of William Macintyre ("Macintyre Dec."), attached hereto as Exhibit 2, at ¶ 2.

[13]    See the Declaration of Douglas Payne ("Payne Dec.") attached hereto as Exhibit 3, at ¶¶ 1-2.

statewide "uncompensated care pools" (i.e. programs under each State's Medicaid Disproportionate Share Hospital or "Medicaid DSH" program).  According to Mr. Payne, each of the intermediaries agreed that the Medicare position was that such assessments and taxes should not be treated as allowable costs for hospitals.[14]

Mr. Payne stated further that it was the position of successive fiscal intermediaries in Connecticut (Connecticut Blue Cross and Anthem), from the inception of the GET Tax in or around 1994 up through the time he left Anthem in 1998, that the GET Tax was a non-allowable cost.  Mr. Payne understood, as early as 1995, that the GET Tax functioned in the same manner as the New York Hospital Tax.[15]

### 2.    Maureen Joslin

From 1980 until 1998, Maureen Joslin worked as a Senior Auditor first for Connecticut Blue Cross and then for Anthem.[16]  Ms. Joslin was copied on agenda items and correspondence in 1995 dealing with the issue of GET from a regional meeting of intermediaries which included representatives of fiscal intermediaries from New England, New Jersey, and New York.  The purpose of such regional meetings was to help develop and articulate consistent interpretation and application of Medicare regulations.  The documents Ms. Joslin received addressed how intermediaries should deal with state assessments and/or taxes imposed by States in order to fund

---

[14]    Id. at ¶ 4.

[15]    Id. at ¶¶ 5&6.

[16]    See the Declaration of Maureen Joslin ("Joslin Dec.") attached hereto as Exhibit 4, at ¶ 2.

statewide "uncompensated care pools."  The consensus was that such assessments and taxes should not be treated as allowable costs.[17]

Ms. Joslin also assisted in promoting consistent policies of the intermediary in the context of auditing (and supervising the auditing of) Medicare cost reports for Connecticut hospitals. During the time of her employment as senior auditor, it was the position of successive fiscal intermediaries in the State of Connecticut (Connecticut Blue Cross and Anthem) that the GET Tax was an uncompensated care pool tax and that payments made under the tax were anon-allowable cost.  According to Ms. Joslin, documentation relative to these policies exists, including contemporaneous writings reflecting the fact that the intermediary took the position in the State of Connecticut that the GET Tax was a non-allowable cost.[18]

### 3.    Rose Cambino

Rose Cambino was a lead auditor for Empire from 1999 through 2002.[19]  She was employed by Empire's predecessor, Anthem, from 1997 until 1999.  Ms. Cambino is now a Regulatory and Reimbursement Specialist with St. Vincent's Medical Center in Connecticut. Ms. Cambino stated without equivocation that during the time that she was employed by Anthem and Empire, it was her understanding, as well as the understanding of the intermediaries' other cost report auditors, that Anthem and Empire took the position that the GET Tax was a  non-allowable cost.[20]

---

[17]     Id. at ¶ 4.

[18]     See id. at ¶¶ 2&5.

[19]     See the Declaration of Rose Cambino ("Cambino Dec.") attached hereto as Exhibit 5, at ¶ 1.

[20]     Id. at ¶ 2.

## IV.    CMS Concedes Its Error and Reverses Its Position on the GET Tax

Rex Shera, a principal at Ernst & Young LLP, worked with twenty-seven Medicare Providers located in the State of Connecticut (there are a total of 31 short-term, acute care hospitals in the entire state) in their efforts to reopen cost reports for past fiscal years and request that CMS and Empire recognize the GET Tax as an allowable, reimbursable cost.[21]   Shera, knowing that Empire's position was one of non-reimbursement and that any overture to Empire on the issue would be futile, prepared a comprehensive submission to CMS, detailing the various reasons why CMS should consider the GET Tax to be an allowable cost.  On August 31, 2001, Shera forwarded his submission to Thomas Talbott, Acting Division Director, Division of Cost Reporting at CMS.  Shera stated his case that the GET Tax was an allowable cost and requested that CMS issue an official pronouncement to that effect.[22]

On December 14, 2001, Talbott responded in writing to Shera's letter, stating that, after reviewing the matter, CMS would now consider the GET Tax to be an allowable cost.[23]   Upon receipt of Talbot's correspondence, Shera contacted Warren Willis and George Porette, both of whom were managers for Empire.    Willis insisted that the existing position of non-reimbursement was the correct one.  Willis stated that he was going to contact CMS on behalf of Empire and attempt to have the agency reconsider the issue.[24]

In early 2002, following Empire's request, CMS and Empire consulted with one another regarding whether the old or new position was the correct one.  These discussions culminated in

---

[21]    See Ex. 1, Shera Dec. at ¶¶ 2, 8.

[22]    Id. at ¶¶ 3-4.

[23]    Id. at ¶ 5.

[24]    Id. at ¶¶ 5&6.

a memorandum from CMS to Empire in which Talbott thanks Porette "for gathering the parties together . . . so we could consider the allowability of the gross earnings tax again."[25]  Talbott reaffirmed in his memo that CMS's new position, that the GET Tax was an allowable cost, "was the correct decision" under the Provider Reimbursement Manual.  Talbott directed Empire "to please reopen any cost reports to make the appropriate adjustments."[26]

Thus, in a stunning admission, the Secretary reversed Empire's position regarding the GET Tax, and ordered immediate reopenings pursuant to Section 405.1885(b).  This was not an instance of hospital neglect in claiming costs, but rather a correction to an existing position of non-reimbursement.  At no point during this process did CMS or Empire ever fault Connecticut hospitals for "failing" to claim GET Tax payments as allowable costs on their cost reports.

This was hugely significant.  Prior to 2002, because of the government's position on the GET Tax, hospitals with which Shera worked (and which are plaintiffs in this matter) had not claimed the GET Tax as an allowable cost.[27]  Ordinarily, this would have impeded efforts to obtain retroactive reimbursement for these facilities.  Empire and other fiscal intermediaries routinely deny reopening requests for items not claimed by a hospital when it files its cost report.  Fiscal intermediaries deny such reopening requests arguing that hospitals that fail to claim allowable costs or other allowable items have "self-disallowed" those items, failed to perfect their administrative rights, and bear the responsibility for those items not being reimbursed.  See Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399 (1988); Little Co. of Mary v. Shalala, 24 F.3d 984 (7th Cir. 1994).

---

[25]      See Def. Ex. A at 1.

[26]      Id.

[27]      See Ex. 1, Shera Dec. at ¶8.

Nor did CMS or Empire ever contend, as the Secretary contends so emphatically now, that if the hospitals had simply claimed the GET Tax as an allowable cost on their cost reports, the government would have reimbursed the hospitals for that expense in due course. Put simply, at the time the reimbursement position was corrected in 2002, CMS conceded that the government had been at fault, not the hospitals. CMS, both in its documents and in its conduct over the ensuing months, directed Empire to reopen numerous cost reports to reimburse hospitals properly for the GET Tax. Neither CMS nor Empire required hospitals to file reopening requests, as would have been the case in the instance of hospital error. Instead, because the non-reimbursement of the GET Tax was the government's fault, Empire simply asked for a list of the 27 hospitals working with Ernst & Young and proceeded to expedite the reopening process on its own initiative, without any formal documentation on the part of individual hospitals requesting that Empire reopen past cost reports.[28]

As further evidence that CMS considered the prior non-reimbursement of the GET Tax to be the government's fault and not the fault of the hospitals, Empire proceeded to initiate contact with those hospitals that were not pursuing the GET Tax issue at all. The purpose of Empire's overture was to allow these additional hospitals to reopen closed cost report years and obtain reimbursement for the GET Tax.[29]

There was a seven year delay in notifying Connecticut hospitals that the GET Tax was reimbursable. This delay, which was entirely within the control of the Connecticut Intermediaries, caused the hospitals' administrative remedies with respect to the GET Tax to

---

[28]    Id. at ¶ 9.

[29]    Id. at ¶ 10.

expire for multiple years before the hospitals even knew there was a viable issue.[30]  Specifically, CMS's reopening provisions under 42 C.F.R. §§ 405.1885(a) and (b) only allowed retrospective reopening for a period of three years following the issuance of an NPR.  The Secretary specifically acknowledges in his memorandum that he finally ordered the three year reopening pursuant to Section 405.1885(b).[31]  The government's seven year delay in reversing its position on the GET Tax resulted in the expiration of a three year period in which the hospital could exercise these administrative remedies.  Likewise, the ability to file administrative appeals within the required 180-day time limit also expired for those years, solely based on the government's wrongful conduct.

On March 15, 2004, the Plaintiff Hospitals, all of whom are Connecticut Medicare providers, filed this action to compel the Secretary to reimburse the Plaintiffs for each of the years for which Empire did not provide the hospitals with retroactive reimbursement for GET Tax payments.[32]  The only remaining issue is whether the Secretary must now reopen the Hospitals' cost reports for fiscal years 1994, 1995 and 1996 pursuant to Section 405.1885(d).

**<u>Argument</u>**

**I.     Plaintiffs Are Entitled To Mandamus Relief Under 42 C.F.R. § 405.1885(d), Based Upon "Fraud or Similar Fault" By the Connecticut Intermediaries.**

---

[30]  Empire, in most instances, reopened audited cost reports dating back to fiscal year 1997. Under CMS's regulations, a hospital-initiated reopening request must ordinarily be filed within three years of the NPR.  42 C.F.R. § 405.1885§ (a).  In those instances in which CMS is directing the intermediary to initiate reopenings, the reopening period is three years from the date of CMS's directive.  42 C.F.R. 405.§ 1885(b).

[31]  <u>See</u> Def.'s Motion to Dismiss Plaintiffs' First Amended Complaint at 1.

[32]  Plaintiffs filed their first amended complaint on January 31, 2005.

Mandamus is a cause of action that seeks to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiffs. 28 U.S.C. §1361. In order to prevail under a mandamus theory, the plaintiff must possess a clear right to relief, the defendant must have had a clear duty to act, and no adequate remedy is available to plaintiff. In Re: Medicare Reimbursement Litigation, 309 F. Supp. 2d 89, 96 (D.D.C. 2004), appeal docketed, No. 04-5203 (D.C. Cir. May 28, 2004), (hereinafter referenced as "Baystate"). The Plaintiff Hospitals have satisfied all three of these elements, and their "right to issuance of the writ is clear and indisputable." See id.

### A.    The Plaintiff Hospitals Have a Clear Right to Relief.

The GET Tax is a necessary and proper cost under the Secretary's Medicare regulations. The Medicare regulations state that reasonable costs are those that are "appropriate and helpful in developing and maintaining the operation of patient care facilities" and that are "common and accepted occurrences in the field of the Provider's activities":

> Necessary and proper costs are costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the Provider's activity.

42 C.F.R. § 413.9(b)(2).

The GET tax was levied directly on the gross receipts of all Connecticut hospitals. It was an unavoidable direct cost to the hospital which, if not paid, exposed the hospital to grievous financial penalties. In CMS's December 2001 correspondence to Rex Shera, CMS admitted that the GET Tax satisfied the foregoing requirements and therefore fit within the regulatory definition of a cost which is necessary and proper. According to CMS, "[a]s administered, the

tax assessments on hospital gross earnings would constitute allowable Medicare costs."[33]  CMS even concedes in its brief that the GET Tax is a reimbursable cost.  The Plaintiff Hospitals' clear right to relief on this substantive claim is, therefore, not only plainly evident, it is also undisputed.  Thus, the Plaintiff Hospitals are entitled to a reopening of these cost reports if they meet the remaining prongs of the mandamus standard.

      **B.**      **The Secretary Has a Clear Duty to Reopen the Cost Reports in Question Pursuant to Section 405.1885(d).**

The Plaintiff Hospitals seek mandamus relief under 42 C.F.R. § 405.1885(d), which provides that an intermediary's determination "shall be reopened and revised at any time if it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision."  As explained at length above in Plaintiff Hospitals' Statement of Facts, the Connecticut Intermediaries (including Empire) wrongfully maintained a position of non-reimbursement with respect to the GET Tax while, at the same time, Empire treated the New York Tax as an allowable cost as early as 1995.  Both taxes were gross receipts taxes and both should have been reimbursed.  The Connecticut Intermediaries' delay in changing their position in Connecticut constituted sufficient "similar fault" under Section 405.1885(d) such that the Plaintiffs' cost reports should be reopened under that subsection and the GET Tax included as an allowable cost.

      **1.**      **The Acts And Failure To Act By CMS And Empire Constitute "Similar Fault."**

"Similar Fault" is more expansive than fraud.  A Supplemental Security Income ruling defined fault as "an action proceeding from an inexcusable negligence or ignorance that is considered nearly equal to fraud."  Supplemental Security Income Ruling SSR 85-23, <u>available</u>

---

[33]    <u>See</u> Def. Ex. A at 3-4.

at http://www.ssa.gov/OP_Home/rulings/ssi/07/SSR85-23-ssi-07.html (emphasis added). Moreover, by analogy, "similar fault" may be defined as equitable fraud to mean "a false representation, usually not one of fact, made by defendant innocently, negligently, with reckless indifference to the truth. . ." Toner v. Allstate Ins. Co., 829 F. Supp. 695, 703 (D. Del. 1993) (citing Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 & n.4 (Del. 1992)). Equitable fraud does not require knowledge and intent. Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT, 106 F. Supp. 2d 606, 624 n.27 (D.N.J. 1999) (stating "[i]n equitable fraud, unlike legal fraud, a plaintiff need not prove scienter – that is, he need not prove (1) knowledge and (2) intent").

Here, the "similar fault" of Connecticut Blue Cross and Anthem occurred when (i) they maintained the position that the GET Tax was non-allowable even though, as early as 1995, the New York Hospital Tax had been deemed to be an allowable cost, (ii) they omitted this fact from their discussions with the hospitals during the audit adjustment process, and (iii) they misrepresented to hospitals that the GET Tax was a non-allowable cost.

As explained above, CMS advised the intermediary in New York in 1995 that it had reversed its position regarding the New York Hospital Tax and that the new position was that the tax would be considered to be an allowable cost.[34]  In 1995, representatives from Connecticut Blue Cross met with representatives from the intermediary in New York, and specifically discussed whether gross receipts taxes were reimbursable.[35]  Payne confirms that the prior intermediaries in Connecticut (Connecticut Blue Cross and Anthem) knew that the New York Hospital Tax and the GET Tax were equivalent taxes.[36]  CMS confirms this fact once again in

---

[34]    See Ex. 1, Shera Dec. at Ex. 1-D.

[35]    See Ex. 3, Payne Dec. at ¶ 4; Ex. 4, Joslin Dec. at ¶ 2.

[36]    See Ex. 3, Payne Dec. at ¶ 4.

Continued on following page

2002.  In a memo to Empire dated March 26, 2002, CMS states that, "based on everyone's opinion that the Gross Earnings Tax is similar to the New York assessment, which was allowable, we agreed that the Connecticut Gross Earnings tax also is allowable."[37]  Nevertheless, Connecticut Blue Cross and Anthem continued to maintain a position of non-reimbursement with respect to the GET Tax.  If, between 1995 and 1999, Connecticut Blue Cross and Anthem had simply acknowledged the change in law which rendered the GET Tax a reimbursable expense, the Plaintiff Hospitals could have either claimed the GET Tax on their cost reports or obtained timely reopenings.  Either way, the Plaintiff Hospitals would have been reimbursed for the cost report years at issue in this litigation (1994, 1995 and 1996).

Empire's "similar fault" is also obvious.  Empire knew that gross receipts taxes qualified as allowable costs and, in fact, reimbursed the New York Tax on that basis as early as 1995.[38]  Despite the fact that gross receipts taxes were formally deemed to be allowable costs, Empire, which became the intermediary in Connecticut in 1999, failed to accord that status to the GET Tax until 2002.  Had it done so in 1999, it would have corrected the error for every cost report year that was the subject of an NPR issued between 1996 and 1999.  The cost report years that would have been the subject of NPRs during this period would have included 1994, 1995 and 1996 (there being a two to three year lag between the hospital's submission of the cost report and the intermediary's issuance of the NPR).  The Secretary's position in 1995 was that gross receipts taxes were reimbursable, period.  The taxing statutes for both the New York Tax and the

_____

Continued from previous page

37      See Def. Ex. A at 2.

38      See Ex. 1, Shera Dec. at Ex. 1-D.

GET Tax plainly state that they are gross receipts taxes.  The suggestion that Empire could be confused about the nature of the GET Tax is therefore absurd.  Empire's decision not to reimburse the GET Tax was the result of either wrongful concealment of its position on gross receipts taxes or reckless conduct in failing to institute a new position in Connecticut in 1999 going back three years to 1996, and thereby capturing NPRs issued in 1996 and thereafter.[39]

The Connecticut Intermediaries all should have taken steps to reveal the change in policy that began in 1995 when they first became aware of it in 1995.  Had they done so, the Hospitals would have claimed the GET Tax for all of the years at issue in the Hospitals' complaint.  Instead of revealing that there had been a correction,  the Connecticut Intermediaries actively led Connecticut hospitals to believe that the GET Tax was a non-allowable cost.

Although the evidence demonstrates that the Connecticut Intermediaries had specific knowledge that the GET Tax was reimbursable, and that they intentionally continued to treat the GET Tax as non-reimbursable despite this knowledge, neither knowledge nor intent is required to demonstrate "similar fault."  Under the standard discussed immediately above, the mere fact that the Connecticut Intermediaries provided the Plaintiff Hospitals with incorrect information regarding GET Tax reimbursement and that the Connecticut Intermediaries accepted cost reports from Connecticut hospitals under the existing policy of disallowance while remaining silent about the correction by CMS, clearly gives rise to a finding of "similar fault" under Section 405.1885(d).

> **2.     CMS And Empire Are "Parties" For Purposes Of 42 C.F.R. § 405.1885(d) And Mandamus Is Therefore Appropriate.**

---

[39]     The NPRs issued after 1996 would include those NPRs for the cost report years at issue in this litigation (1994, 1995 and 1996).

The Secretary contends that he and all governmental actors and agents are beyond the reach of Section 405.1885(d). The Secretary argues that neither he, CMS, nor any intermediary can be a "party" to the intermediary's determination within the meaning of 42 C.F.R. § 405.1885(d). The Secretary's contention, however, is flatly contradicted by the wording of his own regulations as well as by every court that has ever considered the issue.

First, the language of Section 405.1885(d) states that the provision applies to "any party" and not, as the Secretary desires, to a more narrow set of actors, limited to the "provider and related organizations." Nor should those additional terms be inferred. The Secretary and CMS are perfectly capable of using the words "provider and related organizations" when they desire to limit the application of a regulation to only those entities. Indeed, on multiple occasions, when defining who is a "party" for purposes of a particular regulation, CMS includes explicit language not only limiting the universe of potentially covered entities to the provider and related organizations, but also specifically excluding the Secretary, CMS, and the intermediary by name. See 42 C.F.R. § 405.1815 (stating that "[n]either the intermediary nor [CMS] are parties. . ."); 42 C.F.R. § 405.1843(b) (stating that "neither the Secretary nor [CMS] may be made a party to the hearing"). Because the Secretary, CMS and intermediaries are not explicitly excluded as "parties" in Section 405.1885(d), a narrow interpretation of that term is improper.

Second, the rulemaking history behind Section 405.1885(d) also suggests that the term "party" should be given its ordinary, broad definition. As originally proposed, Section 405.1885(d) would have mandated reopening only in instances where there was "fraud or similar fault of the provider." 39 Fed. Reg. 8,170 (Mar. 4, 1974) (emphasis added). The final rule, however, mandated reopening anytime there was "fraud or similar fault of any party to the determination or decision." 39 Fed. Reg. 34,519 (Sept. 26, 1974). Thus, the Secretary's use of

the concept "any party" in place of "provider" serves as a clear indication that 42 C.F.R. § 405.1885(d) should not be interpreted to apply only to the provider.

Finally, the Circuit Courts of Appeals have consistently concluded that the phrase "any party to the determination or decision," in the context of Section 405.1885(d), is not merely limited to the provider, but also includes the intermediary and any other relevant government agent or actor. The United States Court of Appeals for the Eighth Circuit, in a case similar to the instant matter, held that "[w]e do not believe . . . that this definition [pursuant to 42 C.F.R. § 405.1805, limiting section to providers] was intended to exclude intermediaries from the operation of § 405.1885(d)." Rochester Methodist Hosp. v. Travelers Ins. Co., 728 F.2d 1006, 1018 n.12 (8th Cir. 1984)(emphasis added).

In Rochester Methodist, the intermediary argued that the hospital failed to preserve its right to appeal when it elected not to claim dormitory costs in subsequent cost reports. The court rejected the argument: "[The intermediary's] argument that Rochester should have claimed the costs in order to preserve its right to appeal in subsequent years misses the point: because of [the intermediary's] misrepresentations, Rochester did not believe that there was an issue worth appealing." Id. at 1018. "If [the intermediary] had revealed that [it] was reimbursing St. Mary's dormitory costs, Rochester would have known that it had an issue worth pursuing. . . . It would have been reimbursed . . . through [the intermediary's] internal review process, and it would have sought and obtained reimbursement in later years." Id.

A similar dynamic is at work in the present matter. The Connecticut Intermediaries knew that gross receipts taxes on hospitals were reimbursable, in particular the tax in effect in New York State. Notwithstanding this fact, the Connecticut Intermediaries took the position in Connecticut that the GET Tax was not an allowable cost. As a result, the Connecticut hospitals

did not claim the GET Tax on their cost reports.  Their administrative appeal and reopening rights expired (except under Section 405.1885(d)).

The Court of Appeals for the Eighth Circuit considered the issue of whether the term "any party" in Section 405.1885(d) was limited to providers or whether it also included intermediaries.  The court ruled, as noted above, that the section did in fact apply to intermediaries.  Id.  The Third Circuit reached a similar result with respect to 42 C.F.R. § 405.1885(d).  Saint Vincent Health Ctr. v. Shalala, 937 F. Supp. 496, 506-07 (W.D. Pa. 1995), aff'd, 96 F.3d 1434 (3d Cir. 1996).  In that case, the District Court observed that, assuming there was "fraud or similar fault by Blue Cross" then "[r]eopening is mandatory where these circumstances are established."  Id.

It follows that the Secretary's argument that the term "any party" means "just the provider" should be rejected.  As seen by the language of the regulations and the relevant decisional law cited above, the term "any party" means exactly what it says and includes government actors, in this case, CMS and the Connecticut Intermediaries.

> **3.**     **The Secretary's Contention That To Be "Established" A Finding Of Fraud Or Similar Fault Must Be Made In A Proceeding or Inquiry Independent Of This Litigation Is Incorrect.**

The reopening of an intermediary's determination, pursuant to 42 C.F.R. § 405.1885(d), is mandatory when it is established that an intermediary's determination or decision "was procured by fraud or similar fault of any party to the determination or decision."  The plain language of Section 405.1885(d) does not designate who is required to "establish" that the intermediary's determination was procured by fraud or similar fault, nor does Section 405.1885(d) require an independent finding of fraud or similar fault before the mandatory duty to reopen is triggered.

Here, Section 405.1885(d) applies to the Secretary's conduct. Empire paid New York hospitals for its payments under a gross receipts tax while taking the position that the GET Tax was not an allowable cost. The GET Tax was not revealed by CMS to be an allowable cost until after the tax was abolished by the State of Connecticut. This long delay, which was the fault of the government and not the hospitals, caused the hospitals' administrative remedies to expire. Mandamus relief is therefore appropriate.

### 4.      Reimbursement Policies are "Facts."

The Secretary argues that a representation regarding Medicare law is not a material fact.[40] The Secretary misses the point. Reimbursement positions are facts. The fact that Empire treated the New York Hospital Tax as a reimbursable cost, beginning in 1995, is a fact. Likewise, the position held by the Connecticut Intermediaries, that the New York Hospital Tax and the GET Tax were functionally equivalent (taxes associated with Medicaid DSH programs), is also a fact. These facts are capable of being misrepresented, concealed, or omitted and are therefore properly the subject of a subsection (d) claim.

The Connecticut Intermediaries considered the New York Hospital Tax and the GET Tax to be the same for purposes of reimbursement.[41] Douglas Payne, the intermediary's audit manager, attests that this was the case in 1995.[42] CMS confirmed this fact by specific reference to the New York Hospital Tax in its 2002 memorandum to Empire regarding the GET Tax.[43] It was not an analytical failure on the part of the Connecticut Intermediaries that precluded the

---

[40]      Def. Mem. at 44.

[41]      See Ex. 1, Shera Dec. at ¶ 5.

[42]      See Ex. 1, Payne Dec. at ¶ 6.

[43]      See Ex. 1, Def. Ex. A at 2.

GET Tax from being treated as an allowable cost sooner. The Connecticut Intermediaries knew of the contradictory treatment, and nevertheless misrepresented to the hospitals that the GET Tax was a non-allowable cost. These are facts.

Finally, CMS and the Secretary are charged with the same knowledge regarding the two taxes that was possessed by their agents, the Connecticut Intermediaries. United States v. Sun-Diamond Growers of California, 964 F. Supp. 486, 490, 491, n.10 (D.D.C. 1997) (holding that knowledge obtained by an organization's agent, acting within the scope of his employment, is imputed to the organization); BCCI Holdings (Luxembourg), S.A. v. Clifford, 964 F. Supp. 468, 478 (D.D.C. 1997) (holding that "[a]s a general rule, knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself . . . This is true whether the officer or agent has actually disclosed the information to the corporation."). CMS and the Secretary knew or should have known about the contradictory treatment of the taxes, and they did nothing as well. Therefore, their conduct can also be addressed by subsection (d).

No genuine issues of fact remain with respect to the applicability of 42 C.F.R. § 405.1885(d). The intermediary is a party to the NPR's at issue in this case. The intermediary's conduct in omitting, concealing, and misrepresenting the allowability of the GET Tax, even if not rising to the level of fraud, does nevertheless constitute "similar fault." Accordingly, the three cost report years at issue in this litigation should be reopened.

## C.     No Other Adequate Remedies are Available.

Lastly, the Plaintiffs have no other adequate remedy available. CMS mandated that Empire reopen the cost reports of Connecticut hospitals, but only for those years that were the subject of NPRs within the three years preceding CMS's December 14, 2001 letter. As explained above, the hospitals' administrative rights for prior years, to either appeal the issue or

to file a reopening request under 42 C.F.R. § 405.1885(a) and (b), had already expired. Those rights had expired over the course of time that Empire wrongfully represented that the GET Tax was non-reimbursable. That period exceeded the three-year limitations period for appealing under 42 C.F.R. § 405.1885(a) and (b) and the 180-day period for filing administrative appeals. Indeed, the position of non-reimbursement was not corrected until after the GET Tax had already been abolished. The Plaintiff Hospitals were left with no available remedy for these years, other than mandamus.

### D. The Plaintiff Hospitals Have Met Their Burden, and a Writ of Mandamus Should Issue.

In conclusion, the Plaintiff Hospitals have met their burden of demonstrating that a writ of mandamus should issue. The Connecticut Intermediaries had an obligation to deal in good faith with the hospitals in Connecticut. By concealing their knowledge that the GET Tax was a reimbursable expense, and by actively taking the position that the GET Tax was non-reimbursable, the Connecticut Intermediaries failed in their role as reimbursement agents for the Secretary. Section 405.1885(d) imposes a clear duty upon the Secretary to reopen the Plaintiff Hospitals' cost reports for fiscal years 1994, 1995 and 1996. The Plaintiff Hospitals have a right to this relief, and have no other avenue by which to pursue their claims. This Court should, therefore, grant the Plaintiff Hospitals' motion for summary judgment, and issue the writ of mandamus that the Plaintiff Hospitals are seeking.

### II. Plaintiffs Are Entitled To Mandamus Because All Avenues Of Administrative Relief Were Both Foreclosed And Futile.

The Secretary argues that the Plaintiff Hospitals have failed to exhaust their administrative remedies and are therefore precluded from maintaining an action under mandamus. Specifically, the Secretary contends that the Plaintiff Hospitals should have

claimed GET Tax payments in their cost reports, that Empire would have reimbursed the expense, and if Empire did not, the hospitals could have appealed.  These factual and legal contentions are false.

**A.**     **The Secretary's Factual Argument Regarding Exhaustion of Remedies Is Incorrect.**

First, as set forth at length above in the Plaintiffs' Statement of Facts, the GET Tax was not treated as an allowable cost until 2002, when CMS directed Empire to make the correction. This is plainly evident based upon the Secretary's own documents and the declarations discussed above.  Even more troubling, the Secretary offers no explanation for his own conduct, which actively encouraged all hospitals in the state to obtain retroactive reimbursement for the three years prior to the correction ordered by CMS, irrespective of whether the hospitals had even claimed the GET Tax as an allowable cost on their cost reports.

The reason the hospitals did not possess a viable remedy was because the government wrongfully delayed making the correction regarding the GET Tax for seven years. Accordingly, there was no opportunity to obtain an administrative remedy.  As explained below, it is well-settled that a futile or foreclosed remedy is, in fact, no remedy at all.  There is no requirement to exhaust such remedies.

**B.**     **The Secretary's Legal Argument Regarding Exhaustion Of Remedies Is Incorrect.**

The Secretary, in fashioning his argument regarding exhaustion of remedies, is at odds with the law of this Circuit.  The United States Court of Appeals for the District of Columbia Circuit specifically held that mandamus relief is available to a hospital that has not filed an administrative appeal within 180 days of the NPR if the hospital can demonstrate that the relief sought, pursuant to such an appeal, was either foreclosed or futile.  <u>Monmouth Med. Ctr. v.</u>

Thompson, 257 F.3d 807, 815 (D.C.Cir. 2001). An examination of the facts in Monmouth demonstrates that the case is analogous to the present dispute.

At issue in Monmouth was the disproportionate share hospital ("DSH") adjustment. Id. at 808. A hospital that serves a disproportionate share of low-income Medicaid recipients is eligible for a DSH adjustment to its Medicare PPS payment. Id. Under the statute authorizing DSH adjustments, the inclusion of more Medicaid patient days in the hospital's DSH calculation means more DSH funds. From 1986 through 1997, the Secretary construed the DSH calculation to include only patient days for which Medicaid actually made a payment, i.e. "paid days." Patient days that were not paid were not included. Id. at 808, 810.

On February 27, 1997, after the Secretary's position had already been struck down by four Circuit Courts of Appeals, CMS issued Program Memorandum 97-2 ("PM 97-2") rescinding the Secretary's nationwide position. Id. at 810. The pronouncement took a new position more favorable to hospitals, requiring that intermediaries include eligible but not paid patient days in the DSH calculation. The correction applied to all unsettled cost reports and all cases in which jurisdictionally proper appeals were still pending. Id. The language of PM 97-2, however, also foreclosed retrospective application of the correction: "We will not reopen settled cost reports based on this issue." Id. (quotations and citations omitted).

The two plaintiff hospitals in Monmouth failed to file timely appeals of their NPRs for fiscal years 1993 and 1994. Moreover, the Monmouth plaintiffs, in conformance with the policy in effect prior to PM 97-2, did not include eligible but not paid days in their cost report. Id. at 808, 810. The hospitals, however, in an effort to have their DSH adjustments recalculated pursuant to the new correction set forth in PM 97-2, did file reopening requests, pursuant to 42 C.F.R. § 405.1885(a), within three years after their NPRs were issued. Id. at 810. After those

reopening requests were denied, the plaintiffs filed an action against the Secretary, asserting, among other things, that they were entitled to mandamus relief requiring reopening of their fiscal years 1993 and 1994 cost reports.  Id. at 813.  The United States District Court for the District of Columbia dismissed the claims, but the Circuit Court of Appeals reversed, ruling in favor of the hospitals.

The Secretary argued there, as he does in the present matter, that the plaintiffs failed to exhaust their administrative remedies by not appealing their NPRs within 180 days, and were, therefore, precluded from obtaining mandamus relief.  Id. at 815.  In response to this argument, the court stated that the "fact is hardly relevant here."  Id.  Instead, the court found that "[t]he question is whether [the plaintiffs] have done all they can to vindicate their right to reopening."  Id.  The court held that the plaintiffs were entitled to mandamus relief despite not having filed an appeal within 180 days because "all other avenues of relief [were] either foreclosed or futile."  Id.

Following Monmouth, this Court held in Baystate, 309 F. Supp. 2d 89 (D.D.C. 2004), appeal docketed, No. 04-5203 (D.C. Cir. May 28, 2004), that as long as a hospital's remedies are unavailable or futile, the hospital is entitled to mandamus even when the hospital fails to file an appeal within 180 days of the NPR as well as a reopening request within three years of the NPR under 42 C.F.R. § 405.1885(a).  As in Monmouth, the dispute in Baystate involved the Medicare DSH calculation and the application of PM 97-2.

The plaintiffs in Baystate filed suit for declaratory and injunctive relief under mandamus alleging that the Monmouth decision required the court to "direct the intermediaries to reopen and recalculate their NPRs for the three years prior to [PM 97-2]," notwithstanding that the plaintiff hospitals did not request reopening pursuant to 42 C.F.R. § 405.1885 and did not

"proceed through the administrative review channels provided for in the statute and regulations." <u>Id.</u> at 95.

The Secretary argued that the plaintiffs in <u>Baystate</u> should have followed the plaintiffs' path in <u>Monmouth</u> and filed reopening requests under 42 C.F.R. § 405.1885(a). <u>Id.</u> This Court rejected that argument on three separate grounds. First, the Court found that PM 97-2 itself expressly stated that the Secretary would not reopen past NPRs. <u>Id.</u> Thus, according to the Court, the Secretary's position was illogical: the Secretary sought to impose a duty to file a reopening request that the Secretary herself had just proclaimed to be prohibited. <u>Id.</u> The Court found that there is no duty to exhaust those remedies which, as a practical or legal matter, are beyond the reach of the provider.

Second, the court found that an administrative appeal at the time of the original NPR was futile because the Secretary did not issue PM 97-2 until after the time for filing such an appeal had already expired. <u>Id.</u> The hospitals could only reasonably be expected to pursue administrative remedies following the Secretary's announcement in PM 97-2 that there had been a reversal of the Secretary's position. Prior to PM 97-2, hospitals filing appeals or reopening requests would have been knowingly seeking the inclusion of patient days that the Secretary and intermediary had deemed to be unlawful. This Court found such "remedies" to be unrealistic and, as a practical matter, unavailable. If the time period for filing an appeal or a reopening request expired before the Secretary corrected his position in PM 97-2, those remedies were unavailable.

Here, all avenues of administrative relief that the Secretary contends were "available" to the Plaintiff Hospitals were in fact both foreclosed and futile. First, between 1994 and 2002, as set forth in the declarations discussed above, the Connecticut Intermediaries took the position

that the GET tax was not an allowable cost.  The Connecticut Intermediaries took this position even though, unbeknownst to Plaintiffs, CMS informed the intermediary in New York in 1995 that another gross receipts tax on hospitals, the New York Tax, was considered to be an allowable cost.

It was not until seven years later, in December 14, 2001, that CMS reversed its position in Connecticut and instructed Empire to treat the GET tax as an allowable cost.  Contrary to the Secretary's recitation of the law, the courts have found—indeed this very Court has found—that the filing of a reopening request is not a condition precedent to obtaining mandamus relief.  As in Monmouth and Baystate, Plaintiffs' 180-day window to file an appeal of their original NPRs had expired well before the Secretary changed its position.  The same holds true for the three-year window for filing a reopening request.  The plaintiffs in Monmouth filed reopening requests within three-years of the NPRs in question.  Those reopening requests, however, were made after the issuance of PM 97-2, the point in time when the plaintiffs were put on notice that the Secretary had reversed his position.  Under this Court's decision in Baystate, a hospital seeking mandamus is not obligated to file a reopening request within three-years of the NPR if that time period expires before the hospital even knows that it has a viable administrative claim.  Here, as in Baystate, the hospitals' three-year window to file a reopening request expired before the hospitals were put on notice of the Secretary's change in position.

The Connecticut hospitals, like those in Baystate, had no viable administrative remedies.  During the time periods in which the Connecticut hospitals could have filed an appeal or a reopening request, the Connecticut Intermediaries were still taking the position that the GET Tax was not an allowable cost.  Prior to the government correcting its reimbursement position in Connecticut, those time periods for appeals or reopenings, for multiple fiscal years, expired.

The Secretary invokes the Supreme Court's holding in <u>Heckler v. Ringer</u>, 466 U.S. 602 (1984).  This case is inapposite.  <u>Heckler</u> involved the administrative exhaustion requirement that is imposed upon individuals whose claims for Part A Medicare coverage are denied.  <u>Id.</u> at 606.  The dispute in that case arose out of reimbursement for a surgical procedure known as bilateral carotid body resection ("BCBR").  <u>Id.</u> at 609.  In January 1979, the Secretary issued an administrative instruction to all fiscal intermediaries, instructing them that no payment was to be made for Medicare claims arising out of the BCBR surgical procedure when performed to relieve respiratory distress.  <u>Id.</u> at 607.  Many claimants whose BCBR claims were denied by intermediaries as a result of this instruction sought review of the denial before the ALJs who were not bound by the Secretary's instructions.  <u>Id.</u>  Prior to 1980, ALJs were consistently ruling in favor of individual BCBR claimants.  <u>Id.</u> at 607-608.  The Appeals Council also authorized payment for BCBR Part A expenses in a consolidated case involving numerous claimants.  <u>Id.</u> at 608.  In response to the ALJs and the Appeals Council's rulings, on October 28, 1980, the Secretary issued a formal administrative ruling prohibiting the ALJs and the Appeals Council from ordering Medicare payments for BCBR operations occurring after that date.  <u>Id.</u> (<u>citing</u> 45 Fed. Reg. 71,426-71,427 (1980)).

Three of the plaintiffs in <u>Ringer</u> filed claims with their fiscal intermediaries arising out of BCBR operations that had been performed prior to October 28, 1980.  <u>Id.</u>  At the time they filed their action against the Secretary, none of the three plaintiffs had exhausted their administrative remedies seeking coverage for the procedure, and thus none had received a "final decision" on their claims for benefits from the Secretary.  <u>Id.</u>  Nevertheless, the plaintiffs filed their action in the federal district court on September 18, 1980 seeking a "declaration that the Secretary's refusal to find that BCBR surgery is 'reasonable and necessary' under the [Medicare] Act is

unlawful, an injunction compelling the Secretary to instruct her intermediaries to provide payment for BCBR claims, and an injunction barring the Secretary from forcing claimants to pursue individual administrative appeals in order to obtain payment." Id. at 610-611.

In the Supreme Court's discussion of mandamus jurisdiction, it considered whether "the Secretary's formal ruling denying payment for BCBR claims rendered further exhaustion by the respondents futile." Id. at 618. It found that because the plaintiffs had their surgery prior to October 28, 1980, the administrative ruling was not applicable to the plaintiffs' claims. Thus, the Court agreed "with the Secretary that exhaustion is in no sense futile for these three [plaintiffs]. . ." Id.

Next, the court examined the plaintiffs' argument "that there would be a presumption against them as they pursue their administrative appeals because of the very existence of the Secretary's instructions and her formal ruling and thus that exhaustion would not fully vindicate their claims." Id. at 619. In response to this argument, the court noted that in every one of the 170 claims filed with the ALJs between the time of the Secretary's instructions to her intermediaries and the filing of the plaintiffs' lawsuit (before the formal ruling became effective), the ALJs allowed recovery for BCBR claims. Id. The court noted further that in promulgating the formal ruling, the Secretary specifically exempted from the scope of the ruling individuals such as the plaintiffs who had the surgery relying on the favorable ALJ rulings. Id. Based upon these findings, the court held that "[a]lthough [plaintiffs] would clearly prefer an immediate appeal to the District Court rather than the often lengthy administrative review process, exhaustion of administrative remedies is in no sense futile for these [plaintiffs], and

they, therefore, must adhere to the administrative procedure which Congress has established for adjudicating their Medicare claims."[44] Id.

The Heckler plaintiffs, therefore, unlike the plaintiffs in the GET Tax case, were fully aware that the agency position had been corrected, disliked their chances in the administrative context, and pursued a concurrent remedy in federal district court. In the present case, the agency did not even correct its position until the GET Tax was abolished. By this time, the administrative remedy to file a reopening request under 42 C.F.R. § 405.1885(a) had already expired, together with the hospital's right to file an appeal within 180 days of the NPR. Thus, unlike the instant matter, it would have been possible for the plaintiffs in Heckler to resolve their reimbursement issue through the administrative process. The court in Heckler specifically held that the administrative avenues available to the plaintiffs were not futile. Under the holdings of Monmouth and Baystate, this Court should find that the only adequate remedy available to Plaintiffs was to bring the instant action against the Secretary. Plaintiffs' request for mandamus relief, therefore, should be granted.

## III. The Plaintiff Hospitals' Suit Is Timely.

The Secretary's contention that the Plaintiff Hospitals are not entitled to mandamus relief on grounds of unreasonable delay lacks merit. In 2002, once the Plaintiff Hospitals were informed that the Secretary had concluded that the GET tax was reimbursable by Medicare, they

---

[44] As the Secretary notes, the fourth plaintiff, Ringer, never had the surgery in question. Id. at 610. Instead, Ringer "wishe[d] to have the operation and claim[ed] that the Secretary's refusal to allow payment for it precludes him from doing so." Id. at 620. The Supreme Court's "separate" discussion of Ringer has no bearing upon the mandamus analysis in the instant matter because, with respect to mandamus, the Court simply held that "[o]ur discussion of the unavailability of mandamus jurisdiction over the claims of the other three [plaintiffs] is equally applicable to Ringer." Id. This single conclusory statement hardly provides persuasive authority for the Secretary's argument that the Court's holding as to Ringer supports his position that that Plaintiffs' mandamus claim should be rejected.

pursued the limited administrative remedies that were made available to them for the years for which those remedies had not expired.   The Secretary reimbursed Plaintiffs for GET Tax payments for those fiscal years.   The limited nature of these remedies caused Plaintiffs to proceed to file suit for the remaining years.   The hospitals filed suit within two years of Empire being forced by CMS to treat the GET Tax an allowable cost.   Thus, there was no unreasonable delay in the filing of Plaintiffs' complaint.

Furthermore, in the context of PM 97-2, the Secretary's change in position did not constitute sufficient notice to Plaintiffs to file suit.   The United States District Court for the District of Columbia held that the Secretary's ruling "constituted notice to the intermediaries of an inconsistency with applicable law but that it did not give plaintiffs notice of a ground for having their NPRs reopened."   Baystate, 309 F. Supp. 2d at 99.   The Court issued a writ of mandamus because "plaintiffs did not wait a protracted period of time in pursuing their claims." Id.   "While the [Secretary's] Ruling was issued in 1997, the court of appeals did not decide Monmouth – which announced for the first time that the Ruling constituted notice to the intermediaries of the inconsistency with applicable law of the Secretary's prior interpretation – until July 27, 2001.  Plaintiffs filed their suit just eight months later on March 29, 2002, hardly an inordinate time lag." Id.

Similarly, in this case, the Secretary's change in position, that the GET tax was a non-allowable cost, did not give Plaintiff Hospitals notice of a ground for having their NPRs reopened.   No prior court has made a determination regarding this issue.   If Plaintiffs are successful, this Court's determination would constitute notice to Plaintiffs to request a reopening. Thus, an affirmative ruling by this Court, and not the Secretary's conclusion that the Connecticut

gross earnings were reimbursable by Medicare for a limited period of time, would be the relevant

point in time from which to judge the timeliness of these claims.

**<u>Conclusion</u>**

Based on all of the foregoing, the Plaintiff Hospitals' cross motion for summary

judgment should be granted and the Secretary's motion to dismiss should be denied.

Dated:  May 16, 2005

/s/ Jacqueline E. Bennett
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC  20005
(202) 414-9200
(202) 414-9299 Facsimile
JBennett@ReedSmith.com

Steven B. Roosa
*Pro Hac Vice*
**REED SMITH LLP**
Princeton Forestall Village
136 Main Street, Suite 250
Princeton, NJ  08540
(609) 987-0050

Attorneys for the Plaintiffs

Of Counsel:

Murray J. Klein
**REED SMITH LLP**
Princeton Forestall Village
136 Main Street, Suite 250
Princeton, NJ  08540
(609) 987-0050