IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIRVIEW HOSPITAL, et al.,                )
                                          )
                 Plaintiffs,              )
                                          )
         v.                               )          Civ. Action No. 1:05cv01065 (RWR)
                                          )
MICHAEL O. LEAVITT,                       )
                                          )
                 Defendant.               )
_____ )

**DEFENDANT EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRADLEY MEMORIAL HOSPITAL, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:04cv00416 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
<u>SECOND MOTION FOR SUMMARY JUDGMENT</u>**

OF COUNSEL:

ALEX M. AZAR II
General Counsel

ROBERT P. JAYE
Acting Associate General Counsel

MARK D. POLSTON
Acting Deputy Associate General
Counsel

LAWRENCE M. MEISTER
Attorney
Department of Health
and Human Services

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Attorneys
U.S. Department of Justice
20 Massachusetts Ave., N.W., Room 7142
Washington, D.C.  20530
Tel:  (202) 514-3953
Attorneys for Defendant

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   A.  The Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   B.  The "Facts" Imagined by Plaintiffs' Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   C.  Plaintiffs' Misconceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       1.  Plaintiffs do not understand the relationship between hospitals and
           intermediaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       2.  Plaintiffs do not understand which intermediaries processed their
           1994-1996 cost reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       3.  Plaintiffs do not understand what the New York Opinion says . . . . . . . . . . . . 18

       4.  There is no evidence that Connecticut Blue Cross or Anthem
           knew the New York Opinion existed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       5.  Plaintiffs do not understand what Connecticut Blue Cross and Anthem did . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   I.  HOSPITALS MAY NOT JUSTIFIABLY RELY ON THE ALLEGEDLY
      INCORRECT STATEMENTS OF MEDICARE INTERMEDIARIES . . . . . . . . . . . . 27

   II.  PLAINTIFFS HAVE SUBMITTED NO EVIDENCE THAT THEY
       RELIED ON ANY STATEMENT OR OMISSION OF AN INTERMEDIARY . . . . . . 34

   III.  PLAINTIFFS HAVE SUBMITTED NO EVIDENCE SHOWING THAT
        ANY INTERMEDIARY MADE ANY FACTUAL STATEMENT ABOUT
        THE GET TAX THAT COULD HAVE AFFECTED THE 1994-1996
        COST REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   IV.  EMPIRE DID NOT OWE PLAINTIFFS ANY DUTY TO REOPEN
        1994-1996 COST REPORTS WHEN IT ASSUMED DUTIES IN
        CONNECTICUT IN 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V.  CONNECTICUT BLUE CROSS AND ANTHEM WERE NOT REQUIRED
    TO ADVISE PLAINTIFFS ABOUT EITHER THE GET TAX OR NEW
    YORK TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## INTRODUCTION

The following memorandum is one that this Court does not have to read.  To have occasion to rule on plaintiffs' cross-motion for summary judgment, the Court would first have to deny defendant's pending motion to dismiss, and plaintiffs themselves have made this impossible.  In their "opposition" to the motion to dismiss, plaintiffs abandoned all claims for relief other than the one premised on 42 C.F.R. § 405.1885(d), and they did not deny that this remaining claim fails to allege "fraud or similar fault," id., with the particularity demanded by Fed. R. Civ. P. 9(b).  Plaintiffs' complaint therefore must be dismissed in its entirety.  The summary-judgment stage need not be reached.

This case also could not reach the summary-judgment stage unless the Court first rules in plaintiffs' favor on seven separate questions of law raised in defendant's motion to dismiss.  First, the Court must be persuaded that hospitals have a "right to relief" under the mandamus statute, 28 U.S.C. § 1361, to vindicate a "substantive claim" for Medicare reimbursement, Pl. Opp.[1] at 17, even though the claim was not pursued through the administrative and judicial avenues established precisely for this purpose in 42 U.S.C. § 1395oo and 42 C.F.R. § 405.1885(a).  Second, the Court must be persuaded that the general description of "necessary and proper costs" in 42 C.F.R. § 413.9(b) expressly mandates Medicare reimbursement for state gross-earnings taxes in a manner "so plainly prescribed as to be free from doubt and equivalent to a positive command," Consol. Edison Co. of New York, Inc. v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218-19 (1930)), even though the regulation does not mention state tax assessments on any level of generality.  Third,

_____

[1] Plaintiffs' Opposition to Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint and Plaintiffs' Cross-Motion for Summary Judgment.  (Doc. 25).

the Court must be persuaded that plaintiffs' "substantive claim" for Medicare reimbursement, Pl.

Opp. at 17, is not barred by the six-year limitations period in 28 U.S.C. § 2401(a).

Fourth, the Court must be persuaded that Medicare regulations expressly <u>mandate</u> that an

intermediary <u>must</u> be considered a "party" to its own "intermediary determination," 42 C.F.R.

§ 405.1885(d), even though intermediaries are not among the entities expressly delineated as the

"parties to the intermediary's determination" in the controlling definition in 42 C.F.R. § 405.1805

of this regulatory term of art.  Fifth, the Court must be persuaded that there is some coherent

sense in which an intermediary can be said to have "procured" its own determination <u>from itself</u>

by means of "fraud or similar fault," 42 C.F.R. § 405.1885(d), even though plaintiffs make no

such argument in their opposition to the motion to dismiss.  Sixth, the Court must be persuaded

that it has jurisdiction under the mandamus statute to "establish" the existence of the allegedly

blameworthy conduct which triggers a duty to reopen under § 405.1885(d) and <u>thereafter</u> compel

the performance of the judicially-created duty.

Finally, plaintiffs would somehow have to convince the Court that they come before it

with such clean hands as to make a compelling case on equitable grounds, even though they

apparently did nothing to research Medicare law for themselves; they made no attempt to claim

payment; they did not pursue any claims through administrative and judicial channels of review

to get a timely resolution of any disputed issue; and they waited more than a decade after the

relevant 1994-1996 cost reports were submitted to bring their mandamus claims.  For purposes of

this memorandum, defendant assumes, arguendo, that this Court has ruled in plaintiffs' favor on

each and every one of these purely legal issues.  There remains, however, the question of whether

plaintiffs have come forward with sufficient admissible and unconverted evidence, Fed. R. Civ.

P. 56(c), (e), to establish that they have been the victims of "fraud or similar fault" within the meaning of 42 C.F.R. § 405.1885(d).

## PRELIMINARY STATEMENT

Plaintiffs' motion for summary judgment fails to establish that plaintiffs have been the victims of fraud or similar fault on the part of the fiscal intermediaries that processed their cost reports for the 1994-1996 years at issue in this case. For more than twenty years, the Supreme Court has admonished hospitals claiming payment under the Medicare program that they "are expected to know the law and may not rely on the conduct of Government agents contrary to law." Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 63 (1984). Among other things, hospitals are expected to know what substantive Medicare statutes and regulations say. Id. at 63. They are expected to know that a fiscal intermediary, which merely processes reimbursement claims at the initial level of administrative review, is not the final word on how Medicare law should be applied in particular circumstances. Id. at 63-64. And they are expected to know that it is their responsibility – and theirs alone – to claim the expenses they believe are allowable and to bring disputed issues to the attention of the Medicare authorities for prompt resolution through the administrative process created by Congress in 42 U.S.C. § 1395oo. Hospitals have no legal right to expect government agents to do any of their work for them.

For an equal number of years, the Supreme Court has further admonished hospitals that "[t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare." Crawford County, 467 U.S. at 64. In particular, the Secretary of Health and Human Services and his fiscal agents are not required to issue advisory opinions to "address every conceivable question in the process of determining equitable reimbursement." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995). Rather, it

is perfectly permissible for the Secretary to rely on the "elaborate adjudicative structure" in 42

U.S.C. § 1395oo to flesh out how broadly-framed regulations should be applied in case-specific

circumstances.  Guernsey, 514 U.S. at 96-97.  A program that handles hundreds of billions of

dollars in claims every year could not possibly function if hospitals were excused from taking a

proactive role in the decision-making process.  The system would quickly break down if the

Secretary were required to ascertain for each hospital which of its thousands of expenses are

reimbursable, instruct each hospital how to claim the expenses, and then double-check the

submitted cost report to make sure no arguably reimbursable expenses had been left out.  By

taking exception to these propositions, plaintiffs here seek nothing less than a radical

transformation of how Medicare claims are processed.

 For the 1994-1996 years at issue here, the plaintiff hospitals submitted Medicare cost

reports on which they did not claim a certain Connecticut state tax, known as the Gross Earnings

Tax ("GET").  Plaintiffs have not come forward with a scintilla of evidence that any of them

relied on any statement of any government officials when they submitted these reports, let alone

an allegation that they reasonably relied on bad advice about what expenses were and were not

reimbursable.  Indeed, all plaintiffs' evidence shows exactly the opposite:  that the hospitals

consciously decided not to claim the GET tax for reasons entirely their own.  Nonetheless,

plaintiffs contend that they were the victims of "fraud or similar fault" within the meaning of 42

C.F.R. § 405.1885(d), apparently because fiscal intermediaries did not do enough to warn them

that they were making a potential mistake.

 The most basic problem with plaintiffs' "fraud or similar fault" theory is that it seeks to

extend an analysis in Rochester Methodist Hospital v. Travelers Insurance Co., 728 F.2d 1006

(8th Cir. 1984), that was flatly rejected by the Supreme Court just three months after the decision

was rendered.  In <u>Rochester</u>, a two-judge panel of the Eighth Circuit upheld a common-law fraud

judgment against a Medicare intermediary on, among other things, the ground that it was

"justifiable" for a hospital to rely on the intermediary's erroneous statement about whether a

particular expense item was reimbursable.  <u>Id</u>. at 1018.  The dissenting judge argued that such

reliance was not "justifiable" because the hospital should already have been "knowledgeable

about [Medicare] reimbursement" itself and should be held accountable for its own cost-reporting

decisions.  <u>Id</u>. at 1019 (Henley, J., dissenting).

In <u>Heckler v. Community Hospital Services of Crawford County</u>, 467 U.S. 51 (1984), the

Supreme Court subsequently agreed with the dissenting judge.  The Court held that reliance on

an intermediary's alleged misstatements about Medicare law was not justifiable because every

hospital that chooses to participate in the program has a pre-existing "duty to familiarize itself

with the legal requirements for cost reimbursement."  <u>Id</u>. at 64.  Such hospitals also have a duty

to understand "the nature of and limitations on the role of a fiscal intermediary," <u>id</u>., and to be

aware of the administrative mechanisms readily available to health-care providers to get a

disputed payment issue "resolved by the Secretary" in a more definitive manner.  <u>Id</u>. at 65.

Simply put, a hospital cannot be misled by an intermediary where it has been publicly instructed

by the Supreme Court not to rely upon that intermediary as the final authority on Medicare

reimbursement issues.

The second fundamental legal defect in plaintiffs' theory of "fraud or similar fault" is their

unexplained assumption that intermediaries have a legal duty to help hospitals take maximum

advantage of the claims process by providing them with personalized and unsolicited advice on

every aspect of Medicare law that might conceivably be of interest to them.  This proposition is

diametrically opposed to the instruction of the Supreme Court that "[t]here is simply no

requirement that the Government anticipate every problem that may arise in the administration of

a complex program such as Medicare," Crawford County, 467 U.S. at 64, and certainly no "duty

to promulgate regulations that, either by default rule or by specification, address every

conceivable question in the process of determining equitable reimbursement." Guernsey, 514

U.S. at 96.  Contrary to plaintiffs' view, there is nothing in the slightest wrong with issuing

broadly framed regulations (such as the regulation at 42 C.F.R. § 413.9 on which plaintiffs' claim

is based) and leaving it up to the "elaborate adjudicative structure" in 42 U.S.C. § 1395oo to flesh

out how the regulation should be applied in particular circumstances and particular locales.

Guernsey, 514 U.S. at 96-97.  To rule in plaintiffs' favor, this Court would have to reach the

astonishing conclusion that, by doing what the Supreme Court has expressly blessed as

permissible, the Secretary and his fiscal agents committed an act similar to fraud.

Because plaintiffs' legal theory of "fraud or similar fault" is fatally flawed as a matter of

law, it is not necessary for this Court to consider whether it is supported by sufficient admissible

and uncontested evidence to support a motion for summary judgment.  But plaintiffs have come

forward with no evidence of misfeasance at all.  In the first, place, there is no evidence in the

record that any intermediary which processed 1994-1996 cost reports maintained a position that

the GET tax was not a reimbursable expense, at least not in a manner that was committed to

writing, was consistently enforced against hospitals by intermediary personnel, or was enforced

to the detriment of any plaintiff hospital here.  The only proposition that plaintiffs actually

establish, at least with competent and admissible evidence, is that some former employees of the

relevant intermediaries thought, in good faith, that the GET tax was not reimbursable,

Declaration of Douglas Payne ("Payne Dec.") at ¶¶ 5-6 (Pl. Ex. 3); Declaration of Maureen Joslin

("Joslin Dec.") at ¶ 5 (Pl. Ex. 4); Declaration of Rose Cambino ("Cambino Dec.") at ¶ 2 (Pl. Ex.

5), at a time when most Connecticut hospitals apparently thought the same thing. Merely holding an allegedly wrong opinion of law in one's mind, pursuant to which no adverse action is taken, cannot possibly be construed as a form of "fraud or similar fault," 42 C.F.R. § 405.1885(d), under any rational understanding of the term.

Moreover, plaintiffs have submitted no evidence to show that the relevant intermediaries knew any information that might have led them to the conclusion that the opinion in their minds about the status of the GET tax was wrong. First, contrary to plaintiffs' belief, the agency opinion letter on which they rely – which was issued by the Secretary to a New York intermediary about the treatment of a New York state tax – did not apply to Connecticut and did not announce any general policy on gross-receipts taxes. The letter was exactly what its text says it was: an instruction to a New York intermediary about how to treat a specific New York tax. Second, contrary to plaintiffs' belief, there is no record evidence that any intermediary in Connecticut that processed 1994-1996 cost reports knew that the New York opinion letter even existed. Plaintiffs' counsel merely offer implausible speculation that intermediaries might have discussed the New York opinion letter at regional technical conferences, even though plaintiffs have not established the New York opinion was in existence at the time.

Finally, plaintiffs have come forward with no evidence that any relevant intermediary ever said anything at all to any plaintiff hospital, either about the GET tax specifically, or about the treatment of New York taxes specifically, or about the treatment of gross-receipts taxes generally. The only "evidence" is that an administrator of one plaintiff hospital vaguely remembers having some sort of communication about the GET with the auditor of a different intermediary long after the relevant 1994-1996 cost reports had been submitted and determinations had been issued. And there is no evidence that any plaintiff hospital relied on

anything an intermediary said to them, either in preparing their 1994-1996 cost reports or thereafter.  Plaintiffs' motion for summary judgment should therefore be denied.

## STATEMENT OF THE CASE

### A.  The Relevant Facts

The <u>relevant</u> facts in this case can be simply stated.  During cost-reporting periods in 1994-2000, the state imposed the GET tax and a sales tax.  The revenue from the taxes was placed in an "uncompensated care" pool and then distributed back to hospitals on the basis of the proportion of treatment they provided to the indigent.  Letter of Rex A. Shera dated August 31, 2001 ("Shera Letter") at 2-3 (Pl. Ex. 1-A).[2]

Plaintiffs include twenty-seven hospitals in Connecticut that did not claim the GET tax as an expense on their Medicare cost reports.  Rather, "[w]ithin Connecticut, the accepted industry practice for financial statement reporting [was] for the payments and the receipts to be reflected as an adjustment from gross patient revenues (within allowable contractual allowances)."  Id. at 3.  This information was included in a lump-sum entry on a portion of the Medicare cost report devoted exclusively to reporting revenues.  See Worksheet G-3.[3]  As a result, the GET tax was neither claimed as an expense nor reported as an identifiable item anywhere on the cost report.

Plaintiffs have yet to offer an explanation for why they adopted this particular accounting convention.  However, references in a 2001 letter written on behalf of plaintiffs to the Centers for Medicare & Medicaid Services ("CMS") suggest that the reason may have had something to do

---

[2] The Shera Letter appears without attachments in Exhibit 1-A attached to plaintiffs' cross motion for summary judgment.  (Doc. 25).  The complete correspondence appears in Exhibit A to defendant's motion to dismiss plaintiffs' original complaint.  (Doc. 8).

[3] This document appears at Ex. B to defendant's motion to dismiss plaintiffs' original complaint (Doc. 8).

with a perceived need for consistency with the accounting practices used for purposes of the

Medicaid program. The letter states that the GET tax and sales tax "assessments [were] pooled

into a fund that qualifies for federal matching monies" under Medicaid. Shera Letter at 2.

Pursuant to 42 U.S.C. § 1396b(w)(1)(A), a state can lose federal matching support for

expenditures made to hospitals if those expenditures are funded by a tax on the hospitals

themselves. The purpose of the statute is to reduce opportunities for states to inflate federal

matching funds by means of artificial "kickback" arrangements. Ashley County Med. Ctr. v.

Thompson, 205 F. Supp. 2d 1206, 1032 (E.D. Ark. 2002). Plaintiffs' letter indicates that the

Connecticut uncompensated-care program was specifically designed to meet the requirements of

42 C.F.R. § 433.68, a Medicaid regulation that helps enforce the prohibition on abusive

kickbacks. Shera Letter at 2-3. It is reasonable to infer, therefore, that Connecticut hospitals

thought it was better to follow a uniform accounting approach, so as not to jeopardize more

valuable Medicaid funding, even if it meant that some Medicare funding might be sacrificed.

Whatever the reason, the undisputed fact is that plaintiffs did not claim the GET tax on

their cost reports. On the basis of information submitted by the hospitals, see 42 C.F.R.

§ 413.20, the intermediaries issued final payment determinations. The determinations obviously

did not provide reimbursement for the unclaimed and unreported GET expenses. The hospitals

did not appeal these determinations, pursuant to 42 U.S.C. § 1395oo.

Years later, after the GET tax had expired and federal Medicaid funding was no longer an

ongoing concern, plaintiffs apparently began to wonder whether they had made a tactical

mistake. In August 2001, they wrote to CMS requesting "guidance" on whether the tax was

reimbursable. Shera Letter at 1. Plaintiffs' letter contained a four-page argument in favor of their

position, id. at 1-4, and was accompanied by 222 pages of attachments. Def. Ex. A at 10-232

-9-

(attached to defendant's original motion to dismiss). One-hundred-seventy of those pages consisted entirely of complex Connecticut tax law and Medicaid-related regulations. Id. at 44-214. Another 17 pages consisted of agency opinion letters and decisions of the Provider Reimbursement Review Board ("PRRB" or "Board") discussing an ongoing issue as to whether state gross-receipts taxes should be reimbursed under Medicare. Id. at 215-32. Nowhere in the letter did plaintiffs complain about being misled by any federal authorities. On the contrary, the hospitals emphasized that they had not previously contacted the intermediary to discuss the matter, "as we believe the Intermediary would likely seek guidance from the CMS Central Office." Id. at 1.

Four months later, CMS issued an opinion in which it concluded that the GET tax, but not the sales tax, met the standards for reimbursement set forth in § 2122.2 of the Provider Reimbursement Manual. Letter of R. Thomas Talbott dated December 14, 2001 ("CMS Letter") at 1-2 (Pl. Ex. 1-B). Although the agency's opinion letter did not mention it, this conclusion was similar to one CMS had come to five years earlier in response to a similar inquiry about a tax on gross receipts imposed on hospitals in New York. Letter of Anthony J. Seubert dated June 26, 1996 ("New York Opinion") at 1 (Pl. Ex. 1-D). On the basis of its conclusion that the GET tax was covered, CMS ordered the intermediary to reopen payment determinations for the previous three years.[4]

---

[4] It is not clear whether CMS acted pursuant to the reopening authority in 42 C.F.R. § 405.1885(a) or § 405.1885(b). Subsection (a) authorizes intermediaries to reopen payment determinations on their own motion, and the Secretary has always taken the position that he has the inherent authority to order his fiscal agents to exercise that discretion in favor of hospitals. 67 Fed. Reg. 49,982, 50,096 (Aug. 1, 2002). Both reopenings are limited to three years. It therefore makes no particular difference whether subsection (a) or (b) was invoked.

So far, the facts of the case tell a simple story with a happy ending. For reasons entirely of their own making, plaintiffs failed to claim the GET tax as reimbursable. They belatedly noticed their omission, brought it to the Secretary's attention, and asked for help. The Secretary did all he could to help by ordering a three-year reopening. He did so even though it was within his discretion to do nothing. If there is anything "stunning" about this sequence of events, Pl. Opp. at 13, it is only that plaintiffs waited so many years to raise the GET issue and seek an administrative opinion from CMS. Had Connecticut hospitals acted with the diligence of the New York hospitals, they would most likely have received reimbursement for the 1994-1996 years with as little difficulty.[5]

### B. The "Facts" Imagined by Plaintiffs' Counsel

As if to confirm the adage that no good deed goes unpunished, plaintiffs have responded to the generosity of the three-year reopening by alleging that the GET-tax-free cost reports that they submitted for the 1994-1996 years were "procured" from them – in some never-defined sense – by means of "fraud or similar fault" on the part of the intermediaries. 42 C.F.R.

---

[5] As was discussed above, plaintiffs' delay might be explained by the fact that they wanted to wait until the GET tax had expired before raising an issue that could have implications for state Medicaid funding. But there is certainly no reason for plaintiffs to find it "troubling" that defendant's opening memorandum "offers no explanation" for why the Secretary "actively encouraged all hospitals in the state to obtain retroactive reimbursement," without regard to whether they "had even claimed the GET tax as an allowable cost on their cost reports." Pl. Opp. at 27. In the first place, the Secretary did not order "retroactive reimbursement." He ordered a reopening of final payment determinations. In the second place, the breadth of the reopening order merely corresponds to the breadth of the harm Connecticut hospitals had done to themselves and, indirectly, to their Medicare patients, by adopting an "accepted industry practice" of not claiming the GET tax on their cost reports. Shera Letter at 3. That the Secretary did not "fault" the hospitals for their failure to claim the GET tax in a timely manner, Pl. Opp. at 13, merely reflects his judgment that there was no need, in the context of the reopening, to make gratuitous reference to management failings (if failings they were) of which the hospitals no doubt already were painfully aware.

§ 405.1885(d).  The basis for this calumny is a fictional story wholly concocted by plaintiffs' counsel, without a single relevant fact in the record to support it.  For reasons that will shortly become apparent, the fantasy story can be called "the Great Blue Cross Rebellion."

In plaintiffs' view, the story began in 1994, when CMS's predecessor agency advised an intermediary in New York that a New York tax on gross receipts was not reimbursable under Medicare.  (That opinion is not in the record, but is referenced in a later letter.  New York Opinion at 1.)  At that time, the intermediary that processed all hospital cost reports in New York was Empire Blue Cross and Blue Shield, which later became known as Empire Medicare Services ("Empire").  Second Declaration of George E. Porette ("Second Porette Dec.") at ¶¶ 3, 5 (Def. Ex. 2) (attached to this memorandum).  In 1995, the Secretary changed his mind and concluded that the "specific" New York State tax assessment "in question" was reimbursable.  New York Opinion at 1.  The letter is stamped as having been received by Empire on July 5, 1995.  Id.

According to plaintiffs, the Secretary did not intend for his letter to be construed as a opinion limited to the specific New York tax assessment in question, even though that is exactly what the letter says.  Rather, say plaintiffs, the Secretary intended to issue a general proclamation that all "gross receipts taxes" imposed by any state in the country on any terms  "were reimbursable, period."  Pl. Opp. at 19.  Apparently, plaintiffs think the Secretary decided not to put this nationwide directive in the form of an instruction to all intermediaries in the United States, but instead encoded it between the lines of the New York letter.  Plaintiffs further assume that Empire perceived the letter in this manner and immediately saw an obligation to inform intermediaries processing hospital cost reports in all other states, or at least as far away as neighboring Connecticut.

Plaintiffs further assume that Empire fulfilled this implied and understood duty at a regional technical conference attended by fellow members of the Blue Cross Association in the Northeast. According to plaintiffs, this conference occurred sometime "in or around 1995." Payne Dec. at ¶ 4. Plaintiffs' counsel appear to assume that the New York Opinion was discussed at the meeting, Pl. Opp. at 18, even though the only eyewitness in the record – Douglas Payne – says nothing of the kind. Payne Dec. at ¶ 4. In fact, Mr. Payne does not appear to even remember whether the conference was held after the New York Opinion was sent to Empire on July 5, 1995 or before that Opinion issued, when the original instruction not to reimburse New York hospitals had been in effect. Undaunted by these gaps in their evidence, plaintiffs' counsel further theorize that the other intermediaries, in defiance of the Secretary's instructions to New York, joined the New York delegation in agreeing that no form of state taxation used to fund "uncompensated care pools," including the New York gross receipts taxes, should be considered reimbursable under Medicare. Id. Thus, according to plaintiffs, did the intermediaries in the Northeast conspire in bad faith to thwart the putative reimbursement directive of their employer, the Secretary, who had the power to rescind all their contracts for disobedience.

According to plaintiffs, the Connecticut intermediaries then took two additional steps to carry out their part of the Rebellion on the local front. First, say plaintiffs, the intermediaries "maintained" what plaintiffs characterize as a bad-faith "policy" of not reimbursing hospitals for the GET tax, Pl. Opp. at 18, 20, even though they knew this policy was contrary to the Secretary's alleged instructions. None of the former intermediary personnel on whom plaintiffs rely for this "fact," however, avers that he or she knew about the New York Opinion or acted in bad-faith disregard of what they perceived to be any instruction from the Secretary. Payne Dec. at ¶ 6; Joslin Dec. at ¶ 5; Cambino Dec. at ¶ 2. Plaintiffs' counsel further presume that the putative

policy was uniformly enforced by intermediary personnel, even though their own evidence
proves that it was not.  Payne Dec. at ¶ 7.

Next, according to plaintiffs, the rebellious and conspiratorial Connecticut intermediaries
went so far as to establish and "strictly" enforce, Am. Compl. at ¶ 23, a policy (wholly of their
own making) that the GET "could not be claimed on [hospital] cost reports" at all.  Pl. Opp. at 9.
Plaintiffs make this startling accusation even though none of three former intermediary
employees on whom they rely avers that any such restriction was ever imposed, and, in fact, there
were two separate places on the hospital cost report where a disputed claim for the GET tax
could have been reported.  Declaration of Warren A. Willis ("First Willis Dec.") at ¶ 4 (Def. Ex.
3) (attached to this memorandum).  Plaintiffs further suppose that these anti-GET policies were
then communicated in a uniform manner to each of the twenty-seven plaintiff hospitals.
According to plaintiffs' counsel, these conversations occurred during the "audit adjustment
process," Pl. Opp. at 18, even though neither the hospitals themselves nor the three sympathetic
former intermediary employees on whom they rely for evidence avers that a single such auditing
discussion actually occurred in connection with any of the 1994-1996 cost reports at issue here.

The result of the Great Blue Cross Rebellion, according to plaintiffs, was that each and
every one of the plaintiff hospitals came away from its unspecified auditing communications
with the mistaken impression that hospitals in New York were not being reimbursed for the New
York tax on gross receipts and that this meant Connecticut hospitals were not allowed to submit
a claim for the Connecticut tax on gross earnings on their 1994-1996 cost reports.  Without
evidence, plaintiffs' counsel go on to assume that the hospitals then failed to claim the GET tax
on their cost reports "because of" the misimpressions allegedly created by the intermediaries, Pl.
Opp. at 13, and not because of the Medicaid-related considerations discussed in their own letter

-14-

to CMS in 2001. Shera Letter at 2-3. Such is the way, according to plaintiffs, that payment determinations for the 1994-1996 cost-reporting years were procured by fraud or similar fault of intermediaries. Pl. Opp. at 19-20.

### C. Plaintiffs' Misconceptions

There are at least three obvious problems with plaintiffs' account. First, it is every bit as ridiculous as it sounds. Second, it rests on numerous misstatements of law. Third, the declarations and documents attached to plaintiffs' motion for summary judgment, to the extent they are even admissible, do not support even a single one of plaintiffs' "factual" contentions. The simple truth is that plaintiffs did not get reimbursed for the GET tax because they did not claim it. They apparently did not want to claim it because they were afraid of adverse consequences on the Medicaid side of their funding. There was no fraud, or fault similar to fraud, on anyone's part, least of all the intermediaries who gave the hospitals no more and no less than the nothing for which they asked. And there was certainly no detrimental reliance on the part of the hospitals. The account that appears in plaintiffs' opening memorandum is merely a tale told by a lawyer, full of sound and fury and signifying nothing.

#### 1. Plaintiffs do not understand the relationship between hospitals and intermediaries.

Plaintiffs' misconceptions about this case begin with a fundamental misunderstanding of the relationship between hospitals and intermediaries in regard to the submission of Medicare cost reports. Plaintiffs cite no authority for their casually-stated belief that "the function of the intermediary is to work with hospitals to further Medicare's reimbursement policies," Pl. Opp. at 3, in some sort of cooperative partnership. The "functions to be performed by the intermediary" are enumerated in 42 C.F.R. § 421.100. The only area in which the intermediary is required to

"assist providers" is in the promotion of efficient utilization practices. 42 C.F.R. § 421.100(d).[6]

Except as directed by the Secretary, intermediaries are <u>not</u> required to give hospitals advice about

what should and should not be included in annual cost reports.[7]  And they are certainly not

required to "watch the hospitals' backs" by scouring the cost reports submitted by hospitals in

search of expenses that could have been claimed but were not even reported.  <u>See Crawford

County</u>, 467 U.S. at 63-64 (discussing "limitations on the role" of intermediary and duty of

hospitals to "know the law" and act with "scrupulous" regard to it).  As defendant explained in

his opening memorandum, the responsibility for claiming expenses and providing adequate

supporting information rests exclusively with the hospitals seeking reimbursement.  Def. Mem.[8]

at 2-3 &. n.1 (citing 42 C.F.R. §§ 413.20, 413.24).  To impose such a burden on intermediaries

would dramatically increase their already staggering volume of work, Def. Mem. at 1-2, with the

very real threat of bringing the entire Medicare claims process crashing to a halt.

---

[6] Other duties include making sure that Medicare payment is made "only" for covered
services furnished by health-care providers, 42 C.F.R. § 421.100(a)(1); making sure improperly
claimed expenses are rejected or adjusted, 42 C.F.R. § 421.100(a)(2); making sure disbursements
are properly accounted for, 42 C.F.R. § 421.100(b); conducting audits to the extent "necessary to
assure proper payments," 42 C.F.R. § 421.100(c); establishing approved procedures "to consider
and resolve any disputes that may result from provider dissatisfaction with an intermediary's
determinations concerning provider cost reports," 42 C.F.R. § 421.100(e); and establishing
approved procedures for reconsidering intermediary determinations.  42 C.F.R. § 421.100(f).

[7] <u>See</u> 42 U.S.C. § 1395h(a)(2)(A) (intermediaries are "to serve as a center for, and
communicate to providers, any information or instructions furnished to [them] by the Secretary,
and serve as a channel of communication from providers to the Secretary").

[8] Defendant's Memorandum in Support of His Motion to Dismiss Plaintiffs' First
Amended Complaint.  (Doc. 23).

### 2. Plaintiffs do not understand which intermediaries processed their 1994-1996 cost reports.

A second matter about which plaintiffs are confused is which intermediaries processed the 1994-1996 cost reports at issue here. Plaintiffs do not appear to understand that cost reports for six plaintiff hospitals were handled during this time period by Aetna Insurance Company and United Healthcare. Second Declaration of Warren A. Willis ("Second Willis Dec.") at ¶¶ 2-3 (Def. Ex. 4) (attached to this memorandum). The hospitals do not take issue with the conduct of either of these intermediaries, see Am. Compl. at ¶¶ 24-28, and therefore these plaintiffs have stated no claim with respect to any cost reports processed by them.

The remaining 1994-1996 cost reports were processed by Blue Cross and Blue Shield of Connecticut ("Connecticut Blue Cross") and by Anthem Blue Cross and Blue Shield of Connecticut ("Anthem"). Second Willis Dec. at ¶¶ 2, 4. Intermediary determinations on all relevant cost reports were issued between February 1996 and November 1998. Declaration of George E. Porette ("First Porette Dec.") at ¶ 3(a) (Def. Ex. 1) (attached to this memorandum). The current intermediary for hospitals in Connecticut, Empire, did not begin processing Connecticut cost reports until July 1999, and did not process any cost reports for hospitals in Connecticut for cost-reporting years in 1994 through 1996. Second Porette Dec. at ¶ 3; Second Willis Dec. at ¶ 4. Plaintiffs therefore waste a great deal of their opening memorandum complaining about the putative "misfeasance" of Empire. Pl. Opp. at 2-3, 8, 19-20; see also Declaration of William Mcintyre ("Mcintyre Dec.") at ¶ 2 (Pl. Ex. 2). Empire could not possibly have done anything to have "procured" payment determinations for the 1994-1996 cost-reporting

years, 42 C.F.R. § 405.1885(d), no matter how plaintiffs try to twist the meaning of the word "procure."[9]

### 3.  Plaintiffs do not understand what the New York Opinion says.

A third matter about which plaintiffs are confused is the meaning of the opinion letter issued by CMS's predecessor agency in 1995.  At the outset, plaintiffs cannot seriously believe that the way the Secretary establishes a nationally-uniform Medicare policy is to send a letter to an intermediary in one state, limit his discussion to a particular state tax in that particular state, and assume that the intermediary will see to it that the instructions are passed around to intermediaries in other states where similar issues might arise.  Where the Secretary wishes to establish national policies that have the force of law, he does so by issuing regulations or formal administrative rulings.  Second Porette Dec. at ¶ 7; see, e.g., Heckler v. Ringer, 466 U.S. 602, 608 (1984).  Where he wishes to establish nationally-uniform policies for intermediaries, but leave the question open for re-evaluation during the administrative process, the Secretary issues less formal pronouncements, such as instructions in the Provider Reimbursement Manual.  Id. But he would never announce a policy intended for uniform application in all states by communicating it to only one intermediary in one state.  Certainly, no intelligent intermediary personnel would construe such a letter in that manner.  Second Porette Dec. at ¶ 7.

---

[9] Although Empire, Connecticut Blue Cross and Anthem were all members of the Blue Cross Association, they are separate intermediaries.  Second Porette Dec. at ¶ 4; see also 42 C.F.R. § 421.3 (defining intermediary as "an entity that has a contract with CMS to determine and make Medicare payments").  Plaintiffs' newest theory – that it is "obvious" that Empire committed "fraud or similar fault," within the meaning of 42 C.F.R. § 405.1885(d), because it did not reopen prior payment determinations sua sponte when it assumed intermediary duties in 1999, Pl. Opp. at 19-20 – will be disposed of later in this memorandum.

Not surprisingly, therefore, there is absolutely nothing in the text of the 1995 New York

Opinion wherein the Secretary declares that all "gross receipts taxes are reimbursable, period,"

Pl. Opp. at 19, in the manner imagined by plaintiffs' counsel.  The opinion states, in pertinent

part, as follows:

> In determining whether the tax is allowable for Medicare purposes under the
> current regulation and manual provisions, [CMS] must focus on the <u>impact of the</u>
> <u>tax</u> on services provided by providers, not on the other third parties that may or
> may not share the tax burden.  The application of these criteria to <u>the specific New</u>
> <u>York State tax assessment in question</u>, makes <u>that</u> assessment reimbursable by
> Medicare . . . .  [T]hese costs are allowable under existing regulations and
> authority.  We must therefore reverse our earlier determination and direct <u>you</u> to
> consider <u>this item</u> an allowable cost.

New York Opinion at 1 (emphasis added).  The word "specific" means "having special

application, bearing, or reference;" "specified, precise, or particular;" or "concerned specifically

with the item or specific named."  <u>Random House Webster's Unabridged Dictionary</u> 1832 (2d ed.

2001).  For plaintiffs' counsel to contend that the New York Opinion announced a nationwide

policy, applicable to all states, that "gross-receipts taxes were reimbursable, period," Pl. Opp. at

19, is to pretend that black is white.

### 4.   There is no evidence that Connecticut Blue Cross or Anthem knew the New York Opinion existed.

A fourth problem with plaintiffs' theory of the case is that there is absolutely no evidence

that Connecticut Blue Cross or Anthem "knew" anything at all about the New York Opinion or

reimbursement practices in New York, Pl. Opp. at 7, when they processed any of the 1994-1996

cost reports at issue here.  As was discussed above, the New York Opinion was received by

Empire in July 1995 for its exclusive use in processing cost reports in New York.  Second Porette

Dec. at ¶¶ 5-6.  No rational employee at Empire would have seen any need to inform

intermediaries in other states about the contents of the letter.  <u>Id</u>. at ¶ 6.  And none of the former

intermediary employees who have submitted declarations on plaintiffs' behalf makes any averment to the contrary.  What they do is cleverly dance around the question in hopes of creating a deceptive impression.

In his declaration, for instance, Douglas Payne avers that technical conferences were held at some undisclosed location and that these meetings were attended by representatives from some intermediaries in the Northeast.  Payne Dec. at ¶ 4.  Mr. Payne does not say that any Connecticut intermediaries other than Connecticut Blue Cross (for which he worked) were represented, id. at ¶¶ 2, 4, but it is reasonable to believe that Aetna and United Healthcare were not present.  Second Willis Dec. at ¶ 5.  Mr. Payne vaguely avers that the meetings took place sometime "in or around 1995."  Id. at ¶ 4.  The New York Opinion was received by Empire on July 5, 1995.  On the basis of Mr. Payne's declaration, then, there is no reason to believe the New York Opinion was even written when the meetings are alleged to have occurred.  Read in the light most favorable to defendant, it must be assumed that these meetings occurred before the New York Opinion was written, a time when the New York intermediary had been instructed by the Secretary to disallow gross-receipts taxes.

If the New York Opinion was in existence at the relevant time, however, it is reasonable to conclude that it was not discussed at the putative regional meetings.  Mr. Payne does not mention the New York Opinion one way or the other.  But he does aver that "[e]ach of the intermediaries" in attendance, including the intermediary from New York, "agreed that the Medicare policy was" that tax assessments used to fund "uncompensated care pools" should not be treated as allowable costs."  Id. at ¶ 4.  If an Empire representative had attended the conference, as Mr. Payne apparently avers, and he or she knew of the New York Opinion, the Empire representative presumably would not have been able to join in the consensus.  Nor, if the

-20-

New York Opinion had been known to Mr. Payne, would he have been able to join in the

consensus, either, since he avers that "[i]t was the understanding of the intermediary that the GET

tax functioned in the same manner as the New York Hospital Tax." Id. at ¶ 5.  Assuming that

Mr. Payne is not trying to impugn his own intellectual honesty, the most reasonable inference

that can be drawn from his declaration is that Connecticut Blue Cross and Anthem did not have

any knowledge of the New York Opinion at the very times when plaintiffs' whole theory of

"fraud or similar fault" depends on the opposite circumstance being the case.[10]

    The Declaration of Maureen Joslin does nothing to shore up Mr. Payne's confused and

incomplete account.  Although she avers that she received some "agenda items and

correspondence in 1995 dealing with the issue of GET from a regional meeting of

intermediaries," Joslin Dec. at ¶ 4, she does not say that this material included the New York

Opinion or, indeed, whether these documents were compiled before or after the New York

Opinion was sent to Empire in July 1995.  However, as in the case of Mr. Payne, her statement

that "[t]he consensus was that such assessments and taxes should not be treated as allowable

costs," id., leads to the reasonable inference that the New York Opinion was either not in

---

[10] In passing, defendant also notes that it is not even clear from the Payne Declaration that the subject of gross-receipts taxes was discussed on any level of generality at the putative regional meetings.  Mr. Payne merely avers that "uncompensated care pools" and "taxes" were discussed, id. at 4, and a uniform agreement was reached that "such assessments and taxes should not be treated as allowable costs."  Id.  State uncompensated care pools, however, can be funded by many different kinds of taxes, some of which may be allowable expenses under Medicare and some of which may not be.  Second Porette Dec. at ¶ 8.  Indeed, in this case, the Connecticut uncompensated care pool was funded, in part, by a sales tax that was not reimbursable.  CMS Letter at 1.  It would have been strange, therefore, for intermediaries to have reached any kind of consensus on the Medicare treatment of all pool-related taxes in the manner described by Mr. Payne.  The vagueness of Mr. Payne's declaration alone renders it inadmissible, Fed. R. Evid. 901, and its inconsistencies raise serious doubt about whether Mr. Payne's memory of these eleven-year-old events can be considered even remotely close to reliable.

existence at the time or was not discussed in the agenda summaries that Ms. Joslin avers she received. Otherwise, the author of the putative documents would presumably have accounted for the facial discrepancy between the consensus and the known practices in New York. In any event, Ms. Joslin's failure to produce the documents she claims to have received (or account for their unavailability) renders this testimony inadmissible. See Fed. R. Evid. 901, 1002.

### 5. Plaintiffs do not understand what Connecticut Blue Cross and Anthem did.

In addition to misrepresenting the evidence as to what Connecticut Blue Cross and Anthem knew about the New York Opinion, plaintiffs' counsel create a fifth defect in their "fraud or similar fault" theory because they do not understand what intermediaries actually did in connection with the 1994-1996 cost reports at issue here. In particular, plaintiffs' memorandum is confused about the communication – or, more precisely, the lack of any communication – between the plaintiff hospitals and Connecticut Blue Cross and Anthem that appears in the record. Contrary to plaintiffs' counsel's representation, there is no evidence that these intermediaries "provided" any "information" to plaintiffs at any time, Pl. Opp. at 20, either with respect to the GET tax, New York taxes, gross-receipts taxes, or anything else. None of the three former intermediary employee declarants on whom plaintiffs rely for evidence allege that they or any other intermediary personnel communicated with a single plaintiff hospital about the GET tax, let alone with all twenty-seven of them individually on particular dates.

The averment of an accountant that it was "common knowledge" among "Connecticut Medicare Providers that the GET tax would not be treated as a reimbursable cost," Declaration of Rex A. Shera ("Shera Dec.") at ¶ 3 (Pl. Ex. 1), hardly suffices to fill in this evidentiary gap. First, there is no allegation that this putative "common knowledge" existed when the 1994-1996 cost reports were submitted. Second, there is no allegation that any plaintiff hospital - let alone all

twenty-seven of them – individually shared this knowledge.  Third, there is no allegation that any

of this knowledge was acquired as a result of a statement made by Connecticut Blue Cross or

Anthem.  Fourth, it is impossible to believe that proof of this knowledge would exist on

"providers' cost report materials," id., since plaintiffs did not claim the GET tax in the first place.

Unless the hospital raised the question, there would have been no discernable reason why the

intermediary would bring it up during any subsequent review of the reports.  Fifth, to the extent

that this common knowledge derived from either plaintiffs' "cost report materials" or unspecified

"discussions with reimbursement personnel at the hospitals," id., it is based on writings that have

not been produced, in violation of Fed. R. Evid. 1002, and on inadmissible hearsay.  Fed. R.

Evid. 802.  Finally, Mr. Shera's averments about "common knowledge" are essentially nothing

but rumor dressed up as "fact."  His testimony therefore fails to meet even the basic standard of

personal knowledge necessary for admissibility.  Fed. R. Evid. 602.

There also is no evidence that any intermediary ever "took the position" that the GET tax

"could not be claimed by the hospitals on their cost reports," Pl. Opp. at 9, let alone that there

was any time when submission of a such a claim was "strictly forbidden."  Am. Compl. at ¶ 23.

As a matter of law, hospitals cannot be prevented from submitting disputed claims for

reimbursement.  Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 404-05 (1988).  As a matter of

fact, there were two different places on the cost report where a hospital could have submitted a

disputed claim.  First Willis Dec. at ¶ 4.  It would have been impossible, therefore, for any

intermediary to stop a hospital from claiming the GET tax.

Indeed, when previously confronted with the absurdity of this alleged position, plaintiffs

admitted that, "[a]s a matter of simple mechanics, they could have claimed the GET tax as an

allowable cost" and could have "appealed" any denial to the Provider Reimbursement Review

Board.  Pl. Reply[11] at 23;  see also Pl. Opp. at 5 (conceding that a "provider dissatisfied with its

intermediary's determination" may appeal to the Board).[12]  They cannot be heard to argue with

themselves now.  Indeed, plaintiffs' accountant's bizarre statement that no hospitals were

"allowed to claim GET Tax payments as allowable costs prior to 2002," Shera Dec. at ¶ 8,

conflicts with his own averment that the lone (non-plaintiff) hospital that tried to claim the tax

not only was permitted to submit the claim, id. at ¶ 11;  see also Payne Dec. at ¶ 7, but was

eventually awarded reimbursement during the appeals process (after it amended its appeal).

Shera Dec. at ¶ 12; Am. Compl. at ¶ 27(b).  Obviously, then, hospitals in Connecticut were

allowed to claim the GET tax and were not prevented from filing successful administrative

appeals.  They merely declined to take advantage of those opportunities on the basis of their own

"accepted industry practice."  Shera Letter at 3.

In addition, it is far from clear what plaintiffs' declarants even mean when they aver that

Connecticut and Anthem maintained a "policy" that the GET tax was not considered to be a

reimbursable expense.  Payne Dec. at ¶¶ 5-6; Cambino Dec. at ¶ 2; Joslin Dec. at ¶ 5.  Ms. Joslin

avers that it was the "policy" of intermediaries "to consider the GET tax as a kind of

uncompensated care pool tax and to consider payments made under the tax to be a non-allowable

cost."  Joslin Dec. at ¶ 5.  That statement does not even make sense, however.  The purpose for

---

[11] Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' [Original] Cross Motion for Summary Judgment.  (Doc. 18).

[12] Since Empire had nothing to do with the determinations for the 1994-1996 cost reports at issue here, it makes no difference what Empire employees might or might not have said.  But, in passing, plaintiffs' evidence merely supports the conclusion that one intermediary was told by one Empire employee that the GET tax "should not be included" on cost reports, Macintyre Dec." at ¶ 2, not that it "could not be claimed."  Pl. Opp. at 9.  To offer a friendly opinion as to what should be done is not to issue an edict as to what can be done.

-24-

which the state collected the revenue (to fund uncompensated care) is irrelevant to whether a particular <u>tax assessment</u> is a necessary and proper expense within the meaning of 42 C.F.R. § 413.9(b). For instance, part of the Connecticut uncompensated care pool was funded through a sales tax, which has never been recognized by the Secretary as a reimbursable cost. CMS Letter at 1. Plaintiffs are not able to produce a consistent statement of what they allege to be the intermediary's "policy."

The word "policy" connotes a "definitive course of action adopted for the sake of expediency, facility, etc." <u>Random House Websters</u> at 1496. It does not connote personal understandings. Mr. Payne does not define what he means by the word at all, and Ms. Cambino merely states that it was "my understanding" that "the GET tax was considered to be a non-allowable and non-reimbursable cost." Cambino Dec. at ¶ 2. Ms. Joslin states that her version of the putative policy (which, as was shown above, differs from that of the other declarants) "was my understanding, the understanding of the auditors with whom I worked, and the understanding of the intermediary's management team." Joslin Dec. at ¶ 5. The declaration does not establish why the understandings of other employees are within her personal knowledge, however, and therefore the only statement admissible under Fed. R. Evid. 602 is her own understanding.

Plaintiffs have been unable (or unwilling) to produce any written directive by the intermediary to its employees instructing them to enforce the terms of the putative "policy." Ms. Joslin avers that "I am currently in possession of some limited documentation relative to these policies," <u>id</u>., but fails to produce it, making the testimony inadmissible under the "best evidence" rule. Fed. R. Evid. 1002. In addition, her failure to produce the documentation she avers is in her possession reasonably leads to the inference that it does not support her statements.

-25-

Finally, whatever understanding might be said to have existed in the minds of intermediary personnel with respect to the GET tax, the evidence is undisputed that no such policy was ever enforced against plaintiff hospitals. As was discussed above, "[w]ithin Connecticut, the accepted industry practice for financial statement reporting" was "for the payments and receipts" for the uncompensated-care program "to be reflected as an adjustment from gross patient revenues," Shera Letter at 3, rather than to report the GET tax as an itemized expense. As defendant has previously explained, gross patient revenues were reported on the cost report as an undifferentiated lump sum. Def. Mem. at 9-10 & n.6. Thus, the GET tax not only was not claimed as an expense, it was not reported in any fashion on the cost report. Id. And the one (non-plaintiff) that did claim the tax, Shera Dec. at ¶¶ 11-12, had the claim denied for a reason that "had nothing to do with" the purported policy. Payne Dec. at ¶ 7. An employee understanding that was apparently never committed to paper, whose terms cannot be consistently recalled by plaintiffs' declarants, was never enforced against plaintiff hospitals, and was apparently misunderstood by the only employee who ever tried to apply it in any setting is not something that can fairly be characterized as a "policy."

## ARGUMENT

The foregoing discussion takes plaintiffs' theory of "fraud or similar fault" on a long walk to a short plank. A party moving for summary judgment bears the burden of showing – with "such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e) – that there is "there is no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. 56(c)). In evaluating whether these standards have been met, "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Atlantic

-26-

Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 332 n.2 (1990) (quoting Matsushita Elect.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and United States v. Diebold, Inc.,

369 U.S. 654, 655 (1962)).  To establish that judgment in their favor is required as a matter of

law in this case, plaintiffs must show, among other things, that the Secretary owes them a "clear"

and "nondiscretionary" duty, Ringer, 466 U.S. at 616, to reopen payment determinations for the

1994-1996 cost reports.  This duty must be "so plainly prescribed as to be free from doubt and

equivalent to a positive command."  Consol. Edison Co., 286 F.3d at 605 (quoting Kadrie, 281

U.S. at 218-19).  Plaintiffs' motion for summary judgment does not come close to showing that

the Secretary owes them such a duty on the basis of "fraud or similar fault" allegedly committed

by an intermediary, 42 C.F.R. § 405.1885(d), either as a matter of law or as a matter of fact.

Plaintiffs are left merely casting aspersions on the professional reputations of intermediaries to

cover up their own failure to research Medicare law and/or take appropriate steps to claim the

GET tax.  This is a shameful waste of everyone's time.[13]

## I.  HOSPITALS MAY NOT JUSTIFIABLY RELY ON THE ALLEGEDLY INCORRECT STATEMENTS OF MEDICARE INTERMEDIARIES.

At the outset, plaintiffs' theory of fraud or similar fault suffers from the threshold problem

that what they claim was "procured" through the actions of intermediaries was not an

intermediary's "determination" as to how much reimbursement should be paid under Medicare.

---

[13] Further waste could be avoided, of course, if this Court were to grant defendant's motion to dismiss on Rule 9(b) grounds.  Among the "reasons behind the particularity requirement" in Fed. R. Civ. P. 9(b) are "protecting a defendant from reputational harm and 'strike' suits, and providing defendant sufficient information to respond to plaintiff's claims." Firestone v. Firestone, 76 F.3d 1205, 1211 (D.C. Cir. 1996) (per curiam).  This proposition applies equally to claims of "negligent misrepresentation" (e.g., similar fault).  In re U.S. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d 58, 74 (D.D.C. 2003).  Thus, plaintiffs' failure to even defend against dismissal on grounds of failure to plead fraud or similar fault with particularity is especially instructive here.

42 C.F.R. § 405.1885(d).  The documents they allege were procured from them are apparently their <u>cost reports</u> for the 1994-1996 years.  The reopening regulation, however, does not apply to the procurement of cost reports.  In any event, something cannot be said to be "obtained" by means of fraud or similar fault without some element of "reliance" on the part of the victim that is legally "justified"  <u>Field v. Mans</u>, 516 U.S. 59, 66, 70-71 (1995).  The only decision on which plaintiffs rely to establish justifiable reliance was one whose reasoning was repudiated by the Supreme Court just three months after it was handed down.

In <u>Rochester Methodist Hospital v. Travelers Insurance Co</u>., two hospitals in the same Minnesota town purchased dormitory space from the same junior college as part of the same nursing-education program.  728 F.2d at 1008.  The non-plaintiff hospital received reimbursement for the dormitory expenses.  <u>Id</u>. at 1009.  The plaintiff hospital submitted an identical claim for reimbursement, but it was denied by the fiscal intermediary.  <u>Id</u>. at 1008.  When the hospital contacted the intermediary "to discuss whether further action should be taken," the intermediary replied that "there was no validity to the claim," <u>id</u>. at 1009, and represented that a request for reconsideration "would be futile because it was a closed case."  <u>Id</u>.[14]  "Relying on [the intermediary's] statements," the hospital "did not appeal the disallowance" and "did not claim the dormitory costs in its cost reports for subsequent years."  <u>Id</u>.  The hospital then brought a common-law tort action against the intermediary for misrepresentation.  A divided panel of the Eighth Circuit held that the tort action was valid under state common-law standards.[15]

---

[14] At this time, the only appeal available to hospitals was a hearing before the intermediary.  The current appeal procedure at 42 U.S.C. § 1395oo did not yet exist.  <u>Id</u>. at 1009 n.3.

[15] Unlike the plaintiffs here, it did not bring a mandamus action seeking to compel a reopening of the cost reports.

The majority's decision rested on three legal conclusions.  First, the court acknowledged that an erroneous "opinion" of law proffered by the intermediary would not give rise to a tort claim as a general rule.  Id. at 1017.  However, it reasoned that the defendant intermediary's particular statement – that there was "no validity" to the plaintiff hospital's claim for dormitory-expense reimbursement, id. at 1009 – "impliedly represented that, at least to [the intermediary's] knowledge, such costs were not being reimbursed to any provider."  Id. at 1018.  The court concluded that the intermediary knew this imputed factual representation to be "false" because the intermediary was paying another other hospital for exactly the same expenses under exactly the same contractual arrangement with exactly the same junior college.  Id.  Second, the majority imputed to the intermediary the knowledge that the plaintiff hospital would rely on this imputed misinformation by declining to appeal the denial of its dormitory expenses and declining to claim the expenses in the future.  Id.  Finally, the majority held that the hospital's reliance on the intermediary's constructively false statement was "justifiable," id., and therefore "we see nothing unreasonable" in its "failure to appeal" the adverse payment determination, id., or "to include the dormitory costs in subsequent cost reports."  Id.

The dissenting judge took exception to the majority's conclusion that reliance was justifiable as a matter of law.

> The Hospital's representatives were knowledgeable about [Medicare] reimbursement, and the relationship of the parties was, over this issue at least, adversarial.  [The intermediary's] assertion that the Hospital's position was wrong, standing alone, does not seem to be a justifiable reason for refraining from further action.

Id. at 1019 (Henley, J.).  The dissent took the view that hospitals can be reasonably expected to research Medicare law for themselves, draw their own independent conclusions about what expenses are reimbursable, and know how to make use of the administrative process, if

necessary, to contest a contrary opinion of the intermediary.  Because face-value reliance on the intermediary's position was not reasonable, the dissenting judge stated, there was no justifiable reliance and "[w]ithout justifiable reliance, there is no actionable fraudulent misrepresentation." Id. (citation omitted).

Although the case was not cited in the opinion, the dissent's view was consistent with the Supreme Court's earlier holding in Schweiker v. Hansen, 450 U.S. 785 (1981) (per curiam).  In that case, the plaintiff was a woman who was "erroneously" told during an oral conversation with a field representative of the Social Security Administration that she was not eligible for certain "mother's insurance benefits."  Id. at 786.  Although instructions issued by the Secretary expressly told the field representative to "advise applicants of the advantages of filing written applications and to recommend to applicants who are uncertain about their eligibility that they file written applications," the field representative did not do so.  Id.  In reliance on the field representative's erroneous statement and failure to recommend the filing of a written application, the plaintiff did not did not claim benefits.  Id.  After she subsequently learned that she was eligible, the plaintiff submitted an application and was awarded twelve months of back payments, id., "which was the maximum retroactive benefit allowed" under the Social Security Act.  Id. at 787.  She then brought suit seeking to estop the government "from denying retroactive benefits" for earlier periods during which "she was eligible for benefits but had not filed a written application."  Id. at 786.  The Supreme held that equitable estoppel did not lie against the government in these circumstances because the field representative's erroneous advice about the law did not cause the plaintiff "to take action" which she "could not correct at any time" through her own personal initiative.  Id. at 789.  The mere fact that she was presumably unschooled in the often Byzantine intricacies of Social Security law did not suffice to justify reliance on the

erroneous statements of a federal agent, a proposition that has been repeatedly upheld in numerous other federal contexts. See, e.g. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947) (farmers cannot justifiably rely on false representation of agent selling federal crop insurance). Substitute the words "Medicare" and "reimbursement for GET taxes" for "Social Security" and "mother's insurance benefits" and Hansen is on all fours with this case.

Indeed, in Heckler v. Community Hospital Services of Crawford County, the Supreme Court applied the reasoning in Hansen to a Medicare case decided just three months after Rochester. In denying a claim for equitable estoppel, the Court emphasized that every "participant in the Medicare program" has "a duty to familiarize itself with the legal requirements for cost reimbursement" and to be "acquainted with the nature of and limitations on the role of a fiscal intermediary." 467 U.S. at 64. The Court explained its reasoning as follows:

> Justice Holmes wrote: "Men must turn square corners when they deal with the Government." [quoting Rock Island, A. & L.R. Co. v. United States, 254 U.S. 141, 143 (1920)]. This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.

467 U.S. at 63. Applying those principles specifically to the Medicare context, the Court continued:

> There is simply no requirement that the Government anticipate every problem that may arise in a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of sums of money as substantial as those spent by [the plaintiff hospital]. Nor was the advice given under circumstances that should have induced [the plaintiff's] reliance. As a recipient of public funds well acquainted with the role of a fiscal intermediary, [the plaintiff] knew [the intermediary] only acted as a conduit; it could not resolve policy questions. The relevant statute, regulations, and Reimbursement Manual,

> with which [the plaintiff] should have been and was acquainted, made that perfectly clear.  Yet [the plaintiff] made no attempt to have the question resolved by the Secretary; it was satisfied with the policy judgment of a mere conduit.

Id. at 64-65.  Crawford County, therefore, destroyed the assumption of justifiable reliance on which the majority opinion in Rochester was based (and on which the extension of Rochester urged by plaintiffs here is based).

The Supreme Court went on to point out that "[t]he appropriateness" of reliance in Crawford County was "further undermined," where, as here, "the advice" allegedly received from the intermediary "was oral."  Id. at 65.

> It is not merely the possibility of fraud that undermines our confidence in the reliability of official action that is not confirmed or evidenced by a written instrument.  Written advice, like a written judicial opinion, requires its author to reflect about the nature of the advice that is given to the citizen, and subjects that advice to the possibility of review, criticism, and reexamination.  The necessity for ensuring that governmental agents stay within the lawful scope of their authority, and that those who seek public funds act with scrupulous exactitude, argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advice that underlay respondent's cost reports. That is especially true when a complex program such as Medicare is involved, in which the need for written records is manifest.

> In sum, the regulations governing the cost reimbursement provisions of Medicare should and did put respondent on ample notice of the care with which its cost reports must be prepared, and the care which would be taken to review them within the relevant 3-year period.  Yet respondent prepared those reports on the basis of an oral policy judgment by an official who, it should have known, was not in the business of making policy.

Id. at 65-66 (footnotes omitted).  "That is not the kind of reasonable reliance that would even give rise to an estoppel against a private party," the Court concluded, and "therefore cannot estop the Government."  Id. at 66; see also Monongahela Valley Hosp., Inc. v. Sullivan, 945 F.2d 576, 589 (3d Cir. 1991) (hospital could not have "reasonably relied" on intermediary statements "[b]ecause a fiscal intermediary can neither definitively interpret regulations nor make policy

-32-

pronouncements"); S. Ind. Rehab. Hosp. v. Thompson, 2004 WL 784351 at *7 (S.D. Ind. Mar.

23, 2004) (reliance on "oral communications" of intermediary is not "justified") (citation

omitted).

In OPM v. Richmond, the Supreme Court subsequently applied the reasoning of Hansen

and Crawford County to conclude that a "claimant seeking public funds" in contravention of

federal law can never invoke equitable estoppel.  496 U.S. at 434.  The Court placed particular

emphasis on the perverse effect of any rule of law under which the federal government was

expected to "secure perfect performance from the hundreds of thousands of employees scattered

throughout the continent."  Id. at 433 (quoting Hansen v. Harris, 639 F.2d 942, 954 (2d Cir.

1980) (Friendly, J., dissenting), rev'd, 450 U.S. 783 (1981)).

> The natural consequence of a rule that made the Government liable for the
> statements of its agents would be a decision to cut back and impose strict controls
> upon Government provision of information in order to limit liability.  Not only
> would valuable informational programs be lost to the public, but the greatest
> impact of this loss would fall on those of limited means, who can least afford the
> alternative of private advice.  See Braunstein, In Defense of a Traditional
> Immunity--Toward an Economic Rationale for Not Estopping the Government, 14
> Rutgers L.J. 1 (1982).  The inevitable fact of occasional individual hardship
> cannot undermine the interest of the citizenry as a whole in the ready availability
> of Government information.  The rationale of the Appropriations Clause is that if
> individual hardships are to be remedied by payment of Government funds, it must
> be at the instance of Congress.

Id. at 433-34.  The Supreme Court's warning is all the more on point here, in light of the fact that

plaintiffs themselves contend that the reopening standards they urge this Court to create would

apply by analogy to the reopening of claims by individual Social Security and Medicare

claimants.  See Pl. Opp. at 17-18.  It would be perverse indeed to indirectly jeopardize the

interests of ordinary individuals, who struggle every day to understand the complexities of Social

Security and Medicare, merely to enrich sophisticated hospitals, which, though backed by their

own armies of lawyers and accountants, failed to claim arguably allowable expenses for six years.

The decisions in <u>Hansen</u>, <u>Crawford County</u> and <u>Richmond</u> make short work of any contention that plaintiffs could have reasonably relied on the opinion of Connecticut intermediaries that the GET tax was not covered by Medicare (assuming, arguendo, any such statement was ever even made). The hospitals here were obliged to do what the plaintiffs in <u>Hansen</u>, <u>Crawford County</u> and <u>Richmond</u> were obliged to do: research the law and raise the issue themselves (as, for instance, their more diligent sister hospitals in New York did in 1995). Plaintiffs cannot be heard, as a matter of law, to claim that their cost reports were "procured" by anyone but their own selves.

## II. PLAINTIFFS HAVE SUBMITTED NO EVIDENCE THAT THEY RELIED ON ANY STATEMENT OR OMISSION OF AN INTERMEDIARY.

Because reliance on alleged intermediary misstatements cannot be justifiable as a matter of law, it is not necessary to address whether plaintiffs have established reliance as a matter of fact. But plaintiffs' evidence fails in this regard as well. Twenty-six of the twenty-seven plaintiff hospitals have submitted no declaration at all, and no one else can aver reliance on their behalf. The twenty-seventh hospital has merely submitted a two-paragraph declaration averring that it was told of a subsequent intermediary's opinion about the GET tax long after the relevant 1994-1996 cost reports had been submitted and processed. Macintyre Dec. at ¶¶ 1-2. There is no factual basis, therefore, for the assertion of plaintiffs' counsel that any plaintiff hospital – let alone all twenty-seven of them – failed to submit a claim for the GET tax "because of the government's position." Pl. Opp. at 13. In fact, there is no evidence that a single plaintiff hospital <u>relied</u> on anything an intermediary ever said about the GET tax or, for that matter,

-34-

anything an intermediary said about anything at all.  Plaintiffs' counsel merely theorizes that such reliance <u>might have</u> happened, if allegedly offending statements about Medicare law had been made and the managements of the plaintiff hospitals were particularly cavalier about meeting their own fiduciary obligations to check them out for themselves.[16]

### III. PLAINTIFFS HAVE SUBMITTED NO EVIDENCE SHOWING THAT ANY INTERMEDIARY MADE ANY FACTUAL STATEMENT ABOUT THE GET TAX THAT COULD HAVE AFFECTED THE 1994-1996 COST REPORTS.

Because neither reliance nor justifiable reliance has been established, it is not necessary to consider whether an intermediary made (a) a statement (b) of "material fact" (d) to each and every one of the plaintiff hospitals that (d) was untrue and (e) was used to determine rights in the claims process.  <u>Field</u>, 516 U.S. at 66, 70-71; <u>Sotiriades v. Mathews</u>, 546 F.2d 1018, 1020 (1976).  However, twenty-six of the twenty-seven hospitals do not even aver that a statement about the GET tax was made to them at all by anyone.  There is certainly no evidence that any intermediary "misrepresented to [plaintiff] hospitals that the GET tax was a non-allowable cost." Pl. Opp. at 18.  These plaintiffs identify no specific communications at all.  Indeed, it is hard to imagine the intermediary bringing up the treatment of the GET tax during an audit (or other review), since it is undisputed that the tax was neither claimed nor reported on any relevant cost report.  The mere speculation proffered by plaintiffs' counsel is not even plausible speculation.

As was discussed above, plaintiffs do not deny that the only hospital that purports to have had a conversation with an intermediary about the GET tax admits that the communication

---

[16] Plaintiffs cannot solve this problem merely by having an accountant aver that there was some "common knowledge" among Connecticut hospitals that "the GET tax would not be treated as reimbursable as a matter of policy."  Shera Dec. at ¶ 3.  For the reasons stated earlier, this statement is not even admissible.  At this juncture, however, it is enough to point out that knowledge and reliance are hardly the same things.  Defendant knows what plaintiffs' positions in this case are, but he certainly does not rely on them.

occurred only with Empire and only long after the relevant 1994-1996 cost reports had been submitted and final determinations had been issued by predecessor intermediaries.  Furthermore the allegedly offending statement – that "Empire did not consider the GET tax to be an allowable cost," Macintyre Dec. at ¶ 2 – is not even untrue.  According to plaintiffs, Empire did not consider the GET tax to be an allowable cost at the time of conversation.  Cambino Dec. at ¶ 2. Nor was Empire reimbursing any other hospitals in Connecticut for the GET tax.

Plaintiffs' reliance on the analysis in Rochester is therefore entirely misplaced, even assuming, arguendo, there is any post-Crawford County setting where the decision could still be argued to be apposite.  In Rochester, the majority opinion did construe an ostensibly legal opinion that an expense was not allowable as an implied factual misstatement that no other similarly-situated hospital was being reimbursed, but only because exactly same intermediary was making exactly the same reimbursement to another hospital for exactly the same expenses in exactly the same town under exactly the same contractual arrangement with the same junior college.  728 F.2d at 1018.  It is not necessary to argue with this problematic reasoning (although one certainly could do so successfully) to conclude that the same sui generis assumptions cannot be made where entirely different hospitals in entirely different states are being reimbursed for an entirely different state tax.

It would be hard for any reasonable hospital administrator to construe the legal opinion that "we do not consider the GET tax to be an allowable cost" as being tantamount to a factual representation that "we are not making reimbursements to hospitals in New York for a New York state tax on gross receipts."  Certainly, Mr. Macintyre does not say that he came away from the conversation with Empire with this impression.  The most that plaintiffs allege is that Empire's post-1999 treatment of the GET tax and its pre-1999 treatment of the New York tax rested on

-36-

logically inconsistent legal interpretations of different state taxing schemes.  But legal opinions

are not facts, <u>Lincoln Gen. Hosp. v. Shalala</u>, No. 4:98CV3118, mem. op. at 12 (D. Neb. July 13,

2000) (Def. Ex. 5) (attached to this memorandum), and it is perfectly permissible for the

Secretary to reserve any arguable inconsistencies in an intermediary's treatment of different state

taxes for resolution through the "elaborate adjudicative structure" in 42 U.S.C. § 1395oo.

<u>Guernsey</u>, 514 U.S. at 96.

## IV.  EMPIRE DID NOT OWE PLAINTIFFS ANY DUTY TO REOPEN 1994-1996 COST REPORTS WHEN IT ASSUMED DUTIES IN CONNECTICUT IN 1999.

Plaintiffs' newest contention – that it is "obvious" that Empire committed some kind of

fraud-like act by not reopening payment determinations for the 1994-1996 cost-reporting years

when it assumed intermediary duties in Connecticut in 1999, Pl. Opp.at 19-20 – is not only

obviously frivolous, but positively scandalous.  First, decisions not to reopen under 42 C.F.R.

§ 405.1885(a) are committed by law to the intermediary's unreviewable discretion.  <u>Your Home</u>

<u>Visiting Nurse Servs., Inc. v. Shalala</u>, 525 U.S. 449, 454 (1999).  Second, plaintiffs themselves

aver that reopening requests can be and "routinely" are denied where the hospital failed to claim

an allowable expense.  Pl. Opp. at 13.  Third, an intermediary's decision not to reopen is not a

"determination," <u>Your Home</u>, 525 U.S. at 453-54, and therefore is not one of the actions even

potentially subject to 42 C.F.R. § 405.1885(d).  Finally, as was discussed earlier, reliance on the

alleged Empire conversation is not alleged in plaintiffs' complaint, and, even if it were, justifiable

reliance is precluded as a matter of law.  Certainly, Mr. Macintyre cannot be heard to imply that

he was deterred from asking for a reopening by anything Empire said, when just a short time

later, plaintiffs asked for and got a reopening in August 2001.  Nothing had changed between

1999 and 2001 to influence the conduct of Mr. Macintyre, other than perhaps his own level of interest in the GET tax question.

## V. CONNECTICUT BLUE CROSS AND ANTHEM WERE NOT REQUIRED TO ADVISE PLAINTIFFS ABOUT EITHER THE GET TAX OR NEW YORK TAXES.

There is equally little merit in what appears to be plaintiffs' primary contention – that Connecticut Blue Cross and Anthem should have advised plaintiffs that the GET tax was reimbursable because they should have known that New York hospitals were being reimbursed for a New York tax, Pl. Opp. at 17-19, when 1994-1996 cost reports were being processed.  For the reasons stated earlier, the theory is defective at the outset because reliance has not been alleged and justifiable reliance cannot be shown.  In addition, the proposition that the Connecticut GET tax and the New York gross-receipts tax are "functionally equivalent" for purposes of Medicare law is obviously not a statement of fact.  Id. at 24.  It is an opinion of law. Furthermore, it is not an opinion of law with which defendant agrees.  While the two taxes may be "similar," Def. Ex. A at 2 (attached to defendant's motion to dismiss plaintiffs' original complaint), they are certainly not identical.  Second Porette Dec. at ¶¶ 7-8.

In any event, fraudulent or negligent concealment requires, at a minimum, some duty to disclose the concealed information.  Chiarella v. United States, 445 U.S. 222, 228 (1980).  As was discussed earlier, the notion that intermediaries have any legal duty to educate hospitals about Medicare law (let alone about how Medicare law is being applied in other states) is incompatible with the propositions that "[t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare," Crawford County, 467 U.S. at 64, and no duty to "address" in advance "every conceivable question in the process of determining equitable reimbursement."  Guernsey, 514

U.S. at 96. Even the discredited decision on which plaintiffs rely refuses to go so far as to impose on intermediaries a common-law duty to answer questions that were not asked by hospitals. Rochester, 786 F.2d at 1018 (discussing Minnesota common-law standard that there is no concealment in the absence of a duty to speak). Thus, even if Connecticut Blue Cross and Anthem (a) "maintained the position" that the GET tax was not reimbursable in 1994-1996, (b) "knew" at the time that arguably similar taxes in New York were being treated differently, and (c) "omitted this fact from their discussions with the hospitals during the audit adjustment process," Pl. Opp. at 18, these facts could not amount to fraudulent or negligent concealment as a matter of law.

In point of fact, however, there is no evidence that a single one of these alleged circumstances existed. As was discussed above, there is no evidence that Connecticut Blue Cross or Anthem knew about the New York Opinion. There is no evidence that the New York Opinion was even in existence when plaintiffs' counsel theorize it might have been discussed at regional conferences "in or around 1995," Payne Dec. at ¶ 4, and, as was shown above, the most reasonable inference is that it was not. Nor is there any evidence that the intermediaries either mentioned or did not mention the New York Opinion during any auditing-related conversations with plaintiffs. Indeed, there is no evidence that any auditing-related conversations between the hospitals and the two relevant intermediaries even occurred at all.

What plaintiffs characterize as the "policy" of the intermediaries appears to be nothing more substantial than the undocumented personal recollections of former employees about what they and (allegedly) their co-workers thought. The only documented evidence is that one (non-plaintiff) hospital claimed the GET tax, and the claim was denied by the intermediary for reasons unrelated to the putative policy. Payne Dec. at ¶ 7. The undisputed evidence, therefore, is that

there was no intermediary policy which was committed to a written instruction amenable to

uniform enforcement; that no policy denying reimbursement for the GET tax was ever enforced

against plaintiff hospitals; and that no such policy was enforced in a uniform and consistent

manner against any hospital.

Finally, there is also absolutely no evidence that supports plaintiffs' ludicrous contention

that the plaintiff hospitals were not "allowed to claim GET Tax payments as allowable costs prior

to 2002." Shera Dec. at ¶ 8. When plaintiffs tried to dress up this canard as fact during the first

briefing of dispositive motions in this case, defendant pointed out that, as a matter of law,

intermediaries cannot lawfully prevent hospitals from raising a disputed claim for reimbursement

on their cost reports, Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 404-05 (1988), and, as a

matter of fact, there were two different places on the cost report where a hospital could submit a

disputed claim for reimbursement. First Willis Dec. at ¶ 4. Backed into a corner, plaintiffs

admitted that, "[a]s a matter of simple mechanics," each hospital "could have claimed the GET

tax as an allowable cost and later filed an appeal," Pl. Reply at 23, if those claims were denied by

the fiscal intermediary. That plaintiffs' counsel has not only re-submitted this self-discredited

testimony but tried to rely on it for the very proposition they previously admitted was false, Pl.

Opp. at 13, raises troubling ethical questions.

## CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment should be denied.[17]

|  | Respectfully submitted, |
|---|---|
| OF COUNSEL:<br>ALEX M. AZAR II<br>General Counsel | PETER D. KEISLER<br>Assistant Attorney General |
| ROBERT P. JAYE<br>Acting Associate General Counsel | KENNETH L. WAINSTEIN<br>United States Attorney |
| MARK D. POLSTON<br>Acting Deputy Associate<br>General Counsel for Litigation | SHEILA M. LIEBER<br>PETER ROBBINS<br>Department of Justice |
| LAWRENCE M. MEISTER<br>Attorney<br>Department of Health<br>and Human Services | 20 Massachusetts Avenue, N.W., Room 7142<br>Washington, D.C.  20530<br>Tel:  (202) 514-3953<br>Attorneys for Defendant |

---

[17] In the alternative, this Court should deny summary judgment without prejudice until after defendant has had "adequate time for discovery." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990); see also Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 568 n.15 (1987); Anderson, 477 U.S. at 250 n.5; Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1041 (D.C. Cir. 2003); Info. Handling Servs., Inc. v. Def. Automated Printing Servs., 338 F.3d 1024, 1032 (D.C. Cir. 2003).  Defendant's specific discovery needs are set forth in the declaration of defendant's counsel attached to this memorandum as Exhibit 6.