IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIRVIEW HOSPITAL, et al.,      )
                                    )
        Plaintiffs,         )
                                    )
        v.                )     Civ. Action No. 1:05cv01065 (RWR)
                                    )
MICHAEL O. LEAVITT,         )
                                    )
        Defendant.      )
_____)

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND REPLY IN SUPPORT OF HIS MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

OF COUNSEL:
PAULA M. STANNARD
Acting General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel

ROBERT BALDERSTON
Attorney
Department of Health
and Human Services

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C.  20530
Tel:  (202) 514-3953

Attorneys for Defendant

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   I.  MANDAMUS RELIEF SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE
       NOT EXHAUSTED OTHER AVENUES OF RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.  Plaintiffs Could Have Submitted Claims for the UCP Tax with Their
           Cost Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       B.  A Timely Claim for UCP-Tax Reimbursement Would Not Necessarily Have
           Been Denied by Mutual of Omaha or Associated . . . . . . . . . . . . . . . . . . . . . . . 11

       C.  Plaintiffs Did Not Exhaust Available Appeal Rights Afforded by Statute . . . . . 13

       D.  Plaintiffs Did Not Exhaust Available Regulatory Remedies . . . . . . . . . . . . . . . 16

   II.  PLAINTIFFS HAVE NOT ESTABLISHED ANY RIGHT TO A REOPENING
        UNDER MEDICARE STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   III. INTERMEDIARY DETERMINATIONS ARE NOT SUBJECT TO REOPENING
        ON THE BASIS OF COMPLAINTS ABOUT AN INTERMEDIARY'S OFFICIAL
        CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       A.  An Intermediary Is Not a "Party" to Its Own Payment Determinations . . . . . . . . 19

       B.  Payment Determinations Are Not "Procured" by Intermediaries from
           Themselves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       C.  Fraud or Similar Fault Had Not Been "Established" Prior to Plaintiffs' Lawsuit  22

   IV.  PLAINTIFFS HAVE NOT ESTABLISHED THAT ANY PAYMENT
        DETERMINATION WAS PROCURED BY FRAUD OR SIMILAR FAULT
        ON THE PART OF ANY INTERMEDIARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       A.  Plaintiffs Have Not Shown that Any Intermediary Ever Told Them the
           UCP Tax Was Not Reimbursable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.  Intermediaries Were Under No Legal Obligation to Tell Plaintiffs, Without Being Asked, that the UCP Tax Was Reimbursable . . . . . . . . . . . . . . 24

C.  The Proper Treatment of the UCP Tax is an Opinion of Law, not a Statement of Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D.  Plaintiffs Have Not Shown Reliance As a Matter of Fact . . . . . . . . . . . . . . . . . 26

E.  Plaintiffs Cannot Establish Justifiable Reliance As a Matter of Law . . . . . . . . 26

F.  Plaintiffs' Reliance on Rochester Methodist Hospital v. Travelers Insurance Co. Is Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

G.  Plaintiffs Have Not Pled Fraud or Similar Fault with Particularity . . . . . . . . . . 33

V.  THE EQUITIES DO NOT FAVOR MANDAMUS RELIEF . . . . . . . . . . . . . . . . . . . . . 35

VI.  PLAINTIFFS HAVE NOT IDENTIFIED ANY GENUINE ISSUE OF MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## INTRODUCTION

As defendant explained in his opening memorandum, the Medicare program has a
detailed administrative procedure through which hospitals can claim reimbursement for operating
costs.  This procedure places the burden squarely on the hospitals to report the expenses they
believe are allowable and, if necessary, pursue any disputed issues in a timely fashion through a
multi-stage process of administrative and judicial review.  42 U.S.C. § 1395oo.  Contrary to the
view urged by plaintiffs here, the fiscal intermediaries which process hospital cost reports on
behalf of the Secretary of Health and Human Services are not required to "anticipate every
problem that may arise in the administration of a complex program such as Medicare," Heckler v.
Cmty. Health Servs. of Crawford County, 467 U.S. 51, 64 (1984), and they certainly are under no
legal obligation to furnish hospitals with unrequested advisory opinions "that, either by default
rule or by specification, address every conceivable question in the process of determining
equitable reimbursement."  Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995).  Hospitals
that reap the benefits of the Medicare program cannot shirk their responsibility to carefully
research the applicable law for themselves and seek resolution of disputed questions promptly
through the administrative process created for this purpose by Congress.  Whatever "obligation"
intermediaries may have "to deal in good faith" with hospitals, Pl. Mem.[1] at 15, it does not
include a legal responsibility to give unsolicited advice about which arguably reimbursable
expense items a hospital might have left off its cost report for a particular year.  The hospital
must do its own homework before it submits the cost report.

---

[1] Plaintiffs' Memorandum in Support of Their Opposition to Defendant's Motion to
Dismiss or, in the Alternative, for Summary Judgment and Plaintiffs' Cross-Motion for Summary
Judgment.

It is equally well settled that hospitals which fail to take advantage of available avenues of administrative relief have no right to come into federal court years later and complain that they were underpaid.  Shalala v. Illinois Council on Long-Term Care, Inc., 529 U.S. 1, 5-25 (2000); Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 456-57 (1999).  The mandamus statute, in particular, is not available for this purpose.  Heckler v. Ringer, 466 U.S. 602, 616-21 (1984).  As the Supreme Court has made clear, a program that processes hundreds of billions of dollars in claims every year could not possibly function if final payment determinations were "indefinitely" subject to reopening, Your Home, 525 U.S. at 454, merely because a hospital neglected to claim an arguably allowable expense.  Yet that is the right that plaintiffs demand here.  Their claims are utterly without merit, and defendant is entitled to judgment as a matter of law.

## STANDARD OF REVIEW

This case is before the Court on the parties' cross-motions for summary judgment and defendant's motion, in the alternative, to dismiss.  To support their motion for summary judgment, plaintiffs (who bear the burden of proof at trial) must come forward with a quantum of undisputed evidence sufficient to permit a reasonable trier of fact to rule in their favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  To oppose defendant's motion for summary judgment, plaintiffs may not rest on the "mere allegations" in their complaint, but must come forward with "specific facts" supported by evidence.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).  Defendant, on the other hand, is not required to submit any evidence to "negate" plaintiffs' claims.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (plurality)) (emphasis in

Nat'l Wildlife).  It is enough for defendant to point to an absence of sufficient evidence in the record to support plaintiffs' claims.  Id.

The application of these standards to this case is simplified by the fact that plaintiffs have submitted no evidence whatsoever, either in support of their motion or in opposition to defendant's motion.  Nor do they dispute the factual accuracy of any of defendant's evidence. The record evidence submitted by defendant is therefore complete and uncontested.  The question before this Court is simply which side is entitled to judgment on the basis of the undisputed record.[2]

## STATEMENT OF THE CASE

The facts in the record are simple.  Plaintiffs are three Massachusetts hospitals, which since 1985 have been required to pay a certain state tax on private charges to finance an

---

[2] The only question really left for resolution on defendant's alternative motion to dismiss is his argument that plaintiffs have failed to plead fraud or similar fault with the particularity demanded by Fed. R. Civ. P. 9(b).  The motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) is now subsumed in the cross-motions for summary judgment.  Plaintiffs' reliance on motion-to-dismiss standards in support of their cross-motion for summary judgment, Pl. Mem. at 3 n.4, is therefore misplaced.  In any event, however, mandamus is a jurisdictional issue even where the analysis merges with the merits, Wash. Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 901-02 (D.C. Cir. 1996), and it is well settled that this Court may consider "such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001) (citations omitted); see, e.g., Land v. Dollar, 330 U.S. 731, 735 n.4 (1947); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 625 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Flynn v. Veazey Constr. Corp., 310 F. Supp. 2d 186, 190 (D.D.C. 2004); United States ex rel. Rockefeller v. Westinghouse Elec. Co., 274 F. Supp. 2d 10, 14 (D.D.C. 2003), aff'd mem., 2004 WL 180264 (D.C. Cir. Jan. 21, 2004), cert. denied, 125 S. Ct. 60 (2004); Marsh v. Johnson, 263 F. Supp. 2d 49, 54 (D.D.C. 2003); United States ex rel. Ervin & Assocs. v. Hamilton Sec. Group, Inc., 332 F. Supp. 2d 1, 5 (D.D.C. 2003).  The standard for deciding defendant's motion to dismiss under Rule 12(b)(1) is therefore similar, as a practical matter, to the standard for deciding his motion for summary judgment.

uncompensated care pool ("UCP"). Def. Mem.[3] at 8. There is no evidence in the record that any of the hospitals claimed the UCP tax as a reimbursable expense on their annual Medicare cost reports. Id. Nor was any such claim ever denied by a fiscal intermediary. Nor was any claim for UCP-tax reimbursement pursued through the statutory appeals process. Id. Nor is there any evidence any plaintiff hospital was ever led to believe that the tax was not an allowable cost, at least not by any statement made by an intermediary.

Contrary to plaintiffs' view, the record contains no evidence that any intermediary ever made "representations" to any plaintiff hospital that the UCP tax "was not an allowable cost for purposes of Medicare reimbursement." Pl. Mem. at 1. The record evidence shows exactly the opposite: every time an intermediary communicated with a plaintiff hospital about the UCP tax, the hospital was informed that the tax <u>was</u> reimbursable. Plaintiffs apparently failed to claim the tax for certain cost-reporting years because the hospitals themselves concluded <u>on their own</u> that the tax was not an allowable cost. <u>See</u> Letter of Darlene Rodowicz dated August 28, 2002 ("Rodowicz Letter") at 1 (Def. Ex. A at 4) (attached to Def. Mem.); Letter of Robert Baroutas dated November 19, 2002 ("Baroutas Letter") at 1 (Def. Ex. B at 5). The gravamen of plaintiffs' complaint appears to be that their respective intermediaries were negligent in not setting the hospitals straight about the UCP tax sooner than they did.

The fiscal intermediary that processed the cost reports submitted by plaintiff Fairview Hospital ("Fairview") was Mutual of Omaha Insurance Company ("Mutual of Omaha"). The complained-of conduct of Mutual of Omaha is as follows: In 2000, a non-plaintiff hospital submitted a request, pursuant to 42 C.F.R. § 405.1885(a), asking the intermediary to reopen

---

[3] Defendant's Memorandum in Support of His Motion to Dismiss or, in the Alternative, for Summary Judgment.

certain cost-reporting periods and award reimbursement for the UCP tax (which the hospital had apparently neglected to claim on its original cost report). Letter of Tina Kilpatrick dated October 17, 2000 ("Kilpatrick Letter") at 1 (Def. Ex. B at 52). Mutual of Omaha granted the request, apparently without consulting the Centers for Medicare & Medicaid Services ("CMS") for guidance. Id.

Two years later, Fairview submitted a similar reopening request, seeking to correct its own failure to claim the UCP tax on its cost reports for certain years. Rodowicz Letter at 1. Fairview explained that it "had been under the impression" that the UCP tax "was not allowable cost that could be included on Worksheet A of our Medicare cost report." Id. Fairview did not contend that it had acquired that impression from Mutual of Omaha, however. And, even if it did acquire that impression from Mutual of Omaha and neglected to mention it, Fairview's letter did not explain why this knowledge would have prevented it from submitting a claim for reimbursement on the portion of the cost report expressly reserved for disputed claims. See Provider Reimbursement Manual ("PRM") §§ 115-115.1; see also Declaration of Vincent Guarino ("Guarino Dec.") at ¶ 5 (Def. Ex. B at 1). Unlike plaintiffs' opening memorandum, Fairview's letter to Mutual of Omaha did not make any excuses for not claiming the UCP tax as an allowable cost. Rather, the hospital forthrightly took sole and unqualified responsibility for its own mistake and asked the intermediary to exercise its discretionary authority (under 42 C.F.R. § 405.1885(a)) to correct it. Mutual of Omaha granted the request one month after it was received, again without apparent consultation with CMS. Letters of Jeffrey Grabowski at 1 ("Grabowski Letters") (Def. Ex. A at 48-50).

Plaintiffs' misunderstandings about the conduct of Mutual of Omaha are legion. Contrary to their view, there is no evidence in the record that Mutual of Omaha ever took a position that

the UCP tax "was not an allowable cost," Pl. Mem. at 1, let alone made any "representations" to

that effect to Fairview in particular.  Id.  Nor is there any evidence that Mutual of Omaha ever

"allow[ed] selected Massachusetts hospitals to claim the UCP Tax on their cost reports," id.,

while denying that opportunity to others.  Nor is there any evidence that Mutual of Omaha ever

"change[d] its policy" with respect to the tax.  Id.  Nor is there any evidence that Mutual of

Omaha had "to admit" that any prior payment "policy" that it had adopted was "inconsistent with

applicable law."  Id.  Nor is there any evidence that Mutual of Omaha was "admitting" any "past

error" on its part when it granted the hospital's reopening request.  Pl. Mem. at 6 n.11.  When

Mutual of Omaha granted Fairview's reopening request, it was exercising its discretionary

authority under 42 C.F.R. § 405.1885(a) to reopen certain payment determinations,

notwithstanding Fairview's admitted error in not claiming the UCP tax in a timely fashion.

Mutual of Omaha made no admission of error on its own part.

  With respect to Fairview's interaction with Mutual of Omaha, the record evidence is

therefore very simple.  Every time Fairview made some timely effort to claim the UCP tax,

Mutual of Omaha allowed reimbursement, even when the request was made years after the fact in

the form of a request for permissive reopening.  Every time Fairview made no effort of any kind

to claim the UCP tax, Fairview did not receive reimbursement.  (Indeed, it is hard to see how

Fairview could have been reimbursed for tax assessments whose amount had not been reported to

the intermediary).  This is the straightforward course of dealing that Fairview now attempts to

depict as a form of negligent misfeasance through which Mutual of Omaha cheated the hospital

out of its rightful reimbursement for the UCP tax.

  The record evidence with respect to the other intermediary in the case, Associated

Hospital Services ("Associated") is similar, but not identical.  Associated processed the claims

submitted by two plaintiffs, Tufts-New England Medical Center ("Tufts") and Mount Auburn

Hospital ("Mount Auburn").[4]  In 2002, Associated received letters from numerous (non-plaintiff)

hospitals in Massachusetts asking it to reopen payment determinations in a manner similar to the

reopening request received by Mutual of Omaha from Fairview.  Baroutas Letter at 1.

Associated asked CMS for guidance, id., and CMS replied that the UCP tax "can be recognized

as an allowable cost."  Memorandum of Robert Baroutas dated March 18, 2003 ("Baroutas

Memo") at 1 (Ex. A attached to complaint).  The intermediary then notified the hospitals whose

cost reports it processes that pending administrative appeals and pending cost reports on which

no determination had yet been issued could be amended to include a claim for the UCP tax.  Id.

It further advised hospitals that reopening requests demonstrating payment of the UCP tax that

were submitted within the three-year window authorized by 42 C.F.R. § 405.1885(a) would be

granted.  Id.  Pursuant to this guidance, Tufts and Mount Auburn succeeded in obtaining

reimbursement for the UCP tax for numerous cost-reporting years in which they did not claim the

tax on their cost reports as submitted.  Def. Mem. at 9-10.[5]

_____

    [4] Throughout their opening memorandum, plaintiffs adopt a curious convention of
"collectively" referring to the two intermediaries that processed their claims as "the
'Intermediary.'"  Pl. Mem. at 1.  Mutual of Omaha and Associated are separate corporate entities
that have separate contracts with the Secretary to perform the function of fiscal intermediaries.
See 42 U.S.C. § 1395h.  They cannot be referred to "collectively" as "the Intermediary" without
creating distortion, any more than the three plaintiff-providers can be collectively referred to as
"the Hospital."

    [5] Although plaintiffs originally claimed that they were entitled to double reimbursement
for these years, they have since admitted that the claims were erroneous, Pl. Mem. at 2 n.2, and
amended their complaint to withdraw them.  Contrary to plaintiffs' view, id. at 4, there is no
evidence that CMS ordered a reopening, pursuant to 42 C.F.R. § 405.1885(b).  Associated
merely issued guidance to hospitals concerning the actions it would take in response to, among
other things, a timely request for permissive reopening under 42 C.F.R. § 405.1885(a).

In its letter asking CMS for guidance, Associated stated that "we had never considered the UCP as being allowable under the Medicare Program." Baroutas Letter at 1. However, there is no evidence in the record that Associated ever communicated that view to Tufts or Mount Auburn. On the contrary, the record indicates that there was no occasion to make any such communication because, "[h]istorically, providers had not claimed the UCP assessments as an allowable cost on their cost reports," id., and neither Tufts nor Mount Auburn has submitted any evidence showing that either hospital ever claimed the tax prior to 2002. Needless to say, there is no evidence that Associated ever denied a claim for reimbursement made by either hospital. There is no evidence that Associated ever did anything more than hold an opinion.

The record evidence with respect to the conduct of Associated is therefore very similar to the evidence with respect to Mutual of Omaha. Each intermediary made UCP-tax reimbursement to every hospital that made a timely effort to claim it in some fashion. Neither intermediary denied a timely request for UCP-tax reimbursement. The only cost-reporting years for which any plaintiff hospital failed to receive reimbursement for the UCP tax were those years for which no timely effort to secure it was made. There is no evidence that either intermediary ever told any plaintiff hospital that the tax was not an allowable cost. The evidence is that the one time Fairview raised the question, it was told that the tax was reimbursable. This is the course of conduct that plaintiffs contend was fault-worthy to a point similar to fraud.

## ARGUMENT

As defendant explained in his opening memorandum, mandamus relief is available under 28 U.S.C. § 1361 only if plaintiffs can show that they have "exhausted all other avenues of relief" and that the Secretary owes them a "clear nondiscretionary duty" to reopen. Ringer, 466 U.S. at 616. In addition, plaintiffs must show that there is a "compelling" equitable reason, Thirteenth

<u>Reg'l Corp. v. Dep't of Interior</u>, 654 F.2d 758, 763 (D.C. Cir. 1980), why they should be entitled

to the extraordinary remedy of mandamus to solve the problem they created for themselves when

they failed to claim reimbursement for the UCP tax and failed to exhaust available avenues of

administrative and judicial review.  They have not met these tests here.

## I.  MANDAMUS RELIEF SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE NOT EXHAUSTED OTHER AVENUES OF RELIEF.

No serious argument can be made that plaintiffs did not have any alternative avenue by

which they could have sought redress for the complained-of "failure" of Mutual of Omaha and

Associated "to reimburse" them for the UCP tax that they neglected to claim on their cost reports.

Pl. Mem. at 1.  The hospitals could have submitted a claim for reimbursement and, if necessary,

pursued any denial of the claim through the administrative process.  Contrary to plaintiffs' view,

the record evidence shows that it was not only possible that pursuit of these remedies might have

led to reimbursement for the UCP tax, it is virtually certain that pursuit of these remedies would

have been successful for plaintiffs.  The only way a hospital apparently could have <u>failed</u> to

obtain reimbursement for the tax was by doing exactly what plaintiffs did here:  nothing at all

until it was too late for anyone to help them.

### A.  Plaintiffs Could Have Submitted Claims for the UCP Tax with Their Cost Reports.

At the outset, plaintiffs have submitted no evidence to support the allegation in their

complaint that hospitals in Massachusetts "were strictly forbidden" from claiming UCP-tax

payments with their cost reports.  First Amended Complaint at ¶ 25.  On the contrary, the

undisputed record evidence is that there were three ways in which hospitals could have claimed

the tax with their reports.  If the hospital believed the tax was reimbursable and was unaware of

any contrary opinion on the part of the government, it could simply report the cost on Worksheet

A of the cost report.  Guarino Dec. at ¶ 5.  If the hospital believed the cost was reimbursable but had been informed that the government took a contrary position, it could submit the claim on a separate portion of the cost report specifically set aside for raising disputed issues.  Id.; see PRM §§ 115-115.1 ("You are permitted to dispute regulatory and policy interpretations through the appeals process established by the Social Security Act," so long as "the disputed item and amount for each issue" is "specifically identified in footnotes to the settlement worksheet and the fact that the cost report is filed under protest" is "disclosed.").  In practice, intermediaries in Massachusetts also allowed hospitals to raise disputed issues by means of a simple cover letter. Guarino Dec. at ¶ 5.  Plaintiffs have submitted no evidence to the contrary.

Nor is there any evidentiary support for the assertion of plaintiffs' counsel that the real "reason" why plaintiffs failed to claim the UCP tax was because they "wanted to refrain from submitting what they had been incorrectly led to believe would be fraudulent cost reports."  Pl. Mem. at 5.  In the first place, there is no evidence any intermediary ever told any plaintiff hospital that the UCP tax was not reimbursable.  In the second place, a hospital that submits a disputed claim in the manner prescribed in the Provider Reimbursement Manual is expressly assured that there can be "no referral to the U.S. Attorney" for a fraud investigation.  PRM § 2905.2.  Only if the hospital fails to comply with the procedures for submitting a disputed claim does it run any risk of an inference that "fraud or abuse" occurred.  Id. § 115.3.  Thus, it would be "obvious," Pl. Mem. at 5, that plaintiffs failed to submit claims for UCP-tax reimbursement in order "to refrain from submitting what they had been incorrectly led to believe would be fraudulent cost reports," id., only if it were obvious that (a) the hospitals received information that there is no evidence they ever received and (b) they failed to understand the

information plainly set forth in the very manual written by CMS to apprise them of their right to submit disputed claims.

Indeed, it requires only a moment's reflection to see how silly plaintiffs' new "fear-of fraud" theory really is.  In 1975, the Supreme Court held that a Social Security beneficiary seeking to challenge the constitutionality of a Social Security statute must first present a claim for benefits to the government and have that claim denied.  Weinberger v. Salfi, 422 U.S. 749, 756-66 (1975).  Ten years later, the Court held that presentment is also necessary before a Medicare beneficiary can challenge the Secretary's interpretation of a statute or regulation. Ringer, 466 U.S. at 613-27.  Obviously, then, it must be possible for a Medicare claimant, such as a hospital, to be able to present a disputed claim for reimbursement without committing a fraudulent act.  Otherwise, it would be impossible to meet the presentment requirement necessary to challenge the Secretary's interpretation of a Medicare statute on constitutional or other grounds.  See generally Illinois Council, 529 U.S. at 13 (confirming that the Medicare Act "demands the 'channeling' of virtually all legal attacks through the agency").  Fairview certainly was not afraid of being accused of fraud in 2002 when it requested reopenings on the basis of its good-faith belief that the UCP tax was reimbursable.  Nor were the various other hospitals that sought reopenings from Mutual of Omaha and Associated from 2000 to 2002.  There is no reason in law or logic why plaintiff hospitals should have had – and no evidence that they did have – any such a fear at any earlier time.

### B.  A Timely Claim for UCP-Tax Reimbursement Would Not Necessarily Have Been Denied by Mutual of Omaha or Associated.

In addition to there being no evidence that any hospital was legally prevented from submitting a claim for UCP-tax reimbursement on its cost report, there is nothing in the record to

suggest that a claim for reimbursement would necessarily have been denied by either Mutual of Omaha or Associated. Defendant cannot find any place in his opening memorandum where he "contends that if the Plaintiff Hospitals had claimed the UCP tax in their cost reports, the Intermediary would have reimbursed the expense." Pl. Mem. at 15. But the straw-man statement plaintiffs attribute to defendant is only slightly inaccurate. Defendant did point out in his opening memorandum that there is strong evidence to suggest the claim most likely would have been paid. Def. Mem. at 33. The legally relevant point, however, is that it was entirely possible for plaintiffs to have received payment, and therefore presentation of a claim for reimbursement would not have been futile.

As was discussed above, there is no evidence in the record that Mutual of Omaha "took the position, until 2003, that the UCP Tax was not a reimbursable cost." Pl. Mem. at 16. Indeed, there is no evidence that the intermediary ever thought at any time that the tax was not an allowable cost. The two times the question was raised by hospitals (in the form of reopening requests), Mutual of Omaha concluded that the tax was reimbursable. While it is possible that the intermediary might have come to a different conclusion if the issue had been raised earlier in connection with a claim for reimbursement on a cost report, that is not the most likely outcome. If Mutual of Omaha "did not treat" the tax as allowable cost "for" Fairview "until 2002," id., it is only because Fairview never gave the intermediary the chance until 2002.

The facts with respect to Associated are only slightly more nuanced. It is true that Associated at one time thought the UCP tax was not an allowable cost. Baroutas Letter at 1. But Tufts and Mount Auburn did not test the strength of that conviction through the claims process. There is no reason to think the intermediary had dug in its heels on the question to the point where it could not have been convinced to change its mind, if the question had been raised in a

timely manner on a hospital cost report.  On the contrary, the record evidence shows that when

the issue was first raised (in the form of reopening requests in 2002), the intermediary promptly

sought out controlling guidance from CMS.  Id.  There is no reason to assume that Associated

would not have done exactly the same thing if, years earlier, the issue had been raised in

connection with a claim for reimbursement on a cost report.  Plaintiffs' assumption that

Associated's position on the tax would necessarily have led to a denial of a claim for

reimbursement is mere speculation, and not very plausible speculation at that.  We will never

know for sure, of course, how Associated would have responded to a claim for reimbursement,

but this is only because Tufts and Mount Auburn, like Fairview, did not exhaust this available

avenue of relief for the cost-reporting years that remain at issue.  For purposes of futility analysis,

it is enough for defendant to establish that a successful claim for the reimbursement was a legal

possibility.

### C.  Plaintiffs Did Not Exhaust Available Appeal Rights Afforded by Statute.

If plaintiffs' assumption that a claim for UCP-tax reimbursement would necessarily have

been denied by Mutual of Omaha or Associated is factually dubious, their assumption that the

subsequent pursuit of administrative and judicial review would have been "foreclosed" or

"futile," Pl. Mem. at 16, because "the Intermediary was still taking the position that the UCP Tax

was not an allowable cost," id. at 20, is downright mystifying.  In the first place, only one of the

two intermediaries ever expressed an opinion at any time that the UCP tax was not an allowable

cost.  More importantly, however, the intermediary's position would have no relevance on

administrative appeal.  In Ringer, the Supreme Court held that the mere fact that a Medicare

claimant would have to overcome the persuasive force of the Secretary's interpretation of a

statute did not render exhaustion futile.  466 U.S. at 619.  The position of an intermediary would

have even less persuasive force.  Indeed, the record evidence indicates that every time a hospital

appealed with respect to a tax similar to the UCP tax, the hospital was successful before the

Provider Reimbursement Review Board ("PRRB").  Def. Ex. A at 38-46; Def. Ex. B at 44-46.

Tufts itself received reimbursement for some cost-reporting years because it was permitted to

amend pending administrative appeals.  Def. Mem. at 10; Guarino Dec. at ¶ 3.  There is no

reason to think administrative appeals would have been unsuccessful if the UCP-tax issue had

been raised in a timely manner earlier.

   Even if it were certain that the PRRB would have denied an appeal, however, it is hardly

certain that the CMS Administrator would have upheld that decision on subsequent review.  The

first time CMS considered the question, it informed Associated that the tax can be considered an

allowable cost.  It is at least equally likely that the agency would have ruled the same way if,

years earlier, plaintiffs had given it the opportunity to review the tax in connection with a timely

administrative appeal.  The very reason why the Medicare statutory scheme "demands the

'channeling' of virtually all legal attacks through the agency" is to assure the Secretary the

opportunity "to apply, interpret, or revise policies, regulations, or statutes without possibly

premature interference by different individual courts."  Illinois Council, 529 U.S. at 13.  It would

be bizarre, to say the least, to declare that process futile in circumstances where it is virtually

certain that the Secretary would have exercised that authority in plaintiffs' favor.  See Ringer, 466

U.S. at 619 (finding exhaustion of administrative process is not futile where previous

administrative appeals had been successful).

   Finally, even if administrative appeals were somehow deemed to be futile, surely

plaintiffs do not wish to be heard to argue that it would have been futile to ask this Court,

pursuant to a complaint brought under 42 U.S.C. § 1395oo(f), to rule that the UCP tax is an

allowable Medicare cost.  As defendant previously demonstrated, the existence of that "judicial" remedy, <u>Power v. Barnhart</u>, 292 F.3d 781, 786 (D.C. Cir. 2002), is sufficient, standing alone, to defeat mandamus relief.  <u>Ringer</u>, 466 U.S. at 620 (finding reasons for denying mandamus relief "equally applicable" where a binding administrative ruling precluded a Medicare claimant's success at the administrative level and subsequent judicial relief was the only possible remedy).  Whether plaintiffs here find "this single conclusory statement" in <u>Ringer</u> to be "persuasive authority," Pl. Mem. at 23 n.17, is irrelevant.  What matters is that it is controlling authority for this Court.  Plaintiffs' contention that statutory appeals were foreclosed or futile is just plain ridiculous.

The reasons why the <u>sui generis</u> facts in the only two decisions on which plaintiffs rely – <u>Monmouth Medical Center v. Thompson</u>, 257 F.3d 807 (D.C. Cir. 2001), and <u>In re Medicare Reimbursement Litigation</u>, 414 F.3d 7 (D.C. Cir. 2005) – are distinguishable from the facts in this case were discussed in defendant's opening memorandum, Def. Mem. at 31-32, and need not be repeated here.  Exhaustion of statutory appeal remedies was excused in <u>Monmouth</u> solely because the issue raised by the plaintiff hospitals – whether a particular administrative ruling was a notice of inconsistency that triggered a duty to reopen under 42 C.F.R. § 405.1885(b) – could not be challenged through 42 U.S.C. § 1395oo, and the time period for challenging the correctness of the intermediary's final determination had long since elapsed.  <u>Monmouth</u>, 257 F.3d at 811.  Plaintiffs' rambling discussion of those decisions, Pl. Mem. at 16-23, contributes nothing to the analysis.  Suffice it to say that the Seventh Circuit Court of Appeals recently agreed with defendant that <u>Monmouth</u> and <u>Medicare Reimbursement Litigation</u> cannot be broadened to stand for the proposition that mandamus relief is available where, as here, a hospital "complains merely that the intermediary did not properly apply the law in its

determination," <u>Michael Reese Hosp. & Med. Ctr. v. Thompson</u>, 2005 WL 2592455 at *7 (7th

Cir. Oct. 14, 2005), and this result is consistent with every decision that has addressed the

question of whether a plaintiff can rely on 42 C.F.R. § 405.1885(d) to raise a Medicare payment

issue that it did not pursue through the administrative process.  <u>Binghamton Gen. Hosp. v.

Shalala</u>, 856 F. Supp. 786, 792-93 (S.D.N.Y. 1994); <u>Loma Linda Univ. Med. Ctr. v. Shalala</u>,

1994 WL 465830 at *2 (C.D. Cal. July 14, 1994).  Plaintiffs cite no authority to the contrary.

### D.  Plaintiffs Did Not Exhaust Available Regulatory Remedies.

Even if plaintiffs' failure to exhaust statutory administrative remedies were insufficient to

defeat mandamus relief, their failure to request a permissive reopening under 42 C.F.R.

§ 405.1885(a) would be equally fatal to their claim.  No serious argument, of course, can be

made that it would have been futile to request a reopening until after CMS had issued an opinion

on the Medicare treatment of the UCP tax.  Fairview successfully requested a reopening in 2002,

months before the CMS opinion was issued.  And the CMS opinion itself came about as a direct

result of the successful reopening requests of other Massachusetts hospitals brought at about the

same time.  Nothing in the record suggests that resort to the remedy of permissive reopening

would have been futile if invoked years earlier.[6]

---

[6] As defendant explained in his opening memorandum, Def. Mem. at 32-34, the issue
here is not whether "the filing of a reopening request" is <u>always</u> "a condition precedent to
obtaining mandamus relief."  Pl. Mem. at 20.  In <u>Medicare Reimbursement Litigation</u>, for
instance, the Court of Appeals for this Circuit held that exhaustion of permissive reopening
opportunities under 42 C.F.R. § 405.1885(a) was not necessary to bring a mandamus claim
seeking to enforce mandatory reopening requirements under 42 C.F.R. § 405.1885(b), but only in
the particular circumstance where permissive reopening was prohibited both before and after the
issuance of the administrative ruling on which § 405.1885(b) claim was based.  <u>Medicare
Reimbursement Litig.</u>, 414 F.3d at 11.  But exhaustion of the permissive reopening opportunity is
required where, as here, no such prohibition ever existed and the record unarguably proves that
exhaustion of the permissive remedy led to a successful outcome every time it was invoked.
Plaintiffs' contrary reading misconstrues a portion of the decision that discusses a separate

## II. PLAINTIFFS HAVE NOT ESTABLISHED ANY RIGHT TO A REOPENING UNDER MEDICARE STATUTES.

Because plaintiffs have failed to exhaust other available avenues of relief, it is not necessary to address their contention that they have a "clear right to relief" under Medicare statutes and regulations. Pl. Mem. at 7. But this argument is patently without merit, as well.

As defendant demonstrated in its opening memorandum, Def. Mem. at 15-16, plaintiffs' claim that the Secretary owes them "a clear statutory duty to reopen cost reports at issue," Complaint at ¶ 36, founders on the simple fact that there is no such thing as a statutory reopening procedure at all. Your Home, 525 U.S. at 454. A right to reopening exists, if at all, only under the reopening regulation promulgated "by the grace of the Secretary," id., at 42 C.F.R. § 405.1885. Substantive Medicare statutes cannot be enforced by means of mandamus, Ass'n of Am. Med. Colls. v. Califano, 569 F.2d 101, 111 (D.C. Cir. 1977), because 42 U.S.C. § 1395oo provides the exclusive statutory means by which a hospital can contest whether the amount of Medicare reimbursement made by the intermediary was correctly determined.

In any event, the Secretary's conclusion that the UCP "can be recognized as an allowable cost" under broadly-framed Medicare statutes and regulations, Baroutas Memo at 1 (emphasis added), does not suggest that reimbursement is mandated by those statutes and regulations in a manner "so plainly prescribed as to be free from doubt and equivalent to a positive command." Consol. Edison Co. of N.Y., Inc. v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting

---

question as to whether the duty to reopen that exists in § 405.1885(b) can ever come into existence in the absence of a pending reopening request under § 405.1885(a). In that connection only, the Court of Appeals stated that § 405.1885(b) "contains no prerequisite for relief beyond a notice of inconsistency." Id. at 11. That part of the analysis does not address the exhaustion requirement, which exists not because of any language in the reopening regulation, but because the mandamus statute, 28 U.S.C. § 1361, codifies the exhaustion element of the common-law writ of mandamus. Ringer, 466 U.S. at 616.

-17-

Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218 (1930)).  It merely means that the statutes and regulations can permissibly be construed to authorize reimbursement when the Secretary applies his delegated discretion to fill in interstitial interpretive gaps.  It is well settled that mandamus does not lie to enforce that kind of statute or regulation because the duty created is not ministerial in nature.  See Def. Mem. at 14-15.  Thus, if, as plaintiffs contend, the question of whether reimbursement for the UCP tax is so plainly prescribed by substantive Medicare law as to create rights enforceable by means of mandamus is "undisputed" here, Pl. Mem. at 8, the question is not undisputed in any way that benefits plaintiffs.[7]

### III.  INTERMEDIARY DETERMINATIONS ARE NOT SUBJECT TO REOPENING ON THE BASIS OF COMPLAINTS ABOUT AN INTERMEDIARY'S OFFICIAL CONDUCT.

Plaintiffs have also failed to establish that they have any right to a reopening under Medicare regulations.  At the outset, plaintiffs have apparently abandoned their claim that they have a right to reopening under 42 C.F.R. § 405.1885(b).  Complaint at ¶ 38.  Their sole remaining argument on the merits is that reopening is mandated by 42 C.F.R. § 405.1885(d), which provides, in pertinent part, as follows:  "an intermediary determination . . . shall be reopened and revised at any time if it is established that such determination . . . was procured by fraud or similar fault of any party to the determination."  Pl. Mem. at 7-13.  As defendant explained in his opening memorandum, there are many reasons why this regulation is not applicable here.  Def. Mem. at 18-26.  Plaintiffs offer no meaningful response to any of these points.

---

[7] Plaintiffs also decline to address the statute-of-limitations problems inherent in any claim to mandamus relief based on a theory that the plaintiff hospitals were underpaid in the final determinations long ago issued by intermediaries in response to their cost reports.  Def. Mem. at 14.  That point can be taken as conceded.

### A.  An Intermediary Is Not a "Party" to Its Own Payment Determinations.

The most obvious reason why 42 C.F.R. § 405.1885(d) does not apply to the conduct of

the intermediaries here is that an intermediary is not a "party" to its own "intermediary

determination," id., as that term of art is carefully defined elsewhere in the Medicare regulations.[8]

As defendant explained in his opening memorandum, Def. Mem. at 18-19, the meaning of the

term "party" to the "intermediary determination" is not open to discussion.  It means exactly what

the regulations say it means:  "The parties to the intermediary's determination are the provider

and any other entity found by the intermediary to be a related organization of the provider under

§ 413.17 of this chapter."  42 C.F.R. § 405.1805.  No more, no less.  Because intermediaries are

not providers or related organizations, they are not "parties to the intermediary's determination."

No more need be said.

Plaintiffs' counter-argument on this point rests on a simple – or perhaps simplistic –

misunderstanding of defendant's position.  As the Secretary explained in his opening

memorandum, defendant has absolutely no quarrel with the proposition that the scope of 42

C.F.R. § 405.1885(d) extends to more entities than "just the provider."  Pl. Mem. at 12.  In the

case of an intermediary's determination, the parties to the determination include the provider and

any related organization.  42 C.F.R. § 405.1805.  The same is true in the case of an intermediary's

decision on review of its own determination (for claims under $10,000).  42 C.F.R. § 405.1815.

In the case of a PRRB hearing, the provider, related organizations and intermediary are all

parties.  42 C.F.R. § 405.1843(a).  The reason for these distinctions is obvious.  Where the

intermediary acts as a advocate for its position (before the Board), it is a party.  Where it acts as a

---

[8] Plaintiffs do not argue that the Secretary or CMS is a party to the intermediary's determination.  That point is therefore conceded.

-19-

decisionmaker (in the initial determination and during an intermediary hearing), it is not a party. It would reflect a bizarre notion of procedural fairness if a party to the intermediary's determination were given both the power to render the determination and then review it on appeal.  And the regulatory scheme certainly cannot be deemed to so provide in manner "so plainly prescribed as to be free from doubt and equivalent to a positive command."  Consol. Edison, 286 F.3d at 605 (quoting Kadrie, 281 U.S. at 218).

Contrary to plaintiffs' view, Pl. Mem. at 11, nothing in the rulemaking history of § 405.1885(d) suggests that the regulation was intended to apply to actions by entities other than those defined as "parties to the intermediary's determination" in § 405.1805.  It is certainly true that the language originally proposed by the Secretary would have limited subsection (d) exclusively to cases of "fraud or similar fault of the provider."  39 Fed. Reg. 8166, 8170 (Mar. 4, 1974).  Defendant has no quarrel with the proposition that the final rule was revised so that it would not be limited "just to the provider," Pl. Mem. at 12, in all settings.  But, as defendant previously explained, the way the Secretary broadened the scope of § 405.1885(d) was not to make the regulation applicable to CMS and intermediaries in all settings.  It was to make the regulation applicable to the actions of providers and provider-related organizations in all circumstances, and applicable to the actions of intermediaries in circumstances where the intermediary is seeking to procure a favorable ruling from the PRRB in defense of its payment determination.  Compare 42 C.F.R. §§ 405.1805, 405.1815, 405.1843, 405.1885(d).  At the very least, nothing in the rulemaking history suggests that the regulatory scheme must be read in a more expansive fashion than its plain language allows.[9]

-----

[9] The foregoing analysis also defeats plaintiffs' reliance on Rochester Methodist Hospital v. Travelers Insurance Co., 728 F.2d 1006 (8th Cir. 1984), in which a two-judge panel stated, in

## B. Payment Determinations Are Not "Procured" by Intermediaries from Themselves.

Even if plaintiffs could show that an intermediary was a party to its own determination notwithstanding the express and controlling definition in 42 C.F.R. § 405.1805, they do not even attempt to explain how an intermediary can be said to have "procured" its own "determination" from itself.  42 C.F.R. § 405.1885(d).  If, as plaintiffs apparently think, both the provider and the intermediary are parties that procure the intermediary's determination, from whom do they procure it?  Plaintiffs have no answer because no intelligent answer exists.  Plaintiffs'

_____

dicta, that "[w]e do not believe" that the definition in 42 C.F.R. § 405.1805 "was intended to exclude intermediaries from the operation of § 405.1885(d)."  Rochester, 728 F.2d at 1018 n.12.  As was explained above, it is not necessary to believe that intermediaries are excluded from the operation of § 405.1885(d) in all circumstances to conclude that an intermediary is not a "party" in the particular circumstance where it issues its own "intermediary determination."  As discussed above, an intermediary is certainly a "party" to a "decision" of the PRRB within the meaning of 42 C.F.R. § 405.1885(d), because it is a party to the PRRB hearing as defined by 42 C.F.R. § 405.1843(a).  In addition, plaintiffs are simply wrong to the extent that they believe Rochester rendered any holding with respect to the exhaustion requirements that must be satisfied before a mandamus claim can be brought against a government official to vindicate a putative right to a reopening under 42 C.F.R. § 405.1885(d).  Pl. Mem. at 10.  Rochester involved a claim of common-law fraud brought against an intermediary in its individual capacity.

The dicta in the only other decision on which plaintiffs rely, St. Vincent Health Ctr. v. Shalala, 937 F. Supp. 496 (W.D. Pa. 1995), aff'd mem., 96 F.3d 1434 (3d. Cir. 1996), does not discuss the definition in § 405.1805 at all and mentions § 405.1885(d) only in passing.  Id. at 506-07.  (In addition, a summary affirmance is not a decision of "[t]he Third Circuit."  Pl. Mem. at 12.  "[S]ummary affirmances are non-precedential" in the Third Circuit.  Lapid-Laurel, LLC v. Zoning Bd., 284 F.3d 442, 452 n.5 (3d Cir. 2002) (citing 3d Cir. I.O.P. 6.2.1)).  In In re Medicare Reimbursement Litigation, 309 F. Supp. 2d 89 (D.D.C. 2004), aff'd, 414 F.3d 7 (D.C. Cir. 2005), this Court did state, in passing, that the "window of opportunity" for obtaining a permissive reopening "closes after three years unless the movant establishes that [the] determination 'was procured by fraud or similar fault of any party to the determination or decision.'"  Id. at 96 (quoting 42 C.F.R. § 405.1885(d)).  But nothing in this passage suggests that an intermediary is a party to the intermediary's determination, and it certainly does not attempt to reconcile that proposition with the definition in 42 C.F.R. § 405.1805.

-21-

capitulation on this point is so complete that the remainder of their memorandum represents less of an argument than an ungraceful form of surrender.

### C. Fraud or Similar Fault Had Not Been "Established" Prior to Plaintiffs' Lawsuit.

Even if plaintiffs' mandamus theory could survive to this point, they fail to come to grips with the fact that the regulation on which they rely for a clear duty – that is, a duty enforceable by the judicial exercise of mandamus jurisdiction – applies only after it has been "<u>established</u>" that "fraud or similar fault of any party to the determination or decision" has occurred. 42 C.F.R. § 405.1885(d) (emphasis added). It is bootstrapping to ask this Court to take jurisdiction, under 28 U.S.C. § 1361, for the purpose of enforcing a duty that can be created, if at all, only after jurisdiction is taken and the Court renders a decision. Although it is certainly true that 42 C.F.R. § 405.1885(d) "does not designate <u>who</u> is required to 'establish' that the intermediary's determination was procured by fraud or similar fault," Pl. Mem. at 13 (emphasis added), the existence of fraud or similar fault must be "established" by <u>someone</u> in a position of authority <u>before</u> any duty to reopen can come into existence. Thus, the existence of fraud or similar fault must be established <u>before</u> a lawsuit can be filed to enforce a duty to reopen under 42 C.F.R. § 405.1885(d).

### IV. PLAINTIFFS HAVE NOT ESTABLISHED THAT ANY PAYMENT DETERMINATION WAS PROCURED BY FRAUD OR SIMILAR FAULT ON THE PART OF ANY INTERMEDIARY.

Even if 42 C.F.R. § 405.1885(d) were deemed to authorize reopening of a payment determination on the basis of a hospital's complaints about the official conduct of an intermediary, there is no evidence in the record that any payment determination for the cost-reporting years from 1985 through 2001 was procured by means of fraud or similar fault on the

part of any intermediary. The undisputed record shows nothing but exemplary behavior on the part of the two intermediaries that processed plaintiffs claims. If plaintiffs are looking for someone to blame for their troubles, the best investigatory aid is a mirror.

**A. Plaintiffs Have Not Shown that Any Intermediary Ever Told Them the UCP Tax Was Not Reimbursable.**

As defendant demonstrated in his opening memorandum, a claim that a hospital was victimized by a false or misleading statement of an intermediary would require, at the outset, some evidence that a statement about which the hospital takes exception was actually made by the intermediary. Def. Mem. at 22-24. Yet there is no evidence that either intermediary ever "actively or passively provided" any plaintiff hospital with any "information" that plaintiffs, by their own lights, think was erroneous. Pl. Mem. at 9. According to the record evidence, Mutual of Omaha told plaintiff Fairview that the UCP tax was a reimbursable expense in 2002. Grabowski Letters at 1. In the following year, Associated told all hospitals whose claims it processed, including plaintiffs Tufts and Mount Auburn, that the UCP tax was reimbursable. Baroutas Memo at 1. If Mutual of Omaha or Associated ever "made representations" to plaintiffs that the Massachusetts tax "was not an allowable cost for purposes of Medicare reimbursement," Pl. Mem. at 1, those statements do not appear in the record of this case. Plaintiffs' opening memorandum thus reads like a script from the popular *Seinfeld* television series; it is a show about nothing.

No record evidence, for instance, supports Fairview's contention that Mutual of Omaha "was maintaining a position towards certain Massachusetts hospitals," including Fairview, "that the UCP Tax was non-allowable, while at the same time, reimbursing other Massachusetts hospitals for the cost." Pl. Mem. at 9. The record contains no evidence that Mutual of Omaha

ever even <u>thought</u> the UCP tax was not reimbursable, let alone <u>communicated</u> such a position to

Fairview.  Similarly, no record evidence supports the allegation that Associated was "maintaining

a position" of disallowance toward Tufts and Mount Auburn.  <u>Id</u>.  It is certainly true that, in its

2002 request for interpretive guidance, Associated told <u>CMS</u> that it had never considered the

UCP tax to be reimbursable.  Baroutas Letter at 1.  But there is no evidence that Associated ever

communicated that opinion to Tufts or Mount Auburn, let alone communicated that position with

the objective of discouraging the submission of a claim for reimbursement.  The undisputed

evidence is that hospitals in Massachusetts had never claimed the tax on their cost reports, <u>id</u>.,

<u>see also</u> Rodowicz Letter at 1, and therefore there was no need for Associated to discuss the

question with any plaintiff.  As was once said in another context, there is no "there" there.

### B.  Intermediaries Were Under No Legal Obligation to Tell Plaintiffs, Without Being Asked, that the UCP Tax Was Reimbursable.

Plaintiffs' alternative theory – that Mutual of Omaha and Associated misled them by not

issuing an advisory opinion on the UCP tax before 2002 – is without merit as a matter of law.  As

was discussed above, it has long been settled that intermediaries are not required to "anticipate

every problem that may arise in the administration of a complex program such as Medicare,"

<u>Heckler v. Cmty. Health Servs. of Crawford County</u>, 467 U.S. at 64, and they are under no legal

obligation to furnish hospitals with unrequested advisory opinions "that, either by default rule or

by specification, address every conceivable question in the process of determining equitable

reimbursement."  <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. at 96.  Mutual of Omaha, for

instance, was under no legal duty to issue an advisory notice to other hospitals when it granted a

reopening request to a non-plaintiff hospital in 2000.  And Associated was certainly not obligated

to issue an advisory notice about what Mutual of Omaha had done.  Indeed, there is no evidence

that, prior to 2002 at least, Associated even knew that Mutual of Omaha had granted a reopening request to any hospital raising the UCP-tax question.[10]  There is no legal basis, therefore, for plaintiffs' theory of "passive[]" misrepresentation.  Pl. Mem. at 9.

Plaintiffs' contention that Mutual of Omaha and Associated were "allowing selected Massachusetts hospitals to claim" the tax while denying that opportunity to other hospitals, Pl. Mem. at 1, is unsupported by any record evidence.  The record shows that Mutual of Omaha and Associated awarded reimbursement to every hospital that asked for it in a timely manner.  Def. Mem. at 9-10.  The only years for which plaintiffs were not able to obtain reimbursement were those for which they did not submit a timely claim, request for reopening, or amended appeal. Thus, the only hospitals "selected" for non-reimbursement were those hospitals that selected themselves for non-reimbursement by not seeking reimbursement.

### C.  The Proper Treatment of the UCP Tax is an Opinion of Law, not a Statement of Material Fact.

Even if plaintiffs could identify some statement or non-statement about the UCP tax about which they had any legitimate complaint, they do not dispute that a statement about the proper treatment of the UCP tax would be an opinion of law.  An intermediary's expression of an opinion of law, in turn, cannot give rise to a reopening obligation under 42 C.F.R. § 405.1885(d), because it is not a statement of fact.  Lincoln Gen. Hosp. v. Shalala, No. 4:98CV3118, mem. op. at 12 (D. Neb. July 13, 2000) (Def. Ex. C at 12).  Plaintiffs cite no authority to the contrary.

_____

[10] There is no factual support for plaintiffs' contention that Associated "maintained a policy of non-reimbursement," even though "it was apparently aware that Mutual of Omaha was reimbursing selected hospitals for the cost." Pl. Mem. at 1 n.1.  Although Associated attached the 2000 reopening decision of Mutual of Omaha to its own 2002 letter to CMS, Def. Ex. B at 5, 52, the record does not show when Associated learned of Mutual of Omaha's letter.  The attachment bears a 2002 telefax date, however.

### D.  Plaintiffs Have Not Shown Reliance As a Matter of Fact.

Even if plaintiffs' theory of fraud or similar fault could survive to this point, it founders

on the fact that there is no evidence of reliance.  Contrary to the assertions that appear in their

memorandum, the record contains no evidence that any of the plaintiff hospitals failed to claim

the tax as an allowable cost "[a]s a result" of anything said or left unsaid by either intermediary,

Pl. Mem. at 5, or were otherwise relying on "incorrect information" that had been "provided" by

the intermediaries for their guidance.  Id. at 9.  The only evidence of the mental processes of the

plaintiffs is the contemporaneous statement of Fairview that it was "under the impression" in

2002 that the UCP tax was not reimbursable.  Rodowicz Letter at 1.  There is no evidence that

Fairview acquired that impression from Mutual of Omaha.  There is no evidence that Tufts and

Mount Auburn ever gave the UCP tax a thought at all before Associated informed them of CMS'

favorable opinion in 2003.  Reliance therefore has not been established as a matter of fact.[11]

### E.  Plaintiffs Cannot Establish Justifiable Reliance As a Matter of Law.

Even if plaintiffs could show reliance on any statement or non-statement of an

intermediary, they cannot possibly show that reliance on the legal opinion of an intermediary

would be justifiable as a matter of law.  As defendant explained in this opening memorandum,

Def. Mem. at 24, the Supreme Court has repeatedly rejected the proposition that a claimant can

justifiably rely on the legal opinions of government agents when claiming Medicare

reimbursement or other benefits under the Social Security Act.  The law places the burden on the

claimant to know the law for himself or herself.

---

[11] The common-law theory of "equitable fraud" upon which plaintiffs rely by analogy, Pl.
Mem. at 9, requires proof of reliance by a standard of "clear and convincing" evidence.
Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1183 (3d Cir. 1993); Marsellis -Warner Corp.
v. Rabens, 51 F. Supp. 2d 508, 521 n.11 (D.N.J. 1999).

In <u>Schweiker v. Hansen</u>, 450 U.S. 785 (1981) (per curiam), for instance, the plaintiff was a woman who was "erroneously" told during an oral conversation with a field representative of the Social Security Administration that she was not eligible for certain "mother's insurance benefits." <u>Id</u>. at 786. Although instructions issued by the Secretary expressly told the field representative to "advise applicants of the advantages of filing written applications and to recommend to applicants who are uncertain about their eligibility that they file written applications," the field representative did not do so. <u>Id</u>. In reliance on the field representative's erroneous statement and failure to recommend the filing of a written application, the plaintiff did not claim benefits. <u>Id</u>. After she subsequently learned that she was eligible, the plaintiff submitted an application and was awarded twelve months of back payments, <u>id</u>., "which was the maximum retroactive benefit allowed" under the Social Security Act. <u>Id</u>. at 787. She then brought suit seeking to estop the government "from denying retroactive benefits" for earlier periods during which "she was eligible for benefits but had not filed a written application." <u>Id</u>. at 786.

The Supreme Court held that equitable estoppel did not lie against the government in these circumstances because the field representative's erroneous advice about the law did not cause the plaintiff "to take action" which she "could not correct at any time" through her own personal initiative. <u>Id</u>. at 789. The mere fact that she was presumably unschooled in the often Byzantine intricacies of Social Security law did not suffice to justify reliance on the erroneous statements of a federal agent, a proposition that has been repeatedly upheld in numerous other federal contexts. <u>See, e.g.</u> <u>Federal Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380 (1947) (farmers cannot justifiably rely on false representation of agent selling federal crop insurance). Substitute

-27-

the words "Medicare" and "reimbursement for UCP taxes" for "Social Security" and "mother's insurance benefits" and <u>Hansen</u> would mandate entry of judgment for defendant in this case.

      In <u>Heckler v. Community Hospital Services of Crawford County</u>, the Supreme Court applied the reasoning in <u>Hansen</u> to a Medicare case. In denying a claim for equitable estoppel, the Court emphasized that every "participant in the Medicare program" has "a duty to familiarize itself with the legal requirements for cost reimbursement" and to be "acquainted with the nature of and limitations on the role of a fiscal intermediary." 467 U.S. at 64. The Court explained its reasoning as follows:

> Justice Holmes wrote: "Men must turn square corners when they deal with the Government." [quoting <u>Rock Island A. & L.R. Co. v. United States</u>, 254 U.S. 141, 143 (1920)]. This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.

467 U.S. at 63. Applying those principles specifically to the Medicare context, the Court continued:

> There is simply no requirement that the Government anticipate every problem that may arise in a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of sums of money as substantial as those spent by [the plaintiff hospital]. Nor was the advice given under circumstances that should have induced [the plaintiff's] reliance. As a recipient of public funds well acquainted with the role of a fiscal intermediary, [the plaintiff] knew [the intermediary] only acted as a conduit; it could not resolve policy questions. The relevant statute, regulations, and Reimbursement Manual, with which [the plaintiff] should have been and was acquainted, made that perfectly clear. Yet [the plaintiff] made no attempt to have the question resolved by the Secretary; it was satisfied with the policy judgment of a mere conduit.

<u>Id</u>. at 64-65.

The Supreme Court went on to point out that "[t]he appropriateness" of reliance was "further undermined" where, as here, there is no evidence that any written opinion adverse to the claimant's interest was ever given.  Id. at 65.

> It is not merely the possibility of fraud that undermines our confidence in the reliability of official action that is not confirmed or evidenced by a written instrument.  Written advice, like a written judicial opinion, requires its author to reflect about the nature of the advice that is given to the citizen, and subjects that advice to the possibility of review, criticism, and reexamination.  The necessity for ensuring that governmental agents stay within the lawful scope of their authority, and that those who seek public funds act with scrupulous exactitude, argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advice that underlay respondent's cost reports. That is especially true when a complex program such as Medicare is involved, in which the need for written records is manifest.
>
> In sum, the regulations governing the cost reimbursement provisions of Medicare should and did put respondent on ample notice of the care with which its cost reports must be prepared, and the care which would be taken to review them within the relevant 3-year period.

Id. at 65-66 (footnotes omitted).  Reliance on any oral communication "is not the kind of reasonable reliance that would even give rise to an estoppel against a private party," the Court concluded, and "therefore cannot estop the Government."  Id. at 66.[12]

In OPM v. Richmond, 496 U.S. 414 (1990), the Supreme Court subsequently applied the reasoning of Hansen and Crawford County to conclude that a "claimant seeking public funds" in contravention of federal law can never invoke equitable estoppel.  Id. at 434.  The Court placed particular emphasis on the perverse effect of any rule of law under which the federal government was expected to "secure perfect performance from the hundreds of thousands of employees

_____

[12] See also Monongahela Valley Hosp., Inc. v. Sullivan, 945 F.2d 576, 589 (3d Cir. 1991) (hospital could not have "reasonably relied" on intermediary statements "[b]ecause a fiscal intermediary can neither definitively interpret regulations nor make policy pronouncements"); S. Ind. Rehab. Hosp. v. Thompson, 2004 WL 784351 at *7 (S.D. Ind. Mar. 23, 2004) (reliance on "oral communications" of intermediary is not "justified") (citation omitted).

scattered throughout the continent." Id. at 433 (quoting Hansen v. Harris, 619 F.2d 942, 954 (2d

Cir. 1980) (Friendly, J., dissenting), rev'd, 450 U.S. 785 (1981)).

> The natural consequence of a rule that made the Government liable for the
> statements of its agents would be a decision to cut back and impose strict controls
> upon Government provision of information in order to limit liability.  Not only
> would valuable informational programs be lost to the public, but the greatest
> impact of this loss would fall on those of limited means, who can least afford the
> alternative of private advice.  See Braunstein, In Defense of a Traditional
> Immunity--Toward an Economic Rationale for Not Estopping the Government, 14
> Rutgers L.J. 1 (1982).  The inevitable fact of occasional individual hardship
> cannot undermine the interest of the citizenry as a whole in the ready availability
> of Government information.

Id. at 433-34.  The same chilling effect would be threatened here if intermediaries were deemed

to open the door to indefinite reopening merely by expressing an opinion about Medicare law

that later was rejected by CMS.

The decisions in Hansen, Crawford County and Richmond make short work of any

contention that plaintiffs could have reasonably relied on any opinion of Mutual of Omaha or

Associated that the UCP tax was not reimbursable under Medicare (assuming, arguendo, any

such opinion was ever even communicated to them).  The hospitals here were obliged to do what

the plaintiffs in Hansen, Crawford County and Richmond were obliged to do:  research the law

and raise the issue themselves.  Indeed, that is exactly what Fairview did do in 2002.  That

plaintiffs failed to perform that duty earlier is not a failing that can be laid at the doorstep of their

intermediaries.  The fault lies in themselves.

### F.  Plaintiffs' Reliance on Rochester Methodist Hospital v. Travelers Insurance Co. Is Misplaced.

The foregoing analysis defeats plaintiffs' reliance on the only decision they cite in support

of their theory of fraud or similar fault, Rochester Methodist Hospital v. Travelers Insurance Co.

In that case, a community college rented dormitory space to two local hospitals as part of the

hospitals' nurse-training program. 728 F.2d at 1008. The same intermediary processed the cost reports of both hospitals. The first hospital claimed the Medicare-related portion of the dormitory costs on its Medicare cost report and was reimbursed. Id. at 1009. The second hospital submitted the same claim and the intermediary denied it. Id. at 1008. When the second hospital asked the intermediary why the claim had been denied, the intermediary replied that the dormitory expense was not an allowable cost and that it would be pointless to appeal the issue administratively. Id. at 1009. (At the time these events took place, the PRRB did not yet exist, and the only administrative review was reconsideration by the intermediary. Id. at 1009 n.3.) A two-member majority of the court concluded that the intermediary had committed a fraudulent tort. Id. at 1018. The dissenting judge argued that reliance on the legal opinion of the intermediary was not "justifiable" because the hospital should already have been "knowledgeable about [Medicare] reimbursement" itself and should be held accountable for its own cost-reporting decisions. Id. at 1019 (Henley, J., dissenting).

Rochester is inapposite here for three reasons. First, the court's characterization of the intermediary's legal opinion as a statement of fact has not been followed by other courts when construing the standards for a reopening under 42 C.F.R. § 405.1885(d). See Lincoln Gen. Hosp. v. Shalala,, mem. op. at 12. Rochester was a common-law fraud case, and the meaning of the term "fraud or similar fault" as used in § 405.1885(d) was not addressed.

Second, the plaintiff in Rochester actually submitted a claim for reimbursement, had the claim denied, and had a conversation with the intermediary about the reasons for the denial. It was the intermediary's telling of "half a truth" during that follow-up conversation that was the basis of the plaintiff's theory of common-law fraud. Id. at 1017 (quoting Newell v. Randall, 19 N.W. 972, 973 (Minn. 1884)). The court made clear that, in the absence of the claim for

-31-

reimbursement and the subsequent discussion with the intermediary, there would have been no basis for the fraud claim, because the intermediary had no affirmative duty to supply unasked-for advice to the hospital.  Id. at 1018 (quoting Thomas v. Murphy, 91 N.W. 1097, 1098 (Minn. 1902) ("Though one may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, . . . [i]f he speaks at all, he must make a full and fair disclosure.") (emphasis added in Rochester).  Thus, Rochester actually rejected the precise theory of fraud or similar fault urged by plaintiffs here:  that "maintaining a position" that an expense item "was non-allowable," Pl. Mem. at 9, or "maintaining a policy of non-reimbursement" with respect to a cost item, id. at 14, standing alone, constitutes any kind of wrongful conduct.  Under Rochester, the intermediary must, at a minimum, communicate that position to the plaintiff hospital in a specific communication for the purpose of discouraging the submission of a claim for reimbursement and in circumstances where the intermediary had reason to believe the hospital would rely on the information to eschew submission of the claim.  There is no evidence of any such circumstances here.[13]

Finally, even if evidence of such a conversation existed, it would be of no avail because, just four months after Rochester was decided, the Supreme Court held in Crawford County that a health-care provider cannot place justifiable reliance on the legal opinion of an intermediary

---

[13] The notion that either intermediary wanted to discourage hospitals from submitting claims for the UCP tax has no support in the record.  If Mutual of Omaha had wanted to discourage claims, it would hardly have exercised its discretionary authority under 42 C.F.R. § 405.1885(a) to reopen payment determinations for Fairview and another hospital.  Similarly, if Associated had wanted to discourage claims for the UCP tax, it would not have responded to reopening requests by seeking guidance from CMS.  It was within the discretion of both intermediaries to deny the reopening requests without explanation, see 42 C.F.R. § 405.1885(a) (intermediary "may" reopen), and such a denial would not have been reviewable subsequently.  Your Home, 525 U.S. at 454.

because it is responsible for knowing Medicare law for itself.  467 U.S. at 63-64.  The holding

mirrors the analysis of the dissenting judge in <u>Rochester</u>.  This may explain why no court has

ever relied on <u>Rochester</u> for the proposition urged by plaintiffs here.

### G.  Plaintiffs Have Not Pled Fraud or Similar Fault with Particularity.

For the foregoing reasons, defendant is entitled to judgment as a matter of law on

plaintiffs' claims seeking a reopening under 42 C.F.R. § 405.1885(d).  The claims also should be

dismissed, however, for failure to plead fraud or similar fault with particularity.  Indeed,

plaintiffs apparently concede that the bare allegation in their amended complaint that an

intermediary "passively" or "actively" misled them, Def. Mem. at 25, is insufficient to meet the

particularity standards of Rule 9(b).

Plaintiffs are simply mistaken, however, if they think they can solve the pleading

deficiencies in their complaint merely by asserting, in their memorandum, that "the

Intermediar[ies] engaged in fraud or similar fault by knowingly maintaining a policy of non-

reimbursement towards the Plaintiffs while reimbursing selected hospitals for the cost."  Pl.

Mem. at 14.  In the first place, no such allegation appears anywhere in their amended complaint.

Second, even if the complaint were amended to allege such a circumstance, the elements of fraud

or similar fault would still not be plead with particularity.  As defendant explained in his opening

memorandum, fraud is not plead with particularity unless the complaint states "the time, place

and content of the false misrepresentations, the fact misrepresented and what was obtained or

given up as a consequence of the fraud," <u>United States ex rel. Joseph v. Cannon</u>, 642 F.2d 1373,

1385 (D.C. Cir. 1981) (citation omitted), and specifically alleges "that the plaintiffs reasonably

and to their detriment relied on the false information."  <u>In re U.S. Office Prods. Co. Sec. Litig.</u>,

251 F. Supp. 2d 58, 74 (D.D.C. 2003).  Merely alleging that two intermediaries "maintained a

policy of non-reimbursement" – without any averment that the putative policy was ever communicated or justifiably relied upon – does not meet that standard.

Plaintiffs' contention that the pleading standards of Fed. R. Civ. P. 9(b) apply only to fraud but not "similar fault," Pl. Mem. at 14, is simply incorrect. As defendant explained in his opening memorandum, Rule 9(b) applies equally to negligent misrepresentation. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d at 74 & n.9.[14] Plaintiffs cite no authority to the contrary.

And the purposes underlying Rule 9(b), see Def. Mem. at 25-26, certainly apply just as strongly to claims of negligent misconduct as claims of intentional fraud. It is just as important to "safeguard[] potential defendants from frivolous accusations" of negligence where, as here, "the principal defendant is a [government] official whose reputation and position are particularly vulnerable to accusations of wrongdoing," Cannon, 642 F.2d at 1385, and where his agents are "professionals whose reputations in their field of expertise are most sensitive to slander." Id. n.103 (citation omitted). Rule 9(b) exists precisely to protect this kind of defendant from the obfuscation, confabulation, innuendo and lame sarcasm so abundant in plaintiffs' opening memorandum.

## V. THE EQUITIES DO NOT FAVOR MANDAMUS RELIEF.

For the reasons stated above, plaintiffs cannot prevail on their mandamus claim. But even if their claim could survive to this point, it fails because plaintiffs have not established a compelling equitable case. Although plaintiffs seek to defend the timeliness of their claim for mandamus relief, they miss the underlying point. They have offered no credible explanation for

---

[14] See also Anderson v. USAA Cas. Ins. Co., 221 F.R.D. 250, 254 (D.D.C. 2004); Shields v. Wash. Bancorporation, 1992 WL 88004 at *9 (D.D.C. Apr. 7, 1992); Nelson v. Nationwide Mortgage Corp., 659 F. Supp. 611, 618 (D.D.C. 1987).

-34-

why they did not claim the UCP tax as a reimbursable cost decades ago and, if necessary, pursue any denial of their claims through the administrative appeals process created for them by Congress precisely for that very purpose. The only "explanation" proffered in their opening memorandum – that they were afraid of being prosecuted for submitting a fraudulent claim – was shown earlier to be specious, both as a matter of fact and law.

## VI.  PLAINTIFFS HAVE NOT IDENTIFIED ANY GENUINE ISSUE OF MATERIAL FACT.

Finally, plaintiffs have raised no genuine issue of material fact with respect to "whether the Intermediary was reimbursing select hospitals in Massachusetts for the UCP Tax while maintaining a statewide policy of non-reimbursement for the cost." Pl. Mem. at 24. First, there were two intermediaries that processed claims for the three plaintiff hospitals, not one. Second, there is no evidence of the "statewide policy" to which plaintiffs refer. As was discussed above, the only intermediary policy in the record of this case is that Mutual of Omaha and Associated made reimbursement for the UCP tax in every instance where the tax was claimed by a plaintiff hospital or by a non-plaintiff hospital in some timely manner, but they did not make payment in any circumstance where no claim for the tax was made in a timely manner. There is absolutely no evidence that either intermediary "maintain[ed] two separate reimbursement policies," id., unless plaintiffs mean by that remark that the intermediaries maintained a consistent policy of not paying for expenses that were not claimed by hospitals.

## <u>CONCLUSION</u>

For the reasons stated, defendant's motion to dismiss should be granted or, in the alternative, summary judgment in favor of defendant should be entered.

Respectfully submitted,

OF COUNSEL:

PAULA M. STANNARD                   PETER D. KEISLER
Acting General Counsel              Assistant Attorney General

KATHLEEN H. MCGUAN                  KENNETH L. WAINSTEIN
Associate General Counsel           United States Attorney

MARK D. POLSTON                     _____
Deputy Associate General
Counsel                             SHEILA M. LIEBER
                                    PETER ROBBINS
                                    Department of Justice
ROBERT BALDERSTON                   20 Massachusetts Avenue, N.W., Room 7142
Attorney                            Washington, D.C.  20530
Department of Health                Tel:  (202) 514-3953
and Human Services                  Attorneys for Defendant