## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BALL MEMORIAL HOSPITAL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-2254 (RMC) |
| | ) | |
| MICHAEL O. LEAVITT,[1] | ) | |
| | ) | |
| Secretary, U.S. Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiffs, forty-nine hospitals ("Hospitals") that receive reimbursements under the Medicare Act for services provided to Medicare beneficiaries, brought this mandamus action against the Secretary of the Department of Health and Human Services ("Secretary" or the "Government") seeking to compel the recalculation of payments computed under 42 C.F.R. § 413.124(a), which provides for a 5.8 percent reduction in the reimbursement rates for "outpatient hospital services." The Secretary originally interpreted "outpatient hospital services" to include certain services provided to inpatients but reimbursed through Medicare Part B, which, broadly speaking, covers outpatient services. In 2001, the Secretary issued a memorandum that purported to change that view, reinterpreting "outpatient hospital services" to exclude such inpatient services, meaning that they would no longer be subject to the 5.8 percent reduction. That memorandum, however, foreclosed retroactive application of the new interpretation to settled reimbursement claims. In this action, the

---

[1] Michael O. Leavitt is substituted for his predecessor, Tommy G. Thompson, as Secretary of the Department of Health and Human Services, pursuant to Fed. R. Civ. P. 25(d)(1).

Hospitals seek to apply this later, more favorable interpretation to their closed claims.

Before the Court are the Secretary's motion to dismiss and the Hospitals' motion for summary judgment, each of which is fully briefed and ripe for decision. Because circuit law requires that an agency engage in notice and comment rulemaking when it wishes to change a valid, authoritative interpretation of a regulation, the Court finds that the Secretary's attempt to change his original interpretation of 42 C.F.R. § 413.124(a) — without providing notice and an opportunity for public comment — was unlawful. Thus, the new interpretation is invalid and provides no basis for mandamus relief. Accordingly, the Secretary's motion to dismiss will be granted, and the Hospitals' motion for summary judgment denied.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Medicare is a "massive" and "complex" health-insurance program that processes millions of claims per year pursuant to "hundreds of pages of statutes and thousands of pages of often interrelated regulations." *Shalala v. Ill. Council on Long Term Care Inc.*, 529 U.S. 1, 13 (2000). Luckily, a full understanding of the program is not needed to resolve the instant dispute, though some background is critical. As the D.C. Circuit recently summarized:

> Pursuant to the Medicare Act, the Secretary of Health and Human Services reimburses hospitals for the "operating costs of inpatient . . . services" provided to Medicare and Medicaid beneficiaries. *See* 42 U.S.C. § 1395ww. At the end of each fiscal year, eligible hospitals file cost reports with their "fiscal intermediaries," *see* 42 C.F.R. § 413.20(b); *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 809 (D.C. Cir. 2001) — usually insurance companies that serve as the Secretary's agents for purposes of reimbursing health care providers, 42 C.F.R. §§ 421.1, 421.3; *see generally id.* § 421.100-421.128. After auditing the reports, intermediaries issue "Notice of Program Reimbursements" ("NPRs") in which they determine the amount

> owed to the hospitals for the fiscal year at issue. *See id.*
> § 405.1803(a)(2). Hospitals unhappy with their fiscal intermediary's
> award have 180 days to appeal to the Provider Reimbursement
> Review Board ("the Review Board"), 42 U.S.C. § 1395oo(a), which
> issues a decision that the Secretary may "reverse[], affirm[], or
> modify" within 60 days, *id.* § 1395oo(f)(1). Hospitals remaining
> dissatisfied after the Review Board or Secretary issues a final
> decision may seek "judicial review" by filing suit in the appropriate
> U.S. District Court. *Id.*

*In Re Medicare Reimbursement Litigation Baystate Health Systems v. Leavitt*, 414 F.3d 7, 8 (D.C.

Cir. 2005) (alterations and omissions in original).

The Secretary has delegated authority to administer the Medicare Act to the Center

for Medicare and Medicaid Services ("CMS"),[2] which has promulgated regulations that permit or

require that NPRs be reopened under certain circumstances. Three reopening provisions are

pertinent here. The first, 42 C.F.R. § 405.1885(a), provides that "an [NPR] or a decision by the

Review Board or Secretary 'may be reopened' if its issuer or the affected hospital moves to do so

within three years of the date of the determination or decision." *In Re Medicare Reim. Litig.*, 414

F.3d at 9. The second, 42 C.F.R. § 405.1885(b), provided, at all times relevant here,[3] that "an [NPR]

shall be reopened and revised by the intermediary if, within the [same] 3-year period, [CMS] notifies

the intermediary that such determination or decision is inconsistent with the applicable law,

---

[2] CMS was formerly known as the Health Care Financing Administration ("HCFA").
*Monmouth*, 257 F.3d at 809 & n.1.

[3] In 2002, amendments to § 405.1885(b) narrowed the circumstances under which reopening
under that provision was required. *See In re Medicare Reim. Litig.*, 309 F. Supp. 2d 89, 94 n.3
(D.D.C. 2004), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005). Although the Secretary urges the Court to apply
"the current language, not the earlier version," Def.'s Mem. at 15 & n.7; Def.'s Opp'n at 5 n.5, the
Court finds that option foreclosed by the D.C. Circuit's opinion in *In re Medicare Reimbursement
Litigation*, which applied the version of the regulation in effect at the time of "the events at issue."
414 F.3d at 9.

regulations, or general instructions." *Id.* And the third, 42 C.F.R. § 405.1885(d), provides that an

NPR or a decision of the Review Board or Secretary "shall be reopened and revised at any time if

it is established that such determination or decision was procured by fraud or similar fault of any

party to the determination or decision." 42 C.F.R. § 405.1885(d). As will later be explained in

greater detail, the Hospitals argue here that reopening is required under the latter two provisions.

### B. Reimbursement of Ancillary Inpatient Services

The reimbursements at issue involve the intersection of two components of the

Medicare program: Part A and Part B. Broadly speaking, Part A covers "inpatient hospital services,"

42 U.S.C. § 1395d(a), which include bed and board, nursing services, facility charges, and other

inpatient treatment costs, *id.* § 1395x(b). Part A coverage is limited, however, to a certain number

of days per "spell of illness." *Id.* § 1395d(a). Thus, an extended hospital stay might exhaust the

Part A benefits of an otherwise eligible beneficiary.

Part B provides supplementary coverage for certain "medical and other health

services" not reimbursable under Part A, *id.* §§ 1395d(b), 1395k, including physician services (both

in and out of the hospital) and various outpatient services, *id.* § 1395x(s). To address the needs of

Medicare beneficiaries who have exhausted their Part A benefits, since 1968 the Secretary has

interpreted the Medicare Act as allowing a patient enrolled in Part B to use his Part B benefits to pay

for services that would have been covered under Part A but for the exhaustion of benefits. "In other

words, the Part A services provided to these patients were treated *as if* they had been provided on

an outpatient basis and reimbursed under Part B." *St. Barnabas Hosp. v. Thompson*, 139 F. Supp.

2d 540, 542-43 (S.D.N.Y. 2001). These post-exhaustion services are also known as "inpatient

ancillary services."

### C. The Prospective Payment System and 5.8 Percent Reduction

In earlier years, hospitals were reimbursed under both Part A and Part B for the "reasonable cost" of providing medical services. *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 974 (D.C. Cir. 1991); *see also* 42 U.S.C. § 1395f(b) (1988). As a result, hospitals had little incentive to economize, since "[t]he more they spent, the more they were reimbursed." *Tucson*, 947 F.2d at 974. As costs escalated, Congress sought a way to control the call on the public fisc. It did so by adopting a new regime, dubbed the Prospective Payment System ("PPS"), whereby hospitals are reimbursed for most services on the basis of rate schedules set in advance for different diagnostic categories of cases. *Methodist Hosp. v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994); *see also* 42 U.S.C. § 1395ww. "In contrast to hospital reimbursements under the reasonable-cost method, PPS rates do not vary in individual cases[,] . . . regardless of costs actually incurred." *Id.* This system was intended "to create incentives for hospitals to operate in a more efficient manner, since [they] would be allowed to keep payment amounts in excess of their costs and would be required to absorb any costs in excess of the [prospectively fixed] rates." S. Rep. No. 98-23, at 53 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 193. The PPS scheme took effect for inpatient services in 1983; at that time, payments under Part B continued to be made on a reasonable-cost basis. *See Methodist Hosp.*, 38 F.3d at 1227.

Perhaps unsurprisingly, following the advent of inpatient PPS, services that were traditionally performed in the hospital were increasingly delivered as outpatient care, for which reimbursement was not so limited.[4] Congress then moved toward a PPS for outpatient services. *See*

---

[4] *See* Office of Inspector General; Medicare Program; Prospective Payment System for Hospital Outpatient Services, 65 Fed. Reg. 18,434, 18,436 (Apr. 7, 2000).

*Amgen Inc. v. Smith*, 357 F.3d 103, 106 (D.C. Cir. 2004); *St. Barnabas Hosp.*, 139 F. Supp. 2d at

542. Of particular importance here, for the years preceding the shift to outpatient PPS, Congress

imposed a 5.8 percent across-the-board reduction on the reimbursement rates for "outpatient hospital

services." Specifically, Congress amended the Medicare Act to provide:

> The Secretary shall reduce the reasonable cost of outpatient hospital
> services (other than the capital-related costs of such services)
> otherwise determined pursuant to [42 U.S.C. § 1395*l*(a)(2)(B)(i)(I)]
> by 5.8 percent for payments attributable to portions of cost reporting
> periods occurring during fiscal years 1991 through 1999 and until the
> first date that the prospective payment system under [42 U.S.C.
> § 1395*l*(t)] is implemented.

42 U.S.C. § 1395x(v)(1)(S)(ii)(II). The Secretary adopted an implementing regulation that closely

tracked the statutory language:

> [T]he reasonable costs of outpatient hospital services (other than
> capital-related costs of these services) are reduced by 5.8 percent for
> services furnished during portions of cost reporting periods occurring
> on or after October 1, 1990[,] and until the first date that the
> prospective payment system under [42 C.F.R. § 419] is implemented.

42 C.F.R. § 413.124(a). The outpatient PPS scheme was implemented in 2000. 65 Fed. Reg. at

18,434.

As the Government explains in its motion to dismiss, after the 5.8 percent reduction

was enacted, the question arose "whether Congress intended that [inpatient] ancillary services, which

had theretofore been treated for purposes of claims processing 'as if' they had been provided on an

outpatient basis, should be thought of as being included withing the universe of 'outpatient' services

subject to the statutory 5.8 percent reduction or [as] a separate kind of inpatient care." Def.'s Mem.

at 10. In other words, should the 5.8 percent reduction apply strictly to "true" outpatient services,

or also to inpatient ancillary services reimbursed under Part B? "The Secretary took the position that

[inpatient] ancillary services fell within the scope of the reduction." *Id.* Although the parties have

not indicated whether this "position" was adopted in any sort of formal interpretive ruling, it was

reflected in the forms that CMS required the Hospitals to use when submitting their yearly cost

reports. As another district court has explained, the

> HCFA-prescribed form . . . required that the costs of providing
> inpatient services to patients who had exhausted their Part A benefits
> be reported as costs of providing outpatient services — consistent
> with HCFA's policy of treating such services *as if* they had been
> provided to outpatients. The apparent effect of doing so was to apply
> the 5.8 percent cost reduction to those inpatient costs and thus to
> reduce the reimbursement due to the hospital . . . . The fiscal
> intermediary saw it precisely that way and applied the cost reduction.

*St. Barnabas Hosp.*, 139 F. Supp. 2d at 543. The only court to have passed on the issue found the

statute ambiguous and, applying *Chevron* deference, upheld the Secretary's interpretation. *Id.* at

543-44 (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984)). It

commented, however, that the competing interpretation urged by the hospital was "not entirely

implausible." *Id.* at 543.

### D. Program Memorandum A-01-125

"Despite his victory in *St. Barnabas*," the Government explains, "the Secretary

decided to change the policy to reflect the more generous view." Def.'s Mem. at 11. On September

28, 2001, the Secretary issued Program Memorandum A-01-125 ("PM-125"), which instructed that

the "5.8 percent reduction should not be applied when computing reimbursement for inpatient

ancillary services." Pl.'s Opp'n Ex. A (PM-125) at 1. Because of PM-125's central importance here,

its text is set forth in large part:

> The purpose of this Program Memorandum (PM) is to provide
> guidance regarding a change in reimbursement for Part B inpatient

ancillary services involving the application of a 5.8 percent cost reduction for the services.

**Background**

Inpatient ancillary services are medical and other health services furnished to a hospital inpatient who has exhausted or is otherwise not eligible for Part A coverage and who has Part B coverage, provided that the services would have been covered under Part A but for the exhaustion of Part A benefits. Inpatient ancillary services are reimbursed under Medicare Part B. Examples of inpatient ancillary services are diagnostic x-ray tests, diagnostic laboratory tests, and prosthetic devices.

Between 1990 and August 1, 2000, the implementation of the outpatient prospective payment system (OPPS), operating costs for hospital outpatient services were reduced by 5.8 percent in computing reimbursement. This 5.8 percent reduction should not be applied when computing reimbursement for inpatient ancillary services.

**Effective Date**

This PM applies only to properly pending claims. Specifically, the actions requested below are to be taken only for portions of hospital cost reporting periods between Federal Fiscal Year (FFY) 1991 and August 1, 2000, that are either: (1) "open" (i.e., awaiting final settlement by the intermediary), in cases where the 5.8 percent cost reduction was applied to Part B inpatient ancillary services, or (2) settled and pending in a jurisdictionally valid appeal or civil action on such issue.

For cases pending at the Provider Reimbursement Review Board, this instruction applies only to appeals on original notices of amount of program reimbursement (NPRs). It does not apply to appeals on revised NPRs pending on any issues other than the application of the 5.8 percent cost reduction to Part B inpatient ancillary services. For appeals in a civil action, the application of the 5.8 percent cost reduction to Part B inpatient ancillary services must be at issue.

**Action Requested**

For the aforementioned cost reporting periods, intermediaries are to revise the reimbursement for Part B inpatient services by making

> reimbursement as they normally would have done, with the exception
> of applying the 5.8 percent cost reduction in column 5 of Worksheet
> D, HCFA-2552-96.

PM-125 at 1-2. The effective date for PM-125 was September 28, 2001. *Id.* at 2.

### E. This Action

The Hospitals,[5] each of which "furnish[es] inpatient and outpatient hospital services

to, inter alia, patients entitled to benefits under the Medicare Program," filed this action on

December 29, 2004. Compl. ¶ 4. They seek an order in mandamus to compel the Secretary to

reopen their cost reports and reimburse them for the allegedly improper application of the 5.8 percent

reduction to inpatient ancillary services. Compl. ¶ 1.

---

[5] The Hospitals are Ball Memorial Hosp., Muncie, Ind.; Broadway Methodist Southlake Hosp., Merrillville, Ind.; Clark Memorial Hosp., Jeffersonville, Ind.; Deaconess Development Corp., Evansville, Ind.; East Liverpool City Hosp., East Liverpool, Ohio; El Centro Regional Medical Center, El Centro, Cal.; Gary Methodist Northlake Hosp., Gary, Ind.; Glens Falls Hosp., Glens Falls, N.Y.; Greenville Memorial Hosp., Greenville, S.C.; Harrington Memorial Hosp., Southbridge, Mass.; Highlands Regional Medical Center, Prestonburg, Ky.; Holy Cross Hosp., Chicago, Ill.; Johnson City Medical Center, Johnson City, Tenn.; Kenmore Mercy Hosp., Kenmore, N.Y.; Lawrence & Memorial Hosp., New London, Conn.; Licking Memorial Hosp., Newark, Ohio; Loyola Univ. Medical Center, Maywood, Ill.; Medcentral Health System, Mansfield, Ohio; Memorial Hosp. of South Bend, South Bend, Ind.; Mercy Hosp., Buffalo, N.Y.; Mercy Medical Center, Springfield, Mass.; North Memorial Health Care, Robbinsdale, Minn.; Northeast Alabama Regional Medical Center, Anniston, Ala.; Norwalk Hosp., Norwalk, Conn.; Poudre Valley Hosp., Fort Collins, Colo.; San Antonio Community Hosp., Upland, Cal.; Sentara Hampton General Hosp. n/k/a Sentara Careplex Hosp., Hampton, Va.; Sentara Virginia Beach General Hosp., Virginia Beach, Va.; Shands Healthcare at Univ. of Florida, Gainsville, Fla.; Sisters of Charity Hosp., Buffalo, N.Y.; Southern Ohio Medical Center, Portsmouth, Ohio; Spectrum Health Hosp. – East Campus, Grand Rapids Mich.; St. Alphonsus Regional Medical Center, Boise, Idaho; St. Elizabeth Medical Center – South, Covington, Ky.; St. Elizabeth's Hosp. of Chicago, Chicago Ill.; St. Francis Medical Center, Lynwood Cal.; St. Mary's Medical Center, Hobart, Ind.; St. Vincent's Richmond of Staten Island, Staten Island, N.Y.; Bayley Seton Hosp., Staten Island, N.Y.; St. Vincent's Hosp. – Manhattan, New York, N.Y.; Swedish Covenant Hosp., Chicago, Ill.; Trinity Health System, Steubenville, Ohio; Univ. of Colorado Hosp., Denver, Colo.; Univ. of Missouri Hosp. & Clinic, Columbia, Mo.; Univ. Hosp. & Medical Center at Stony Brook, Stony Brook, N.Y.; Vanderbilt Univ. Medical Center, Nashville, Tenn.; Williamson Medical Center, Franklin, Tenn.; Wooster Community Hosp., Wooster, Ohio; and Wuestoff Medical Center, Rockledge, Fla.

## II. LEGAL STANDARDS

This Court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus relief may be granted only where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare Reim. Litig.*, 414 F.3d at 10 (citing *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)). "Even when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds 'compelling . . . equitable grounds.'" *Id.* (citing *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

The Secretary moves to dismiss the Hospitals' mandamus claims under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion challenges the adequacy of a complaint on its face, testing whether the plaintiffs have properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The plaintiffs need not plead the elements of a prima facie case in the complaint. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). In deciding a Rule 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

### III. DISCUSSION

The Hospitals' claims, though pleaded in a single count, present two distinct grounds for relief. Compl. ¶¶ 43-47; Pls.' Opp'n at 1-2. First, the Hospitals argue that PM-125 constituted a "notice of inconsistency" that triggered the Secretary's nondiscretionary duty under 42 C.F.R. § 405.1885(b) to direct the intermediaries to reopen NPRs issued during the three-year period preceding the issuance of PM-125. Second, the Hospitals argue that the Secretary's delay in issuing PM-125, which in their view "correct[ed]" his interpretation of the statute, amounted to "fraud or similar fault" that under 42 C.F.R. § 405.1885(d) required reopening of *all* NPRs, from 1990 to 2000, to which the 5.8 percent reduction was applied. The Court considers each argument in turn.

#### A. Section 405.1885(b)

To begin with common ground, the parties agree that § 405.1885(b) "*mandates* reopening in one special circumstance," namely, where CMS "'notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by [CMS].'" *Monmouth*, 257 F.3d at 809 (quoting 42 C.F.R. § 405.1885(b)). There is likewise no doubt that, if PM-125 constituted a notice of inconsistency, the reopening of any NPRs issued during the three-year period preceding its issuance would be required. *See* 42 C.F.R. § 405.1885(b). Understandably, then, the parties vigorously dispute whether PM-125 constituted a notice of inconsistency. The Hospitals interpret PM-125's instruction that the 5.8 percent reduction should no longer be applied to inpatient ancillary services as a correction of a past error. Pls.' Opp'n at 13. The Secretary, of course, disagrees, characterizing PM-125 as a "change in policy" that "merely announce[d] a 'change in reimbursement for Part B inpatient ancillary services.'" Def.'s Mem. at 15 (quoting PM-125 at 1). This scenario, however, raises an antecedent

11

question: whether the issuance of PM-125 was a lawful exercise of CMS's interpretive authority.

### 1. *Paralyzed Veterans, Alaska Professional Hunters*, and *Monmouth*

The law of this circuit is clear: "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997).[6] This is because under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, an agency's obligation to engage in notice and comment procedures before promulgating regulations also extends to amendments and repeals of regulations. *Paralyzed Veterans*, 117 F.3d at 586. "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended that rule, something it may not accomplish without notice and comment." *Alaska Prof'l Hunters Assoc. Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999).

However, this notice and comment obligation is implicated only when the disavowed interpretation was an "authoritative" one. *See Paralyzed Veterans*, 117 F.3d at 587 (requiring an "authoritative departmental position"); *Alaska Prof'l Hunters*, 177 F.3d at 1035 (same). In *Paralyzed Veterans*, the early "interpretation" that the plaintiffs argued was improperly modified came from a speech given by "a mid-level official" and was not "the sort of 'fair and considered judgment' that can be thought of as an authoritative departmental position." *Paralyzed Veterans*, 117 F.3d at 587. Thus, when the agency later adopted a formal policy, which was circulated in a technical assistance manual, there had been no "change" in position necessitating notice and

---

[6] The *Paralyzed Veterans* court explicitly rejected the argument that "an agency is completely free to change its interpretation of an ambiguous regulation so long as the regulation reasonably will bear the second interpretation." 117 F.3d at 586.

comment. *Id.*; *see also N.Y. State Dep't of Soc. Servs. v. Bowen*, 835 F.3d 360, 366-67 (D.C. Cir.

1987) (distinguishing an "informal, nonauthoritative" memorandum containing "the recapitulation

of a telephone conversation between two mid-level agency employees" from a formal interpretation

memorialized in an "Action Transmittal").

        But an agency's prior interpretation need not be in writing to be authoritative. In

*Alaska Professional Hunters*, the plaintiffs, a group of hunting and fishing guides who flew small

aircraft as part of their guiding services, operated for more than thirty years on advice from the

Federal Aviation Administration's ("FAA") Alaskan Region that, because their flying activities were

"incidental" to their businesses, they were subject to regulation under 14 C.F.R. part 91 (which

governs the operation of aircraft generally) but not parts 121 and 135 (which govern commercial

operations). *Alaska Prof'l Hunters*, 177 F.3d at 1031-32. Although this interpretation of parts 121

and 135 was "never set forth . . . in a written statement, . . . FAA personnel in Alaska consistently

followed the interpretation in official advice to guides." *Id.* at 1032. The FAA then reversed course,

publishing in the Federal Register a "Notice to Operators" that "acknowledged that the Alaskan

Region had not enforced parts 121 or 135 against guide pilots in the past" but nevertheless

"announced that [guide pilots] . . . henceforth must comply" with those regulations. *Id.* at 1033. The

court rejected the FAA's argument that the prior interpretation was not authoritative, holding that

the Alaskan Region's uniform advice to guide pilots over the thirty-year period "became an

authoritative departmental interpretation," and that the Notice to Operators purporting to change that

interpretation was "invalid" because it was published without notice and comment. *Id.* at 1035-36.

This analysis in *Paralyzed Veterans* and *Alaska Professional Hunters* has previously been applied to CMS on similar facts. In *Monmouth Medical Center v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001), the D.C. Circuit considered whether HFCA Ruling 97-2 ("HCFAR 97-2") was a notice of inconsistency that required reopening under 42 C.F.R. § 405.1885(b). In that case, the Secretary promulgated a formal regulation on how to calculate Disproportionate Share Hospital ("DSH") payments, which are essentially Medicare reimbursement adjustments that benefit hospitals serving high percentages of low-income patients. *Id.* at 809. At the same time, he published an interpretation of that regulation in the Federal Register. *Id.* at 810. After the interpretation was challenged and struck down in four circuits, the Secretary issued HCFAR 97-2, which rescinded the challenged interpretation and established a new one. As with PM-125, HCFAR 97-2 purported to foreclose retroactive application and was issued without notice or comment. *Id.* at 810.

In the wake of HCFAR 97-2, a pair of hospitals sued for reopening, arguing that the ruling triggered the mandatory reopening provisions of § 405.1885(b). In an intriguing analysis, the D.C. Circuit agreed. The court first found that HCFAR 97-2 purported to change an existing authoritative interpretation. *See id.* at 814. Following *Paralyzed Veterans*, the court next found that "[t]he new interpretation established by HCFAR 97-2 would therefore be invalid absent notice and comment rulemaking, unless the original interpretation was itself invalid." *Id.* Noting, however, that four circuits had already found the original interpretation invalid, the court read HCFAR 97-2 as having "concede[d] the invalidity" of the original interpretation on a national basis. *Id.* Thus, the court found HCFAR 97-2 to be a notice of inconsistency, deemed the original interpretation invalid, approved the new interpretation, and required reopening under § 405.1885(b). *Id.*

14

### 2. The Secretary's original interpretation was authoritative

This Court is, of course, bound by the *Monmouth* analysis. As in *Monmouth*, here the Secretary issued a formal regulation concerning a statutory provision. Unlike *Monmouth*, he did not issue an interpretation of the regulation in the Federal Register. He did, however, adopt and impose a particular interpretation — applying the 5.8 percent reduction to *all* Part B reimbursements, including those for ancillary inpatient services — by virtue of the forms that CMS required the Hospitals to use when submitting their yearly cost reports. *See St. Barnabas Hosp.*, 139 F. Supp. 2d at 543 (explaining that the "HCFA-prescribed form . . . required that the costs of providing inpatient services to patients who had exhausted their Part A benefits be reported as costs of providing outpatient services").

The Secretary argues that his issuance of PM-125 did not run afoul of *Monmouth* because he never issued a regulation defining the meaning of the word "outpatient" in 42 U.S.C. § 1395x(v)(1)(S)(ii)(II); therefore, he has at "most . . . changed an informal interpretation of a statute." Def.'s Mem. at 17. But this argument ignores that the Secretary did, in fact, issue a regulation essentially mirroring the statutory text, and that both the statute and the implementing regulation left the phrase "outpatient hospital services" undefined. It was thus the Secretary's interpretation of the regulation as applying the 5.8 percent reduction to inpatient ancillary services that gave meaning to the phrase "outpatient hospital services."

Moreover, the Court cannot agree that this original interpretation was informal; to the contrary, it was quite clearly authoritative. Though perhaps not committed to a formal memorandum, it was not the mere opinion of a mid-level bureaucrat; indeed, the Government has taken to calling it the Secretary's position. *See, e.g.*, Def.'s Mem. at 10 ("After the 5.8 percent

reduction was enacted, . . . [t]he Secretary took the position that [inpatient] ancillary services fell

within the scope of the reduction."). The interpretation was reflected, albeit silently, in the CMS-

prescribed reimbursement forms. *See St. Barnabas Hosp.*, 139 F. Supp. 2d at 543. And it was

official CMS policy for a decade, covering cost reporting years from 1990 to 2000.[7] Accordingly,

the Court finds that, during this period, the Secretary's original interpretation — that the 5.8 percent

reduction would apply to inpatient ancillary services — was an authoritative departmental

interpretation that, under *Paralyzed Veterans* and its progeny, could not be altered absent notice and

an opportunity for public comment — unless it was itself invalid. *See Monmouth*, 257 F.3d at 814.

### 3. The Secretary's original interpretation was valid

The Hospitals argue energetically that the original interpretation was invalid because

it was contrary to the plain language of 42 U.S.C. § 1395x(v)(1)(S)(ii)(II), which imposed the 5.8

percent reduction to "the reasonable cost of outpatient hospital services," with nary a mention of

inpatient ancillary services. Pls.' Opp'n at 16-17. In the Hospitals' view, because the terms

"inpatient" and "outpatient" are unambiguous, it must also be the case that "inpatient hospital

services" are provided only to inpatients, and "outpatient hospital services" only to outpatients. *See

id.* at 17. The Hospitals would have the Court view the complicating factor that, at the time of the

statute's enactment, the Secretary for years had permitted inpatient ancillary services to be

--------

[7] Further, at least two hospitals (not plaintiffs here) challenged the Secretary's original interpretation on appeal to the Provider Reimbursement Review Board, which sided with the hospitals, ruling that the 5.8 percent reduction should not be applied to inpatient ancillary services. *Daniel Freeman Mem'l Hosp. v. Blue Cross & Blue Shield Ass'n*, No. 96-0939, 2000 WL 796349 (P.R.R.B. May 31, 2000); *Daniel Freeman Marina Hosp. v. Blue Cross & Blue Shield Ass'n*, No. 96-2623, 2000 WL 669068 (P.R.R.B. May 15, 2000). These Review Board decisions, however, were overturned by the CMS Administrator, acting as the Secretary's designee, Def.'s Opp'n at 24 (citing 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1875), lending additional evidence that the Secretary's interpretation was not merely informal, but authoritative and binding.

reimbursed with Part B funds — "as if they had been provided on an outpatient basis," *St. Barnabas*,

139 F. Supp. 2d at 543 — as a red herring. *See* Pls.' Opp'n at 18.

     As set forth above, however, the question here is not one of statutory interpretation

but of regulatory interpretation, and the Court must give "substantial deference" to an agency's

interpretation of its own regulation. *NTEU v. Chertoff*, 452 F.3d 839, 859 (D.C. Cir. 2006). As the

Supreme Court has instructed, the task at hand "is not to decide which among several competing

interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given

controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas

Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations and internal quotation marks

omitted). Such "deference is 'even more warranted' when the Secretary's interpretation concerns

. . . a 'complex and highly technical regulatory program'" such as Medicare. *Cmty. Care Found. v.

Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512).

     The Court concedes that the Hospitals' textual argument is not unreasonable.

Inpatient ancillary services, though reimbursed under Part B, are provided to inpatients, not

outpatients; thus, the contention that they cannot logically fall under the rubric of "outpatient hospital

services" carries some force. However, this view gives short shrift to the context in which the

Medicare statute was amended — namely, during the shift from reasonable-cost to PPS

reimbursement. "Interpretation of a word or phrase depends upon reading the whole statutory text,

considering the purpose and context of the statute, and consulting any precedents or authorities that

inform the analysis." *Dolan v. U.S. Postal Serv.*, 126 S. Ct. 1252, 1257 (2006).

     It is first important to recognize that Congress never mandated that inpatient ancillary

services be reimbursable with Part B funds. As the district court in *St. Barnabas* explained, "That

extension of coverage was effected by administrative interpretation by the Secretary. Hence, the
inference of [c]ongressional intent to exclude such inpatient costs from the 5.8 percent cut . . . is not
compelling." *St. Barnabas*, 139 F. Supp. 2d at 543.

Rather, it is apparent that the 5.8 percent reduction was implemented as a cost-
containment measure during the transition to outpatient PPS. After inpatient services became subject
to PPS in 1983, outpatient services "continued to be paid based on hospital-specific costs, which
provided little incentive for hospitals to furnish outpatient services efficiently. At the same time,
advances in medical technology and changes in practice patterns were bringing about a shift in the
site of medical care from the inpatient to the outpatient setting." 65 Fed. Reg. at 18,436. In laying
the groundwork for outpatient PPS, Congress directed the Secretary to "reduce the reasonable cost
of outpatient hospital services . . . by 5.8 percent . . . until the first date that [outpatient PPS] is
implemented." 42 U.S.C. § 1395x(v)(1)(S)(ii)(II). At that point, given that inpatient services were
already subject to PPS, and outpatient services soon would be, it would have made little sense to
except inpatient ancillary services from this budget cut — particularly in view of the absence of
evidence of congressional intent to maintain such an "island" where reasonable-cost reimbursement
would continue to reign unchecked.

Later congressional action provides a modicum of further guidance. Although the
phrase "outpatient hospital services" has not been further defined by regulation or statute, in 1997
Congress defined the phrase "covered outpatient department services" to include, *inter alia*,
"hospital outpatient services designated by the Secretary" *and* "inpatient hospital services designated
by the Secretary that are covered under [Part B] and furnished to a hospital inpatient who (I) is
entitled to benefits under part A but has exhausted benefits for inpatient hospital services during a

18

spell of illness, or (II) is not so Entitled." Balanced Budget Act of 1997, Pub. L. 105-33, § 4325(a), 111 Stat. 251, 445 (Aug. 5, 1997) (codified at 42 U.S.C. § 1395*l*(t)(1)(B)(ii)).

The late arrival of this statutory definition supports competing inferences. On one hand, it suggests that Congress both recognizes that outpatient Part B services and inpatient ancillary Part B services differ, and knows how to distinguish them when appropriate. Thus, Congress might not have intended "outpatient hospital services" to have included "inpatient ancillary services" when it enacted the 5.8 percent reduction. This inference is weakened, of course, by the fact that Congress waited several years to demonstrate that it was cognizant of this distinction. On the other hand, the preceding observation is incomplete in one important respect: Congress did not just distinguish between these two categories; it defined outpatient services to *include* inpatient ancillary services reimbursable under Part B. Thus, the contrary inference is that in 1997 Congress simply made explicit what it had intended all along: that the phrase "outpatient hospital services" is meant to include "inpatient ancillary services" reimbursable under Part B.

Although it is often said that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *PDK Labs. v. U.S. DEA*, 438 F.3d 1184, 1192 (D.C. Cir. 2006), when a court is required "not to divine conclusively the meaning of [a statute] but rather to determine whether it is reasonably susceptible to more than one meaning," then "post-enactment legislative commentary offering a plausible interpretation is certainly relevant, much like plausible interpretations from litigants, other courts, law review articles, or any other source would be." *McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999). If pressed, the Court would find the second inference the stronger one. For present purposes, however, it is enough to say that either is plausible.

Again, the Court's role here is not to select the best interpretation, but to determine whether the Secretary's interpretation is "plainly erroneous" or "inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512. It is neither. Thus, the Court finds that the Secretary's original, authoritative interpretation was valid.

### 4. PM-125 was improperly issued

The *Monmouth* court concluded: "The new interpretation . . . would . . . be unlawful absent notice and comment rulemaking, unless the original interpretation was itself invalid." *Monmouth*, 257 F.3d at 814. Here, the Court has found that the Secretary's original interpretation was both authoritative and valid. Because the new interpretation set forth in PM-125 was issued without notice and comment, *see* Def.'s Mem. at 16-17, that interpretation is unlawful and PM-125 is, in effect, a nullity, *see Monmouth*, 257 F.3d at 814. Accordingly, its issuance cannot have triggered the Secretary's duty to direct reopening under 42 C.F.R. § 405.1885(b).

### B. Section 405.1885(d)

The Hospitals' alternative argument — that the Secretary's delay in issuing PM-125, which in their view "correct[ed]" his interpretation of the statute, amounted to "fraud or similar fault" under 42 C.F.R. § 405.1885(d) — also fails. As the Court has found, the original interpretation was not impermissible; therefore, the Secretary was under no duty to correct it, and the adverse NPRs were in no sense the result of "fraud" or "fault" on his part. *See* 42 C.F.R. § 405.1885(d).[8] Moreover, if the issuance of PM-125 was unlawful, as the Court has also found, then it is difficult to fathom how a delay in its issuance can be viewed as "fraud" or "fault" infecting

---

[8] The Court neither addresses nor decides whether the Secretary is properly considered a "party to the determination or decision." 42 C.F.R. § 405.1885(d).

20

NPR determinations that were completed years earlier.

## IV. CONCLUSION

The Secretary's attempt to change a valid, authoritative regulatory interpretation without notice and comment was unlawful under the precedent of this circuit, and PM-125 is therefore a nullity that cannot have triggered mandatory reopening under 42 C.F.R. § 405.1885(b) or 42 C.F.R. § 405.1885(d). Accordingly, the Hospitals have failed to demonstrate a "clear right to relief" and their mandamus action fails. *See In re Medicare Reim. Litig.*, 414 F.3d at 10. The Secretary's motion to dismiss will be granted, and the Hospitals' motion for summary judgment denied.[9] A memorializing Order accompanies this Memorandum Opinion.


Date: September 22, 2006                          /s/
                                      ROSEMARY M. COLLYER
                                      United States District Judge


---

[9] In view of this disposition, the Court finds it unnecessary to address the Secretary's arguments that (1) the mandamus claims of the vast majority of the Hospitals are barred by their failure to pursue their statutory appeals rights under 42 U.S.C. § 1395oo or seek permissive reopening under 42 C.F.R. § 405.1885(a); or that (2) mandamus relief should be denied on equitable grounds.